IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IPC International Corporation, *et al.*[1] | ) | Case No. 13-12050 (MFW) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DECLARATION OF SCOTT M. STRONG,
CHIEF FINANCIAL OFFICER OF IPC INTERNATIONAL CORPORATION, IN
SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Scott M. Strong, hereby declare as follows:

1.      I am the Chief Financial Officer of IPC International Corporation[2] ("IPC"), a privately held corporation organized under the laws of the State of Illinois, a debtor and debtor in possession in the above-captioned cases, and the wholly owned subsidiary of The Security Network Holdings Corporation, a privately held corporation organized under the laws of the State of Delaware ("SNH" and together with IPC, the "Debtors"). In such capacity, I am generally familiar with the Debtors' business, day-to-day operations, and financial affairs.

2.      On the date hereof (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") through the filing of voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). To enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business, thereby preserving and maximizing the value of their estates, the Debtors have requested various types of relief in the "first day" pleadings and applications (each, a "First Day Pleading")

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: IPC International Corporation (2698); and The Security Network Holdings Corporation (7985).

[2]      I am also a member of the board of directors of SNH (defined below).

described below.[3] I am familiar with the contents of each First Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful result in these Chapter 11 Cases; and (c) is in the best interests of the Debtors' estates and their creditors.

3.    Except as otherwise indicated, all facts set forth herein are based upon: (a) my personal knowledge; (b) information learned from my review of relevant documents; and (c) information supplied to me by other members the Debtors' management and the Debtors' advisors. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I. Background and History

### A.    Organizational Structure: Overview of Debtors' Operations

4.    IPC is a wholly owned subsidiary of SNH. SNH's principal asset is its equity interest in IPC. SNH is also the sole shareholder of IPC's sister corporations, Uniformity, Inc., an Illinois corporation ("Uniformity"), and IPC International Realty Company, LLC, an Illinois limited liability company ("Realty"). In addition, IPC is the sole shareholder of IPC Technologies Inc., an Illinois corporation ("Technologies"). None of these entities has sought relief under the Bankruptcy Code. Uniformity, Realty, and Technologies provide ancillary services or hold assets related to the Debtors' business. Uniformity is a public safety uniform and equipment company that provides approximately 99% of the uniforms for IPC's guard force. Realty holds the real property used by SNH, IPC, and Uniformity. Technologies provided CCTV installation services, although it no longer actively operates.

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleading.

PAC 1118386v.1

5.     IPC is a leading provider of comprehensive security services and programs to both public and private venues across the United States. IPC's services include uniformed and armed security services, security consulting, K-9 services, and specialty training. IPC is also the leading provider of unarmed security services for shopping centers, currently providing security services at approximately 350 shopping center locations. IPC is widely recognized for revolutionizing the shopping center security industry by pioneering every commonly used security program utilized today in America's shopping centers.

6.     Howard Kaplan, the Debtors' current President and SNH shareholder, founded IPC under the name General Investigative Corporation in 1978. In 1981, current Senior Executive Vice President and SNH shareholder Donald Lantz joined the Company after spending more than 20 years as a police officer for the Northfield Police Department. Mr. Kaplan and his new company ventured into the shopping center security space with one shopping center client. 35 years later, Mr. Kaplan and his team have transformed this start-up into the pre-eminent security company serving shopping centers in the U.S. IPC's track record of innovation can be traced back to 1980, when the Company instituted a proprietary in-house training program tailored for shopping center security services. Over the next 10 years, IPC expanded its business to over 100 properties while perfecting its blueprint for staffing and servicing American shopping centers. IPC quickly developed the reputation as the best-in-class contract security provider to the shopping center industry and IPC executives were regularly requested to give presentations and educate industry professionals. By 1999, IPC served over 200 locations.

7.     As the U.S. shopping center industry transformed so did the security landscape. The number of developers of shopping centers drastically declined from 100+, and as a result developers became well-educated in the appropriate means to provide security to facilities.

3

Additionally, competitive security companies began to copy IPC's blueprint and penetrated the market. Despite the competition, IPC has been able to differentiate itself by continually innovating and incorporating the latest techniques and standards across its organization's professionals which ensures its clients of the highest quality of service.

### B.    Pre-Petition Capital Structure

*Senior Secured Debt*

8.    The Debtors, along with their non-debtor affiliates Realty, Uniformity, and Technologies, are indebted under a Credit Agreement dated as of August 31, 2009 with The PrivateBank and Trust Company, as administrative agent for the lenders thereunder (as amended and supplemented from time to time, the "Existing Credit Agreement"). Pursuant to the Existing Credit Agreement, Lender has made revolving loans to Borrowers, Realty, IPCT and Uniformity in the outstanding principal amount of $6,949,303.73 ("Existing Revolving Loans"), a term loan in the outstanding principal amount of $4,373,333.28 ("Existing Mortgage Term Loan"), a term loan in the outstanding principal amount $6,017,836.54 ("Existing ESOP Term Loan"), and has issued letters of credit in an outstanding face amount of $2,381,865.00 ("Existing Letters of Credit", together with the Existing Revolving Loans, Existing Mortgage Loan, Existing ESOP Term Loan, Existing Letters of Credit and all accrued and unpaid interest, fees and expenses, collectively referred to as the "Existing Obligations").

*Shareholder Loans*

9.    The Debtors are also indebted under loans from their individual shareholders, Donald Lantz and Howard Kaplan with an outstanding balance of approximately $1,652,578.36.

PAC 1118386v.1

### C.    Events and Factors Leading Up To the Chapter 11 Filing

10.    The Debtors have historically operated a financially sound and profitable business. For fiscal year, 2012, the Debtors generated earnings before interest, taxes, depreciation, amortization, and rent (EBITDA) of $3,191,169.

11.    Since 2008, major players providing security staffing to shopping centers (including IPC) were confronted with compressed margins and decreased deployment as shopping mall owners and operators retrenched slightly in an attempt to counter the broader macroeconomic malaise impacted the U.S., and more specifically, the U.S. consumer. In addition, IPC was impacted due to the funding of its loss-generating UK-based operation which was sold in 2010 (the Debtors estimate that they utilized $6 to $7 million of liquidity during this period to fund their UK operation). As a result of this industry-wide phenomenon and the funding of the UK operation, IPC was faced with tightened liquidity and was forced to look inward and evaluate key aspects of its business. After a thorough review, Company management, along with its advisor, Silverman Consulting Group, LLC, set out on a path to implement a sweeping number of liquidity and profitability-improving strategic initiatives.

12.    A typical contract to provide security staffing services in a shopping center requires that the security provider indemnifies the mall owner/operator for a wide variety of claims. In many instances, even if the security company is not already named in the suit, it is still required to indemnify the owner/operator. Prior to June 30, 2011, the self-insured retention on the Company's general liability policy was $1,000,000 (i.e., the Company was responsible for the first $1,000,000 of any claim). For some time prior to June 30, 2011, IPC had tried to lower its SIR but its insurance broker, Marsh, assured the Company that such a policy was not available. In Spring 2011, the Company's new general liability policy lowered the SIR from $1,000,000 per claim to $100,000 per claim, and the new automobile liability policy lowered the SIR from

5

$100,000 per claim to $1,000 per claim. This change has, and will continue to have, an extremely material impact on the Company's free cash flow generation. Based on checks paid for general liability claims in FY2011, the reduction in SIR from $1,000,000 to $100,000 would have saved the company approximately $2.8 million of cash in FY 2011 alone.

13.   The major obstacle facing the Debtors has been general liability claims. The Debtors typical contracts to provide staffing services in a shopping center require that the security provider indemnify the mall owner/operator for a wide variety of claims. In many instances, even if the security company is not already named in the suit, it is still required to defend and indemnify the owner/operator. These liabilities have become a significant problem for the Debtors.

**D.      Prepetition Marketing of the Debtors' Business**

14.   On May 7, 2012, the Debtors retained Livingstone Partners LLC and StoneLiving Securities LLC (together, "Livingstone") to provide investment banking services to the Debtors pursuant to the Livingstone Engagement Letter.

15.   Mr. Kaplan, Mr. Lantz, the Debtors' management, and Livingstone developed a strategy for pursuing a sale of the Debtors' business. Livingstone compiled a comprehensive list of close to 200 potential strategic and financial buyers in the United States, Canada, and Europe. Mr. Kaplan, Mr. Lantz, Livingstone and the Debtors' management team reviewed and analyzed the list, notably with respect to identifying key strategic buyers in the security industry. After these discussions, Livingstone finalized the buyer list, which included 190 parties, approximately 20% of which were strategic buyers and 80% of which were financial buyers (the "Buyer List").

16.   Livingstone began to market the Debtors' assets on or about May 30, 2012. Livingstone contacted the parties on the Buyer List to gauge interest in a potential transaction. The initial contact with the parties on the Buyer List resulted in 162 parties receiving a "teaser"

letter, which set forth an overview of the Debtors, select sales information, investment highlights, and growth strategies. Thereafter, 56 parties executed confidentiality agreements and received a 51-page confidential information memorandum which included an executive summary, investment highlights, growth opportunities, company overview, corporate information, and financial overview.

17. Also, on or about July 2, 2012, Livingstone distributed instructions for submissions of initial indications of interest (the "IOI Instructions"). The IOI Instructions established July 19, 2012 as the deadline for submission of initial indications of interest. Livingstone extended the deadline to allow parties additional time to conduct review the opportunity, and by close of business on July 27, 2012, five initial indications of interest had been submitted by five different parties, including Stalking Horse Bidder.

18. After a review and analysis of the initial indications of interests, three of the parties received access to an online data room and were invited to meet with Mr. Kaplan, Mr. Lantz, Debtors' management and Livingstone at Debtors' headquarters in Bannockburn, IL. These presentations were held between August 7, 2012 and August 14, 2012.

19. On or about August 15, 2012, Livingstone distributed instructions for submissions of letters of intent (the "LOI Instructions"). The LOI Instructions established August 29, 2012 as the deadline for submission of letters of intent. Of the three remaining parties in the process, two parties submitted a written letter of intent while the Stalking Horse Bidder provided a verbal indication of how their proposed value for the Debtors as well as the proposed transaction structure. Based on these three offers, Debtors determined it would be best to pursue a transaction with Party A, a strategic buyer, who submitted their letter of intent on September 13, 2012.

7

20.    Debtor and Party A negotiated the constructs of a transaction throughout the rest of September and the month of October, eventually executing a non-exclusive, letter of intent on October 31, 2012 to acquire the stock of the Debtor. The letter of intent stipulated that a sale would close by November 25, 2012. In addition, Party A was negotiating with Debtor's senior lender to provide financing for the acquisition. A transaction with Party A did not close by November 25, 2012, so Debtor provided Party A with additional time to close a transaction. By late January 2013, Party A was still not in a position to close a transaction, and therefore Mr. Kaplan, Mr. Lantz, and Debtors' management instructed Livingstone to reengage with a select group of Buyers that had previously expressed interest in acquiring Debtor.

21.    On February 4, 2013, Livingstone started to reengage select parties. Throughout the months of February, March, and April 2013, Livingstone engaged in discussions with several previously interested Buyers and one new party, and received five new letters of intent from five parties at various dates. By March 20, 2013, Debtor had received all five new letters of intent, including a written letter of intent by Stalking Horse Bidder. On April 24, 2013, Debtor executed a letter of intent with Stalking Horse Bidder.

22.    On August [    ], 2013, the Debtors' entered into a stalking horse Asset Purchase Agreement with Universal Protection Services, LLC (the "Stalking Horse Purchase Agreement"), which agreement is described in detail in a sale and bidding procedures motion that has been filed with the Court. In sum, the Stalking Horse Purchase Agreement provides for a going concern sale of the Debtors' business. The Stalking Horse Purchase Agreement provides a purchase price that will pay the secured lender in full in cash, provide sufficient additional cash to pay all anticipated administrative claims, and pay a projected dividend to unsecured creditors. Upon the Court's approval of proposed bid procedures, the Stalking Horse Purchase Agreement

8

will be tested in the market and at an auction. The Debtors anticipate spirited, robust bidding at any auction.

23.    The Debtors, in consultation with their advisors, determined that the value of the estates would best be maximized and preserved through an orderly, going concern sale of substantially all the Debtors' assets. Accordingly, the Debtors intend to conduct an auction for the going-concern sale of all of the Debtors' business and assets in one or more sale transactions to be implemented pursuant to section 363 of the Bankruptcy Code. I believe that immediately commencing an orderly sale process is the best way to preserve the Debtors' business and to maximize the value of the Debtors' estate for the benefit of all stakeholders.

## II.    FACTS IN SUPPORT OF FIRST DAY MOTIONS

### A.    <u>Procedural Motions</u>

#### (i)    DEBTORS' MOTION FOR AN ORDER DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES PURSUANT TO BANKRUPTCY RULE 1015(b) (the "<u>Joint Administration Motion</u>")

24.    The Debtors in these Chapter 11 Cases are affiliated entities. Joint administration will save time and money and avoid duplicative and potentially confusing filings by permitting parties in interest to: (a) use a single caption on all documents that will be served and filed in the Debtors' Chapter 11 Cases; and (b) file pleadings in one case rather than in two cases. Joint administration will also protect parties in interest by ensuring that parties in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in these cases. Joint administration of these Chapter 11 Cases will ease the administrative burden for the Court and all parties in interest. Accordingly, I believe that joint administration is in the best interests of the Debtors' estates.

PAC 1118386v.1

**(ii)     MOTION FOR ADMINISTRATIVE ORDER UNDER 11 U.S.C. §§ 105(a) AND 331 ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES OF PROFESSIONALS AND COMMITTEE MEMBERS (the "Interim Compensation Motion")**

25.     As discussed below, the Debtors are seeking approval of the employment of Proskauer Rose LLP as general bankruptcy counsel, Potter Anderson & Corroon as bankruptcy co-counsel, Livingstone Partners LLC as investment bankers, and Silverman Consulting LLP as financial advisors. In addition, a statutory committee of unsecured creditors (the "Committee") may be appointed in these cases and, if so, likely will retain counsel and possibly other professionals as well (collectively, with the professionals set forth above, the "Professionals"). The Debtors request the entry of an order authorizing and establishing procedures for compensating and reimbursing the Professionals on a monthly basis, comparable to those procedures established in other chapter 11 cases filed in this District. Such an order would enable Professionals to receive timely payment of fees and reimbursement of expenses while allowing the Court, the United States Trustee for the District of Delaware (the "U.S. Trustee") and other parties in interest to effectively monitor the Professionals' fees and expenses incurred in these Chapter 11 Cases. I believe that such procedures are in the best interests of the Debtors' estates, and are needed not only to encourage Professionals to provide services in connection with these Chapter 11 Cases, but also to avoid having Professionals fund these cases.

**B.     Professional Retention and Related Motions**

**(i)     APPLICATION OF DEBTORS FOR ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF PROSKAUER ROSE LLP AS COUNSEL, NUNC PRO TUNC TO THE PETITION DATE (the "Proskauer Retention Application")**

26.     The Debtors request an order authorizing them to employ and engage Proskauer Rose LLP ("Proskauer") as attorneys for the Debtors effective *nunc pro tunc* to the Petition Date.

PAC 1118386v.1

The Debtors selected Proskauer because its attorneys have extensive experience, knowledge and resources in the area of debtors' and creditors' rights, and, in addition to a national bankruptcy practice, have extensive experience with the bankruptcy courts in various jurisdictions. Proskauer has the ability to commit substantial resources to legal problems on an urgent basis. The Debtors, therefore, believe that Proskauer is well qualified to represent them in these Chapter 11 Cases.

27.    In assisting the Debtors with the filing of these Chapter 11 Cases and as a result of Proskauer's prepetition representation of the Debtors, Proskauer's attorneys have become familiar with the complex factual and legal issues that will have to be addressed in these Chapter 11 Cases. The retention of Proskauer, with its knowledge of and experience with the Debtors, will assist in the efficient administration of the estate, thereby minimizing the expense to the estate.

28.    I believe that the employment of Proskauer would be in the best interests of the Debtors and their estates and desire to employ Proskauer, effective on the Petition Date, with compensation to be determined upon application to this Court. Were the Debtors required to engage counsel other than Proskauer in connection with these proceedings, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtors' businesses and financial affairs.

(ii)    **APPLICATION OF DEBTORS FOR ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF POTTER ANDERSON & CORROON AS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE (the "Potter Retention Application")**

29.    The Debtors request an order authorizing them to employ and engage Potter Anderson & Corroon ("Potter") as attorneys for the Debtors effective *nunc pro tunc* to the

11

Petition Date. The Debtors selected Potter because its attorneys have extensive experience, knowledge and resources in the area of debtors' and creditors' rights, and, in addition to a national bankruptcy practice, have extensive experience with the bankruptcy courts in various jurisdictions. Potter has the ability to commit substantial resources to legal problems on an urgent basis. The Debtors, therefore, believe that Potter is well qualified to represent them in these Chapter 11 Cases.

30.    In assisting the Debtors with the filing of these Chapter 11 Cases and as a result of Potter's prepetition representation of the Debtors, Potter's attorneys have become familiar with the complex factual and legal issues that will have to be addressed in these Chapter 11 Cases. The retention of Potter, with its knowledge of and experience with the Debtors, will assist in the efficient administration of the estate, thereby minimizing the expense to the estate.

31.    I believe that the employment of Potter would be in the best interests of the Debtors and their estates and desire to employ Potter, effective on the Petition Date, with compensation to be determined upon application to this Court. Were the Debtors required to engage counsel other than Potter in connection with these proceedings, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtors' businesses and financial affairs.

(iii)    **APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING RETENTION OF AND APPOINTING KURTZMAN CARSON CONSULTANTS LLC AS NOTICE, CLAIMS AND BALLOTING AGENT FOR THE DEBTORS (the "KCC Retention Application")**

32.    The Debtors seek an order authorizing the employment and retention of Kurtzman Carson Consultants LLC ("KCC") as their claims and noticing agent. The Debtors believe that such relief is prudent in light of the number of creditors, potential creditors, and parties in interest to whom certain notices will be sent and from whom proofs of claims will be received.

12

Although the Debtors have not yet filed their schedules of assets and liabilities, there is expected to be in excess of 25,000 entities to be noticed. Accordingly, the Debtors believe that the most effective and efficient manner by which to give notice and provide solicitation services in these cases is to engage KCC, an independent third party with significant experience in this role, to act as an agent of the Court.

<strong>(iv)    APPLICATION FOR AN ORDER AUTHORIZING THE DEBTORS' TO RETAIN SILVERMAN CONSULTING GROUP, LLC AS FINANCIAL ADVISOR (the "<u>Silverman Retention Application</u>")</strong>

33.    Silverman has extensive experience in providing restructuring and financial advisory services in reorganization proceedings, and has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors. Silverman is a financial advisory firm with a major focus on advising clients regarding the management and restructuring of underperforming companies, including in the context of a chapter 11 filing.

34.    The Debtors selected Silverman as their financial advisor based on Silverman's longstanding reputation in assisting companies through complex financial restructurings, including bankruptcy sales and reorganizations, and its high degree of success in a wide range of industries.

35.    Furthermore, Silverman was engaged prior to the Petition Date to provide financial advisory services to the Debtors pursuant to the Silverman Engagement Letter. As a result of its prepetition work for the Debtors, Silverman is familiar with the Debtors' corporate and capital structure, management, operation, and various other aspects of their business. Silverman has a well-developed knowledge of the Debtors' financial history, business operations, customers and creditors, and is well suited to provide the Debtors with the financial advisory services contemplated by the Silverman Engagement Letter.

PAC 1118386v.1

36.  I believe that the resources, capabilities, and experience of Silverman in advising the Debtors are crucial to the Debtors during these Chapter 11 Cases. Silverman and its professionals have extensive experience and an excellent reputation for providing high quality financial advisory services to debtors and creditors in large and complex chapter 11 cases and other debt restructurings. Silverman already possesses extensive knowledge of the Debtors' financial history and business operations developed over three years of serving as the Debtors' financial advisor, and is well suited to provide the Debtors with financial advisory services.

37.  Furthermore, I believe that the employment of Silverman would be in the best interests of the Debtors and their estates. Were the Debtors required to engage an alternative financial advisor in connection with these proceedings, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such advisor's familiarization with the intricacies of the Debtors' businesses and financial affairs.

(v)    **APPLICATION FOR AN ORDER AUTHORIZING THE DEBTORS' TO RETAIN LIVINGSTONE PARTNERS LLC AND STONELIVING SECURITIES LLC AS INVESTMENT BANKER (the "Livingstone Retention Application")**

38.  The Debtors selected Livingstone as their investment banker based on Livingstone's longstanding reputation in assisting companies through complex financial restructurings, including bankruptcy sales and reorganizations, and its high degree of success in a wide range of industries.

39.  Livingstone was engaged prior to the Petition Date to provide investment banking services to the Debtors. As a result of its prepetition work for the Debtors, Livingstone is intimately familiar with the Debtors' corporate and capital structure, management, operation, and various other aspects of their business. Livingstone has a well-developed knowledge of the

14

Debtors' financial history and business operations and is well suited to provide the Debtors with investment banking services.

40.    I believe the resources, capabilities, and experience of Livingstone in advising the Debtors are crucial to the Debtors during these Chapter 11 Cases. Livingstone and its professionals have extensive experience and an excellent reputation for providing high quality financial advisory services to debtors and creditors in large and complex chapter 11 cases and other debt restructurings. Livingstone already possesses a well-developed knowledge of the Debtors' financial history and business operations and is well suited to provide the Debtors with the investment banking services contemplated by the Livingstone Engagement Letter.

41.    Furthermore, I believe that the employment of Livingstone would be in the best interests of the Debtors and their estates. Were the Debtors required to engage an alternative financial advisor in connection with these proceedings, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such advisor's familiarization with the intricacies of the Debtors' businesses and financial affairs.

    **B.**    <u>**Operational Motions**</u>

        **(i)**    **DEBTORS' MOTION PURSUANT TO SECTIONS 105(A), 363(B), 363(C), 507(A)(4), AND 507(A)(5) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004 FOR ORDER (I) AUTHORIZING PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS AND CONTINUATION OF PREPETITION EMPLOYEE BENEFITS, (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) GRANTING CERTAIN OTHER RELIEF**

42.    To minimize the Employees' personal hardships and to enhance the Debtors' ability to retain such Employees during these Chapter 11 Cases and in support of the Debtors' going concern sale process, the Debtors seek authority to pay certain prepetition claims arising on account of the Employees for, among other items, wages (including but not limited to salaries,

15

accrued bonuses, commissions and other compensation), vacation and other paid leave, federal and state withholding taxes, payroll taxes, contributions to employee benefit plans, health claims, the Reimbursable Expenses (as defined below), and all other employee benefits which the Debtors pay in the ordinary course of business (collectively, the "Employee Obligations"), including, as defined herein, the Unpaid Compensation, the Employee Deductions, the Employee Benefits, the Health Benefits, the Employee Insurance Benefits, the Other Benefits (collectively, with the Employee Obligations, the "Employee Payments").

43. The Debtors believe they are current with the majority of their Employee Obligations that have become due and payable. However, certain of these Employee Obligations have accrued but, as of the Petition Date, have yet to become due and owing. In this case, any delay in payment or failure to satisfy Employee Obligations would irreparably impair the Debtors' employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with its employees at a time when the employees' support is critical to the Debtor's chapter 11 case and going concern sale process. At this critical juncture, the Debtors simply cannot risk damage to their business from a rapid decline in its employees' morale, or incur the risk that employees may seek employment with competitors. Absent the relief requested herein, the employees may suffer undue hardship and, in many instances, serious financial difficulties, as employees rely on their wages and benefits to meet their personal financial obligations. Without the requested relief, the stability of the Debtors' operations will be irreparably harmed. In addition, it would be inequitable to require the Debtors' employees to bear the cost of any business expenses they incurred prepetition with the belief such expenses would be promptly reimbursed.

PAC 1118386v.1

44.   For the reasons stated above, I believe it to be in the best interests of Debtors' estates, creditors and other parties in interest to grant the relief requested in the Wages Motion.

(ii)   **DEBTORS' MOTION PURSUANT TO SECTIONS 105(A), 363(B), AND 507(A)(8) OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER (I) AUTHORIZING PAYMENT OF PREPETITION TAXES AND FEES TO TAXING AUTHORITIES, AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

45.   In connection with the normal operation of their business, the Debtors are sometimes required to collect certain Sales and Use Taxes and must remit these taxes to various governmental entities of the jurisdictions in which the Debtors conduct business. The process by which the Debtors remit Sales and Use Taxes varies, depending on the nature of the tax at issue and Taxing Authority to which the relevant tax is paid.

46.   The Debtors, in the ordinary course of their business, incur various Other Taxes. The process by which the Debtors remit the Other Taxes varies, depending on the nature of the tax at issue and Taxing Authority to which the relevant tax is paid.

47.   The Debtors also are required by certain regulatory authorities to pay certain Regulatory Fees. The process by which the Debtors remit such Regulatory Fees varies, depending on the nature of the fee at issue and the regulatory authority to which the relevant Regulatory Fee is paid.

48.   As of the Petition Date, the Debtors were generally current on all of their Taxes and Regulatory Fees.[4] Over the past twelve (12) months, the Debtors have paid approximately $48,490.82 in Other Taxes, $3,852,994.11 in Sales and Use Taxes, and $263,000.00 in Regulatory Fees. Prior to the Petition Date, the Debtors paid, on an estimated basis, some but not

---

[4] Debtor IPC International Corporation was delinquent on certain federal payroll tax obligations in the amount of approximately $2,628,825.26 as of the Petition Date (the "Payroll Tax Delinquency"). Although the Debtors intend to satisfy this obligation from estate assets in the Chapter 11 Cases, they are not seeking authority to pay any portion of the Payroll Tax Delinquency through this Motion.

PAC 1118386v.1

all of the prepetition accrued and unpaid amounts outstanding on account of the Taxes and Regulatory Fees. The Debtors estimate a prepetition outstanding balance of approximately $482,000 (excluding the Payroll Tax Delinquency) related to current Taxes and Regulatory Fees.

49.    The Debtors pay the Taxes and Regulatory Fees to the Taxing Authorities on a periodic basis with funds drawn by checks (the "Checks") or by means of electronic fund transfers (the "Electronic Transfers") whether sent directly to the Taxing Authorities or sent to a third party administrator who pays the appropriate Taxing Authorities. Prior to the Petition Date, certain Taxing Authorities were sent Checks or Electronic Transfers in respect of such obligations that may not have cleared the Debtors' banks or other financial institutions (together, the "Banks") as of the Petition Date. The Debtors have also not received certain bills from certain Taxing Authorities for taxes owed pre-petition.

50.    There are several reasons to grant the relief requested in the motion.  First, as I understand the requirements of section 507(a)(8) of the Bankruptcy Code, a portion of the Taxes and Fees may be entitled to priority status and therefore must be paid in full under any plan of reorganization.  Thus, the payment of certain of the prepetition Taxes and Fees at this time would not prejudice the rights of other creditors, but merely would accelerate payments that otherwise would become due in connection with the Debtor's chapter 11 case.  At the same time, payment likely would avoid conflict and administrative problems arising from actions the Taxing Authorities would take against the Debtor to collect due and owing Taxes and Fees.

51.    Second, certain Taxing Authorities may assert that certain of the Taxes and Fees are so-called "trust fund" taxes that the Debtors are required to collect from third parties and hold in trust for the benefit of such Taxing Authorities.  Further, even if some of the Taxes and Fees would not ordinarily be considered "trust fund" taxes in a particular jurisdiction, payment of

18

such Taxes and Fees should nevertheless be authorized because some Taxing Authorities may audit the Debtors if such Taxes and Fees are not timely paid.  Such audits would needlessly divert the Debtors' attention from its reorganization effort.  In addition, as with unpaid property taxes, some Taxing Authorities may also seek to impose liens on the Debtors' assets on account of unpaid "trust fund" Taxes, which liens would require time, effort, and expense for the Debtor to challenge and remove.  An improper lien or the failure to pay certain Taxes might also affect the Debtor's good standing in a particular state, potentially affecting the Debtor's ability to continue operating in the ordinary course.

52.    Any delay in paying the obligations relating to the Taxes and Fees would be detrimental to the Debtor, its creditors and its estates.  Timely payment of the Taxes and Fees is necessary to avoid such distractions and is thus in the best interests of the Debtor and its estate.

> **(iii)    Debtors' Motion  for Entry of an Order Pursuant to Sections 105(a), 363(b), and 363(c) of the Bankruptcy Code (I) Authorizing Continuation of Insurance Policies and Payment of Prepetition Insurance Obligations, and (II) Authorizing Banks and Financial Institutions To Honor and Process Related Checks and Transfers**

53.    By this Motion, the Debtors seek authority to continue honoring their monthly Premium Obligations. In view of the importance of maintaining insurance coverage with respect to their business activities and the preservation of the Debtors' cash flow and estate by financing the insurance premiums, the Debtors believe it is in the best interests of their estates to authorize the Debtors to fulfill their Premium Obligations. Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtors' going concern sale efforts.

54.    In the ordinary course of the Debtors' business, the Debtors retain and maintain numerous insurance policies providing coverage for, among other things, general liability (property and casualty), excess liability, commercial crime, management liability, workers'

19

compensation, commercial automobile, business owners, commercial property, key-man life, and directors and officers liability (collectively, the "Insurance Policies") with First Specialty Insurance Company, General Star, United States Fire Insurance Company, Berkley Regional Insurance Company, Great American Insurance Company, The Hartford Insurance Company, The Prudential, Transamerica Life, United of Omaha, and National Union Fire Insurance Company of Pittsburgh, Pa. (collectively, the "Insurers"). The Insurance Policies are essential to the preservation of the Debtors' business, property and assets and, in many cases, such coverages are required by various regulations, laws and contracts that govern the Debtors' commercial activity. Moreover, because the Debtors are generally obligated to indemnify their property-owner clients for certain general liability to such clients' guests, the Debtors ordinary course operations and protection against runaway administrative claims against their estates.

55.    The total annual premiums for the Insurance Policies equal approximately $8,209,219.80, with varying payment schedules for the different types of Insurance Policies. As of the date hereof, approximately $6,962,179.16 in premium payments on existing Insurance Policies accrued prepetition and remains unpaid.

56.    If the Debtors are not able to meet the Premium Obligations, the Insurers may seek relief from the automatic stay to terminate the Insurance Policies. The Debtors would then be required to obtain replacement insurance on an expedited basis and at tremendous cost to the Debtors' estates. If the Debtors were required to obtain replacement insurance, any replacement payments would likely be greater than what the Debtors currently pay. Even if the Insurers were not permitted to terminate the Insurance Policies, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

57.    In addition, because some Insurance Policies may expire during the course of these Chapter 11 Cases, the Debtors seek authority to renew or enter into new insurance arrangements, as may be required, without the need for further Court approval. The Debtors will need to continue their insurance coverage throughout the entire duration of these Chapter 11 Cases. The Debtors respectfully submit that renewal of the Insurance Policies falls squarely within its ordinary course of business. To reduce the administrative burden, as well as the expense of operating as debtors in possession, the Debtors seek the Court's authority now to renew any Insurance Policies that expire if and when necessary.

58.    For the reasons stated above, I believe it to be in the best interests of the Debtors' estates, creditors and other parties in interest to grant the relief requested in the motion.

### (iv)    DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO MAINTAIN AND ADMINISTER CERTAIN CUSTOMER PROGRAMS AND HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO

59.    By this Motion, the Debtors seek entry of an order authorizing, but not directing, payment of amounts and satisfaction of certain obligations related to certain customer programs in the ordinary course of business and to continue such customer programs on a postpetition basis. Because the customer programs may give rise to postpetition payment obligations from prepetition practices, the Debtors also seek authority to make such payments in the ordinary course of their business.

60.    The Debtors also request that all applicable banks and other financial institutions be authorized to receive, process, honor and pay any and all checks drawn on the Debtors' accounts on account of the customer programs, whether such checks were presented prior to or after the Petition Date.

61.    In the Debtors' business judgment, the uninterrupted maintenance of its customer programs is essential to maintaining existing customer satisfaction. The market for the Debtors' services is highly competitive, and the Debtors' customer programs are integral to the Debtors' ability to retain and expand upon existing customer relationships. Discontinuation of the customer programs would thus disrupt the Debtors' business operations, and undermine the Debtors' customer relationships.

62.    Specifically, prior to the Petition Date and in the ordinary course of their business, certain of the Debtors' customers might hold contingent prepetition claims against the Debtors resulting from such customers' participation in one or more of the customer programs.

63.    The Debtors pay some of their customers rent for office space at the customer's facility (the "Customer Rental Program"). Pursuant to separate lease agreements or the customer contracts themselves, the Debtors are making rental payments at 41 locations, totaling approximately $105,000 on a monthly basis. Currently, the following customers participate in the Customer Rental Program: (1) Bayer Properties; (2) CBL & Associates, (3) Cushman & Wakefield, (4) Glimcher Properties Ltd. Partnership, (5) Grand Avenue Ownership, (6) Jones Lang LaSalle, (7) The Gardens on El Paseo, LLC. Davis Street Land Co, (8) The Taubman Company LLC; (9) Vestar Property Management; and (10) WCF Development/Fox Properties. The rental spaces are used by the Debtors to enhance the quality of service provided to the clients, specifically, for such purposes as training, meetings, and CCTV monitoring (where applicable).

64.    Through this Motion, the Debtors seek to pay rental payments that accrued but were not paid as of the Petition Date. The Debtors estimate that this amount will be approximately $ 30,556.554. While the Debtors may ultimately assume all of its obligations under the

22

underlying contracts giving rise to the Customer Rental Program, the Debtors cannot make that ultimate determination until the completion of its going concern sale process. In the meantime, maintaining the Debtors' customer relationships is of paramount importance to preserving the value of the Debtors' estates for the benefit of the Debtors, their creditors and all parties in interest, as these relationships constitute the vast majority of the assets the Debtors intend to sell as a going concern.

65.    In addition, the Debtors offer two types of customer programs to customer facilities (the "JLL Facilities") managed by Jones Lang LaSalle Incorporated ("JLL"): (1) a sponsorship program by which JLL Facilities may receive cash incentive payments based on the amount of billings they have generated in the previous year (the "Sponsorship Program"); and (2) a discount program by which JLL Facilities may receive discounts to their invoices based on the amount of billings they generated in the previous month (the "Discount Program," and together with the Sponsorship Program and Customer Rental Program, the "Customer Programs"). Approximately sixty-six JLL Facilities participate in one or both of the Debtors' customer programs.

66.    Historically, under the Sponsorship Program, the Debtors book a liability monthly of between approximately $15,000 and $19,000 in the aggregate. The Debtors pay down this liability in the following year by making monthly cash payments to the customers, which have historically averaged $15,000 in the aggregate.

67.    Under the Discount Program, the Debtors provide a discount to participating JLL Facilities based on the amount of billings generated by each JLL Facility in the previous month, which has historically averaged $24,000-$30,000 in the aggregate. The aggregate discount to be

PAC 1118386v.1

applied to the participating customers' August invoices (based on their July billings) is $30,067.42.

68.  For the reasons stated above, I believe it to be in the best interests of the Debtors' estates, creditors and other parties in interest to grant the relief requested in the motion.

### (v)   DEBTORS' MOTION FOR AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO CONTINUE TO USE CORPORATE CREDIT CARDS AND GAS CARDS AND TO PAY PREPETITION OBLIGATIONS IN CONNECTION THEREWITH

69.  By this Motion, the Debtors an order authorizing, but not directing, the Debtors to continue to use various corporate credit cards issued by American Express (collectively, the "Corporate Cards") and gas cards issued by BP Amoco, Chevron and Texaco, Exxon, Shell and LeasePlan USA, Inc. (collectively, the "Gas Cards") and further authorizing, but not directing, the Debtors to pay prepetition amounts owed on the Corporate Cards and Gas Cards which, in the Debtors' reasonable judgment, are necessary to prevent the disruption of the Debtors' operations.

70.  The Debtors have used and continue to use approximately 50 American Express Corporate Cards for miscellaneous charges incurred by its employees in the ordinary course of the Debtors' business such as car rental, airfare, hotel rooms, meals and supplies for properties. The aggregate monthly cost for all of the Debtors' Corporate Cards is approximately $100,000 and the current aggregate balance on these cards is approximately $80,612.52.

71.  Additionally, the Debtors have used and continue to use gas cards with four different vendors. The Debtors use the Gas Cards to fuel their patrol vehicles at around 110 different locations. In addition, LeasePlan USA, Inc. provides fuel and maintenance services for patrol vehicles used in connection with the Taubman portfolio of properties. The average monthly charges for the Gas Cards are as follows: (a) the BP Amoco Gas Cards average $20,700

24

a month; (b) the Chevron and Texaco Universal Gas Cards average $12,100 a month; (c) Exxon Fleet (Wex Bank) Gas Cards average $13,400 a month; (d) the Shell Fleet Plus Gas Cards average $14,700 a month; and (e) the LeasePlan USA, Inc. Gas Cards (including maintenance) average $55,000. The aggregate monthly cost for all of the Debtors' Gas Cards is approximately $115,900, and the current aggregate balance on these cards is approximately $110,900.

72.    The Debtors believe that these Corporate Cards and Gas Cards will be terminated if the prepetition balances are not satisfied. It is critical for the continued operation of the Debtors' business to ensure that its employees have immediate access to credit for incurring ordinary course expenses, in the regular course of performing their duties on behalf of the Debtors. The credit card and fuel card services provided by American Express, BP Amoco, Chevron and Texaco, Exxon, and Shell to the Debtors under their respective corporate card, fuel card, and corporate purchasing services programs are important to the Debtors' business because they enable the Debtors' employees to conduct business on the Debtors' behalf without coming out of pocket themselves and without requiring access to the Debtors' main checking account. The Debtors are able to operate significantly more efficiently with access to these cards. Payment of the Corporate Cards and Gas Cards is vital to the Debtors because if the Debtors were forced to replace the Corporate Cards and Gas Cards, it would significantly harm the Debtors' estates. In particular, the Debtors believe that the delay and expense associated with obtaining new Gas Cards to service their patrol vehicles in approximately 110 locations would cause immediate and irreparable harm. Moreover, the relief requested in this Motion is essential to preserving good relationships with the providers of the Gas Cards and Corporate Cards and to the continued operations of the Debtors' business.

PAC 1118386v.1

73. For the reasons stated above, I believe it to be in the best interests of the Debtors' estates, creditors and other parties in interest to grant the relief requested in the motion.

      **(vi)**    **Debtor's Motion Pursuant to Sections 105(a) And 366 of the Bankruptcy Code for Order (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (II) Approving the Debtor's Proposed Form of Adequate Assurance, (III) Establishing Procedures for Resolving Objections Thereto by Utility Providers, and (IV) Scheduling a Final Hearing Thereon.**

74. By this Motion, the Debtors seek entry of (i) an interim order and (ii) a final order: (a) finding that the utilities providers (collectively, the "Utility Providers"), have adequate assurance of future payment within the meaning of section 366 of the Bankruptcy Code based, *inter alia*, on the Debtors' establishment of a security deposit in a segregated account equal to 50% of the average monthly bill for each Utility Provider, which amount may be adjusted by the Debtors for reasons specified herein following the final hearing on this motion and which is without prejudice to the Utility Providers' rights to request additional adequate assurance according to the procedures set forth below, (b) enjoining the Utility Providers from altering, refusing, discontinuing, or interfering with services to the Debtors on account of any unpaid invoice for pre-petition services, including the making of demands for security deposits or accelerated payment terms, or while a request for adequate assurance of payment in accordance with the procedures set forth herein is pending, (c) establishing procedures for determining requests for additional adequate assurance and authorizing the Debtors to provide such adequate assurance to the Utility Providers, and (d) scheduling the final hearing on the relief sought in the motion.

75. In connection with its ongoing business operations, the Debtors incur utility expenses in the ordinary course for, among other things, the use of electricity, water, sewer service, local and long-distance telephone service, Internet services, waste disposal, and other

similar services (collectively, the "Utility Services"). On a monthly basis, the Debtors spend an

aggregate of approximately $71,632.01 per month for the various Utility Services.  These Utility

Services are supplied by numerous Utility Providers throughout the United States with which the

Debtors may have multiple accounts.

76.    Uninterrupted Utility Services are essential to the Debtors' ongoing operations.

Without these essential services, the Debtors' business will cease to operate. Moreover,

replacement Utility Providers would be difficult to identify and, in some locations, impossible to

find, given that many utilities enjoy a virtual monopoly in certain regions, leaving consumers

with no alternatives. The business disruption that would likely result from interruption of the

Utility Services would negatively impact the Debtor's operations, and would adversely affect the

Debtor's estate, creditors, and employees. Accordingly, to continue as a going concern, the

Debtor must continue to receive uninterrupted Utility Services.

77.    As I understand, the Bankruptcy Code prohibits utilities from altering, refusing, or

discontinuing service to a debtor for the first 20 days of a bankruptcy case. However, a utility

provider may only refuse or discontinue service to a debtor after the first 30 days if the debtor

has not furnished the utility provider with adequate assurance of future payment within such

period. The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a

timely manner, consistent with the ordinary course of operating its business. However, to provide

adequate assurance of payment for future services as required by section 366(c) of the

Bankruptcy Code, the Debtor proposes to deposit (within twenty (20) days of the Petition Date)

an amount into an interest-bearing, newly-created, segregated account (the "Adequate Assurance

Account") equal in the aggregate to 50% of the average monthly bill for each Utility Provider

over the course of the last twelve months prior to the Petition Date (the "Adequate Assurance

Deposit") pending further order of the Court. If the Debtors have not received Utility Services from a Utility Provider for the twelve months prior to the Petition Date, then the Adequate Assurance Deposit will be equal to approximately 50% of the Debtors' estimated average postpetition monthly cost for utility consumption from that particular Utility Provider. Because the Debtor's approximate monthly spending on all Utility Services is approximately $321,802, the initial Adequate Assurance Deposit will be approximately one half of that amount, or $160,901.

78.    The Debtors further propose to maintain the Adequate Assurance Account with a minimum balance in the aggregate equal to 50% of the Debtors' average monthly cost of Utility Services through the final hearing on the Motion.  Thereafter, the Debtor proposes to adjust the amount in the Adequate Assurance Account to reflect several factors such as (i) the termination of Utility Services by the Debtor regardless of any Utility Provider's additional assurance request and (ii) an agreement with any Utility Provider pursuant to the procedures below. These adjustments will permit the Debtors to maintain the Adequate Assurance Account in an amount that consistently provides the Utility Providers with a half-month's deposit on account of such services.

79.    The Debtors submit the Adequate Assurance Deposit, taken together with the facts and circumstances of the Debtor's chapter 11 case (together, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers.

80.    These protections ensure that all Utility Providers will have adequate assurance of payment throughout these cases, and the Debtors believe no other or further assurance is necessary.  If any Utility Provider believes adequate assurance is required beyond the Proposed

PAC 1118386v.1

Adequate Assurance, however, it must request such additional assurance pursuant to the procedures described below (the "Adequate Assurance Procedures").

81.   The relief requested herein will ensure the Debtors' business operations will not be disrupted by the lack of critical Utility Services. If a disruption occurs, it would severely harm the Debtor's business operations and, indeed, could result in the cessation of the Debtor's operations altogether. The Adequate Assurance Procedures provide the Utility Providers with sufficient protection during the Debtors' chapter 11 case, as well as fair and orderly procedures under which to resolve requests for additional or different adequate assurance. Absent approval of the proposed Adequate Assurance Procedures, the Debtors could be forced to negotiate with each Utility Provider individually with the attendant risk that a Utility Provider will delay until the expiration of the 30-day period in section 366(c)(2). During this critical postpetition period, the Debtors' efforts and resources would unquestionably be more productive if focused on the continuation of its operations.

82.   For the reasons stated above, I believe it to be in the best interests of the Debtors' estates, creditors and other parties in interest to grant the relief requested in the motion.

**(vii)   MOTION OF DEBTOR IPC, LTD. FOR ENTRY OF ORDER UNDER 11 U.S.C. §§ 105, 363, 364, 1107 AND 1108 AUTHORIZING MAINTENANCE OF EXISTING BANK ACCOUNTS, CONTINUED USE OF EXISTING BUSINESS FORMS, CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, AND FOR RELATED RELIEF**

83.   Prior to the Petition Date, the Debtors, in the ordinary course of business, maintain numerous bank accounts at different banks as identified on Exhibit A to this Motion (collectively, the "Bank Accounts"). The Debtors employ an integrated, centralized cash management system (the "Cash Management System") involving a series of independent depositary accounts (the "Accounts"). Operational proceeds are deposited into one of two

deposit accounts, and then aggregated into a single concentration account (the "Concentration Account"). From that Concentration Account, the Debtors make disbursements to numerous accounts to pay operating expenses.

84.    The Cash Management System is controlled by the Debtors' accounting department at its corporate headquarters and is similar to those commonly employed by corporate enterprises of comparable size and complexity to the Debtors.

85.    The Debtors maintain current and accurate accounting records of daily cash transactions and submits that maintenance of this Cash Management System will prevent undue disruption to IPC's business and operations, while protecting IPC's cash for the benefit of the estate.

86.    Each of the Bank Accounts is maintained with financial institutions that are financially stable.  Each of the financial institutions are either authorized depositories in this or other jurisdictions or are of equal financial sophistication and security as those financial institutions that are authorized.  Consequently, a waiver of the requirement to comply with section 345(b)'s investment guidelines should pose no risk to IPC's estate or creditors.

87.    If the Debtors are not permitted to continue to utilize their Cash Management System as described herein, their operations will not only be severely impaired, but critical funds may not be collected on account of certain accounts receivable and valuable resources will be expended unnecessarily implementing a new cash management system. Accordingly, the Court should authorize the Debtors' continued use of the existing Cash Management System.

88.    Furthermore, prior to the Petition Date, the Debtors issued checks in the aggregate amount of approximately $325,076.05 for goods and tax payments in the ordinary course of business that had not cleared as of the Petition Date (the "Outstanding Checks") . Failure to

honor these Outstanding Checks will likely cause serious disruption to the Debtor's operations. The Debtors, therefore, out of an abundance of caution, seeks authority for the deposit banks where it maintains Bank Accounts honor the Outstanding Checks.

89.    Because of the nature of the Debtors' business, parties doing business with the Debtors likely will be aware of the Debtors' status as chapter 11 debtor in possession. Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors; business operations. For these reasons, the Debtors request authority to use their checks and business forms without placing the label "Debtor in Possession" on such checks or forms.

**(viii)    MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDER PURSUANT TO 11 U.S.C. §§ 361 AND 363; AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

90.    The Debtors respectfully submit that approval of the proposed DIP Facility is critical to their ability to continue to operate as a going concern, to preserve and protect the value of their assets and operations for the benefit of their stakeholders and, in furtherance thereof, to provide the Debtors with the financial wherewithal to effectuate a sale of substantially all of their assets.  As discussed more fully below, the Debtors require immediate access to working capital to fund and support ordinary business expenditures, including payroll and employee benefits and other overhead expenses, while at the same time marketing substantially all of their assets. Absent immediate and uninterrupted access to adequate financing, the Debtors will not have sufficient liquidity to sustain ordinary business operations and would be forced to consummate a

31

sale of their assets on an extremely expedited timeline or otherwise liquidate to the detriment of their creditors and estates.

91.    Concurrently herewith, the Debtors filed a *Motion for Orders: (1)(a) Approving Bidding Procedures for the Sale of Assets Used in the Debtors' Standing Guard and Patrol Business, (b) Scheduling an Auction and Hearing to Consider Such Sale of Assets, (c) Authorizing Payment of the Break-Up Fee and Expense Reimbursement, (d) Approving Assumption and Assignment Procedures Related to Such Sale, and (e) Approving the Form and Manner of Related Notice; and (2)(a) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (b) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Such Sale* (the "Sale Motion"), in which the Debtors seek approval to proceed with a process to sell substantially all of the assets used to operate the Debtors' standing guard and patrol business (the "Sale").

92.    Receiving access to the DIP Facility, and use of Cash Collateral, will provide the Debtors with the vital liquidity they need to sustain ordinary business operations pending consummation of the Sale. I believe that the financing arrangements proposed are reasonable and necessary, serve the best interests of the Debtors' creditors and estates and should be approved in all respects.

## C.    **Other Motions**

(i)    **DEBTORS' MOTION FOR AN ORDER AUTHORIZING AND APPROVING IMPLEMENTATION OF A KEY EMPLOYEE INCENTIVE PROGRAM PURSUANT TO SECTIONS 105(a), 363(b), 503(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE**

93.    In order to effectuate a successful sale of the Debtors' business, certain key employees (defined below as the KEIP Participants) have been called upon to perform services

32

above and beyond their normal course job requirements. The KEIP Participants have been, and will continue to be, instrumental in preserving the value of the Debtors' assets, maintaining and preserving customer relationships, and maintaining employee morale and focus, all in the extremely difficult environment of a business in chapter 11. The KEIP Participants are also responsible for managing the Debtors' accounts receivable, and administering the Debtors' payroll, all of which is essential to preserving the value of the Debtors' business.

94.    Under these circumstances, the Debtors believe that it is critical that the KEIP Participants not only be compensated for their extraordinary efforts, but that they be appropriately motivated to ensure that the value of the Debtors' estate is maximized, regardless of the uncertainties that surrounds their future employment prospects or other outside concerns.

95.    To that end, the Debtors, with the assistance of their advisors, have developed a narrowly-tailored and reasonable KEIP that provides two different types of awards. First, with respect to the one insider KEIP Participant, the KEIP provides an incentive bonus (the "Incentive Award") only upon consummation of a successful sale of all (or substantially all) of the Debtors' assets to either Universal Protection Service, LLC ("UPS") or a bidder with a higher or otherwise better bid. Second, with respect to the five non-insider KEIP Participants (collectively, the "Non-Insider KEIP Participants"), the KEIP provides monthly incentive awards (the "Monthly Awards") designed to incentivize the retention of key non-insider employees whose efforts will be integral to the successful sale of the Debtors' business.

      (ii)    **MOTION OF THE DEBTORS FOR ORDERS: (1)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF ASSETS USED IN THE DEBTORS' STANDING GUARD AND PATROL BUSINESS, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SUCH SALE OF ASSETS, (C) AUTHORIZING PAYMENT OF THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (D) APPROVING THE DEPOSIT ESCROW AGREEMENT , (E) APPROVING ASSUMPTION AND ASSIGNMENT**

**PROCEDURES RELATED TO SUCH SALE, AND (F) APPROVING THE FORM AND MANNER OF RELATED NOTICE; AND (2)(A) AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SUCH SALE**

96. The Debtors seek entry of: (a) an order (the "Bidding Procedures Order") (i) setting the time, date, and place of a hearing (the "Sale Hearing") to consider the sale (the "Sale") of substantially all of the Debtors' assets used to operate their standing guard and patrol business to Universal Protection Service, LLC (or its designee, "UPS") or to the qualified bidder with the highest or otherwise best bid at an auction (the "Auction") to be conducted at a date to be determined by this Court, (ii) approving the Bidding Procedures (as defined and described below) for the conduct of the Auction, (iii) approving the Break-Up Fee and Expense Reimbursement (each as defined below), (iv) approving the Deposit Escrow Agreement (as defined below), (v) approving the Assumption and Assignment Procedures (as defined below); and (b) an order (the "Sale Order") approving (i) the Sale, to either UPS under that certain Asset Purchase Agreement dated as of **August __, 2013** by and between IPC International Corporation (as Seller) and Universal Protection Service, Inc. (as Purchaser) (the "Purchase Agreement"), or to the qualified bidder with the highest or otherwise best bid at the Auction (including, possibly, UPS, the "High Bidder"), in either case free and clear of all liens, claims, encumbrances, and interests, other than permitted encumbrances and expressly assumed liabilities; and (ii) the assumption and assignment of executory contracts and unexpired leases identified in the purchase agreement of the High Bidder.

97. Consummation of the Sale in an expeditious manner is critical in these Chapter 11 Cases. The Debtors do not have the financial wherewithal to continue operations without

34

additional financing. As discussed above, the Debtors' prepetition senior secured lender has agreed to provide debtor-in-possession financing. As set forth in the Debtors' motion seeking approval of debtor-in-possession financing, the Debtors do not believe that they will be able to secure alternate debtor-in-possession financing over the objection of their existing senior secured lenders.

98.    The prompt Sale to UPS or another High Bidder will maximize the value of the Debtors' standing guard and patrol business, reduce the Debtors' operating liabilities, and provide the Debtors' with liquidity (and thus, additional time) to provide for administration of the balance of their estates for the benefit of all of their stakeholders. Many of the Debtors' customer contracts (bar far the largest generators of value for the Debtors and their most valuable assets) may be terminated on 30 days notice to the Debtors. For this reason, it is critically important that the Debtors' customers know that their contracts will be honored, either by the Debtors or by the assignee of such contracts in connection with the Sale.

99.    UPS is a third party, not comprised of insiders of the Debtors, with no affiliation to the Debtors. UPS is a strategic, industry buyer, with a proven track record of operating businesses not dissimilar to the Debtors' standing guard and patrol business.

**(iii)    DEBTORS' MOTION FOR AN ORDER EXTENDING THE AUTOMATIC STAY TO CERTAIN THIRD-PARTY INDEMNITEE LITIGATION**

100.  By this motion, the Debtors seek an order extending the automatic stay to certain litigation against customers for which the Debtors are obligated to provide a defense and indemnification (collectively, the "Indemnitee Litigation"). The Debtors typical contracts to provide staffing services in a shopping center require that the security provider indemnify the mall owner/operator for a wide variety of claims. In many instances, even if the security

PAC 1118386v.1

company is not already named in the suit, it is still required to defend and indemnify the owner/operator. These liabilities have become a significant drain on the Debtors' resources.

101. If the stay is not extended to the Indemnitee Litigation, the Debtors will be forced to expend significant resources defending the Indemnitee Litigation in order to limit of eliminate potential claims against the Debtors. At the very least, this process would require the Debtors to obtain additional DIP financing, assuming it were able to do so. I believe that granting the relief requested in this motion is necessary to prevent serious and irreparable harm to the Debtors' going concern sale process.

PAC 1118386v.1

Executed on August 9 2013

Scott M. Strong, Chief Financial Officer

34