## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IPC International Corporation, *et al.*[1] | ) | Case No. 13-12050 (MFW) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDER PURSUANT TO 11 U.S.C. §§ 361 AND 363; AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

The above-captioned debtors and debtors in possession (together, the "Debtors"), hereby move (the "Motion"), by and through their undersigned counsel, for entry of an interim order on an expedited basis and substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and, following a final hearing to be scheduled by the Court (the "Final Hearing"), entry of a final order (the "Final Order"), pursuant to sections 105, 361, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), as more fully detailed below. In support of the relief sought in the Interim Order and Final Order, the Debtors rely on the *Declaration of Scott M. Strong, Chief Financial Officer of IPC International Corporation, in Support of Chapter 11 Petitions and First Day Pleadings* (the "Strong

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: IPC International Corporation (2698); and The Security Network Holdings Corporation (7985).

Declaration"), filed concurrently herewith and incorporated herein by reference, and respectfully represent:

## I.   **Summary of the Relief Requested Herein**

1.      By this Motion,[2] the Debtors seek entry of the Interim Order, granting the following relief on an interim basis, and a Final Order (together, such orders are sometimes referred to herein as the "DIP Financing Orders"):

### *Use of Cash Collateral and the DIP Facility*

(a)     Authorizing the Debtors to obtain, and be obligated in respect of, a senior secured priming revolving loan credit facility in an amount of up to $12,000,000 (the "DIP Facility") from The PrivateBank and Trust Company (the "DIP Lender" or "PrivateBank") under that certain Post-Petition Loan and Security Agreement in substantially the form attached to the Interim Order as Exhibit A (the "DIP Agreement"), in accordance with the terms of the DIP Financing Orders;

(b)     authorizing the Debtors to execute and enter into the DIP Agreement and the other "Loan Documents" (as defined in the DIP Agreement; the DIP Agreement and such other Loan Documents being referred to herein collectively as the "DIP Documents") and to perform such other and further acts as may be required in connection with the DIP Documents;

(c)     granting the DIP Lender valid priming first priority perfected liens, subject only to the Carve-Out (as defined in the DIP Financing Orders) and certain permitted liens permitted by the prepetition credit documents, on substantially all of the Debtors' assets (the "DIP Liens") to secure the Debtors' obligations under the DIP Documents (the "DIP Obligations");

(d)     granting the DIP Lender superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code, in respect of the DIP Obligations (the "DIP Superpriority Claim"), subject only to the Carve-Out;

---

[2]      Each capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the DIP Agreement (as defined below) or the DIP Financing Orders (as defined below), as applicable.  In the event of an inconsistency between the descriptions contained herein and the DIP Agreement, the terms of the DIP Agreement shall control.  In the event of an inconsistency between the DIP Agreement and the DIP Financing Orders, the DIP Financing Orders shall control.

(e)     authorizing the Debtors to use all cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code) in which PrivateBank has an interest (the "Cash Collateral"), in accordance with the terms of the DIP Financing Orders;

(f)     granting PrivateBank, as the Debtors' prepetition secured lender (the "Prepetition Secured Lender"), for, among other things, the use of Cash Collateral, certain adequate protection, including the Adequate Protection Liens, the Adequate Protection Priority Claim and the Adequate Protection Payments (each as defined in the DIP Financing Orders) as described in the DIP Financing Orders;

### Modifying the Automatic Stay

(g)     modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Orders; and

### Final Hearing

(h)     scheduling a Final Hearing to consider entry of the Final Order and approving the form of notice with respect to the Final Hearing.

### Preliminary Statement

2.     The Debtors respectfully submit that approval of the proposed DIP Facility is critical to their ability to continue to operate as a going concern, to preserve and protect the value of their assets and operations for the benefit of their stakeholders and, in furtherance thereof, to provide the Debtors with the financial wherewithal to effectuate a sale of substantially all of their assets. As discussed more fully below, the Debtors require immediate access to working capital to fund and support ordinary business expenditures, including payroll and employee benefits and other overhead expenses, while at the same time marketing substantially all of their assets. Absent immediate and uninterrupted access to adequate financing, the Debtors will not have sufficient liquidity to sustain ordinary business operations and would be forced to liquidate, to the detriment of their creditors and estates.

3

3.      Concurrently herewith, the Debtors filed a *Motion for Orders: (1)(a) Approving Bidding Procedures for the Sale of Assets Used in the Debtors' Standing Guard and Patrol Business, (b) Scheduling an Auction and Hearing to Consider Such Sale of Assets, (c) Authorizing Payment of the Break-Up Fee and Expense Reimbursement, (d) Approving Assumption and Assignment Procedures Related to Such Sale, and (e) Approving the Form and Manner of Related Notice; and (2)(a) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (b) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Such Sale* (the "Sale Motion"), in which the Debtors seek approval to proceed with a process to sell substantially all of the assets used to operate the Debtors' standing guard and patrol business (the "Sale").

4.      Receiving access to the DIP Facility, and use of Cash Collateral, will provide the Debtors with the vital liquidity they need to sustain ordinary business operations pending consummation of the Sale.

5.      As more fully set forth below, the Debtors submit that the financing arrangements proposed herein are reasonable and necessary, serve the best interests of the Debtors' creditors and estates and should be approved in all respects.

**Concise Statement of DIP Facility Terms**

6.      In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary of the terms of the proposed financing arrangements:[3]

(a)     <u>Obligated Parties</u>: Debtors The Security Network Holdings Corp. and IPC International Corporation are the Borrowers. Interim

---

[3]      The summaries and descriptions of the terms and conditions of the DIP Agreement and the Interim DIP Financing Orders set forth in the Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions herein are qualified in their entirety by the terms of the DIP Agreement and the DIP Financing Orders.

Order at ¶ 3; DIP Agreement at Preamble. Nondebtors IPC International Realty Company, LLC, IPC Technologies, Inc. and Uniformity, Inc. are guarantors.

(b)    <u>Lender</u>:    PrivateBank is the DIP Lender. Interim Order at Preamble; DIP Agreement at Preamble.

(c)    <u>Amount and Type of Facility</u>: A senior secured priming revolving loan credit facility in an amount of up to $12,000,000. DIP Agreement at Recitals.

(d)    <u>Availability</u>: The Debtors seek authority to immediately borrow and use, pursuant to the DIP Agreement and the other DIP Documents, the DIP Facility, only in accordance with the Budget, a copy of which is attached to the Interim Order as Exhibit B. Interim Order at ¶¶ 3, 9.

(e)    <u>Use of Proceeds</u>: The proceeds of the loans under the DIP Facility shall be used by the Debtors: (1) to repay the Existing Revolving Loans; (2) for the generation of receivables and other lawful purposes as permitted under the DIP Agreement and in accordance with the Budget (which may include certain prepetition expenses approved by the Court provided that the incurrence or payment thereof is not otherwise violative of the DIP Agreement, the DIP Financing Orders, any other order of the Court or applicable law); (3) to pay fees required to be paid to the Office of the United States Trustee; and (4) to pay any of the Obligations or the Existing Obligations. Interim Order at ¶¶ E, F; DIP Agreement at Recitals.

(f)    <u>Priority and Security</u>: As security for the full and timely payment and performance of all of the DIP Obligations, the DIP Lender is granted the DIP Liens. The DIP Obligations also shall be treated as superpriority administrative expense claims (including, upon entry of the Final Order, with respect to avoidance actions), pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out. Interim Order at ¶¶ 13, 16.

(g)    <u>Maturity/Termination Date</u>: The earliest of: (1) January 31, 2014; (2) thirty (30) days after entry of the Interim Order if the Final Order, which shall be in form and substance acceptable to the DIP Lender, shall not have been entered on or before such date; (3) the occurrence of an Event of Default under the DIP Documents and the acceleration by the DIP Lender of the DIP Obligations and exercise of its rights and remedies after notice to the Debtors and any official committee of unsecured creditors (the "Committee"); (4) the date of substantial consummation (as defined in section 1102(b) of the Bankruptcy Code) of any plan of reorganization or

liquidation for the Debtors; and (5) the closing of a sale or any other disposition by the Debtors of all or substantially all of the Debtors' assets. Interim Order at ¶ 10; DIP Agreement at § 1.1 (definition of "Maturity Event").

(h)   Interests Rate and Interest Period:  Interest will accrue at a rate equal to two and one-half percent (2.5%) per annum in excess of, at any time, the greater of (1) the Federal Funds Rate plus 0.5% and (2) the Prime Rate. DIP Agreement at § 4.1(a).

(i)   Default Rate:  Upon the occurrence and during the continuance of an Event of Default under the DIP Agreement, interest shall accrue on the outstanding amount of the obligations thereunder and shall be payable at 2.0% per annum above the ordinary interest rate. DIP Agreement at § 4.1(b).

(j)   Carve-Out:  As used in the DIP Financing Orders, the "Carve Out" means: (1) all statutory fees payable by the Debtors pursuant to 28 U.S.C. § 1930(a)(6); and (2) the sum of (A) any unpaid professional fees and expenses specified in the Budget that were incurred but not paid as of the date of a Cash Collateral Termination Event (provided that such unpaid professional fees and expenses together with all previously-paid professional fees and expenses shall not exceed the aggregate amount of professional fees and expenses set forth in the Budget for the period prior to such Cash Collateral Termination Event) of the professionals retained by the Debtors and any Committee (if one is appointed in these cases) that are subsequently allowed by order of this Court, in each case only to the extent not subsequently paid and after application of any retainers, and (B) any fees and expenses incurred after such Cash Collateral Termination Event by the professionals retained by the Debtors (collectively, the "Professionals") in an aggregate amount not to exceed $100,000. Interim Order at ¶ 17.

(k)   Conditions Precedent:  The conditions precedent to borrowing under the DIP Facility include customary conditions precedent and also require the entry of the Interim Order. DIP Agreement at § 17.

(l)   Covenants:  The DIP Agreement contains affirmative, negative and financial reporting covenants customary for facilities of this nature. DIP Agreement at §§ 12, 13 and 14.

(m)   Events of Default/Termination Events:  Numerous Events of Default relating to the DIP Facility are set forth in section 15 of the DIP Agreement and paragraph 12 of the Interim Order.  DIP

6

Agreement at § 15; Interim Order at ¶ 12.  Paragraph 11 of the Interim Order sets forth Cash Collateral Termination Events. Interim Order at ¶ 11.

(n)     DIP Facility Fees:  (1) Unused Line Fee – one-half of one percent (0.5%) of the difference between the Revolving Loan Commitment and the average daily balance of the Revolving Loans plus the Letter of Credit Obligations for each month; (2) Costs and Expenses – out-of-pocket costs and expenses, including, without limitation, reasonable and documented legal expenses and reasonable attorneys' fees of a single firm of counsel (plus one firm of local counsel in each applicable jurisdiction), incurred by DIP Lender; and (3) Facility Fee – ($100,000), earned upon execution of the DIP Agreement and payable on the occurrence of a Maturity Event.  DIP Agreement at § 4.2.

(o)     Debtors' Stipulations, Waivers and Releases:  The Debtors propose to stipulate as to the amount, validity and priority of the Prepetition Secured Lender's prepetition claims.  Interim Order at ¶ D.  The Debtors also propose to waive certain rights and causes of action and grant releases in favor of the Prepetition Secured Lender as to any and all prepetition claims (including the Debtors' rights under section 506(c) of the Bankruptcy Code but only upon entry of the Final Order).  Interim Order at ¶ D(7), 21.

(p)     Waiver or Modification of the Automatic Stay:  Subject to three (3) business days' prior notice, the automatic stay will be vacated in the event of an Event of Default under the Interim Order to permit the exercise of remedies by the DIP Lender; *provided, however*, that during such three (3) business day period, the Debtors shall be entitled to seek an emergency hearing contesting that an Event of Default has occurred.  Interim Order at ¶ 27.

(q)     Amount of Cash Collateral to Be Used.  The Debtors seek to use Cash Collateral in an amount consistent with the expenditures described in the Budget, subject to permitted variances as set forth in the Interim Order and DIP Agreement.

(r)     Party with an Interest in Cash Collateral.  The party with an interest in the Cash Collateral is the Prepetition Secured Lender.

(s)     Use of Cash Collateral.  The Prepetition Secured Lender has consented to the Debtors' use of Cash Collateral in accordance with the terms of the Interim Order and the Budget.

(t)     Adequate Protection for the Prepetition Secured Lender.  As adequate protection for the interest of the Prepetition Secured

7

Lender in the Prepetition Collateral (including the Cash Collateral) on account of the Debtors' use of Cash Collateral and any decline in value arising out of the automatic stay, the Debtors' use, sale, depreciation, or disposition of the Prepetition Collateral or any other reason during this case, the Prepetition Secured Lender shall receive adequate protection in the form of Adequate Protection Liens, the Adequate Protection Priority Claim and the Adequate Protection Payments. Interim Order at ¶ I.

(u)     <u>Automatic Perfection</u>. The DIP Liens and the Adequate Protection Liens granted in the DIP Agreement, the Interim Order and the Final Order shall be valid and automatically perfected without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of lien, or other instrument or document that may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens or the Adequate Protection Liens or to entitle the DIP Liens or the Adequate Protection Liens. Interim Order at ¶ 15.

(v)     <u>Sale Milestones</u>.   The DIP Agreement contains sale process milestones that are required to be satisfied. Failure to comply with any one of these milestones constitutes an Event of Default under the DIP Facility. Interim Order at ¶ 12; DIP Agreement at § 15.7. The sale milestones are as follows:

    (i)     Debtors must file with the Court the Bid Procedures Motion by August 12, 2013;

    (ii)    Debtors must obtain an order of the Court, in form and substance satisfactory to the DIP Lender and the Prepetition Secured Lender, approving the Bid Procedures Motion by September 16, 2013;

    (iii)   Debtors must obtain an order of the Court, in form and substance reasonably acceptable to the DIP Lender and the Prepetition Secured Lender, approving the sale or other disposition of all or substantially all of the Debtors' assets by October 31, 2013; and

    (iv)    Debtors must consummate the sale or other disposition of all or substantially all of the Debtors' assets on or before November 15, 2013.

**Disclosures**

7.      Pursuant to Bankruptcy Rule 4001(d) and Local Rule 4001-2, a debtor in possession seeking authority to obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the financing.  The debtor in possession must also justify the inclusion of such provisions.  Set forth below are the disclosures required in accordance with such rules:

(a)     Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to prepetition secured creditors in connection with the debtor's cash collateral usage or additional financing.  **The proposed Interim Order does not provide for the granting of cross-collateralization protection to PrivateBank.**

(b)     Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters.  **The Debtors propose to stipulate as to the amount, validity and priority of the Prepetition Secured Lender's prepetition claims.  Interim Order at ¶ D.  The Debtors also propose to waive certain rights and causes of action and grant releases in favor of the Prepetition Secured Lender as to any and all prepetition claims (including the Debtors' rights under section 506(c) of the Bankruptcy Code but only upon entry of the Final Order). Interim Order at ¶ D(7), 21.  The Interim Order provides parties in interest with requisite standing an investigation period that expires upon the earlier of (A) seventy-five (75) days from the Petition Date and (B) sixty (60) days after the date of appointment of a Committee.  Interim Order at ¶ 29.**

(c)     Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code.  **Subject to entry of the Final Order, all rights to surcharge any Prepetition Collateral or Collateral under section 506(c) of the Bankruptcy Code shall be finally and irrevocably waived. Interim Order at ¶ 21.**

(d)    Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. **The proposed Interim Order, at paragraph 13, subject to entry of the Final Order, grants valid and perfected senior, first priority liens on avoidance actions pursuant to chapter 5 of the Bankruptcy Code ("Avoidance Actions") and proceeds of Avoidance Actions, which shall be junior, subject, and subordinate only to (1) the Carve-Out, (2) unavoidable, valid and properly perfected liens existing as of the Petition Date that are senior to the Prepetition Liens and (3) the DIP Liens. Interim Order at ¶ 13.**

(e)    Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt to be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditors' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code). **The Interim Order provides that from and after its entry, the Debtors shall be deemed to have (1) remitted to the Prepetition Secured Lender for application to and repayment of the Prepetition Revolving Debt, all Cash Collateral in their possession or control or coming into their possession and control and arising from, or constituting proceeds of, the Prepetition Collateral, including, but not limited to, all funds contained in all of their deposit accounts on the Petition Date, and (2) reborrowed a like amount as a DIP Obligation under the DIP Facility. Interim Order at ¶6.**

(f)    Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. **The Carve-Out does not provide for disparate treatment to professionals. Interim Order at ¶17. The Budget sets forth the fees and expenses of the Committee's professionals lower than fees and expenses of the Debtors' professionals.**

(g)    Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienholder. **The proposed Interim Order does not provide for the priming of any secured lien without the consent of that lienholder. The Prepetition Secured Lender consents to the relief requested herein.**

(h)     Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case. **The proposed Interim Order, at paragraph 19, describes the forms of adequate protection to be provided to the Prepetition Secured Lender.**

(i)     Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay. **The proposed Interim Order, at paragraph 27, describes the modification of the automatic stay in the event of an occurrence of an Event of Default under the DIP Agreement.**

(j)     Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate. **The proposed Interim Order, at paragraph 15, includes provisions that provide for the automatic perfection and validity of the liens, security interests and adequate protection provided in the DIP Agreement and the DIP Financing Orders without the necessity of any further filing or recording under the laws of any jurisdiction.**

## II.     Jurisdiction

8.     The Court has jurisdiction over this Motion under 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) in that it is a matter concerning the administration of the Debtors' estates. Venue of these proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.     Background

9.     On the date hereof (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") through the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

PAC 1118331v.2

10.     The factual background relating to the Debtors' commencement of their Chapter 11 Cases and descriptions of the Debtors' organizational and capital structure are set forth in detail in the Strong Declaration.

## IV.    Proposed Debtor-in-Possession Financing

## A.    The Critical Need for Post-Petition Financing

11.     The Debtors have an immediate need for post-petition financing under the DIP Facility to continue to finance their post-petition operations and pay administrative expenses. Such financing is critical to preserve the going concern value of the Debtors' assets, thereby maximizing the returns to all creditors and stakeholders that will be obtained from the contemplated Sale of the Debtors' assets.

12.     Because virtually all of the Debtors' assets are encumbered by prepetition liens in favor of the Prepetition Secured Lender, the Debtors have no unencumbered funds with which to pay ongoing wages, salaries and day-to-day operating expenses, all of which are vital to sustain normal course business operations. Due to the nature and magnitude of the Debtors' operations, which are dependent upon uninterrupted access to necessary working capital, the Debtors' immediate access to the DIP Facility is essential to prevent irreparable harm to the Debtors' estates. The DIP Facility also is necessary to provide assurance to employees and other parties that they will be paid on a timely basis for post-petition services. Without access to the DIP Facility, the Debtors' operations could come to a halt, a result that would be devastating as the Debtors attempt to maximize the going concern value of their assets through an expedited sale process.

13.     The Debtors also submit that, other than the DIP Facility, there are no viable financing alternatives available to them under the circumstances. In that regard, prior to the Petition Date, the Debtors and their advisors contacted alternative sources of post-petition

financing, but no viable alternative financing was forthcoming. The Debtors are unable to obtain alternative post-petition financing through credit allowable as an administrative expense, or credit secured by liens on the Debtors' assets junior to the Prepetition Secured Lender's liens and the Debtors have neither the money nor the time to engage in a potentially difficult and protracted priming contest with the Prepetition Secured Lender, the results of which would be uncertain. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their chapter 11 goals.

14.    Under these circumstances, the Debtors, in the exercise of their considered business judgment, have determined that the DIP Facility is the only financing available to them and provides the Debtors with necessary liquidity to maintain the going concern value of their business pending the culmination of the Debtors' proposed sale process.

15.    The DIP Facility, which is the product of arm's length negotiations between the DIP Lender and the Debtors, provides the Debtors with continued financing pursuant to (a) the terms of the DIP Agreement and the other DIP Documents, (b) the operating Budget annexed to the Interim Order as Exhibit B and (c) the terms of the proposed Interim Order (pending approval of the DIP Facility on a final basis at the Final Hearing).

16.    The Debtors believe that the terms of the DIP Facility pursuant to the DIP Agreement are reasonable and fair under the circumstances and, therefore, that the financing provided under the DIP Facility serves the best interests of the Debtors, their creditors and their estates.

**B.    Use of Cash Collateral and Proposed Adequate Protection**

17.    In connection with the proposed DIP Facility, the Debtors require and request authorization, pursuant to sections 363(c)(2) and (e) of the Bankruptcy Code, to continue

13

using cash receipts and equivalents constituting the Prepetition Secured Lender's Cash Collateral in accordance with the Budget.

18.    Pursuant to the Interim Order, as adequate protection for any decrease in the value of its interests in the Prepetition Collateral (including the Cash Collateral) resulting from the automatic stay, from the Debtors' use, sale, or lease of the Prepetition Collateral (including the Cash Collateral), or for any other reason during this case, the Prepetition Secured Lender will receive adequate protection, which shall be junior, subject, and subordinate to the Carve-Out (as defined below), the DIP Obligations, the DIP Liens, and the DIP Superpriority Claim, pursuant to sections 361, 363, and 364 of the Bankruptcy Code, as follows (collectively, "Adequate Protection"; the obligations imposed on the Debtors thereby, the "Adequate Protection Obligations"):

(a)    **Adequate Protection Liens.**    The Prepetition Secured Lender shall be granted valid and perfected senior, first priority liens on all of the Debtors' assets and property (whether existing prior to or following the Petition Date), and subject to entry of the Final Order, Avoidance Actions and proceeds of Avoidance Actions, which shall be junior, subject, and subordinate only to (i) the Carve-Out, (ii) unavoidable, valid and properly perfected liens existing as of the Petition Date that are senior to the Prepetition Liens, and (iii) the DIP Liens (the "Adequate Protection Liens").

(b)    **Prepetition Superpriority Claim.**    Pursuant to section 507(b) of the Bankruptcy Code, the Prepetition Secured Lender shall be granted in the Chapter 11 Cases, a superpriority administrative expense claim with respect to all Adequate Protection Obligations and the proceeds of Avoidance Actions (the "Superpriority Claims"), which shall be junior, subject, and subordinate to (i) the Carve-Out and (ii) the DIP Superpriority Claim.

14

(c)   **Adequate Protection Payments**.   As additional adequate protection, the Prepetition Secured Lender shall be entitled to (i) the payment of all fees (including reasonable professional fees and expenses owing under the Prepetition Credit Agreement as of the Petition Date), as and when set forth in the Budget, and (ii) the current payment of all such post-petition fees and expenses (collectively, the "Adequate Protection Payments"). All Adequate Protection Payments shall be paid regardless of whether such amounts accrued prior to or after the Petition Date, and shall be paid without further motion, fee application, or order of the Court.

19.   The Debtors believe that the proposed use of Cash Collateral and adequate protection described above and set forth in the Interim Order are reasonable and necessary and should be approved by the Court. In that regard, the Debtors understand that PrivateBank has consented to the Debtors' use of Cash Collateral, subject to the provisions and protections outlined above and contained in the Interim Order.

**V.   Basis for Approval of the DIP Facility and the Granting of Senior Liens and Superpriority Administrative Claims in Connection Therewith and the Debtors' Use of Cash Collateral**

**A.   The Granting of Senior Liens and Superpriority Administrative Claim Status to the DIP Lender in Connection with the DIP Facility is Warranted**

20.   Section 364 of the Bankruptcy Code authorizes this Court to allow the Debtors to obtain post-petition financing from the DIP Lender in the manner proposed in the DIP Agreement. As described above, as security for all borrowings under the DIP Facility, the Debtors propose to grant the DIP Lender a superpriority administrative claim, and a first priority lien on and security interest in all of the assets of the Debtors, subject to certain permitted liens and claims specified in the Interim Order.

PAC 1118331v.2

21.     The granting of superpriority administrative claim status is governed by Section 364(c) of the Bankruptcy Code.  Specifically, Section 364(c) provides:

> if the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any and all administrative expenses of the kind specified in section 503(b) and 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien;
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

22.     As noted above, substantially all of the Debtors' assets are encumbered by prepetition liens granted to the Prepetition Secured Lender.   Furthermore, the Debtors are otherwise unable to obtain unsecured financing.  Accordingly, section 364(c) of the Bankruptcy Code is satisfied, and the Court is authorized to grant the DIP Lender superpriority administrative claim status as provided in the Interim Order.

23.     Because the DIP Facility also contemplates the granting of priming liens to the DIP Lender (subject to the Carve-Out and other Permitted Liens, as defined in the Prepetition Credit Agreement), the DIP Facility also is subject to approval under the requirements of Section 364(d) Bankruptcy Code.  Section 364(d)(1) provides:

> The court after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)     the trustee is unable to obtain such credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

16

24.     The Debtors submits that this Court should grant the DIP Lender senior liens and security interests as provided in the Interim Order.   First, as discussed above, Section 364(d)(1)(A) of the Bankruptcy Code is satisfied because the Debtors are unable to obtain credit sufficient to sustain their day-to-day business operations or to maintain the going concern value of their assets other than by the granting to the DIP Lender a first priority lien and security interest in the Debtors' assets as provided in the Interim Order.   Moreover, the Debtors negotiated the DIP Agreement at arm's length and have determined, in the exercise of their business judgment and in consultation with their professional advisors, that such financing is the best and only viable financing available under the circumstances.   Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment.   *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

25.     Second, section 364(d)(1)(B) of the Bankruptcy Code is satisfied because the Debtors propose to provide adequate protection to the Prepetition Secured Lender in the manner set forth above.   The Prepetition Secured Lender supports and consents to the proposed priming DIP Facility in its entirety, subject to the terms and conditions set forth in the Interim Order and the DIP Agreement.

26.     Thus, for all of the reasons set forth above, the Debtors submit that the circumstances of these Chapter 11 Cases require the Debtors to obtain financing pursuant to

17

sections 364(c) and 364(d) of the Bankruptcy Code. The Debtors further submit that the terms of the DIP Facility and the Interim Order are fair, reasonable and necessary under the circumstances, and should be approved in their entirety.

**B.    The Use of Cash Collateral and Proposed Adequate Protection Should be Approved**

27.    Pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use ... in accordance with the provisions of this section." 11 U.S.C. §363(c)(2).    In addition, Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used ... or proposed to be used ... by a [debtor in possession], the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interests. 11 U.S.C. §363(e).

28.    Here, the Debtors require use of Cash Collateral in addition to the financing provided under the DIP Facility.

29.    To adequately protect PrivateBank's interests on account of the Debtors' use of Cash Collateral, the Debtors propose to provide PrivateBank with the protections described above and in the Interim Order.    Additionally, as discussed above, PrivateBank consents to the use of Cash Collateral on the terms set forth herein and in the Interim Order. Accordingly, the Debtors' request to use Cash Collateral as provided herein and in the Interim Order should be approved.

**C.    Modification of the Automatic Stay**

30.    The Interim Order provides that the automatic stay shall be modified solely to the extent necessary to:  (a) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to PrivateBank under the Interim

18

Order; (b) authorize PrivateBank to retain and apply payments as provided by the Interim Order; and (c) authorize PrivateBank to take any and all actions authorized hereby upon the occurrence and continuation of an Event of Default, subject to the required notice and protections afforded to the Debtors and the Committee under the terms of the Interim Order.

**VI.    Request For Immediate Interim Approval of Relief Requested Herein**

31.    Pursuant to Bankruptcy Rule 4001(c)(2), a minimum of fourteen (14) days' notice is required before the Final Hearing on this Motion may commence. Upon request, however, the Court may conduct a preliminary expedited hearing on the Motion to the extent necessary to avoid immediate and irreparable harm to the estate pending the Final Hearing. Fed. R. Bankr. P. 4001(c)(2). In accordance with Bankruptcy Rule 4001(c), the Debtors respectfully request that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtors to borrow under the DIP Facility and use Cash Collateral on an interim basis, pending entry of a Final Order. The Debtors submit that such relief is vital in order to maintain and finance the Debtors' ongoing operations, to preserve the going concern value of the Debtors' assets pending the conclusion of their sale process, and, therefore, to prevent immediate and irreparable harm to the Debtors' estates. The Debtors further request that the Court schedule a hearing to consider entry of a Final Order as soon as possible but not later than twenty-five (25) days from the hereof.

32.    As discussed above, it is essential to the continued operation of their businesses that the Debtors be authorized to obtain emergency financing under the DIP Facility on an interim basis pending the Final Hearing. Funds are urgently needed so that the Debtors may continue to operate as a going concern, to preserve and protect the value of their assets and operations for the benefit of their stakeholders and, in furtherance thereof, to consummate a Sale

19

and exit chapter 11. In the absence of emergency access to interim financing, the Debtors' sale efforts and Chapter 11 Cases would be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' creditors and estates.

33.    To successfully implement the relief requested in this Motion, the Debtors request a waiver of the notice requirements set forth in Bankruptcy Rule 6004(a) and the ten-day stay set forth Bankruptcy Rule 6004(h).

## VII.    Notice with Respect to Emergency Interim Financing Request and Final Hearing

34.    Notice of this Motion has been given to the following parties: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for PrivateBank; (c) all known parties with liens of record on assets of the Debtors as of the Petition Date; (d) all financial institutions at which the Debtors maintain deposit accounts; (e) the Internal Revenue Service; (f) the Illinois Department of Revenue; (g) the Debtors' twenty (20) largest unsecured creditors (on a consolidated basis); and (h) all other parties requesting notice pursuant to Bankruptcy Rule 2002 ((a) through (h), collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

35.    The Debtors request that the Court schedule the Final Hearing and authorize the Debtors to mail copies of the entered Interim Order, which fixes the date, time and manner for the filing of objections, to the Notice Parties.

### No Prior Request

36.    No previous motion for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request that the Court (a) enter the Interim Order authorizing, *inter alia*, the Debtors to obtain financing pursuant to the DIP Facility

20

and use Cash Collateral on an emergency interim basis through the conclusion of the Final

Hearing on the terms set forth in the DIP Financing Orders and in the DIP Agreement, (b) enter a

Final Order authorizing the Debtors to obtain financing under the DIP Facility and use Cash

Collateral on a permanent basis on the terms set forth in the DIP Financing Orders and in the DIP

Agreement, (c) grant all related relief requested in this Motion and (d) grant the Debtors such

other or further relief as may be just and proper.

Dated: August 9, 2013                  **POTTER ANDERSON & CORROON LLP**
      Wilmington, Delaware

                                  /s/ Etta R. Mayers

                  Jeremy W. Ryan (DE Bar No. 4057)
                  Etta R. Mayers (DE Bar No. 4164)
                  1313 North Market Street, Sixth Floor
                  P.O. Box 951
                  Wilmington, DE  19801
                  Telephone:  (302) 984-6000
                  Facsimile:  (302) 658-1192

                  *Proposed Co-Counsel for Debtors and Debtors in Possession*

                  -and-

                  **PROSKAUER ROSE LLP**
                  Paul V. Possinger
                  Brandon W. Levitan
                  Three First National Plaza
                  70 West Madison, Suite 3800
                  Chicago, IL  60602-4342
                  Telephone:  (312) 962-3550
                  Facsimile:  (312) 962-3551

                  *Proposed Co-Counsel for Debtors and Debtors in Possession*

21

**Exhibit A**

[Proposed Interim Order]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IPC International Corporation, *et al.*[1] | ) | Case No. 13-12050 (MFW) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |
| | ) | **Re: Docket No. ___** |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDER PURSUANT TO 11 U.S.C. §§ 361 AND 363, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Upon the motion of the debtors and debtors in possession (together the, "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), dated August 9, 2013 (the "Motion"), (a) seeking the entry of an interim order (the "Order") and a final order (the "Final Order"): (i) authorizing the Debtors to enter into a senior secured post-petition loan agreement (the "DIP Facility"), pursuant to section 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), with The PrivateBank and Trust Company, an Illinois banking corporation ("PrivateBank" or the "DIP Lender"), in substantially the form attached hereto as **Exhibit A** (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), pursuant to the terms of this Order, the DIP Credit Agreement, and any related documents required to be delivered by or in connection with the DIP Credit Agreement (collectively with the DIP Credit Agreement, the "DIP Credit Documents") and to perform such other and further acts as may be required in connection with the DIP Credit Documents; (ii) granting security interests, liens, and superpriority claims (including a superpriority administrative

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  IPC International Corporation (2698); and The Security Network Holdings Corporation (7985).

claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Lender to secure all obligations of the Debtors under and with respect to the DIP Facility; (iii) authorizing Debtors' use of the Cash Collateral (as hereinafter defined) solely on the terms and conditions set forth in this Order and in the DIP Credit Agreement; (iv) granting adequate protection to PrivateBank in its capacity as the Prepetition Secured Lender (as hereinafter defined); and (vi) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the DIP Lender, and the Prepetition Secured Lender to implement the terms of this Order; (b) requesting, pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), that an emergency interim hearing (the "Interim Hearing") on the Motion be held for the Court to consider entry of this Order; and (c) requesting, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), that the Court (i) schedule a final hearing (the "Final Hearing") on the Motion within thirty (30) days of the Petition Date (as hereinafter defined) to consider entry of the Final Order, and (ii) approve certain notice procedures with respect thereto; and the Interim Hearing having been held by this Court on August ___, 2013; and the Court having considered the Motion and all pleadings related thereto, including the record made by the Debtors at the Interim Hearing; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

### THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

A.    On August 9, 2013 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their businesses and are managing their respective properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee of unsecured creditors has been

2

appointed in the Chapter 11 Cases.

   B.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

   C.  The Debtors have provided notice of the Motion and the Interim Hearing by facsimile, electronic mail, or overnight mail to: (i) the Office of the United States Trustee (the "U.S. Trustee"); (ii) the twenty (20) largest unsecured creditors of the Debtors; (iii) counsel to the DIP Lender; (iv) counsel to the Prepetition Secured Lender; (v) all known parties with liens of record on assets of the Debtors as of the Petition Date; (vi) all financial institutions at which the Debtors maintain deposit accounts; (vii) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; (viii) the Internal Revenue Service; and (ix) all other parties requesting notice pursuant to Bankruptcy Rule 2002. The Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with Bankruptcy Rule 4001 in all respects.

   D.  Without prejudice to the rights of any other party, but subject to the limitations thereon set forth in paragraph 29 below, the Debtors admit, stipulate and agree that:

     (1)  Pursuant to that certain Credit Agreement dated as of August 31, 2009 (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Credit Agreement"), by and among, on the one hand, The Security Network Holdings Corp., IPC International Corporation, Uniformity, Inc., IPC International Realty Company, LLC, and IPC Technologies Inc., as the borrowers, and, on the other hand, The PrivateBank and Trust Company as administrative agent, syndication agent and documentation agent for the lenders, and as the sole lender (the "Prepetition Secured Lender"), the Prepetition Secured Lender made certain loans and other financial accommodations to or for the benefit of the Debtors. In connection with the Prepetition Credit Agreement, the Debtors entered into

3

certain collateral and ancillary documentation with the Prepetition Secured Lender (such collateral and ancillary documentation collectively with the Prepetition Credit Agreement, the "Prepetition Credit Documents").   All obligations of the Debtors arising under the Prepetition Credit Documents, including all loans, advances, debts, liabilities, principal, interest, fees, swap exposure, charges, expenses, indemnities, and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Secured Lender by the Debtors, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "Prepetition Obligations."§

(2)        As of the Petition Date, the Debtors were truly and justly indebted to the Prepetition Secured Lender pursuant to the Prepetition Credit Documents, without defense, counterclaim or offset of any kind, in the following aggregate amounts in respect of loans and other financial accommodations made by the Prepetition Secured Lender pursuant to and in accordance with the terms of the Prepetition Credit Documents, not including fees and interest: (a) Revolving Loan: $7,055,749.80 (the "Prepetition Revolving Debt"); (b) ESOP Term Loan: $7,017,836.54; (c) Mortgage Term Loan: $4,373,333.28; and (d) Outstanding Letters of Credit: $2,381,865.00 (ESOP Term Loan, Mortgage Term Loan, and Outstanding Letters of Credit, collectively, the "Prepetition Term Debt").

(3)        In addition, as of the Petition Date, the Debtors were further truly and justly indebted to the Prepetition Secured Lender pursuant to the Prepetition Credit Documents, without defense or setoff of any kind, in the aggregate amounts of (i) all other accrued or hereafter accruing bank fees and unpaid interest on the Prepetition Revolving Debt and the Prepetition Term Debt, (ii) all unpaid fees and expenses (including the fees and expenses of attorneys and financial advisors for the Prepetition Secured Lender) now or hereafter due under the Prepetition Credit Documents, and (iii) any other obligations of the Debtors under

4

the Prepetition Credit Documents.

(4)     Pursuant to the Prepetition Credit Documents, the Prepetition Obligations are secured by valid, duly perfected first-priority (subject to certain permitted liens permitted by the Prepetition Credit Documents) security interests in and continuing liens on substantially all of the assets and property of the Debtors, including, but not limited to, all personal and fixture property of every kind and nature, including without limitation, all goods (including inventory, equipment, and any accessions thereto), instruments, documents, accounts receivable, chattel paper (including electronic chattel paper), the Debtors' lockbox and cash concentration account, letter of credit rights, commercial tort claims, securities and all other investment property, insurance claims and proceeds, intellectual property, and all general intangibles, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, in each case wherever located, whether then owned or existing or thereafter acquired or arising.    All collateral granted or pledged by the Debtors to the Prepetition Secured Lender pursuant to the Prepetition Credit Documents shall collectively be referred to herein as the "Prepetition Collateral."

(5)     Substantially all of the Debtors' cash, including, without limitation, all cash and other amounts on deposit or maintained in the Debtors' lockbox and cash concentration account by the Debtors and any amounts generated by collection of the Debtors' accounts receivable, the sale of the Debtors' inventory, or any other disposition of the Prepetition Collateral constitutes proceeds of the Prepetition Collateral and therefore constitutes cash collateral of the Prepetition Secured Lender within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

(6)     All Prepetition Credit Documents executed and delivered by the Debtors to the Prepetition Secured Lender are valid and enforceable by the Prepetition Secured Lender against the Debtors.    The Prepetition Secured Lender duly perfected its liens

5

upon and security interests in the Prepetition Collateral in accordance with applicable law. The liens and security interests of the Prepetition Secured Lender in the Prepetition Collateral, as security for the Prepetition Obligations, constitute valid, binding, enforceable and perfected first-priority (subject to certain permitted liens permitted by the Prepetition Credit Documents) liens and security interests and are not subject to avoidance, disallowance, subordination or re-characterization pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except insofar as such liens are subordinated to the DIP Liens, and the Carve-Out (as each term is hereinafter defined) in accordance with this Order).

(7)    The Prepetition Obligations constitute legal, valid and binding obligations of the Debtors, no offsets, defenses or counterclaims to the Prepetition Obligations exist, and no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction, subordination or re-characterization pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Secured Lender with respect to the Prepetition Credit Documents or otherwise, whether arising at law or at equity, including, without limitation, any re-characterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code. The Debtors irrevocably waive any right to (i) challenge or contest the liens or security interests of the Prepetition Secured Lender in the Prepetition Collateral, (ii) challenge or contest the validity of the Prepetition Obligations, or (iii) assert any claims or causes of action against the Prepetition Secured Lender or any of its affiliates, agents, attorneys, financial advisors, officers, managers, directors or employees under the Bankruptcy Code or applicable non-bankruptcy law.

E.    The Debtors have an immediate and critical need to obtain post-petition financing under the DIP Facility in order to operate their businesses as debtors in possession and

6

comply with their obligations as debtors in possession.

F.      The Debtors also have an immediate and critical need to use Cash Collateral pursuant to the terms of this Order to, among other things, finance the ordinary costs of their operations, maintain business relationships with vendors, suppliers and customers, make payroll, and satisfy other working capital and operational needs.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral pursuant this Order is vital to the preservation and maintenance of the going concern value of the Debtors' estates. Consequently, without the continued use of Cash Collateral by the Debtors, to the extent authorized pursuant to this Order, the Debtors and their estates would suffer immediate and irreparable harm.

G.      The Debtors are unable to obtain (i) adequate unsecured credit allowable either under (a) sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured either by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code or (y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Facility.  The only funding available to the Debtors is the DIP Facility.

H.      The DIP Lender has indicated a willingness to provide the Debtors with certain financing commitments but solely on the terms and conditions set forth in this Order and the DIP Credit Documents.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of this Order and the DIP Credit Documents represents the best post-petition financing presently available to the Debtors.

I.      The Prepetition Secured Lender is prepared to consent to: (i) the imposition

7

of certain liens under section 364(d)(1) of the Bankruptcy Code in favor of the DIP Lender, but solely

on the terms and conditions set forth in this Order and in the DIP Credit Documents, which liens will

prime the Primed Liens (as defined in paragraph 14, *infra*), and (ii) the Debtors' use of the Prepetition

Collateral (including the Cash Collateral), provided that the Court authorizes the Debtors, pursuant to

sections 361, 363 and 364 of the Bankruptcy Code, to grant to the Prepetition Secured Lender, as

adequate protection for the Adequate Protection Obligations (as hereinafter defined), but subject to the

Carve-Out (a) replacement security interests in and liens and mortgages upon (collectively, the

"Adequate Protection Liens") all of the DIP Collateral (as hereinafter defined) (including, upon

entry of the Final Order, all Avoidance Actions (as hereinafter defined) and the proceeds thereof),

and (b) a superpriority administrative expense claim under section 507(b) of the Bankruptcy Code (the

"Adequate Protection Priority Claim"), which Adequate Protection Priority Claim shall be

subordinate in priority only to the Carve-Out, and the superpriority claim under section 364(c)(1) of

the Bankruptcy Code in favor of the DIP Lender (and which, upon entry of the Final Order, shall be

legally payable from the proceeds of Avoidance Actions).  The Adequate Protection Liens and the

Adequate Protection Priority Claim shall secure the payment of the Prepetition Obligations in an

amount equal to any diminution in the value of the Prepetition Secured Lender's interests in the

Prepetition Collateral, including the Cash Collateral from and after the Petition Date (the aggregate

amount of such diminution, the "Adequate Protection Obligations") including, without limitation, any

diminution resulting from: (i) the Debtors' use of the Prepetition Collateral, (ii) the imposition of the

DIP Liens, which will prime the Primed Liens (as defined in paragraph 14, *infra*), and (iii) the

imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code; provided,

however, that notwithstanding the foregoing, the diminution claim secured by the Adequate

Protection Liens and the Adequate Protection Priority Claim shall not include the diminution in the

Prepetition Collateral arising from, and to the extent of, the deemed repayments of the Prepetition

Obligations under paragraph 6 of this Order.  The Adequate Protection Liens shall be junior to the

8

Carve-Out, the DIP Liens, and the Permitted Liens (as hereinafter defined) with respect to the collateral encumbered by any Permitted Liens to the extent such Permitted Liens are senior to the liens securing the Prepetition Obligations. As additional adequate protection, the Prepetition Secured Lender shall be entitled to (a) the payment of all fees (including reasonable professional fees and expenses owing under the Prepetition Credit Agreement as of the Petition Date), as and when set forth in the Budget, and (b) the current payment of all such post-petition fees and expenses.

        J.     The consent of the Prepetition Secured Lender to the priming of its liens by the DIP Liens is limited to the DIP Facility presently before the Court, with PrivateBank as the DIP Lender, and shall not extend to any other post-petition financing or to any modified version of such DIP Facility. Furthermore, the consent of the Prepetition Secured Lender to the priming of its liens by the DIP Liens does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Secured Lender that its interests in the Prepetition Collateral are adequately protected pursuant to this Order or otherwise. The Prepetition Secured Lender does not consent to the Debtors' use of the Prepetition Collateral, including the Debtors' use of the Cash Collateral, except on the terms of this Order.

        K.     The security interests and liens granted pursuant to this Order to the DIP Lender are appropriate under section 364(d) of the Bankruptcy Code because, among other things: (i) such security interests and liens do not impair the interests of any holder of a valid, perfected and non-avoidable prepetition security interest in or lien upon the property of the Debtors' estates, or (ii) the holders of such valid, perfected, prepetition security interests and liens have consented to the security interests and priming liens granted pursuant to this Order to the DIP Lender.

        L.     Good cause has been shown for immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2). In particular, the authorization granted herein for Debtors to continue using Cash Collateral and for the Debtors to execute the DIP Credit Documents and obtain interim financing, including on a priming lien basis, is necessary to avoid

9

immediate and irreparable harm to the Debtors and their estates. Entry of this Order is in the best interest of the Debtors, their estates and creditors. The terms of the DIP Credit Documents and the terms of the Debtors' continued use of Cash Collateral pursuant to this Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

M.    The Debtors, the DIP Lender, and the Prepetition Secured Lender have negotiated the terms and conditions of the DIP Credit Documents and this Order (including the Debtors' use of Cash Collateral pursuant hereto) in good faith and at arm's-length, and any credit extended and loans made to the Debtors pursuant to this Order and the DIP Credit Documents shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

N.    Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefore,

### IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is approved on the terms and conditions set forth in this Order. Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on the merits. This Order shall become effective and binding upon all parties in interest immediately upon its entry. To the extent the terms of the DIP Credit Documents differ in any respect from the terms of this Order, this Order shall control.

2.    The Debtors are hereby authorized to execute the DIP Credit Documents, including the DIP Credit Agreement and such additional documents, instruments, and agreements as may be reasonably required by the DIP Lender to implement the terms or effectuate the purposes of this Order.

3.    The Debtors are hereby authorized to use the Cash Collateral and to incur DIP

10

Obligations (as hereinafter defined) solely in accordance with the Budget (as hereinafter defined) and the other terms and conditions set forth in the DIP Credit Agreement and in this Order.

4.      The Debtors are hereby authorized and directed to pay on demand all fees, expenses and other amounts payable under the terms of the DIP Credit Agreement and all out-of-pocket costs and expenses of the DIP Lender in accordance with the terms of the DIP Credit Agreement (including, without limitation, the reasonable fees and disbursements of legal counsel and financial advisors retained by the DIP Lender (including the professional fees incurred by the DIP Lender in connection with the preparation or enforcement of the DIP Credit Agreement and the other DIP Credit Documents)).  No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court.  In addition, the Debtors are hereby authorized and directed to indemnify the DIP Lender against any liability arising in connection with the DIP Credit Documents to the extent set forth in the DIP Credit Documents.  All unpaid fees, expenses and indemnity rights of the DIP Lender shall constitute DIP Obligations (as hereinafter defined) and shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations.

5.      Upon execution and delivery of the DIP Credit Documents, the DIP Credit Documents shall constitute valid and binding obligations of the Debtors and shall be enforceable against the Debtors in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the DIP Credit Documents or this Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.      From and after the entry of this Order, the Debtors shall be deemed to have (a) remitted to the Prepetition Secured Lender for application to and repayment of the Prepetition Revolving Debt, all Cash Collateral in their possession or control or coming into their possession and control and arising from, or constituting proceeds of, the Prepetition Collateral, including,

11

but not limited to, all funds contained in all of their deposit accounts on the Petition Date, and (b) reborrowed a like amount as a DIP Obligation under the DIP Facility. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the foregoing remission and application of Cash Collateral and proceeds of Prepetition Collateral by the Debtors and the Prepetition Secured Lender. Any and all payments and proceeds remitted, or deemed remitted, to the Prepetition Secured Lender pursuant to this paragraph shall be received by the Prepetition Secured Lender free and clear of any claim, charge, assessment or other liability including, without limitation, any such claim or charge arising out of or based on sections 506(c) or 552(b) of the Bankruptcy Code, whether directly or indirectly, all of which are hereby waived by the Debtor. For purposes of this Order, "proceeds" of any collateral shall mean proceeds (as defined in the Illinois Uniform Commercial Code) of such collateral as well as: (x) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to or for the account of the Debtors from time to time with respect to such collateral; and (y) all other payments, dividends, interest or other distributions on or in respect of any such Prepetition Collateral.

7.    All draws made on the DIP Facility (or deemed made pursuant to paragraph 6 hereof), all interest thereon, all contingent reimbursement obligations of the Debtors with respect to the undrawn amounts under the DIP Facility, and all fees, costs, expenses, indemnification obligations and other liabilities owing by the Debtors to the DIP Lender or any other parties under the DIP Credit Documents and this Order shall hereinafter be referred to as the "DIP Obligations." The DIP Obligations shall: (a) be evidenced by the books and records of the DIP Lender; (b) bear interest and be subject to fees payable at the rates and in the amounts set forth in the DIP Credit Agreement; (c) be secured in the manner set forth in paragraphs 13 and 14 below; (d) be payable in accordance with the terms of the DIP Credit Documents; and (e) comply with and otherwise be governed by the terms of this Order and the terms of the DIP

12

Credit Documents.

8.      Subject to the terms and conditions set forth in this Order and in the DIP Credit Documents (including the Budget), the Debtors may use the Cash Collateral to: (a) pay interest, fees and expenses associated with the DIP Facility, as provided in the DIP Credit Documents, (b) make any adequate protection payments required under this Order, and (c) fund its general corporate and working capital requirements (including, without limitation, certain administrative expenses in the Chapter 11 Cases), in each case in accordance with the Budget and the terms of this Order.¶

9.      Attached hereto as Exhibit B is a budget (the "Budget") for the period commencing on the Petition Date and ending on November 1, 2013. The Budget reflects on a line-item basis the Debtors' anticipated cumulative cash receipts and expenditures on a weekly basis and all necessary and required cumulative expenses which the Debtors expect to incur during each week of the Budget. Subject to the variances permitted under section 14.1(d) of the DIP Credit Agreement, the Debtors shall not make any payments or other disbursements other than as set forth in the Budget, without the prior written consent of the DIP Lender and the Prepetition Secured Lender. Failure by the Debtors to comply with the Budget variance provisions set forth in this paragraph 9 and in section 14.1(d) of the DIP Credit Agreement shall constitute an Event of Default under the DIP Credit Agreement and this Order. The Budget shall not be modified without the prior written consent of the DIP Lender and the Prepetition Secured Lender. The Debtors shall comply with all reporting requirements set forth in the DIP Credit Documents and shall provide the DIP Lender with such additional financial reports as the DIP Lender may reasonably request from time to time.

10.     On the earliest to occur of: (a) January 31, 2014; (b) thirty (30) days after entry of this Order if the Final Order, which shall be in form and substance acceptable to the DIP Lender, shall not have been entered on or before such date; (c) the occurrence of the effective date under any plan of reorganization or liquidation for the Debtors; (d) the occurrence of an Event of Default and

13

the acceleration by the DIP Lender of the DIP Obligations; and (e) the closing of a sale or any other disposition by the Debtors of all or substantially all of the Debtors' assets, the Debtors shall be required to repay the DIP Lender in full and in cash all outstanding DIP Obligations.

11.     The Debtors' authority to use Cash Collateral in accordance with this Order and the Budget shall terminate on the earliest to occur (the "Cash Collateral Termination Event") of: (a) January 31, 2014, unless prior to such date the Debtors' use of Cash Collateral has been extended with the consent of the Prepetition Secured Lender; (b) thirty (30) days after entry of this Order if the Final Order, which shall be in form and substance acceptable to the DIP Lender and the Prepetition Secured Lender, shall not have been entered by this Court on or before such date; (c) the occurrence of the effective date under any plan of reorganization or liquidation for the Debtors; (d) the completion of the sale or any other disposition by the Debtors of all or any material portion of the Debtors' assets; and (e) the occurrence and continuation of an Event of Default under this Order or the DIP Credit Agreement and a determination by the Prepetition Secured Lender, by written notice delivered by hand-delivery, overnight mail, facsimile, or email to counsel for the Debtors, to terminate the Debtors' use of Cash Collateral pursuant to the terms of this Order.

12.     The occurrence of any of the events set forth in clauses (a) through (p) below shall constitute an immediate Event of Default under this Order and the DIP Credit Agreement: (a) failure by the Debtors to make any payment due and owing to the DIP Lender or the Prepetition Secured Lender; (b) subject to any applicable grace or cure periods set forth in the DIP Credit Documents, failure by the Debtors to comply with any provision of this Order or the DIP Credit Agreement including, without limitation, the Budget variance provisions set forth in section 14.1(d) of the DIP Credit Agreement and paragraph 9 hereof, and any other affirmative or negative covenants set forth in this Order or the DIP Credit Documents, or any other "Event of Default" shall have occurred and be continuing under and as defined in the DIP Credit Documents; (c) except for actions required by this Order or the DIP Credit Documents, the Debtors shall take any

14

material action in the Chapter 11 Cases that is adverse to the Prepetition Secured Lender or its interests in the Prepetition Collateral; (d) failure by the Debtors to file a motion, in form and substance reasonably satisfactory to the DIP Lender and the Prepetition Secured Lender, for approval of bidding and sale procedures for the sale of all or substantially all of the Debtors' assets (the "Bid Procedures Motion") with the Court by August 12, 2013; (e) failure by the Debtors to obtain an order of this Court, in form and substance satisfactory to the DIP Lender and the Prepetition Secured Lender, approving the Bid Procedures Motion by September 15, 2013; (f) failure by the Debtors to obtain an order of this Court, in form and substance acceptable to the DIP Lender and the Prepetition Secured Lender, approving the sale or other disposition of all or substantially all of the Debtors' assets by October 31, 2013; (g) failure by the Debtors to consummate the sale or other disposition of all or substantially all of the Debtors' assets on or before November 15, 2013; (h) any of the Chapter 11 Cases are dismissed or converted to a chapter 7 case, or a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the Debtors' business is appointed in any of the Chapter 11 Cases; (i) this Court enters an order granting relief from the automatic stay to the holder or holders of any security interest to permit an exercise of remedies with respect to any of the Debtors' assets with a combined fair market value in excess of $100,000 (unless the Prepetition Secured Lender and the DIP Lender have consented to such relief or such relief consists solely of insurance proceeds payable to such creditor); (j) an order is entered reversing, amending, supplementing, staying, vacating or otherwise modifying this Order without the consent of the Prepetition Secured Lender and the DIP Lender; (k) the Debtors create, incur or suffer to exist any post-petition liens or security interests other than: (i) those granted pursuant to this Order, and (ii) any other junior liens or security interests that the Debtors are permitted to create, incur or suffer to exist under the Prepetition Credit Agreement or under the DIP Credit Documents; (l) the filing by the Debtors of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or

15

priority of the liens securing the Prepetition Obligations or asserting any claim or cause of action against and/or with respect to the Prepetition Obligations, the liens securing the Prepetition Obligations, or the Prepetition Secured Lender or any of its affiliates, agents, attorneys, financial advisors, officers, managers, directors or employees (or if the Debtors support any such motion, application or adversary proceeding commenced by any third party); (m) this Court enters an order terminating the Debtors' exclusive period to file a plan of reorganization; (n) the Debtors file, or support the filing by a third party of, any plan of reorganization or liquidation that is not acceptable to the DIP Lender and the Prepetition Secured Lender; (o) any misrepresentation of a material fact made after the Petition Date by the Debtors or any of their agents to the Prepetition Secured Lender about (i) the financial condition of the Debtors, (ii) the nature, extent, location or quality of any Prepetition Collateral, or (iii) the disposition or use of any Prepetition Collateral, including the Cash Collateral; or (p) without the consent of the Prepetition Secured Lender and the DIP Lender, the Debtors file, or support the filing of, a motion seeking the authority for the Debtors to abandon any of the Prepetition Collateral pursuant to section 554 of the Bankruptcy Code or otherwise.

13.     As security for the full and timely payment of the DIP Obligations, the DIP Lender is hereby granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable and fully perfected security interests in and liens and mortgages (collectively, the "DIP Liens") upon all prepetition and post-petition real and personal property of the Debtors (including, without limitation, all right, title and interest in all now-owned and hereafter-acquired accounts, chattel paper, deposit accounts, cash collateral, cash, money, cash equivalents, rights with respect to letters of credit, documents, equipment, motor vehicles, fixtures, general intangibles, instruments, inventory, investment property, commercial tort claims, intellectual property, intercompany advances, leasehold interests and fee simple interests in real property and licenses and easements with respect to real property, and all products, accessions and proceeds with respect to any of the foregoing), whether now existing or hereafter acquired or arising

16

and of any nature whatsoever, including, without limitation, (a) all Prepetition Collateral, (b) all assets

of the Debtors that do not constitute Prepetition Collateral, and (c) upon entry of the Final Order, all

avoidance actions of the Debtors' estates arising under chapter 5 of the Bankruptcy Code (the

"Avoidance Actions") and the proceeds thereof ((a) through (c) collectively, the "DIP Collateral").

   14. The DIP Liens shall be subject and subordinate to the Carve-Out and shall: (a)

pursuant to section 364(c)(2) of the Bankruptcy Code, constitute first-priority security interests in and

liens upon all DIP Collateral that is not otherwise subject to any valid, perfected, enforceable and

non-avoidable lien in existence as of the Petition Date; (b) pursuant to section 364(d)(1) of the

Bankruptcy Code, be senior to and prime (i) those liens on the Prepetition Collateral in favor of the

Prepetition Secured Lender with respect to the Prepetition Obligations, (ii) any and all valid,

perfected, enforceable and non-avoidable liens on the Prepetition Collateral that are junior in

priority to the liens of the Prepetition Secured Lender, and (iii) the Adequate Protection Liens ((i),

(ii) and (iii) above, collectively, the "Primed Liens"); and (c) pursuant to section 364(c)(3) of the

Bankruptcy Code, be immediately junior in priority to any and all valid, properly perfected,

enforceable and non-avoidable liens other than the Primed Liens on assets of the Debtors in existence

as of the Petition Date, but only to the extent such liens are senior in priority to the Primed Liens

(collectively, the "Permitted Liens").

   15. The DIP Liens and the Adequate Protection Liens shall not be subject to

challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by

operation of law as of the Petition Date without any further action by the Debtors, the DIP Lender or

the Prepetition Secured Lender, and without the necessity of execution by the Debtors, or the filing or

recordation, of any financing statements, security agreements, vehicle lien applications, mortgages,

fixture filings, filings with the U.S. Patent and Trademark Office, or other documents. All DIP

Collateral shall be free and clear of other liens, claims and encumbrances, except the Primed Liens,

the Permitted Liens, the Carve-Out, and other permitted liens and encumbrances as provided in the DIP

Credit Documents.  If the DIP Lender hereafter requests that the Debtors execute and deliver to the DIP Lender any financing statements, security agreements, collateral assignments, mortgages, fixture filings, or other instruments and documents considered by the DIP Lender to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, mortgages, fixture filings, collateral assignments, instruments, and documents, and the DIP Lender is hereby authorized to file or record such documents in its discretion, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Order.

16.      In addition to the priming liens and security interests granted to the DIP Lender pursuant to this Order, pursuant to section 364(c)(1) of the Bankruptcy Code, all DIP Obligations shall constitute allowed superpriority administrative expense claims (the "Superpriority Claims") with priority, subject and subordinate to the Carve-Out, over any and all administrative expenses, diminution claims (including all Adequate Protection Obligations), and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726, or any other provisions of the Bankruptcy Code, which Superpriority Claims shall, subject to the Carve-Out, be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, including, upon entry of the Final Order, all Avoidance Actions and the proceeds thereof.

17.      Upon the occurrence and during the continuation of a Cash Collateral Termination Event, to the extent unencumbered funds are not available to pay administrative expenses in full, the DIP Liens, the Superpriority Claims, and the Primed Liens shall be subject to the payment of the Carve-Out.  For purposes of this Order, the "Carve-Out" shall mean, collectively: (a) all statutory fees payable by the Debtors pursuant to 28 U.S.C. 1930(a)(6) and (b) the sum of (i) any unpaid professional fees and expenses specified in the Budget that were incurred but not paid as of the

date of such Cash Collateral Termination Event (provided that such unpaid professional fees and expenses together with all previously-paid professional fees and expenses shall not exceed the aggregate amount of professional fees and expenses set forth in the Budget for the period prior to such Cash Collateral Termination Event) of the professionals retained by the Debtors, and any official committee of unsecured creditors (if one is appointed in the Chapter 11 Cases) that are subsequently allowed by order of this Court, in each case only to the extent not subsequently paid and after application of any retainers, and (ii) any fees and expenses incurred after such Cash Collateral Termination Event by the professionals retained by the Debtors (collectively, the "Professionals") in an aggregate amount not to exceed $100,000. Notwithstanding any other provision of this Order or the DIP Credit Documents, all liens, claims and interests of the DIP Lender and the Prepetition Secured Lender shall be subject and subordinate to the Carve-Out.

18.    No portion of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting any claims or causes of action against the Prepetition Secured Lender or the DIP Lender, or any of their respective affiliates, agents, attorneys, financial advisors, officers, managers, directors or employees, including, without limitation, any action challenging or raising any defenses to the Prepetition Obligations or the DIP Obligations, the liens of the Prepetition Secured Lender or the DIP Lender, or the validity or enforceability of the DIP Credit Documents or the Prepetition Credit Documents; provided, however, that no more than $25,000 of the proceeds of the DIP Collateral may be used by the official committee of unsecured creditors (if one is appointed in the Chapter 11 Cases) to investigate the prepetition liens and claims of the Prepetition Secured Lender.

19.    As adequate protection for the payment of the Adequate Protection Obligations and subject to the Carve-Out, the Prepetition Secured Lender shall be granted the

19

Adequate Protection Liens (as defined in paragraph I above) and the Adequate Protection Priority Claim (as defined in paragraph I above). The Adequate Protection Liens shall be junior in priority to the Carve-Out, the DIP Liens, and the Permitted Liens with respect to the collateral encumbered by any such Permitted Liens to the extent such Permitted Liens were senior to the liens of the Prepetition Secured Lender securing the Prepetition Obligations as of the Petition Date, and senior to any other liens. The Adequate Protection Priority Claim shall be junior in priority to the Carve-Out, and the Superpriority Claims and senior to all other administrative claims. As additional adequate protection, (a) the Prepetition Secured Lenders shall be entitled to the current payment of all post-petition fees and expenses, including the reasonable post-petition fees and expenses of legal counsel and other professionals retained by the Prepetition Secured Lender, as and when due and payable under the Prepetition Credit Agreement; and (b) except for the DIP Facility and the DIP Liens granted to the DIP Lender pursuant to this Order or as otherwise provided in the DIP Credit Documents, the Debtors shall be prohibited from incurring additional indebtedness having priority claims or liens equal to or senior in priority to the Prepetition Obligations or the liens securing such obligations, and (c) the Prepetition Secured Lender shall be entitled to receive all reporting due to the DIP Lender under the DIP Credit Agreement. Without the prior written consent of the DIP Lender and the Prepetition Secured Lender, no portion of the DIP Collateral or the Prepetition Collateral (including any Cash Collateral) shall, except as expressly permitted under the terms of the Budget, be used by the Debtors to satisfy chapter 11 administrative expenses.

20. Nothing herein shall preclude the Prepetition Secured Lender from (a) seeking additional adequate protection from the Debtors at any time, (b) seeking to terminate the Debtors' use of Cash Collateral, or (c) seeking the payment of all interest accruing under the Prepetition Credit Agreement from and after the Petition Date. Furthermore, nothing herein shall be construed as an acknowledgment or stipulation by the Prepetition Secured Lender that its interests in the Prepetition Collateral are adequately protected.

20

21.     Upon entry of the Final Order, in consideration for (a) the Prepetition Secured Lender's consent to the Debtors' use of Cash Collateral in accordance with the Budget, and (b) the Carve-Out, the Debtors shall irrevocably waive and shall not assert any surcharge claim against the DIP Lender or the Prepetition Secured Lender, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender or the Prepetition Secured Lender upon, the DIP Collateral or the Prepetition Collateral. In no event shall the DIP Lender or the Prepetition Secured Lender be subject to the equitable doctrine of marshaling or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral.

22.     In consideration for the loans and other financial accommodations provided by the DIP Lender and the Prepetition Secured Lender pursuant to this Order, the Debtors irrevocably waive the right to (a) seek the authority to use the Cash Collateral without the consent of the Prepetition Secured Lender, (b) propose or support any plan of reorganization or liquidation that is not acceptable to the DIP Lender and the Prepetition Secured Lender, or (c) pursue the sale of any of the Prepetition Collateral pursuant to sections 363 or 365 of the Bankruptcy Code on terms that are not acceptable to the DIP Lender and the Prepetition Secured Lender. The Debtors expressly acknowledge the Prepetition Secured Lender's right to credit bid the Prepetition Obligations, and the DIP Lender's right to credit bid the DIP Obligations, in any sale of all or part of the Prepetition Collateral, whether pursuant to sections 363 or 365 of the Bankruptcy Code or any plan of reorganization or liquidation that may be proposed in the Chapter 11 Cases.

23.     None of the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Priority Claims or the Carve-Out shall be (a) subject or subordinated to, or made *pari passu* with, any lien that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, or (b) subject or subordinated to, or made *pari passu* with, any other lien or security interest, whether under sections 363 or 364 of the Bankruptcy Code or

21

otherwise.  The Adequate Protection Liens granted pursuant to this Order shall constitute valid, enforceable and duly perfected security interests and liens upon entry of this Order and the Prepetition Secured Lender shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens.  Failure by the Debtors to execute any documentation relating to the Adequate Protection Liens shall in no way affect the validity, enforceability, perfection or priority of such Adequate Protection Liens.

24.     The Prepetition Secured Lender shall be entitled to all of the rights and benefits arising under section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall have no application to the Prepetition Collateral.

25.     The provisions of this Order shall be binding upon and inure to the benefit of the DIP Lender, the Prepetition Secured Lender, the Debtors, and their respective successors and assigns.  The provisions of this Order and any actions taken pursuant thereto (a) shall survive the entry of any order: (i) confirming any plan of reorganization in these Chapter 11 Cases; (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (iii) dismissing the Chapter 11 Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens and security interests granted pursuant to this Order shall maintain their priority as provided by this Order until all of the DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full and discharged in accordance with the terms of the DIP Credit Agreement and this Order.

26.     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect (a) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt by the DIP Lender or the Prepetition Secured Lender, as applicable, of written notice of the effective date of

22

such reversal, modification, vacatur or stay, or (b) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Credit Documents with respect to any DIP Obligations or Adequate Protection Obligations.  Notwithstanding any such reversal, modification, vacatur or stay, any use of Cash Collateral or the incurrence of DIP Obligations or Adequate Protection Obligations by the Debtors prior to the actual receipt by the DIP Lender of written notice of the effective date of such reversal, modification, vacatur or stay, shall be governed in all respects by the provisions of this Order, and the DIP Lender and the Prepetition Secured Lender shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Order and the DIP Credit Documents with respect to all uses of Cash Collateral and the incurrence of the DIP Obligations and Adequate Protection Obligations by the Debtors.

27.    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Lender or the Prepetition Secured Lender to exercise, upon the occurrence and during the continuation of any Event of Default (under the DIP Credit Documents or this Order), all rights and remedies provided in the DIP Credit Documents and to take any or all of the following actions without further order of or application to this Court: (a) terminate the Debtors' use of Cash Collateral upon written notice delivered by hand-delivery, overnight mail, facsimile, or email to counsel for the Debtors; (b) immediately declare all DIP Obligations to be due and payable; (c) immediately terminate the lending commitments under the DIP Credit Agreement; and (d) take any other actions or exercise any other rights or remedies permitted under this Order, the DIP Credit Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that the DIP Lender or the Prepetition Secured Lender, as applicable, shall provide three (3) business days' written notice (by hand-delivery, overnight mail, facsimile or email) to counsel to the Debtors, counsel to the official committee of unsecured creditors (if one is appointed in the Chapter 11 Cases), and counsel to the U.S.

23

Trustee prior to exercising any lien enforcement rights or remedies with respect to the DIP Collateral or the Prepetition Collateral. The rights and remedies of the DIP Lender and the Prepetition Secured Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender and the Prepetition Secured Lender may have under the DIP Credit Documents, the Prepetition Credit Documents or otherwise. Upon entry of this Order, neither the Debtors nor any other party shall have the right to contest the enforcement of the remedies set forth in this Order and the DIP Credit Documents on any basis other than an assertion that no Event of Default has occurred, and, except with respect to such an assertion, neither the Debtors nor any other party shall have the right to enjoin any such enforcement under section 105 of the Bankruptcy Code or otherwise, or to seek any injunctive relief inconsistent with the provisions of this Order or the DIP Credit Documents.

28.      The Debtors are hereby authorized, without further order of this Court: (a) to enter into agreements with the DIP Lender providing for any non-material modifications to any DIP Credit Document or the Budget, or for any other modifications to any DIP Credit Document necessary to conform such DIP Credit Document to this Order; and (b) to enter into any material modifications or amendments to any DIP Credit Document; provided, however, that the Debtors shall promptly provide notice of any material modification or amendment of such DIP Credit Document to counsel to the official committee of unsecured creditors (if one is appointed in the Chapter 11 Cases) and counsel to the U.S. Trustee, each of which shall have three (3) business days from the date of such notice within which to object in writing to such modification or amendment. If the official committee of unsecured creditors or the U.S. Trustee timely objects to any material modification or amendment to the applicable DIP Credit Document, such modification or amendment shall only be permitted pursuant to an order of this Court.

29.      The stipulations and admissions contained in this Order, including, without limitation, in recital paragraphs D(l) through D(7) of this Order, shall (a) be binding on the Debtors

24

under all circumstances and (b) be binding upon all other parties in interest unless, and solely to the extent that, (i) no later than the earlier of (A) seventy-five (75) days from the Petition Date and (B) sixty (60) days after the date of appointment of an official committee of unsecured creditors (if one is appointed in the Chapter 11 Cases), a party in interest with requisite standing has timely filed an adversary proceeding or contested matter in this Court (subject to the limitations set forth in paragraph 18 hereof) challenging the amount, validity or enforceability of the Prepetition Obligations, or the perfection or priority of the Prepetition Secured Lender's liens on and security interests in the Prepetition Collateral, or otherwise asserting any Avoidance Actions or any other claims or causes of action on behalf of the Debtors' estates against the Prepetition Secured Lender or any of its affiliates, agents, attorneys, financial advisors, officers, managers, directors or employees under the Bankruptcy Code or non-bankruptcy law, and (ii) the Court enters a final order in favor of the plaintiff in any such timely filed adversary proceeding or contested matter. If no such adversary proceeding or contested matter is timely filed in respect of the Prepetition Obligations, (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, re-characterization, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition Obligations shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding and perfected first-priority liens not subject to defense, counterclaim, re-characterization, subordination or avoidance, and (z) the Prepetition Obligations and the liens on the Prepetition Collateral granted to secure the Prepetition Obligations shall not be subject to any other or further challenge by any party-in-interest, and all such parties-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or trustee appointed or elected for any of the Debtors' estates). If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained herein shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph)

25

on all parties-in-interest, except as to any such findings and admissions that were successfully challenged in such adversary proceeding or contested matter.

30.     In providing the DIP Facility and permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Order, the DIP Credit Documents or the Prepetition Credit Documents, as applicable, neither the DIP Lender nor the Prepetition Secured Lender shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Order shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Secured Lender any liability for any claims arising from the prepetition or post-petition activities of the Debtors or any of their affiliates.

31.     The Final Hearing is scheduled for _____, 2013 at _____ (prevailing Eastern Time) before this Court. The Debtors shall promptly serve a notice of entry of this Order and the Final Hearing, together with a copy of this Order, by first class mail, postage prepaid, upon: (a) counsel to the U.S. Trustee; (b) the twenty (20) largest unsecured creditors of the Debtors; (c) counsel to the DIP Lender; (d) counsel to the Prepetition Secured Lender; (e) all known parties with liens of record on assets of the Debtors as of the Petition Date; (f) all financial institutions at which the Debtors maintain deposit accounts; (g) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; (h) the Internal Revenue Service; and (i) all other parties requesting notice pursuant to Bankruptcy Rule 2002. The notice of the entry of this Order and the Final Hearing shall state that objections to the entry of the Final Order shall be filed with the United States Bankruptcy Court for the District of Delaware, by no later than 4:00 p.m. (prevailing Eastern Time) on _____, 2013 (the

"Objection Deadline"), which objections shall be served so that the same are actually received before the Objection Deadline by (x) counsel to the Debtors, (y) counsel to the DIP Lender and the Prepetition Secured Lender, and (z) counsel to the U.S. Trustee.  Any objections by creditors or other parties-in-interest to any provisions of this Order shall be deemed waived unless timely filed and served in accordance with the foregoing terms.

Dated: _____, 2013

                                              _____
                                              United States Bankruptcy Judge

27

# EXHIBIT A

*Katten Muchin Rosenman LLP*
*Draft Dated August 9, 2013*

---

### POST PETITION LOAN AND SECURITY AGREEMENT

### DATED AS OF AUGUST ___, 2013

### BETWEEN

## THE PRIVATEBANK AND TRUST COMPANY

### THE LENDER,

### AND

### THE SECURITY NETWORK HOLDINGS CORP.,
### IPC INTERNATIONAL CORPORATION

### THE BORROWERS

---



**THE PRIVATEBANK**

# TABLE OF CONTENTS

Page

SECTION 1    DEFINITIONS. .......................................................................................1
    1.1.    Definitions. ...........................................................................................1

SECTION 2    LOANS. ..................................................................................................11
    2.1.    Repayment of Existing Obligations. ....................................................11
    2.2.    Revolving Loans. ..................................................................................11
    2.3.    [Intentionally Omitted.] ........................................................................11
    2.4.    [Intentionally Omitted.] ........................................................................11
    2.5.    Borrowing Procedures. .........................................................................11
    2.6.    Repayments. ..........................................................................................12
    2.7.    Notes. ....................................................................................................12
    2.8.    Recordkeeping. .....................................................................................12

SECTION 3    LETTERS OF CREDIT. ..........................................................................13
    3.1.    General Terms. ......................................................................................13
    3.2.    Letter of Credit Procedures. .................................................................13

SECTION 4    INTEREST, FEES AND CHARGES. ......................................................14
    4.1.    Interest Rate. .........................................................................................14
    4.2.    Fees And Charges. ................................................................................14
    4.3.    Taxes. ....................................................................................................15
    4.4.    Maximum Interest. ...............................................................................15

SECTION 5    COLLATERAL. ......................................................................................15
    5.1.    Grant of Security Interest to Lender. ....................................................15
    5.2.    Other Security. ......................................................................................16
    5.3.    Possessory Collateral. ..........................................................................16
    5.4.    Electronic Chattel Paper. ......................................................................17
    5.5.    Super Priority Nature of Obligations and Lender's Liens. ...................17

SECTION 6    PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY
                INTERESTS THEREIN. ........................................................................17

SECTION 7    POSSESSION OF COLLATERAL AND RELATED MATTERS. ...............18

SECTION 8    COLLECTIONS. .....................................................................................18
    8.1.    Lockbox and Lockbox Account. ..........................................................18
    8.2.    Lender's Rights. ....................................................................................19
    8.3.    Application of Proceeds. .......................................................................19
    8.4.    Account Statements. .............................................................................19

SECTION 9    COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND
                SCHEDULES. .........................................................................................20
    9.1.    Weekly Reports. ...................................................................................20
    9.2.    Monthly Reports. ..................................................................................20

| | | |
|---|---|---|
| 9.3. | Budget Variance Report. | 20 |
| 9.4. | Financial Statements. | 20 |
| 9.5. | Other Information. | 21 |

| | | |
|---|---|---|
| SECTION 10 | TERMINATION. | 21 |

| | | |
|---|---|---|
| SECTION 11 | REPRESENTATIONS AND WARRANTIES. | 21 |
| 11.1. | Financial Statements and Other Factual Information. | 21 |
| 11.2. | Locations. | 22 |
| 11.3. | Loans by Borrower. | 22 |
| 11.4. | Accounts and Inventory. | 22 |
| 11.5. | Liens. | 22 |
| 11.6. | Organization, Authority and No Conflict. | 22 |
| 11.7. | Litigation. | 23 |
| 11.8. | Compliance with Laws and Maintenance of Permits. | 23 |
| 11.9. | Affiliate Transactions. | 23 |
| 11.10. | Names and Trade Names. | 23 |
| 11.11. | Equipment. | 23 |
| 11.12. | Enforceability. | 24 |
| 11.13. | Solvency. | 24 |
| 11.14. | Indebtedness. | 24 |
| 11.15. | Margin Security and Use of Proceeds. | 24 |
| 11.16. | Subsidiaries and Affiliates. | 24 |
| 11.17. | No Defaults. | 24 |
| 11.18. | Employee Matters. | 24 |
| 11.19. | Intellectual Property. | 25 |
| 11.20. | Environmental Matters. | 25 |
| 11.21. | ERISA Matters. | 25 |
| 11.22. | Investment Company Act. | 25 |
| 11.23. | Anti-Terrorism Laws. | 25 |
| 11.24. | Reorganization Matters. | 26 |

| | | |
|---|---|---|
| SECTION 12 | AFFIRMATIVE COVENANTS. | 26 |
| 12.1. | Maintenance of Records. | 27 |
| 12.2. | Notices. | 27 |
| 12.3. | Compliance with Laws and Maintenance of Permits. | 28 |
| 12.4. | Inspection and Audits. | 28 |
| 12.5. | Insurance. | 29 |
| 12.6. | Collateral. | 30 |
| 12.7. | Use of Proceeds. | 30 |
| 12.8. | Taxes. | 30 |
| 12.9. | Intellectual Property. | 30 |
| 12.10. | Checking Accounts and Cash Management Services. | 31 |
| 12.11. | USA Patriot Act, Bank Secrecy Act and Office of Foreign Asset Control. | 31 |

| | | |
|---|---|---|
| SECTION 13 | NEGATIVE COVENANTS. | 31 |
| 13.1. | Guaranties. | 31 |
| 13.2. | Indebtedness. | 31 |
| 13.3. | Liens. | 31 |

|  | 13.4. | Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary Course of Business. | 32 |
|  | 13.5. | Dividends and Distributions. | 32 |
|  | 13.6. | Investments; Loans. | 32 |
|  | 13.7. | Fundamental Changes, Line of Business | 32 |
|  | 13.8. | Equipment. | 32 |
|  | 13.9. | Affiliate Transactions. | 33 |
|  | 13.10. | Settling of Accounts. | 33 |
|  | 13.11. | Application to the Bankruptcy Court. | 33 |
|  | 13.12. | Modifications to Orders. | 33 |
| SECTION 14 |  | FINANCIAL COVENANTS. | 33 |
|  | 14.1. | Compliance with DIP Budget. | 33 |
| SECTION 15 |  | DEFAULT. | 34 |
|  | 15.1. | Payment. | 34 |
|  | 15.2. | Breach of this Agreement and the other Loan Documents. | 34 |
|  | 15.3. | Breaches of Other Obligations. | 34 |
|  | 15.4. | Breach of Representations and Warranties. | 34 |
|  | 15.5. | Loss of Collateral. | 34 |
|  | 15.6. | Levy, Seizure or Attachment. | 34 |
|  | 15.7. | Bankruptcy Defaults. | 35 |
|  | 15.8. | Criminal Proceedings. | 36 |
|  | 15.9. | Change of Control. | 36 |
| SECTION 16 |  | REMEDIES UPON AN EVENT OF DEFAULT. | 36 |
|  | 16.1. | Acceleration. | 36 |
|  | 16.2. | Other Remedies. | 36 |
| SECTION 17 |  | CONDITIONS PRECEDENT. | 37 |
|  | 17.1. | Conditions to Initial Loans. | 37 |
|  | 17.2. | Conditions to All Loans. | 37 |
| SECTION 18 |  | MISCELLANEOUS. | 38 |
|  | 18.1. | Assignments; Participations. | 38 |
|  | 18.2. | Customer Identification - USA Patriot Act Notice. | 39 |
|  | 18.3. | Indemnification by Borrowers: | 39 |
|  | 18.4. | Notice. | 40 |
|  | 18.5. | Modification and Benefit of Agreement. | 40 |
|  | 18.6. | Headings of Subdivisions. | 40 |
|  | 18.7. | Power of Attorney. | 40 |
|  | 18.8. | Confidentiality. | 40 |
|  | 18.9. | Counterparts. | 41 |
|  | 18.10. | Electronic Submissions. | 41 |
|  | 18.11. | Waiver of Jury Trial: Other Waivers. | 41 |
|  | 18.12. | Choice of Governing Laws; Construction; Forum Selection. | 42 |
| SECTION 19 |  | NONLIABILITY OF LENDER. | 43 |

-iii-

SECTION 20    BORROWER REPRESENTATIVE ............................................................................43

SECTION 21    JOINT AND SEVERAL LIABILITY .......................................................................44

EXHIBIT A – COMPLIANCE CERTIFICATE

EXHIBIT B – NOTICE OF BORROWING

EXHIBIT C – COMMERCIAL TORT CLAIMS

EXHIBIT D – FORM OF REVOLVING NOTE

SCHEDULE 1 – PERMITTED LIENS

SCHEDULE 11.2 – LOCATIONS

SCHEDULE 11.6 – STATE OF ORGANIZATION

SCHEDULE 11.7 – PENDING LITIGATION

SCHEDULE 11.9 – AFFILIATE TRANSACTIONS

SCHEDULE 11.10 – TRADE NAMES

SCHEDULE 11.14 – OTHER INDEBTEDNESS

SCHEDULE 11.16 – SUBSIDIARIES AND AFFILIATES

SCHEDULE 17.1 – CLOSING DOCUMENT CHECKLIST

61086372_3

## POST PETITION LOAN AND SECURITY AGREEMENT

THIS POST PETITION LOAN AND SECURITY AGREEMENT (as amended, modified or supplemented from time to time, this "**Agreement**") made this ____ day of August, 2013 by and between THE PRIVATEBANK AND TRUST COMPANY ("**Lender**"), 120 South LaSalle Street, Suite 200, Chicago, Illinois 60603, and THE SECURITY NETWORK HOLDINGS CORP., a Delaware corporation ("**SNHC**"), and IPC INTERNATIONAL CORPORATION, an Illinois corporation ("**IPC**", and together with SNHC, each a "**Borrower**" and collectively, the "**Borrowers**").

## W I T N E S S E T H:

WHEREAS, Borrowers, IPC International Realty Company, LLC ("**Realty**"), IPC Technologies, Inc. ("**IPCT**"), Uniformity, Inc. ("**Uniformity**"), and The Privatebank and Trust Company, as administrative agent for the Lenders and as a Lender are parties to a Credit Agreement dated as of August 31, 2009 (as amended and supplemented from time to time, the "**Existing Credit Agreement**");

WHEREAS, pursuant to the Existing Credit Agreement, Lender has made revolving loans to Borrowers, Realty, IPCT and Uniformity in the outstanding principal amount of $7,055,749.80 ("**Existing Revolving Loans**"), a term loan in the outstanding principal amount of $4,373,333.28 ("**Existing Mortgage Term Loan**"), a term loan in the outstanding principal amount $7,017,836.54 ("**Existing ESOP Term Loan**"), and has issued letters of credit in an outstanding face amount of $2,381,865.00 ("**Existing Letters of Credit**", together with the Existing Revolving Loans, Existing Mortgage Loan, Existing ESOP Term Loan, Existing Letters of Credit and all accrued and unpaid interest, fees and expenses, collectively referred to as the "**Existing Obligations**");

WHEREAS, Borrowers have requested that Lender make available to Borrowers a revolving credit facility (the "**Revolving Facility**") in a maximum principal amount at any time outstanding of up to Twelve Million Dollars ($12,000,000), the proceeds of which shall be used by Borrowers exclusively for the following purposes: (a) to repay the Existing Revolving Loans; (b) for the generation of receivables and other lawful purposes as permitted under this Agreement and in accordance with the DIP Budget (which may include certain prepetition expenses approved by the Bankruptcy Court provided that the incurrence or payment thereof is not otherwise violative of this Agreement, the Orders, any other order of the Bankruptcy Court or applicable law); (c) to pay fees required to be paid to the Office of the United States Trustee; and (d) to pay any of the Obligations or the Existing Obligations.

NOW, THEREFORE, in consideration of any Loan (including any Loan by renewal or extension) hereafter made to Borrowers by Lender, or any Letter of Credit issued for the account of Borrowers, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Borrowers, the parties agree as follows:

SECTION 1    DEFINITIONS.

1.1.    Definitions.

When used herein the following terms shall have the following meanings:

"**Account**" shall have the meaning ascribed to such term in the UCC.

"**Account Debtor**" shall have the meaning ascribed to such term in the UCC.

"**Affiliate**" of any Person shall mean (i) any other Person which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, such Person, (ii) any other Person which beneficially owns or holds five percent (5%) or more of the voting control or equity interests of such Person, (iii) any other Person of which five percent (5%) or more of the voting control or equity interest of which is beneficially owned or held by such Person, or (iv) any officer or director of such Person.  Unless expressly stated otherwise herein, Lender shall not be deemed an Affiliate of any Loan Party.

"**Avoidance Actions**" shall mean causes of action under Section 5 of the Bankruptcy Code.

"**Bank Product Agreements**" shall mean those certain agreements pursuant to which Lender or its Affiliates provide any of the Bank Products to any Loan Party.

"**Bank Product Obligations**" shall mean all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by the Loan Parties to Lender or its Affiliates pursuant to or evidenced by the Bank Product Agreements and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that a Loan Party is obligated to reimburse to Lender as a result of Lender purchasing participations or executing indemnities or reimbursement obligations with respect to the Bank Products provided to the Loan Parties pursuant to the Bank Product Agreements.

"**Bank Products**" shall mean any service provided to, facility extended to, or transaction entered into with, any Loan Party by Lender or its Affiliates, including, without limitation, (a) deposit accounts, (b) cash management services, including, without limitation, controlled disbursement, lockbox, electronic funds transfers (including, without limitation, book transfers, fedwire transfers, ACH transfers), online reporting and other services relating to accounts maintained with Lender or its Affiliates, and (c) debit cards and credit cards.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code (11 U.S.C. §§ 101 et.seq.), as amended from time to time, and any successor statute.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Chapter 11 cases.

"**Base Rate**" shall mean at any time the greater of (a) the Federal Funds Rate plus 0.5%, and (b) the Prime Rate.

"**Bid Procedures Motion**" shall mean a motion, in form and substance reasonably satisfactory to the Lender, for approval of bidding and sale procedures for the sale of all or substantially all of the Loan Parties' assets.

"**Borrower Representative**" shall mean IPC International Corporation.

"**Budget Variance Report**" means a report separated into line items for each category of receipt or disbursement, in each case, certified by an officer of the Borrowers, in form satisfactory to Lender in its reasonable discretion, to be delivered on a weekly basis and showing comparisons of the

actual results for the immediately prior week against the DIP Budget. For the avoidance of doubt, nothing herein shall affect, impair or in any way modify the Borrowers' obligations under Section 14.1.

"**BSA**" shall have the meaning set forth in Section 12.11.

"**Business Day**" shall mean any day on which Lender is open for commercial banking business in Chicago, Illinois.

"**Capital Expenditures**" shall mean with respect to any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including expenditures for capitalized lease obligations) by Borrowers and their Subsidiaries during such period that are required by generally accepted accounting principles, consistently applied, to be included in or reflected by the property, plant and equipment or similar fixed asset accounts (or intangible accounts subject to amortization) on the balance sheet of Borrowers and their Subsidiaries.

"**Carve-Out**" shall have the meaning provided therefor in the Orders.

"**Cash Collateralize**" means to deliver cash collateral to Lender, to be held as cash collateral for outstanding Letters of Credit, pursuant to documentation reasonably satisfactory to Lender. Derivatives of such term have corresponding meanings.

"**Chapter 11 Cases**" shall mean each of the voluntary cases commenced under Chapter 11 of the Bankruptcy Code by the Borrowers on the Petition Date.

"**Chattel Paper**" shall have the meaning ascribed to such term in the UCC.

"**Closing Date**" shall have the meaning set forth in Section 17.1.

"**Collateral**" shall mean all of the property of Borrowers described in Section 5.1 hereof, together with all other real or personal property of any Loan Party or any other Person now or hereafter pledged to Lender to secure, either directly or indirectly, repayment of any of the Obligations.

"**Commercial Tort Claims**" shall have the meaning ascribed to such term in the UCC.

"**Committee**" shall mean the official committee of unsecured creditors in the Chapter 11 Cases.

"**Deposit Accounts**" shall have the meaning ascribed to such term in the UCC.

"**Dilution**" shall mean, with respect to any period, the percentage obtained by dividing (i) the sum of non-cash credits against Accounts (including, but not limited to returns, adjustments and rebates) of Borrowers for such period, plus pending or probable, but not yet applied, non-cash credits against Accounts of Borrowers for such period, as determined by Lender in its Permitted Discretion by (ii) gross invoiced sales of Borrowers for such period.

"**DIP Budget**" means a budget, acceptable to the Lender in its sole discretion (subject to the last sentence of this definition), as amended, supplemented or otherwise modified from time to time with Lender's prior written consent in Lender's sole discretion containing line items of sufficient detail to reflect all anticipated receipts and disbursements of the Borrowers on a calendar weekly basis from the Petition Date through and including November 1, 2013. The DIP Budget, which has been approved by and is acceptable to the Lender on the date of this Agreement, is attached hereto as Exhibit I.

"**Documents**" shall have the meaning ascribed to such term in the UCC.

"**Electronic Chattel Paper**" shall have the meaning ascribed to such term in the UCC.

"**Eligible Account**" shall mean an Account owing to IPC which is acceptable to Lender in its Permitted Discretion for lending purposes. Without limiting Lender's discretion, Lender shall, in general, consider an Account to be an Eligible Account if it meets, and so long as it continues to meet, the following requirements:

(i)     it is genuine and in all respects what it purports to be;

(ii)    it is owned by IPC and IPC has the right to subject it to a security interest in favor of Lender or assign it to Lender and, subject to the entry of the Orders, the priorities set forth in the Interim Order or the Final Order, as applicable, and the Carve-Out, it is subject to a first priority perfected security interest in favor of Lender and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Liens;

(iii)   it arises from (A) the performance of services by IPC in the ordinary course of its business, and such services have been fully performed; or (B) the sale or lease of Goods by IPC in the ordinary course of its business, and (x) such Goods have been completed in accordance with the specifications (if any) agreed to by IPC with the Account Debtor and delivered to the Account Debtor, (y) such Account Debtor has not refused to accept, returned (prior to the expiration of the underlying lease, with respect to leased Goods) or offered to return (prior to the expiration of the underlying lease, with respect to leased Goods), any of the Goods which are the subject of such Account; and (z) IPC has possession of, or has delivered to Lender (at Lender's request) shipping and delivery receipts evidencing delivery of such Goods;

(iv)    it is evidenced by an invoice rendered to the Account Debtor thereunder, is due and payable within thirty (30) days after the date of the invoice and does not remain unpaid ninety (90) days past the invoice date thereof; provided, however, that if and for so long as more than twenty five percent (25%) of the aggregate dollar amount of invoices owing by a particular Account Debtor remain unpaid ninety (90) days after the respective invoice dates thereof then all Accounts owing by that Account Debtor shall be deemed ineligible;

(v)     it is a valid, legally enforceable and unconditional obligation of the Account Debtor thereunder, and it shall not be an Eligible Account to the extent of any setoff, counterclaim, credit, allowance or adjustment by such Account Debtor, or if it is subject to any claim by such Account Debtor denying liability thereunder in whole or in part;

(vi)    it does not arise out of a contract or order which fails in any material respect to comply with the requirements of applicable law;

(vii)   the Account Debtor thereunder is not a director, officer, employee or agent of Borrower, or a Subsidiary, Parent or Affiliate of a Borrower;

(viii)  it is not an Account with respect to which the Account Debtor is the United States of America or any state or local government, or any department, agency or instrumentality thereof, unless IPC assigns its right to payment of such Account to Lender pursuant to, and in full compliance with, the Assignment of Claims Act of 1940, as amended, or any comparable state or local law, as applicable;

-4-

(ix)    it is not an Account with respect to which the Account Debtor is located in a state which requires the Borrower to whom such Account is due, as a precondition to commencing or maintaining an action in the courts of that state, either to (A) receive a certificate of authority to do business and be in good standing in such state; or (B) file a notice of business activities report or similar report with such state's taxing authority, unless (x) such Borrower has taken one of the actions described in clauses (A) or (B); (y) the failure to take one of the actions described in either clause (A) or (B) may be cured retroactively by such Borrower at its election; or (z) such Borrower has proven, to Lender's reasonable satisfaction, that it is exempt from any such requirements under any such state's laws;

(x)    the Account Debtor is located within the United States of America or Canada;

(xi)    it is not an Account with respect to which the Account Debtor's obligation to pay is subject to any repurchase obligation or return right, as with sales made on a bill-and-hold, guaranteed sale, sale on approval, sale or return or consignment basis;

(xii)    it is not an Account (A) with respect to which any representation or warranty contained in Section 11.4 of this Agreement is untrue; or (B) which violates any of the covenants of Borrowers contained in this Agreement; and

(xiii)    it is not an Account with respect to which the prospect of payment or performance by the Account Debtor is or will be impaired, as determined by Lender in its Permitted Discretion.

"**Eligible Unbilled Accounts**" shall mean Accounts which otherwise satisfy the criteria for Eligible Accounts except that such Accounts have not been billed and invoiced to the Account Debtor.

"**Environmental Laws**" shall mean all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental matters, as now or at any time hereafter in effect, applicable to any Borrower's business or facilities owned or operated by any Borrower, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes into the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

"**Equipment**" shall have the meaning ascribed to such term in the UCC.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, modified or restated from time to time.

"**Event of Default**" shall have the meaning specified in <u>Section 15</u> hereof.

"**Excluded Taxes**" shall mean taxes based upon, or measured by, Lender's (or a branch of Lender's) overall net income, overall net receipts, or overall net profits (including franchise taxes imposed in lieu of such taxes), but only to the extent such taxes are imposed by a taxing authority (a) in a jurisdiction in which Lender is organized, (b) in a jurisdiction which Lender's principal office is located,

-5-

or (c) in a jurisdiction in which Lender's lending office (or branch) in respect of which payments under this Agreement are made is located.

"**Federal Funds Rate**" shall mean for any day, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Lender from three Federal funds brokers of recognized standing selected by Lender. Lender's determination of such rate shall be binding and conclusive absent manifest error.

"**Final Order**" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to Lender, in its sole discretion, and from which no appeal or motion to reconsider has been timely filed and such order is not in any respect subject to a stay pending appeal (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Lender and Borrowers, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain credit, incur (or guaranty) indebtedness, and grant liens under this Agreement and the other Loan Documents, as the case may be, and provides for the permanent super priority of the Lender's claims contemplated by this Agreement.

"**Fiscal Year**" shall mean each twelve (12) month accounting period of Borrowers, which ends on December 31 of each year.

"**Fixtures**" shall have the meaning ascribed to such term in the UCC.

"**FRB**" shall mean the Board of Governors of the Federal Reserve System or any successor thereto.

"**GAAP**" shall mean generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" shall have the meaning ascribed to such term in the UCC.

"**Goods**" shall have the meaning ascribed to such term in the UCC.

"**Hazardous Materials**" shall mean any hazardous, toxic or dangerous substance, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including, without limitation any that are or become classified as hazardous or toxic under any Environmental Law).

"**indebtedness for borrowed money**" shall mean indebtedness of any Borrower incurred in connection with any loan or borrowing of money from any Person (other than Lender).

"**Instruments**" shall have the meaning ascribed to such term in the UCC.

"**Interim Order**" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing under Bankruptcy Rule 4001(c) or such other procedure as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to Lender, and all extensions, modifications and amendments in its sole discretion, thereto, in form and substance satisfactory to Lender and Borrower, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain Credit, incur (or guaranty) indebtedness, and grant liens under this Agreement and the other Loan Documents, as the case may be, and provides for interim super priority of the Lender's claims contemplated by this Agreement.

"**Inventory**" shall have the meaning ascribed to such term in the UCC.

"**Investment Property**" shall have the meaning ascribed to such term in the UCC.

"**L/C Application**" shall mean with respect to any request for the issuance of a Letter of Credit, a letter of credit application in the form being used by the L/C Issuer at the time of such request for the type of Letter of Credit requested.

"**L/C Issuer**" shall mean Lender, in its capacity as the issuer of Letters of Credit hereunder, any Affiliate of Lender that may issue Letters of Credit hereunder, and each of their successors and assigns.

"**Lender Party**" shall have the meaning set forth in Section 18.3 hereof.

"**Letter of Credit**" shall mean any Letter of Credit issued on behalf of a Borrower in accordance with this Agreement.

"**Letter of Credit Obligations**" shall mean, as of any date of determination, the sum of (i) the aggregate undrawn face amount of all Letters of Credit, and (ii) the aggregate unreimbursed amount of all drawn Letters of Credit not already converted to Loans hereunder.

"**Letter-of-Credit Right**" shall have the meaning ascribed to such term in the UCC.

"**Loan Documents**" shall mean all agreements, instruments and documents, including, without limitation, guaranties, mortgages, trust deeds, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements, Bank Product Agreements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of any Loan Party and delivered to Lender or to any parent, Affiliate or Subsidiary of Lender in connection with the Obligations or the transactions contemplated hereby, as each of the same may be amended, modified or supplemented from time to time.

"**Loan Party**" shall mean each Borrower and each other Person who is or shall become primarily or secondarily liable for any of the Obligations in compliance with the Loan Documents.

"**Loans**" shall mean the Revolving Loans and all other loans and advances made by Lender to or on behalf of a Borrower hereunder.

-7-

""**Lockbox**" and **Lockbox Account**" shall have the meanings specified Section 8.1 hereof.

"**Master Letter of Credit Agreement**" shall mean the Master Letter of Credit dated as of August 25, 2009 between IPC and Lender.

"**Material Adverse Effect**" shall mean (i) a material adverse change in, or a material adverse effect on the business, property, assets, operations or prospects of the Loan Parties, taken as a whole (except for or as a result of the commencement of the Chapter 11 Cases and events that typically result from the commencement of cases under Chapter 11 of the Bankruptcy Code as determined by Lender in its Permitted Discretion), (ii) a material impairment of the ability of any Loan Party to perform any of its obligations under the this Agreement and the other Loan Documents as determined by Lender in its Permitted Discretion, (iii) a material adverse effect upon the Collateral or its value as determined by Lender in its Permitted Discretion, or (iv) a material impairment of the enforceability or priority of Lender's liens upon the Collateral or the legality, validity, binding effect or enforceability of this Agreement and the other Loan Documents as determined by Lender in its Permitted Discretion.

"**Maturity Date**" shall mean January 31, 2014.

"**Maturity Event**" shall mean the earliest of (i) the Maturity Date, (ii) the occurrence of an Event of Default and the acceleration by Lender of the Obligations and exercise its rights and remedies after notice to Borrowers and the Committee, (iii) the date of substantial consummation (as defined in Section 1102(b) of the Bankruptcy Code) of the Borrowers' Reorganization Plan; (iv) the last termination date set forth in the Final Order; and (v) the closing of a sale for all or substantially all of the Borrowers' assets.

"**Net Cash Proceeds**" means with respect to any Permitted Disposition, the aggregate cash proceeds (including cash proceeds received pursuant to policies of insurance and by way of deferred payment of principal pursuant to a note, installment receivable or otherwise), received by any Borrower in connection with a Permitted Disposition net of (i) the reasonable direct costs relating to such Permitted Disposition, (ii) any portion of such proceeds deposited in an escrow account pursuant to the documentation relating to so Permitted Disposition (provided that such amounts shall be treated as Net Cash Proceeds upon their release from such escrow account to the applicable Borrower), (iii) taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), and (iv) amounts required to be applied to the repayment of indebtedness secured by a lien that has priority over the lien of Agent on the asset subject to such Permitted Disposition.

"**Notice of Borrowing**" shall have the meaning set forth in Section 2.6.2.

"**Obligations**" shall mean any and all obligations, liabilities and indebtedness of each Loan Party to Lender or to any Affiliate of Lender of any and every kind and nature, howsoever created, arising or evidenced and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, whether primary, secondary, direct, indirect, absolute, contingent or otherwise, in each case arising under this Agreement or any other Loan Documents (including, without limitation, obligations of performance and Bank Product Obligations), whether several, joint or joint and several, and whether arising or existing under written or oral agreement or by operation of law.

"**OFAC**" shall have the meaning set forth in Section 12.11 hereof.

"**Orders**" shall mean the Interim Order and, upon entry thereof, the Final Order.

-8-

"**Parent**" shall mean, with respect to any Person, the direct parent company of such Person.

"**PBGC**" shall have the meaning specified in Section 12.2.5 hereof.

"**Permitted Discretion**" means a determination in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"**Permitted Dispositions**" shall mean (i) sales, leases or other dispositions of Inventory in the ordinary course of business, (ii) the use or transfer of money or cash equivalents in a manner that is not prohibited by the terms of any Loan Document, (iii) the granting of Permitted Liens and the making of investments permitted by Section 13.6, (iv) any involuntary loss, damage or destruction of property, (v) the lapse of registered patents, trademarks and other intellectual property of any Borrower or any other Loan Party to the extent economically desirable in the conduct of their business and so long as such lapse is not adverse to the interests of the Lender in any material respect, and (vi) the disposition of obsolete, worn-out or unuseful Equipment.

"**Permitted Liens**" shall mean (i) statutory liens of landlords, carriers, warehousemen, processors, mechanics, materialmen or suppliers incurred in the ordinary course of business and securing amounts not yet due or declared to be due by the claimant thereunder or amounts which are being contested in good faith and by appropriate proceedings and for which Borrowers have maintained adequate reserves; (ii) liens or security interests in favor of Lender; (iii) liens for taxes, assessments and governmental charges not yet due and payable or which are being contested in good faith and by appropriate proceedings and Borrowers are in compliance with Section 12.8 hereof; (iv) zoning restrictions and easements, licenses, covenants and other restrictions affecting the use of real property that do not individually or in the aggregate have a material adverse effect on Borrowers' ability to use such real property for its intended purpose in connection with Borrowers' business; (v) liens in connection with purchase money indebtedness and capitalized leases otherwise permitted pursuant to this Agreement, provided, that such liens attach only to the assets the purchase of which was financed by such purchase money indebtedness or which are the subject of such capitalized leases; (vi) liens set forth on Schedule 1; (vii) liens specifically permitted by Lender in writing; (viii) involuntary liens securing amounts less than $25,000 and which are released or for which a bond acceptable to Lender in its sole discretion, determined in good faith, has been posted within fifteen (15) days of its creation, and (ix) liens granted or authorized by the Orders, including the Primed Liens, the Adequate Protection Liens and the Permitted Liens (each as defined in the Interim Order or the Final Order, as applicable).

"**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or foreign or United States government (whether federal, state, county, city, municipal or otherwise), including, without limitation, any instrumentality, division, agency, body or department thereof.

"**Petition Date**" shall mean August ____, 2013.

"**Plan**" shall have the meaning specified in Section 12.2.5 hereof.

"**Prime Rate**" shall mean, for any day, the rate of interest in effect for such day as publicly announced from time to time by Lender as its prime rate (whether or not such rate is actually charged by Lender), which is not intended to be Lender's lowest or most favorable rate of interest at any one time. Any change in the Prime Rate announced by Lender shall take effect at the opening of business

-9-

on the day specified in the public announcement of such change; provided that Lender shall not be obligated to give notice of any change in the Prime Rate.

"**Proceeds**" shall have the meaning ascribed to such term in the UCC.

"**Reorganization Plan**" shall mean a joint plan of reorganization in respect of the Loan Parties in the Chapter 11 Cases that provides, among other things, that the order of the Bankruptcy Court confirming such plan of reorganization shall not discharge any of the Obligations of the Loan Parties to Lender under this Agreement and the other Loan Documents other than after payment in full of such Obligations, other than contingent indemnification and reimbursement Obligations for which no claim has been asserted, Obligations which by their terms survive the termination of this Agreement and Obligations in respect of Letters of Credit that have been Cash Collateralized (unless otherwise consented to in advance in writing by Lender), and in no event shall indemnities in favor of the Lender, which by its terms survive the termination of this Agreement and the other Loan Documents, be affected by the repayment of the Obligations.

"**Revolving Loan Availability**" shall mean an amount up to the sum of the following sublimits: (i) eighty five percent (85%) of the face amount (less, without duplication of any such amounts resulting in a reduction in IPC's Eligible Accounts, maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of IPC's business) of IPC's Eligible Accounts; provided that such advance rate shall be reduced by one (1) percentage point for each whole or partial percentage point by which Dilution (as determined by Lender in good faith based on the results of the most recent twelve (12) consecutive month period for which Lender has conducted a field audit of Borrowers) exceeds five percent (5%); plus (ii) eighty percent (80%) of the face amount (less, without duplication of any such amounts resulting in a reduction in IPC's Eligible Unbilled Accounts, the maximum discounts, credits, and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of IPC's business) of IPC's Eligible Unbilled Accounts due from Account Debtors billed monthly, or two million five hundred thousand dollars ($2,500,000), whichever is less; plus (iii) eighty five percent (85%) of the face amount (less, without duplication of any such amounts resulting in a reduction in IPC's Eligible Accounts, maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of IPC's business) of IPC's Eligible Unbilled Accounts due from Account Debtors billed weekly, or two million dollars ($2,000,000), whichever is less; plus (iv) the cash value of any pre-paid insurance up to an amount not to exceed one million dollars ($1,000,000), plus (v) $2,000,000; minus (vi) such reserves as Lender elects, in its Permitted Discretion to establish from time to time, including, without limitation, reserves with respect to outstanding Bank Products Obligations.

"**Revolving Loan Commitment**" shall mean an amount equal to Twelve Million and No/100 Dollars ($12,000,000).

"**Revolving Loans**" shall have the meaning specified in Section 2.1 hereof.

"**Subsidiary**" shall mean with respect to any Person, a corporation of which such Person owns, directly or indirectly, more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time stock of any other class of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned by a Borrower, or any partnership, joint venture or limited liability company of which more than fifty percent (50%) of the outstanding equity interests are at the time, directly or indirectly, owned by such Person or any

-10-

partnership of which such Person is a general partner. Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to Subsidiaries of Borrowers.

"**Supporting Obligations**" shall have the meaning set forth in the UCC.

"**Tangible Chattel Paper**" shall have the meaning ascribed to such term in the UCC.

"**Taxes**" shall mean any and all present and future taxes, duties, levies, imposts, deductions, assessments, charges or withholdings and any and all liabilities (including interest and penalties and other additions to taxes) with respect to the foregoing, but excluding the Excluded Taxes.

"**UCC**" shall mean the Uniform Commercial Code as in effect in the State of Illinois.

"**USA Patriot Act**" shall have the meaning set forth in Section 18.2 hereof.

SECTION 2        LOANS.

2.1.    Repayment of Existing Obligations.

Upon the Closing Date, Borrowers shall repay the Existing Revolving Loans with the proceeds of the Loans and the Existing Letters of Credit shall be deemed to be Letters of Credit issued under this Agreement.

2.2.    Revolving Loans.

Subject to the terms and conditions of this Agreement and the other Loan Documents, prior to the Maturity Date, Lender shall make revolving loans and advances (the "**Revolving Loans**") in an aggregate amount up to the lesser of Revolving Loan Availability at such time and the Revolving Loan Commitment.

The aggregate unpaid principal balance of the Revolving Loans shall not at any time exceed the lesser of (i) Revolving Loan Availability minus the Letter of Credit Obligations and (ii) the Revolving Loan Commitment minus the Letter of Credit Obligations. If at any time the outstanding Revolving Loans exceeds either Revolving Loan Availability or the Revolving Loan Commitment, in each case minus the Letter of Credit Obligations, or any portion of the Revolving Loans and Letter of Credit Obligations exceeds any applicable sublimit within Revolving Loan Availability, Borrowers shall immediately, and without the necessity of demand by Lender, pay to Lender such amount as may be necessary to eliminate such excess and Lender shall apply such payment to the Revolving Loans to eliminate such excess.

2.3.    [Intentionally Omitted.]

2.4.    [Intentionally Omitted.]

2.5.    Borrowing Procedures.

(a)    Borrower Representative shall give written notice (each such written notice, a "Notice of Borrowing") substantially in the form of Exhibit B or telephonic notice (followed immediately by a Notice of Borrowing) to Lender of each proposed borrowing not later than 11:00 A.M., Chicago time, on the proposed date of such borrowing. Each such notice shall be effective upon receipt by Lender, shall be

-11-

irrevocable, and shall specify the date and amount of such borrowing. Each borrowing shall be on a Business Day.

(b)      Borrowers hereby authorize Lender in its sole discretion, to advance Revolving Loans to pay any Obligations (whether principal, interest, fees or other charges when due), and any such Obligations becoming due, if not paid by or on behalf of Borrowers on or prior to the due date thereof (after giving effect to any applicable grace periods), shall be deemed a request for a borrowing of a Revolving Loan on the due date, in the amount of such Obligations. The proceeds of such Revolving Loans shall be disbursed as direct payment of the relevant Obligation. In addition, Lender may, at its option, charge such Obligations against any operating, investment or other account of any Borrower constituting Collateral and maintained with Lender or any of its Affiliates and shall provide prompt written notice thereof to the Borrower Representative; provided that the failure to give such notice shall not affect or limit such charging of Obligations.

2.6.    Repayments.

The Obligations shall be repaid as follows:

2.6.1.    Repayment of Loans. The Loans and all other Obligations shall be repaid on a Maturity Event. Borrowers may repay the Loans in whole or in part at any time without premium or penalty.

2.6.2.    Mandatory Prepayments of the Loans.

(a)      Sales of Assets. Promptly following receipt of the Net Cash Proceeds of the sale or other disposition of any assets of any Borrower or if any of the Inventory, Equipment or real property of any Borrower is damaged, destroyed or taken by condemnation in whole or in part, the Net Cash Proceeds thereof shall be paid by Borrower to Lender such payment to be applied (subject to the Carve-Out) against the Obligations, as determined by Lender, in its sole discretion.

2.7.    Notes.

The Loans shall, in Lender's sole discretion, be evidenced by one or more promissory notes in the form attached hereto as Exhibit D or otherwise in form and substance satisfactory to Lender. However, if such Loans are not so evidenced, such Loans may be evidenced solely by entries upon the books and records maintained by Lender.

2.8.    Recordkeeping.

Lender shall record in its records the date and amount of each Loan made by Lender and each repayment thereof. The aggregate unpaid principal amount so recorded shall be rebuttably presumptive evidence of the principal amount of the Loans owing and unpaid. The failure to so record any such amount or any error in so recording any such amount shall not, however, limit or otherwise affect the Obligations of Borrowers hereunder or under any note to repay the principal amount of the Loans hereunder, together with all interest accruing thereon in accordance herewith.

-12-

SECTION 3       LETTERS OF CREDIT.

3.1.    General Terms.

Subject to the terms and conditions of this Agreement and the other Loan Documents prior to the Maturity Date, Lender may, in its sole discretion, without any obligation to do so, from time to time cause to be issued and co-sign for or otherwise guarantee, upon Borrower Representative's request, commercial and/or standby Letters of Credit. Payments made by the L/C Issuer to any Person on account of any Letter of Credit shall be immediately payable by Borrowers without notice, presentment or demand and Borrowers agree that each payment made by the L/C Issuer in respect of a Letter of Credit shall constitute a request by Borrowers for a Loan to reimburse L/C Issuer. In the event such Loan is not advanced by Lender for any reason, such reimbursement obligations (whether owing to the L/C Issuer or Lender if Lender is not the issuer) shall become part of the Obligations hereunder and shall bear interest at the rate then applicable to Revolving Loans constituting Base Rate Loans until repaid. Borrower shall remit to Lender a Letter of Credit fee equal to two and one-half percent (2.50%) per annum on the aggregate undrawn face amount of all Letters of Credit outstanding (which include the Existing Letters of Credit deemed to be Letters of Credit issued hereunder), which fee shall be payable monthly in arrears on the last Business Day of each month. Upon the occurrence of an Event of Default and during the continuance thereof, the Letter of Credit fee shall be increased to an amount equal to two percent (2%) per annum in excess of the Letter of Credit fee otherwise payable thereon, which fee shall be payable on demand. Said fee shall be calculated on the basis of a 360 day year. Borrower shall also pay promptly following receipt of written demand therefor from the L/C Issuer the normal and customary administrative charges of L/C Issuer for issuance, amendment, negotiation, renewal or extension of any Letter of Credit.

3.2.    Letter of Credit Procedures.

3.2.1.    L/C Applications. The Master Letter of Credit Agreement shall govern all Letters of Credit issued by Lender (which include the Existing Letters of Credit deemed to be Letters of Credit issued hereunder). Borrowers shall give notice to Lender and the L/C Issuer of the proposed issuance of each Letter of Credit on a Business Day which is at least three Business Days (or such lesser number of days as the L/C Issuer shall agree in any particular instance in its sole discretion) prior to the proposed date of issuance of such Letter of Credit. Each such notice shall be accompanied by an L/C Application, duly executed by Borrowers and in all respects satisfactory to the L/C Issuer, together with such other documentation as the L/C Issuer may reasonably request in support thereof, it being understood that each L/C Application shall specify, among other things, the date on which the proposed Letter of Credit is to be issued, the expiration date of such Letter of Credit (which shall not be later than the scheduled Maturity Date (unless such Letter of Credit is Cash Collateralized on or prior to the Maturity Date)) and whether such Letter of Credit is to be transferable in whole or in part. Any Letter of Credit outstanding after the scheduled Maturity Date which is Cash Collateralized for the benefit of the L/C Issuer shall be the sole responsibility of the L/C Issuer. In the event of any inconsistency between the terms of the Master Letter of Credit Agreement, any L/C Application and the terms of this Agreement, the terms of this Agreement shall control.

3.2.2.    Reimbursement Obligations Unconditional. Borrowers' reimbursement obligations hereunder shall be irrevocable and unconditional under all circumstances, including (a) any lack of validity or enforceability of any Letter of Credit, this Agreement or any other Loan Document, (b) the existence of any claim, set-off, defense or other right which any Loan Party may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with

-13-

any Letter of Credit, this Agreement, any other Loan Document, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between any Loan Party and the beneficiary named in any Letter of Credit), (c) the validity, sufficiency or genuineness of any document which the L/C Issuer has reasonably determined in good faith complies on its face with the terms of the applicable Letter of Credit, even if such document should later prove to have been forged, fraudulent, invalid or insufficient in any respect or any statement therein shall have been untrue or inaccurate in any respect, or (d) the surrender or impairment of any security for the performance or observance of any of the terms hereof. Without limiting the foregoing, no action or omission whatsoever by Lender in its capacity as such under or in connection with any Letter of Credit or any related matters shall result in any liability of Lender to Borrowers, or relieve Borrowers of any of their obligations hereunder to any such Person.

SECTION 4        INTEREST, FEES AND CHARGES.

4.1.    Interest Rate.

Subject to the terms and conditions set forth below, the Loans shall bear interest at the per annum rate of interest set forth in subsection (a) or (b) below:

(a)    Prior to the occurrence and continuation of an Event of Default the Loans shall bear interest at the rate of two and one-half percent (2.50%) per annum in excess of the Base Rate in effect from time to time, payable on the first Business Day of each month in arrears for interest through the last day of the prior month. Said rate of interest shall increase or decrease by an amount equal to each increase or decrease in the Base Rate effective on the effective date of each such change in the Base Rate.

(b)    Upon the occurrence of an Event of Default and during the continuance thereof, the Loans shall bear interest at the rate of two percent (2.0%) per annum in excess of the interest rate otherwise payable thereon, which interest shall be payable on demand. All interest shall be calculated on the basis of a 360 day year.

4.2.    Fees And Charges.

4.2.1.    Unused Line Fee: Borrowers shall pay to Lender an unused line fee of one-half of one percent (0.5%) of the difference between the Revolving Loan Commitment and the average daily balance of the Revolving Loans plus the Letter of Credit Obligations for each month, which fee shall be fully earned by Lender on the first day of each month and payable monthly in arrears on the first Business Day of each month with respect to all activity through the last day of the prior month. Said fee shall be calculated on the basis of a 360 day year.

4.2.2.    Costs and Expenses: Borrowers shall reimburse Lender for all out-of-pocket costs and expenses, including, without limitation, reasonable and documented legal expenses and reasonable attorneys' fees of a single firm of counsel (plus one firm of local counsel in each applicable jurisdiction), incurred by Lender in connection with the (i) documentation and consummation of this transaction, including, without limitation, Uniform Commercial Code and other public record searches and filings, overnight courier or other express or messenger delivery, appraisal costs, surveys, title insurance and environmental audit or review costs; (ii) collection, protection or enforcement of any rights in or to the Collateral; (iii) collection of any Obligations; and (iv) administration and enforcement of any of Lender's rights under this Agreement or any other Loan Document (including, without limitation, any reasonable and documented costs and expenses of any third party provider engaged by Lender for such purposes). Borrowers shall also pay all normal service charges of general application to Lender's

-14-

customers with respect to all accounts maintained by any Borrower with Lender and any additional services requested in writing by any Borrower from Lender.

4.2.3.    Facility Fee.  Borrowers shall pay to Lender a facility fee in the amount of $100,000, which shall be fully earned as of the date of this Agreement and shall be due and payable on the occurrence of a Maturity Event.

4.3.    Taxes.

(a)    All payments made by Borrowers hereunder or under any Loan Documents shall be made without setoff, counterclaim, or other defense.  To the extent permitted by applicable law, all payments hereunder or under the Loan Documents (including any payment of principal, interest, or fees) to, or for the benefit of, any person shall be made by Borrowers free and clear of and without deduction or withholding for, or account of, any Taxes now or hereinafter imposed by any taxing authority.

(b)    If any Borrower makes any payment hereunder or under any Loan Document in respect of which it is required by applicable law to deduct or withhold any Taxes, Borrowers shall increase the payment hereunder or under any such Loan Document such that after the reduction for the amount of Taxes withheld (and any taxes withheld or imposed with respect to the additional payments required under this Section 4.4(b)), the amount paid to Lender equals the amount that was payable hereunder or under any such Loan Document without regard to this Section 4.4(b).  To the extent any Borrower withholds any Taxes on payments hereunder or under any Loan Document, Borrowers shall pay the full amount deducted to the relevant taxing authority within the time allowed for payment under applicable law and shall deliver to Lender within 30 days after it has made payment to such authority a copy of a receipt issued by such authority (or other evidence reasonably satisfactory to Lender) evidencing the payment of all amounts so required to be deducted or withheld from such payment.

If Lender is required by law to make any payments of any Taxes on or in relation to any amounts received or receivable hereunder or under any other Loan Document, or any Tax is assessed against Lender with respect to amounts received or receivable hereunder or under any other Loan Document, Borrowers will indemnify such person against (i) such Tax (and any reasonable counsel fees and expenses associated with such Tax) and (ii) any taxes imposed as a result of the receipt of the payment under this Section 4.4.  A certificate prepared in good faith including supporting calculations in reasonable detail as to the amount of such payment by Lender shall, absent manifest error, be final, conclusive, and binding on all parties.

4.4.    Maximum Interest.

It is the intent of the parties that the rate of interest and other charges to Borrowers under this Agreement and the other Loan Documents shall be lawful; therefore, if for any reason the interest or other charges payable under this Agreement are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Lender may lawfully charge Borrowers, then the obligation to pay interest and other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be refunded to Borrowers.

SECTION 5    COLLATERAL.

5.1.    Grant of Security Interest to Lender.

As security for the payment of all Loans now or in the future made by Lender to Borrowers hereunder and for the payment, performance or other satisfaction of all other Obligations,

-15-

subject to any limitations contained in the Orders and to the Carve-Out, effective upon the entry of the Interim Order, Borrowers hereby assign to Lender and its Affiliates and grant to Lender and its Affiliates and reaffirm their prior grant to Lender of a continuing security interest in the following property of Borrowers, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located: (a) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by any Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, any Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, payment intangibles, security interests, security deposits and rights to indemnification); (c) all Inventory (whether or not Eligible Inventory); (d) all Goods (other than Inventory), including, without limitation, Equipment, vehicles and Fixtures; (e) all Investment Property; (f) all Deposit Accounts, bank accounts, deposits and cash; (g) all Letter-of-Credit Rights; (h) Commercial Tort Claims listed on <u>Exhibit C</u> hereto (i) all Supporting Obligations; (j) any other property of Borrowers now or hereafter in the possession, custody or control of Lender or any agent or any parent, affiliate or subsidiary of Lender or any participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (j) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Borrowers' books and records relating to any of the foregoing and to Borrowers' business.

5.2.    <u>Other Security.</u>

Lender, in its sole discretion, without waiving or releasing (i) any obligation, liability or duty of Borrowers under this Agreement or the other Loan Documents or (ii) any Event of Default, may at any time or times hereafter, but shall not be obligated to, pay, acquire or accept an assignment of any security interest, lien, encumbrance or claim asserted by any Person in, upon or against the Collateral, provided, that Lender may take such actions with respect to Permitted Liens only after the occurrence and during the continuance of an Event of Default. All sums paid by Lender in respect thereof and all out-of-pocket costs, fees and expenses including, without limitation, reasonable and documented attorney fees of a single firm of counsel (plus one firm of counsel in each applicable local jurisdiction), all court costs and all other charges relating thereto incurred by Lender shall constitute Obligations, payable by Borrowers to Lender promptly following receipt by Borrowers of written demand therefor from Lender and, until paid, shall bear interest at the rate then applicable to Loans hereunder.

5.3.    <u>Possessory Collateral.</u>

Within one (1) Business Day following any Borrower's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any Tangible Chattel Paper and any Investment Property consisting of certificated securities, Borrowers shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance reasonably acceptable to Lender). If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as Borrowers' attorney and agent-in-fact, to endorse or assign the same on Borrowers' behalf.

5.4.    Electronic Chattel Paper.

To the extent that any Borrower obtains or maintains any Electronic Chattel Paper, Borrowers shall create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (i) a single authoritative copy of the record or records exists which is unique, identifiable and except as otherwise provided in clauses (iv), (v) and (vi) below, unalterable, (ii) the authoritative copy identifies Lender as the assignee of the record or records, (iii) the authoritative copy is communicated to and maintained by the Lender or its designated custodian, (iv) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Lender, (v) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (vi) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

5.5.    Super Priority Nature of Obligations and Lender's Liens.

(a)    The priority of Lender's liens on the Collateral owned by the Loan Parties shall be set forth in the Orders entered with respect to the Chapter 11 Cases and shall be subject to the Carve-Out and Permitted Liens.

(b)    Upon the entry of the Orders, all Obligations shall constitute administrative expenses of the Loan Parties in the Chapter 11 Cases, with administrative priority and senior secured status under sections 364(c) and 364(d) of the Bankruptcy Code.  Subject to the Carve-Out to the extent of the Carve-Out Reserve and Permitted Liens, (i) such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 326, 328, 330, 331, 506(b), 506(c) (subject to entry of the Orders), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of the Loan Parties, the Loan Parties' bankruptcy estates, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, and (ii) the liens granted to Lender on the Collateral owned by the Loan Parties, and the priorities accorded to the Obligations shall have the priority and senior secured status afforded by sections 364(c) and 364(d)(1) of the Bankruptcy Code (all as more fully set forth in the Orders).

(c)    Notwithstanding anything herein to the contrary, all proceeds received by or on behalf of Lender from the Collateral subject to the liens and security interests granted in this Section 5 or in any other Loan Document or by the Orders shall be subject to the prior payment of the Carve-Out to the extent set forth in the Orders.

SECTION 6    PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY INTERESTS THEREIN.

Borrowers shall, at Lender's request, at any time and from time to time, authenticate, execute and deliver to Lender such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender in its Permitted Discretion) and do such other acts and things or cause third parties to do such other acts and things as Lender may deem necessary or desirable in its sole discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (free and clear of all other liens or security interests, whether voluntarily or involuntarily created, except Permitted Liens and the Carve-Out) to secure payment of the Obligations, and in order to facilitate the collection of the Collateral.  Borrowers irrevocably hereby make, constitute and appoint Lender as Borrowers' true and lawful attorney and agent-in-fact to execute and file such financing statements,

-17-

documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect Lender's security interest in the Collateral. Borrowers further ratify and confirm the prior filing by Lender of any and all financing statements which identify any Borrower as debtor, Lender as secured party and any or all Collateral as collateral for the Obligations.

SECTION 7    POSSESSION OF COLLATERAL AND RELATED MATTERS.

Until otherwise notified by Lender following the occurrence and during the continuation of an Event of Default, Borrowers shall have the right, except as otherwise provided in this Agreement or in the Orders, in the ordinary course of Borrowers' business, to (a) sell, lease or furnish under contracts of service any of Borrowers' Inventory normally held by Borrowers for any such purpose; (b) use and consume any raw materials, work in process or other materials normally held by Borrowers for such purpose; and (c) dispose of obsolete, worn-out or unuseful Equipment so long as all of the Net Cash Proceeds (if any) thereof, subject to the Carve-Out, are paid to Lender for application to the Obligations; provided, however, that a sale in the ordinary course of business shall not include any transfer or sale in satisfaction, partial or complete, of a debt owed by any Borrower (other than the Obligations provided that Lender consents thereto and any required orders of the Bankruptcy Court are obtained).

SECTION 8    COLLECTIONS.

8.1.    Lockbox and Lockbox Account.

Borrowers shall direct all of their Account Debtors to make all payments on the Accounts directly to a mailing address designated by, and under the exclusive control of, Lender, at Lender (the "**Lockbox**"). Borrowers shall establish an account (the "**Lockbox Account**") in Borrowers' name, for the benefit of Lender, with Lender, into which all payments received in the Lockbox shall be deposited, and into which Borrowers will on the date of receipt thereof (or, if such date is not a Business Day, on the next succeeding Business Day) deposit all payments received by Borrowers on Accounts in the identical form in which such payments were received, whether by cash or check. If any Borrower, any Affiliate or Subsidiary, any shareholder, officer, director, employee or agent of any Borrower or any Affiliate or Subsidiary, or any other Person acting for or in concert with Borrower shall receive any monies, checks, notes, drafts or other payments relating to or as Proceeds of Accounts or other Collateral, Borrowers and each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Lender and, on the date of receipt thereof (or, if such date is not a Business Day, on the next succeeding Business Day), shall remit the same (or cause the same to be remitted) in kind to the Lockbox Account in a manner reasonably satisfactory to Lender. The daily ledger balance of such accounts as of the beginning of each Business Day shall be transferred to Lender each Business Day for application in accordance with Section 8.3. Borrowers agree that all payments made to such Lockbox Account or otherwise received by Lender, whether in respect of the Accounts or as Proceeds of other Collateral or otherwise (except for proceeds of Collateral or other amounts which are required to be delivered to the holder of a Permitted Lien which is prior in right of payment), will be applied on account of the Obligations in accordance with the terms of this Agreement. Borrowers agree to pay all customary fees, costs and expenses in connection with opening and maintaining the Lockbox and Lockbox Account. All of such fees, costs and expenses if not paid by Borrowers, may be paid by Lender or otherwise charged to Borrowers and in such event all amounts paid by Lender or charged by Lender shall constitute Obligations hereunder, shall be payable to Lender by Borrowers promptly following receipt of written demand therefor, and, until paid, shall bear interest at the rate then applicable to Loans hereunder. All checks, drafts, instruments and other items of payment or Proceeds of Collateral shall be endorsed by Borrowers to Lender, and, if that endorsement of any such item shall not be made for any reason, Lender is hereby irrevocably authorized to endorse the same on Borrowers' behalf. For the purpose of this section, Borrowers irrevocably hereby make,

-18-

constitute and appoint Lender (and all Persons designated by Lender for that purpose) as Borrowers' true and lawful attorney and agent-in-fact (i) to endorse Borrowers' name upon said items of payment and/or Proceeds of Collateral and upon any Chattel Paper, Document, Instrument, invoice or similar document or agreement relating to any Account of Borrower or Goods pertaining thereto; (ii) to take control in any manner of any item of payment or Proceeds thereof and (iii) to have access to any lockbox or postal box into which any of Borrowers' mail is deposited, and open and process all mail addressed to Borrowers and deposited therein.

8.2.    Lender's Rights.

Lender may, at any time and from time to time after the occurrence and during the continuance of an Event of Default, whether before or after notification to any Account Debtor and whether before or after the maturity of any of the Obligations, to the maximum extent permitted by law, (i) enforce collection of any of Borrowers' Accounts or other amounts owed to any Borrower by suit or otherwise; (ii) exercise all of Borrowers' rights and remedies with respect to proceedings brought to collect any Accounts or other amounts owed to any Borrower; (iii) surrender, release or exchange all or any part of any Accounts or other amounts owed to any Borrower, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder; (iv) sell or assign any Account of any Borrower or other amount owed to any Borrower upon such terms, for such amount and at such time or times as Lender deems advisable; (v) prepare, file and sign (but not vote) any Borrower's name on any proof of claim in bankruptcy or other similar document against any Account Debtor or other Person obligated to any Borrower; and (vi) do all other acts and things which are necessary, in Lender's sole discretion, to fulfill any Borrower's obligations under this Agreement and the other Loan Documents and to allow Lender to collect the Accounts or other amounts owed to any Borrower.  In addition to any other provision hereof, Lender may at any time, after the occurrence and during the continuance of an Event of Default, at Borrowers' expense, notify any parties obligated on any of the Accounts to make payment directly to Lender of any amounts due or to become due thereunder; provided that Lender shall promptly rescind any such notification at such time as no Event of Default shall have occurred and be continuing.

8.3.    Application of Proceeds.

For purposes of calculating interest and fees, Lender shall, within two (2) Business Days after application of the opening daily ledger balance to the Obligations as set forth in the immediately following sentence, apply the whole or any part of such collections or Proceeds against the Obligations in such order as Lender shall determine in its sole discretion.  For purposes of determining the amount of Loans available for borrowing purposes, Lender shall apply the opening daily ledger balance in the Lockbox Account as of the beginning of each Business Day in whole or in part against the Obligations, in such order as Lender shall determine in its sole discretion, subject to actual collection.

8.4.    Account Statements.

On a monthly basis, within 30 days after the end of each month, Lender shall deliver to Borrowers an account statement showing all Loans, charges and payments for such month, which shall be deemed final, binding and conclusive upon Borrowers, absent manifest error, unless Borrowers notify Lender in writing, specifying any error therein, within thirty (30) days of the date such account statement is received by Borrowers and any such notice shall only constitute an objection to the items specifically identified.

-19-

SECTION 9    COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND SCHEDULES.

9.1.    Weekly Reports.

Borrowers shall deliver to Lender an executed loan report and certificate in Lender's then current form at least once each week, which shall be accompanied by copies of Borrowers' sales journal, cash receipts journal and credit memo journal for the relevant period. Such report shall reflect the activity of Borrowers with respect to Accounts for the immediately preceding week, and shall be in a form and with such specificity as is reasonably satisfactory to Lender and shall contain such additional information available to Borrowers concerning Accounts Inventory and estimated billings as may be reasonably requested by Lender including, without limitation, but only if specifically requested by Lender, copies of all invoices prepared in connection with such Accounts.

9.2.    Monthly Reports.

Borrowers shall deliver to Lender, in addition to any other reports, as soon as practicable and in any event: (i) within fifteen (15) days after the end of each month, (A) a detailed trial balance of Borrowers' Accounts aged per invoice date, in form and substance reasonably satisfactory to Lender including, without limitation, the names and addresses of all Account Debtors of Borrowers, and (B) a summary and detail of accounts payable, including a listing of any held checks.

9.3.    Budget Variance Report.

On Tuesday of each calendar week (or, if such Tuesday is not a Business Day, on the next succeeding Business Day), a Budget Variance Report on the basis of the actual prior week. In the event that the Obligations (other than contingent indemnity and reimbursement Obligations for which no claim has been made, such Obligations that by their terms survive the termination of this Agreement and Obligations in respect of outstanding Letters of Credit that are Cash Collateralized) have not been repaid in full and this Agreement terminated prior to November 1, 2013, Borrowers shall provide to Lender, on or before November 1, 2013, a revised DIP Budget in form and substance acceptable to Lender in its sole discretion, covering the period from November 1, 2013 to the Maturity Date.

9.4.    Financial Statements.

Borrowers shall deliver to Lender the following financial information, all of which shall be prepared in accordance with generally accepted accounting principles consistently applied over the periods applicable to the relevant financial statements referenced below (subject in the case of unaudited financial statements to the absence of footnotes and customary year-end adjustments), and shall be accompanied by a compliance certificate in the form of Exhibit A hereto, which compliance certificate shall include a calculation of all financial covenants contained in Section 14 this Agreement: (i) no later than twenty (20) days after the end of each calendar month, copies of internally prepared financial statements, including, without limitation, balance sheets and statements of income, retained earnings and cash flow of Borrowers, certified by the Chief Financial Officer of Borrowers; and (iii) no later than one hundred twenty (120) days after the end of each of Borrowers' Fiscal Years, audited annual financial statements with an unqualified opinion by independent certified public accountants selected by Borrowers and reasonably satisfactory to Lender, which financial statements shall be accompanied by copies of any management letters sent to the Borrowers by such accountants.

-20-

9.5.    Other Information.

Concurrently, (i) with the filing thereof, copies of all pleadings, motions, applications, final information and other papers and documents of any kind filed by or on behalf of any Loan Party in any Chapter 11 Case; (ii) with the furnishing thereof, copies of all written statements, reports, information and other papers and documents of any kind furnished by or on behalf of each Loan Party to the Committee in any Chapter 11 Case; and (iii) with the furnishing thereof, copies of all written statements, reports, information and other papers and documents of any kind furnished to any other creditor of any Loan Party pursuant to the terms of any indenture, loan or credit or similar agreement.

SECTION 10      TERMINATION.

Lender's obligations under this Agreement shall be in effect from the Closing Date until the earlier of (i) occurrence of a Maturity Event and (ii) the termination of this Agreement in accordance with this Section 10. Upon the occurrence and during the continuation of an Event of Default, Lender shall not be obligated to make any additional Loans. Notwithstanding the foregoing, this Agreement shall terminate on the date thereafter that the Obligations are paid in full (except for contingent indemnity and reimbursement Obligations for which no claim has been made, such Obligations that by their terms survive the termination of this Agreement and Obligations in respect of outstanding Letters of Credit that are Cash Collateralized), all Letters of Credit are returned to the L/C Issuer for cancellation, are Cash Collateralized in accordance with the terms of this Agreement or expire in accordance with their terms prior to any presentation for payment thereunder, and the commitments to extend credit under this Agreement are terminated. At such time as this Agreement has terminated, Borrowers shall deliver to Lender a release, in form and substance satisfactory to Lender, of all obligations and liabilities of Lender and its officers, directors, employees, agents, parents, Subsidiaries and Affiliates to Borrowers arising under or in connection with this Agreement and the other Loan Documents, in each case with respect to events, actions or inactions on or prior to the date on which such release is delivered.

SECTION 11      REPRESENTATIONS AND WARRANTIES.

Each Borrower hereby represents and warrants to Lender, which representations and warranties (whether appearing in this Section 11 or elsewhere) shall be true at the time of Borrowers' execution hereof and the closing of the transactions described herein or related thereto and shall be remade by each Borrower at the time each Loan is made pursuant to this Agreement, provided, that (i) representations and warranties made as of a particular date shall be true and correct as of such date, and (ii) the representations and warranties shall survive execution and delivery of this Agreement and the closing of the transactions contemplated hereby until the termination of this Agreement.

11.1.    Financial Statements and Other Factual Information.

The financial statements and other written factual information delivered or to be delivered by any Borrower to Lender after the Petition Date, taken as a whole, fairly present in all material respects the financial condition of such Borrower as of the date thereof, and, other than as a result of the Chapter 11 Cases and except as set forth in any information or financial statements or schedules to this Agreement delivered pursuant to this Agreement or any other Loan Document, there has been no material adverse change in the financial condition or the operations of the Borrowers, taken as a whole, since the date of the financial statements delivered to Lender most recently prior to the date of this Agreement. All written factual information now or heretofore furnished by any Borrower to Lender pursuant to this Agreement or any other Loan Document is true and correct as of the date with respect to which such information was furnished (except to the extent an earlier date is set forth therein); provided

-21-

that, for the avoidance of doubt, the Borrowers make no representations or warranties as to information of a general industry or economic nature, or as to any information in the nature of forecasts, projections or budgets, including the Budget, it being agreed that none of the foregoing constitute factual information.

      11.2.   Locations.

      The office where each Borrower keeps its books, records and accounts (or copies thereof) concerning the Collateral, each Borrower's principal place of business and all of Borrowers' other places of business, locations of Collateral with a fair market value in excess of $50,000 and post office boxes and locations of bank accounts are as set forth in Schedule 11.2 and at other locations within the United States of which Lender has been advised by Borrower in accordance with Section 12.2.1. The Collateral, including, without limitation, the Equipment (except any part thereof which any Borrower shall have advised Lender in writing consists of Collateral normally used in more than one state) is kept, or, in the case of vehicles, based, only at the addresses set forth on Schedule 11.2, and at other locations within the United States of which Lender has been advised by any Borrower in writing in accordance with Section 12.2.1 hereof.

      11.3.   Loans by Borrower.

      No Borrower has made any loans or advances to any Affiliate or other Person except for advances authorized hereunder to employees, officers and directors of a Borrower for travel and other expenses arising in the ordinary course of such Borrower's business and loans permitted pursuant to Section 13.6.

      11.4.   Accounts and Inventory.

      Each Account or item of Inventory which any Borrower shall, expressly or by implication, request Lender to classify as an Eligible Account or as Eligible Inventory, respectively, as of the time when such request is made, conforms in all respects to the requirements of such classification as set forth in the respective definitions of Eligible Account and Eligible Inventory as set forth herein (other than any requirement involving a subjective or discretionary determination by Lender).

      11.5.   Liens.

      Each Borrower is the lawful owner of all Collateral now purportedly owned by such Borrower and will be the lawful owner of or have rights in, or the power to transfer rights in all Collateral hereafter purportedly acquired by such Borrower, free from all liens, claims, security interests and encumbrances whatsoever, whether voluntarily or involuntarily created and whether or not perfected, other than the Permitted Liens and the Carve-Out.

      11.6.   Organization, Authority and No Conflict.

      Each Borrower is a corporation or limited liability company, duly organized, validly existing and in good standing in the State or organization, its state organizational identification number is set forth on Schedule 11.2 and, except for exceptions to the following that would not have a Material Adverse Effect on any Borrower, each Borrower is duly qualified and in good standing in all states where the nature and extent of the business transacted by it or the ownership of its assets makes such qualification necessary. Each Borrower has the right and power and, subject to entry of the Orders, is duly authorized and empowered to enter into, execute and deliver this Agreement and the other Loan Documents and perform its obligations hereunder and thereunder. Subject to entry of the Orders, each

-22-

Borrower's execution, delivery and performance of this Agreement and the other Loan Documents does not conflict with the provisions of the organizational documents of such Borrower, any statute, regulation, ordinance or rule of law, or any agreement, contract or other document which may now or hereafter be binding on such Borrower, except for conflicts with agreements, contracts or other documents which would not have a Material Adverse Effect on any Borrower, and each Borrower's execution, delivery and performance of this Agreement and the other Loan Documents shall not result in the imposition of any lien or other encumbrance upon any of Borrower's property (other than Permitted Liens) under any existing indenture, mortgage, deed of trust, loan or credit agreement or other agreement or instrument by which any Borrower or any of its property may be bound or affected.

### 11.7.    Litigation.

Except as disclosed to Lender on Schedule 11.7 hereto, there are no actions or proceedings which are pending or, to each Borrower's knowledge, threatened in writing against Borrower which would reasonably be expected to have a Material Adverse Effect on any Borrower, and each Borrower shall, promptly upon becoming aware of any such pending or threatened action or proceeding, give written notice thereof to Lender. No Borrower has any Commercial Tort Claims pending that exceed $25,000 in amount other than those set forth on Exhibit D hereto as Exhibit D may be amended from time to time.

### 11.8.    Compliance with Laws and Maintenance of Permits.

Subject to entry of the Orders, each Borrower has obtained all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on any Borrower. Each Borrower is in compliance in all material respects with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety), in each case the failure to comply with which would have a Material Adverse Effect on Borrower.

### 11.9.    Affiliate Transactions.

Except as set forth on Schedule 11.9 hereto or as permitted pursuant to Section 11.3 hereof, no Borrower is conducting, permitting or suffering to be conducted, transactions with any Affiliate other than transactions with Affiliates in the ordinary course of business pursuant to terms (taken as a whole) that are no less favorable to such Borrower than the terms (taken as a whole) upon which such transactions would have been made had they been made to or with a Person that is not an Affiliate.

### 11.10.    Names and Trade Names.

As of the date hereof, each Borrower's name has always been as set forth on the first page of this Agreement and, as of the date hereof, no Borrower uses any trade names, assumed names, fictitious names or division names in the operation of its business, except as set forth on Schedule 11.10 hereto.

### 11.11.    Equipment.

No Equipment constituting Collateral is a Fixture to real estate unless such real estate is owned by such Borrower and is subject to a mortgage in favor of Lender, or if such real estate is leased, is subject to a landlord's agreement in favor of Lender on terms reasonably acceptable to Lender, or an

-23-

accession to other personal property unless such personal property is subject to a first priority lien in favor of Lender (subject to Permitted Liens).

### 11.12.  Enforceability.

Upon Entry of the Orders, this Agreement and the other Loan Documents to which each Borrower is a party are the legal, valid and binding obligations of each Borrower and are enforceable against Borrower in accordance with their respective terms.

### 11.13.  Solvency.

The Borrowers, taken as a whole, are, after giving effect to the transactions contemplated hereby and entry of the Orders, solvent, able to pay their debts as they become due, have capital sufficient to carry on their business, now own property having a value both at fair valuation and at present fair saleable value greater than the amount required to pay their debts, and, after giving effect to the entry of the Orders, will not be rendered insolvent by the execution and delivery of this Agreement or any of the other Loan Documents or by completion of the transactions contemplated hereunder or thereunder.

### 11.14.  Indebtedness.

Except as set forth on Schedule 11.14 hereto, after giving effect to the Orders, no Borrower is obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than the Loans or as permitted by Section 13.2.

### 11.15.  Margin Security and Use of Proceeds.

No Borrower owns any margin securities, and none of the proceeds of the Loans hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

### 11.16.  Subsidiaries and Affiliates.

Except as set forth on Schedule 11.16 hereto, no Borrower has any Subsidiaries or other Affiliates (other than direct or indirect parent companies of such Borrower), nor is any Borrower engaged in any joint venture or partnership with any other Person.

### 11.17.  No Defaults.

No Borrower is in default under any contract, lease or commitment to which it is a party or by which it is bound which would reasonably be expected to have a Material Adverse Effect on such Borrower, nor does any Borrower know of any dispute regarding any contract, lease or commitment which would have a Material Adverse Effect on such Borrower.

### 11.18.  Employee Matters.

There are no controversies pending or threatened between any Borrower and any of its employees, agents or independent contractors other than any such controversies which would not, in the aggregate, have a Material Adverse Effect on such Borrower, and each Borrower is in compliance with all

-24-

federal and state laws respecting employment and employment terms, conditions and practices except for such non-compliance which would not have a Material Adverse Effect on such Borrower.

11.19.  Intellectual Property.

Each Borrower possesses adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue to conduct its business as heretofore conducted by it except to the extent that the failure to possess such items would not have a Material Adverse Effect on such Borrower.

11.20.  Environmental Matters.

Except for exceptions to the following that would not have a Material Adverse Effect on any Borrower, (i) no Borrower has generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates in any material respect any Environmental Law or any license, permit, certificate, approval or similar authorization thereunder and (ii) the operations of each Borrower comply in all respects with all Environmental Laws and all licenses, permits, certificates, approvals and similar authorizations thereunder. Except for exceptions to the following that would not reasonably be expected to have a Material Adverse Effect on any Borrower, there has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any governmental authority or any other Person, nor is any pending or threatened in writing with respect to any non-compliance with or violation of the requirements of any Environmental Law by any Borrower or the release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter, which affects any Borrower or its business, operations or assets or any properties at which any Borrower has transported, stored or disposed of any Hazardous Materials. Except for exceptions to the following that would not reasonably be expected to have a Material Adverse Effect on any Borrower, no Borrower has any liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

11.21.  ERISA Matters.

Each Borrower has paid and discharged all obligations and liabilities arising under ERISA of a character which, if unpaid or unperformed, would result in the imposition of a Lien against any of its properties or assets (other than a Permitted Lien).

11.22.  Investment Company Act.

No Loan Party is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company" within the meaning of the Investment Company Act of 1940.

11.23.  Anti-Terrorism Laws.

(a)  No Loan Party (and, to the knowledge of each Loan Party, no joint venture or subsidiary thereof) is in violation in any material respects of any United States Requirements of Law relating to terrorism, sanctions or money laundering (the "**Anti-Terrorism Laws**"), including the United

-25-

States Executive Order No. 13224 on Terrorist Financing (the "**Anti-Terrorism Order**") and the USA Patriot Act.

(b)     No Loan Party (and, to the knowledge of each Loan Party, no joint venture or Subsidiary thereof) (i) is listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (iii) commits, threatens or conspires to commit or supports "terrorism" as defined in the Anti-Terrorism Order or (iv) is named as a "specially designated national and blocked person" in the most current list published by OFAC.

(c)     No Loan Party (and, to the knowledge of each Loan Party, no joint venture or Affiliate thereof) (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in clauses (b)(i) through (b)(iv) above, (ii) deals in, or otherwise engages in any transactions relating to, any property or interests in property blocked pursuant to the Anti-Terrorism Order or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

11.24.  Reorganization Matters.

(a)     The Chapter 11 Cases were commenced, and the motion seeking approval of the Loan Documents and entry of each proposed Order was filed with the Bankruptcy Court, in each case in accordance with the Bankruptcy Code and the Bankruptcy Rules, and proper notice thereof and proper notice of the hearing for the approval of each Order have been given.

(b)     After the entry of each Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Section 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code subject, as to priority only, to the Carve-Out to the extent of the Carve-Out Reserve.

(c)     After the entry of each Order, the Obligations will be secured by a valid and perfected first priority lien on all of the Collateral, subject only to Permitted Liens.

(d)     Each Order (with respect to the period on and after entry of such Order) is in full force and effect and has not been reversed, stayed, modified or amended without the prior written consent of Lender.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of each Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of the Loan Documents.

SECTION 12     AFFIRMATIVE COVENANTS.

Until payment and satisfaction in full of all Obligations (other than contingent indemnity and reimbursement Obligations for which no claim has been made, Obligations that by their terms survive

termination of this Agreement and Obligations in respect of outstanding Letters of Credit that have been Cash Collateralized) and termination of this Agreement, unless Borrowers obtain Lender's prior written consent waiving or modifying any of Borrower's covenants hereunder in any specific instance, each Borrower covenants and agrees as follows:

12.1.    Maintenance of Records.

Each Borrower shall at all times keep accurate and complete books, records and accounts with respect to all of its business activities, in accordance with sound accounting practices, and shall keep such books, records and accounts, and any copies thereof, only at the addresses indicated for such purpose on Schedule 11.2 (as updated from time to time).

12.2.    Notices.

Each Borrower shall:

12.2.1.    Locations.  Promptly (but in no event less than ten (10) days prior to the occurrence thereof) notify Lender of the proposed opening of any new place of business or new location of Collateral, the closing of any existing place of business or location of Collateral, any change of in the location of any Borrower's books, records and accounts (or copies thereof), the opening or closing of any post office box, the opening or closing of any bank account or, if any of the Collateral consists of Goods of a type normally used in more than one state, the use of any such Goods in any state other than a state in which any Borrower has previously advised Lender that such Goods will be used.

12.2.2.    Eligible Accounts and Inventory.  Promptly upon becoming aware thereof, notify Lender if any Account or Inventory identified by any Borrower to Lender as an Eligible Account or Eligible Inventory becomes ineligible for any reason (other than as a result of a subjective or discretionary determination by Lender).

12.2.3.    Litigation and Proceedings.  Promptly upon becoming aware thereof, notify Lender of any actions or proceedings which are pending or threatened in writing against any Borrower which would have a Material Adverse Effect on such Borrower and of any Commercial Tort Claims of any Borrower in excess of $25,000 in amount which may arise, which notice shall constitute Borrowers' authorization to Lender to amend Exhibit D to add such Commercial Tort Claim.

**12.2.4.    [Reserved]**

12.2.5.    ERISA Matters.  Promptly notify Lender of (x) the occurrence of any "reportable event" (as defined in ERISA) which might result in the termination by the Pension Benefit Guaranty Corporation (the "**PBGC**") of any employee benefit plan ("**Plan**") covering any officers or employees of any Borrower, any benefits of which are, or are required to be, guaranteed by the PBGC, (y) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor or (z) its intention to terminate or withdraw from any Plan.

12.2.6.    Environmental Matters.  Promptly  notify Lender upon becoming aware of any investigation, proceeding, complaint, order, directive, claim, citation or notice with respect to any non-compliance with or violation of the requirements of any Environmental Law by any Borrower or the generation, use, storage, treatment, transportation, manufacture handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter which affects any Borrower or its business operations or assets or any properties at which such Borrower has transported, stored or disposed

-27-

of any Hazardous Materials, in each case unless the foregoing would not have a Material Adverse Effect on such Borrower.

   12.2.7. <u>Default; Material Adverse Change</u>. Promptly advise Lender of the occurrence of any event having or causing a Material Adverse Effect on any Loan Party, the occurrence of any Event of Default hereunder or of becoming aware of the occurrence of any event which, if uncured, will become an Event of Default after notice or lapse of time (or both).

All of the foregoing notices shall be provided by Borrowers (or the Borrower Representative) to Lender in writing.

   12.3. <u>Compliance with Laws and Maintenance of Permits.</u>

   Each Borrower shall maintain all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on any Borrower and each Borrower shall remain in compliance with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety), in each case the failure with which to comply would have a Material Adverse Effect on any Borrower.

   12.4. <u>Inspection and Audits.</u>

   Each Borrower shall permit Lender, or any Persons designated by it, to call at any Borrower's places of business at any reasonable times and prior to the occurrence of an Event of Default, upon reasonable advance written notice, and, without hindrance or delay, to inspect the Collateral and to inspect, audit, check and make extracts from any Borrower's books, records, journals, orders, receipts and any correspondence and other data relating to any Borrower's business, the Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning any Borrower's business as Lender in good faith may consider reasonable under the circumstances. Each Borrower shall furnish to Lender such information relevant to Lender's rights under this Agreement and the other Loan Documents as Lender shall at any time and from time to time request. Lender, through its officers, employees or agents shall have the right, at any time and from time to time, to verify the validity, amount or any other matter relating to any of any Borrower's Accounts, by mail, telephone, telecopy, electronic mail, or otherwise. Each Borrower authorizes Lender and its agents to discuss the affairs, finances and business of any Borrower with any officers, employees or directors of any Borrower or with its Parent or any Affiliate or the officers, employees or directors of its Parent or any Affiliate, and to discuss the financial condition of any Borrower with such Borrower's independent public accountants. Any such discussions shall be without liability to any officer, director or employee of any Borrower or of any Borrower's direct or indirect parent companies or Affiliates, Lender or to such Borrower's independent public accountants. Borrowers shall pay to Lender all customary fees charged to similarly situated borrowers and all costs and out-of-pocket costs and expenses incurred by Lender in the exercise of its rights hereunder, and all of such fees, costs and expenses shall constitute Obligations hereunder, shall be payable on demand and, until paid, shall bear interest at the rate then applicable to Loans hereunder.

-28-

12.5.    Insurance.

Each Borrower shall:

12.5.1.    Casualty Insurance; Business Interruption Insurance. Keep the Collateral properly housed and insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (in the case of motor vehicles) and such other risks as are customarily insured against by Persons engaged in businesses similar to that of Borrowers, with such companies, in such amounts, with such deductibles, and under policies in such form, as shall be reasonably satisfactory to Lender. Original (or certified) copies of such policies of insurance have been or shall be, within thirty (30) days of the Closing Date, delivered to Lender, together with evidence of payment of all premiums therefor, and shall contain an endorsement, in form and substance reasonably acceptable to Lender, showing loss under such insurance policies payable to Lender. Such endorsement, or an independent instrument furnished to Lender, shall provide that the insurance company shall give Lender written notice before any such policy of insurance is altered or canceled and that no act, whether willful or negligent, or default of any Borrower or any other Person shall affect the right of Lender to recover under such policy of insurance in case of loss or damage. In addition, each Borrower shall cause to be executed and delivered to Lender a collateral assignment of proceeds of its business interruption insurance policies. Each Borrower hereby directs all insurers under all policies of insurance required under this Section 12.5.1 to pay all proceeds payable thereunder directly to Lender. Each Borrower irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as such Borrower's true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of such Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and making all determinations and decisions with respect to such policies of insurance, provided however, that if no Event of Default shall have occurred and is continuing, Borrower may make, settle and adjust claims involving less than $50,000 in the aggregate without Lender's consent.

12.5.2.    Liability Insurance. Maintain, at its expense, such public liability and third party property damage insurance as is customary for Persons engaged in businesses similar to that of Borrowers with such companies and in such amounts, with such deductibles and under policies in such form as shall be reasonably satisfactory to Lender and original (or certified) copies of such policies have been or shall be, within thirty (30) days after the Closing Date, delivered to Lender, together with evidence of payment of all premiums therefor; each such policy shall contain an endorsement showing Lender as additional insured thereunder and providing that the insurance company shall give Lender written notice before any such policy shall be altered or canceled.

12.5.3.    Lender May Purchase Insurance. If any Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above under this Section 12.5 (and provide evidence thereof to Lender promptly following receipt of written request thereof from Lender) or to pay any premium relating thereto, then Lender, without waiving or releasing any obligation or default by Borrowers hereunder, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Lender deems advisable upon notice to Borrowers. Such insurance, if obtained by Lender, may, but need not, protect Borrowers' interests or pay any claim made by or against Borrowers with respect to the Collateral. Such insurance may be more expensive than the cost of insurance Borrowers may be able to obtain on their own and may be cancelled only upon Borrowers providing evidence that they have obtained the insurance as required above. All sums disbursed by Lender in connection with any such actions, including, without limitation, court costs, expenses, other charges relating thereto and reasonable attorneys' fees, shall constitute Obligations hereunder, shall be payable by Borrower to Lender

-29-

promptly following receipt of written demand therefor from Lender and, until paid, shall bear interest at the rate then applicable to Loans hereunder. This provision shall constitute the notice to Borrower required pursuant to paragraph (3) of section 180/10 of Chapter 815 of the Illinois Compiled Statutes (2004).

12.6.    Collateral.

12.6.1.    Each Borrower shall keep the Collateral in good condition, repair and order and shall make all necessary repairs to the Equipment and replacements thereof so that the operating efficiency and the value thereof shall at all times be preserved and maintained in all material respects. Each Borrower shall permit Lender to examine any of the Collateral at any reasonable time during normal business hours upon reasonable advance written notice and wherever the Collateral may be located.

12.7.    Use of Proceeds.

All monies and other property obtained by any Borrower from Lender pursuant to this Agreement shall be used solely (a) to repay the Existing Revolving Loans; (b) for the generation of receivables and other lawful purposes as permitted under this Agreement and in accordance with the DIP Budget (which may include certain prepetition expenses approved by the Bankruptcy Court provided that the incurrence or payment thereof is not otherwise violative of this Agreement, the Orders, any other order of the Bankruptcy Court or applicable law); (c) to pay fees required to be paid to the Office of the United States Trustee under the Orders; and (d) to pay any of the Obligations or the Existing Obligations.

12.8.    Taxes.

Each Borrower shall file all required tax returns and, unless otherwise prohibited under any Order and other than taxes owed by any Borrower arising from the period before the Petition Date that have not been authorized to be paid by the Bankruptcy Court and provided for in the DIP Budget, pay all of its taxes when due, subject to any extensions granted by the applicable taxing authority, including, without limitation, taxes imposed by federal, state or municipal agencies, and shall cause any liens for taxes to be promptly released; provided, that Borrowers shall have the right to contest the payment of such taxes in good faith by appropriate proceedings so long as (i) the amount so contested is shown on Borrowers' next financial statements required to be delivered hereunder if such amount is still being contested during the period covered by such financial statements; and (ii) the contesting of any such payment does not give rise to a lien for taxes. If Borrowers fail to pay any such taxes and in the absence of any such contest by Borrowers, Lender may (but shall be under no obligation to) advance and pay any sums required to pay any such taxes and/or to secure the release of any lien therefor, and any sums so advanced by Lender shall constitute Obligations hereunder, shall be payable by Borrowers to Lender on demand, and, until paid, shall bear interest at the rate then applicable to Loans hereunder.

12.9.    Intellectual Property.

Each Borrower shall maintain adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue its business as heretofore conducted by it or as hereafter conducted by it unless the failure to maintain any of the foregoing would not reasonably be expected to have a Material Adverse Effect on any Borrower.

12.10.  Checking Accounts and Cash Management Services.

Unless Lender otherwise consents in writing, in order to facilitate Lender's maintenance and monitoring of the Collateral, each Borrower shall maintain, and shall cause each of its Subsidiaries to maintain its general checking/controlled disbursement account and all of its other deposit accounts with Lender.  Borrowers shall be responsible for all normal charges assessed thereon.  Each Borrower shall notify Lender in writing thirty (30) days prior to opening any new Deposit Account.

12.11.  USA Patriot Act, Bank Secrecy Act and Office of Foreign Asset Control.

Each Borrower shall ensure, and cause each other Loan Party to ensure, that no Person who owns a controlling interest in or otherwise controls a Loan Party is or shall be (i) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (ii) a Person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (b) comply, and cause each other Loan Party to comply, with all applicable Bank Secrecy Act ("**BSA**") and anti-money laundering laws and regulations.

SECTION 13      NEGATIVE COVENANTS.

Until payment and satisfaction in full of all Obligations (other than contingent indemnity and reimbursement Obligations for which no claim has been made, Obligations that by their terms survive termination of this Agreement and Obligations in respect of outstanding Letters of Credit that have been Cash Collateralized) and termination of this Agreement, unless Borrowers obtain Lender's prior written consent waiving or modifying any of Borrowers' covenants hereunder in any specific instance, each Borrower agrees as follows:

13.1.  Guaranties.

Each Borrower shall not, and shall not permit any other Loan Party to assume, guarantee or endorse, or otherwise become liable in connection with, the indebtedness for borrowed money of any Person, except by endorsement of instruments for deposit or collection or similar transactions in the ordinary course of business.

13.2.  Indebtedness.

Each Borrower shall not, and shall not permit any other Loan Party to create, incur, assume or become obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than the Loans, except that Borrowers and the other Loan Parties may (i) borrow money from a Person other than Lender on an unsecured and subordinated basis if a subordination agreement in favor of Lender and in form and substance satisfactory to Lender is executed and delivered to Lender relative thereto; (ii) maintain their present indebtedness listed on Schedule 11.14 hereto or as permitted under the Orders; and (iii) incur unsecured indebtedness to trade creditors in the ordinary course of business.

13.3.  Liens.

No Borrower shall, nor shall it permit any other Loan Party to grant or permit to exist (voluntarily or involuntarily) any Lien on any of its assets, other than Permitted Liens.

-31-

13.4.    Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary Course of Business.

No Borrower shall, nor shall it permit any other Loan Party to (i) enter into any merger or consolidation; (ii) change the state of any Borrower's organization or enter into any transaction which has the effect of changing any Borrower's state of organization; (iii) sell, lease or otherwise dispose of any of its assets other than Permitted Dispositions; (iv) purchase the stock, other equity interests or all or a material portion of the assets of any Person or division of such Person; or (v) except as otherwise expressly permitted by this Agreement, enter into any other transaction outside the ordinary course of any Borrower's business, including, without limitation, any purchase, redemption or retirement of any shares of any class of its stock or any other equity interest, and any issuance of any shares of, or warrants or other rights to receive or purchase any shares of, any class of its stock or any other equity interest. No Borrower shall form any Subsidiaries or enter into any joint ventures or partnerships with any other Person.

13.5.    Dividends and Distributions.

No Borrower shall declare or pay any dividend or other distribution (whether in cash or in kind) on any class of its stock (if such Borrower is a corporation) or on account of any equity interest in Borrower (if such Borrower is a partnership, limited liability company or other type of entity).

13.6.    Investments; Loans.

No Borrower shall nor shall it permit any other Loan Party to purchase or otherwise acquire, or contract to purchase or otherwise acquire, the obligations or stock of any Person, other than direct obligations of the United States, obligations insured by the Federal Deposit Insurance Corporation, obligations unconditionally guaranteed by the United States and obligations or stock of any other Person acquired involuntarily in connection with the satisfaction of indebtedness or other claims due or owing to any Borrower or Loan Party (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such indebtedness or claims; nor shall Borrower lend or otherwise advance funds to any Person except for advances made to employees, officers and directors for travel and other expenses arising in the ordinary course of business and loans to employees not exceeding Fifty Thousand Dollars ($50,000) in the aggregate outstanding for all Persons at any one time.

13.7.    Fundamental Changes, Line of Business.

No Borrower shall nor shall it permit any other Loan Party to (i) amend its organizational documents or change its Fiscal Year unless (w) such actions would not have a Material Adverse Effect on any Borrower; (x) such actions would not adversely affect the obligations of Borrowers or any other Loan Party to Lender; (y) such actions would not adversely affect the interpretation of any of the terms of this Agreement or the other Loan Documents and (z) Lender has received ten (10) days prior written notice of such amendment or change or (ii) enter into a new line of business materially different from any Borrower's current business.

13.8.    Equipment.

No Borrower shall nor shall it permit any other Loan Party to (i) permit any Equipment constituting Collateral to become a Fixture to real property unless such real property is owned by a Borrower or such Loan Party and is subject to a mortgage in favor of Lender, or if such real estate is leased, is subject to a landlord's agreement in favor of Lender on terms reasonably acceptable to Lender,

-32-

or (ii) permit any Equipment to become an accession to any other personal property unless such personal property is subject to a first priority lien in favor of Lender (other than Permitted Liens).

13.9. Affiliate Transactions.

Except as set forth on Schedule 11.9 hereto or as permitted pursuant to Section 11.3 hereof or as required or authorized by the Orders no Borrower shall conduct, permit or suffer to be conducted, transactions with Affiliates other than transactions for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to such Borrower than the terms upon which such transactions would have been made had they been made to or with a Person that is not an Affiliate.

13.10. Settling of Accounts.

No Borrower shall settle or adjust any Account identified by a Borrower as an Eligible Account or with respect to which the Account Debtor is an Affiliate without the consent of Lender, provided, that following the occurrence and during the continuance of an Event of Default, Borrowers shall not settle or adjust any Account without the consent of Lender.

13.11. Application to the Bankruptcy Court.

Borrowers shall not apply to the Bankruptcy Court for authority to (a) except as provided in the Orders, take any action that is prohibited by the terms of this Agreement or any of the other Loan Documents, (b) except as provided in the Orders, refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents or (c) permit any indebtedness or claim to be pari passu with or senior to any of the Obligations, except as provided in this Agreement and the Orders.

13.12. Modifications to Orders.

Borrowers shall not consent to any amendment, supplement, extension or other modification of any of the terms or provisions contained in, or applicable to, the Orders, without Lender's prior written consent.

SECTION 14   FINANCIAL COVENANTS.

Borrowers shall comply with each of the financial covenants set forth below:

14.1. Compliance with DIP Budget.

(a)   Borrowers shall not expend any funds or monies for any purpose other than those line items set forth in the DIP Budget. Borrowers' actual cash payments (as verified by bank account records) for any measurement period covered by the DIP Budget set forth in (c) below may not exceed the budgeted amount (both as to individual line items and as to total disbursements) through the conclusion of such measurement period set forth in (c) below, plus, the applicable variance set forth in (d) below.

(b)   Borrowers shall comply with the cash receipt projections set forth in the Budget for any measurement period covered by the Budget set forth in (c) below and verified by the actual amounts of cash posted to the Lockbox Account.

(c)   Compliance with the DIP Budget shall be measured on a **[weekly]** basis.

-33-

(d)     During any weekly period covered by the DIP Budget there will be a permitted variance to the DIP Budget amounts for line item disbursements of ten percent for any single line item contained in the DIP Budget and for any monthly period covered by the DIP Budget there shall be a permitted variance to DIP Budget amounts for line item disbursements of five percent for any single line item contained in the DIP Budget.  Except as provided above, there shall be no other variance to the DIP Budget.

SECTION 15    DEFAULT.

The occurrence of any one or more of the following events shall constitute an "Event of Default" by Borrowers hereunder:

15.1.    Payment.

The failure of any Loan Party to pay when due, declared due, or demanded by Lender, any of the Obligations.

15.2.    Breach of this Agreement and the other Loan Documents.

The failure of any Loan Party to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Loan Party under this Agreement, any Order or any of the other Loan Documents; provided that any such failure by Borrowers under subsections 12.2.1, 12.2.4, 12.2.5, 12.2.6, 12.3 and 12.8 of this Agreement shall not constitute an Event of Default hereunder until the fifteenth (15th) day following the occurrence thereof.

15.3.    Breaches of Other Obligations.

The failure of any Loan Party to perform, keep or observe (after any applicable notice and cure period) any of the covenants, conditions, promises, agreements or obligations of such Loan Party under any agreement (other than a Loan Document) with any Person if such failure might have a Material Adverse Effect on such Loan Party.

15.4.    Breach of Representations and Warranties.

[The making or furnishing by any Loan Party to Lender of any representation, warranty, certificate, schedule, report or other written communication within or in connection with this Agreement or the other Loan Documents, which is untrue or misleading in any material respect as of the date made.]

15.5.    Loss of Collateral.

The loss, theft, damage or destruction of any of the Collateral in an amount in excess of $100,000 in the aggregate for all such events during any Fiscal Year as determined by Lender in its sole discretion determined in good faith, or (except as permitted hereby) sale, lease or furnishing under a contract of service of, any of the Collateral.

15.6.    Levy, Seizure or Attachment.

The making or any attempt by any Person to make any levy, seizure or attachment upon any of the Collateral.

15.7.    Bankruptcy Defaults.

The occurrence of any of the following in any Chapter 11 Case:

(a)    Except for actions required by either Order or any Loan Document, any Borrower shall take any material action in the Chapter 11 Cases that is adverse to the Lender or its interests in the prepetition Collateral;

(b)    failure by the Borrowers to file with the Bankruptcy Court the Bid Procedures Motion by August ____, 2013;

(c)    failure by the Borrowers to obtain an order of the Bankruptcy Court, in form and substance satisfactory to the Lender, approving the Bid Procedures Motion by September 15, 2013;

(d)    failure by the Borrowers to obtain an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Lender, approving the sale or other disposition of all or substantially all of the Loan Parties' assets by October 31, 2013;

(e)    failure by the Borrowers to consummate the sale or other disposition of all or substantially all of the Debtors' assets on or before November 15, 2013;

(f)    any of the Chapter 11 Cases are dismissed or converted to a chapter 7 case, or a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers (beyond those set forth in sections 1106(a) and (b) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code relating to the operation of the Borrowers' business is appointed in any of the Chapter 11 Cases;

(g)    the Bankruptcy Court enters an order granting relief from the automatic stay to the holder or holders of any security interest to permit an exercise of remedies with respect to any of the Debtors' assets with a combined fair market value in excess of $100,000 (unless the Lender has consented to such relief or such relief consists solely of insurance proceeds payable to such creditor);

(h)    an order is entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Orders without the consent of the Lender;

(i)    the Borrowers create, incur or suffer to exist any post-petition liens or security interests other than: (i) those granted or authorized pursuant to the Orders, and (ii) any other liens or security interests that the Borrowers are permitted to create, incur or suffer to exist under the Existing Credit Agreement or under the Loan Documents;

(j)    the filing by the Borrowers of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the Existing Obligations or asserting any claim or cause of action against and/or with respect to the Existing Obligations, the liens securing the Existing Obligations, or the Lender or any of its affiliates, agents, attorneys, financial advisors, officers, managers, directors or employees (or if the Borrowers support any such motion, application or adversary proceeding commenced by any third party);

(k)    the Bankruptcy Court enters an order terminating the Borrowers' exclusive period to file a plan of reorganization;

-35-

(l)    the Borrowers file, or support the filing by a third party of, any plan of reorganization or liquidation that is not acceptable to the Lender (other than a plan that contains a provision for the payment in full in cash of (A) all Obligations (other than inchoate Obligations, other Obligations that by their terms survive termination of this Agreement and Obligations in respect of outstanding Letters of Credit that have been Cash Collateralized) under the Loan Documents and (B) all Existing Obligations (other than inchoate Obligations, other Obligations that by their terms survive termination of the Existing Credit Agreement and Obligations in respect of outstanding Letters of Credit that have been Cash Collateralized) under the Existing Credit Agreement on or before the effective date of such plan upon entry thereof);

(m)    any misrepresentation of a material fact (it being agreed the projections, forecasts or budgets, including, without limitation, the DIP Budget, do not constitute facts) made after the Petition Date by the Borrowers to the Lender about (i) the financial condition of the Borrowers, (ii) the nature, extent or location of any Collateral, or (iii) the disposition or use of any Collateral, including cash Collateral; or

(n)    without the consent of the Lender, the Borrowers file, or support the filing of, a motion seeking the authority for the Borrowers to abandon any of the Collateral pursuant to section 554 of the Bankruptcy Code or otherwise.

15.8.    Criminal Proceedings.

The institution in any court of a criminal proceeding against any Loan Party which would have a Material Adverse Effect on such Loan Party.

15.9.    Change of Control.

The failure of SNHC to own and have voting control of at least one hundred percent (100%) of the issued and outstanding voting equity interest of any Borrower.

SECTION 16       REMEDIES UPON AN EVENT OF DEFAULT.

16.1.    Acceleration

Upon the occurrence and during the continuance of an Event of Default described in Section 15.7 hereof, subject to the Orders, all of the Obligations shall immediately and automatically become due and payable, without notice of any kind. Upon the occurrence of any other Event of Default, subject to the Orders, the Obligations may, at the option of Lender, in whole or in part at Lender's sole discretion, and without demand, notice or legal process of any kind, be declared, and immediately shall become, due and payable.

16.2.    Other Remedies.

Upon the occurrence and during the continuance of an Event of Default, Lender may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code and any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or in any of the other Loan Documents and all of Lender's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law. In particular, but not by way of limitation of the foregoing, Lender may, without notice, demand or legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which it already has possession), wherever it may be

-36-

found, and, subject to compliance with the terms of any lease and any landlord access agreement, for that purpose may pursue the same wherever it may be found, and, subject to compliance with the terms of any applicable lease and any landlord access agreement, may enter onto any of Borrowers' premises where any of the Collateral may be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of, and Lender shall have the right to store the same at any of Borrowers' premises without cost to Lender. At Lender's request, each Borrower shall, at Borrowers' expense, assemble the Collateral and make it available to Lender at one or more places to be designated by Lender and reasonably convenient to Lender and Borrowers. Borrowers recognize that if any Borrower fails to perform, observe or discharge any of its Obligations under this Agreement or the other Loan Documents, no remedy at law will provide adequate relief to Lender, and agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages. Any notification of intended disposition of any of the Collateral required by law will be deemed to be a reasonable authenticated notification of disposition if given at least ten (10) days prior to such disposition and such notice shall (i) describe Lender and Borrowers, (ii) describe the Collateral that is the subject of the intended disposition, (iii) state the method of the intended disposition, (iv) state that Borrowers are entitled to an accounting of the Obligations and state the charge, if any, for an accounting and (v) state the time and place of any public disposition or the time after which any private sale is to be made. Lender may disclaim any warranties that might arise in connection with the sale, lease or other disposition of the Collateral and has no obligation to provide any warranties at such time. Any Proceeds of any disposition by Lender of any of the Collateral may be applied by Lender, subject to the Carve-Out, except as otherwise limited by this Agreement, to the payment of expenses in connection with the Collateral, including, without limitation, legal expenses and reasonable attorneys' fees, and any balance of such Proceeds and all other payments received by Lender during the continuance of an Event of Default may be applied by Lender toward the payment of such of the Obligations, and in such order of application, as Lender may from time to time elect.

SECTION 17        CONDITIONS PRECEDENT.

      17.1.    <u>Conditions to Initial Loans.</u>

      The obligation of Lender to fund the Loans and to issue or cause to be issued the initial Letter of Credit, is subject to the satisfaction or waiver of the following conditions precedent (and the date on which all such conditions precedent have been satisfied and the initial Loans are advanced by Lender is called the "**Closing Date**"):

      (a)    Lender shall have received each of the agreements, reports, approvals, consents, certificates and other documents set forth on the closing document list attached hereto as <u>Schedule 17.1</u> (the "**Closing Document List**") in each case in form and substance satisfactory to Lender;

      (b)    Lender shall have received payment in full of all fees and expenses payable to it by Borrowers or any other Person pursuant to this Agreement or the Interim Order, on or before disbursement of the initial Loans hereunder; and

      (c)    The Interim Order shall have been entered by the Bankruptcy Court.

      17.2.    <u>Conditions to All Loans.</u>

      Lender shall not be obligated to fund any Loans or arrange for the issuance of any Letters of Credit, unless the following conditions are satisfied:

(a)     No Event of Default shall exist at the time of or result from such funding, issuance or grant;

(b)     The representations and warranties of each Loan Party in this Agreement and the other Loan Documents shall be true and correct as of the date, and after giving effect to such funding or issuance (except for representations and warranties that expressly relate to an earlier date which must be true and correct as of such earlier date); and

(c)     No event shall have occurred or circumstances exist that has or could reasonably be expected to have a Material Adverse Effect.

Each request (or deemed request) by Borrowers for funding of a Loan or issuance of a Letter of Credit shall constitute a representation by Borrowers that the foregoing conditions in this Section 17.2 are satisfied on the date of such request and on the date of such funding, issuance or grant.

SECTION 18        MISCELLANEOUS.

18.1.    Assignments; Participations.

18.1.1.        Assignments. (a) Lender may at any time assign to one or more entities that (i) is an accredited investor as such term is used in Regulation D made under the Securities Act of 1933, as amended and (ii) except following the occurrence and during the continuation of an Event of Default, is not a direct competitor of any Loan Party (any such Person meeting such criteria, an "**Assignee**") all or any portion of its Loans and Revolving Loan Commitment, without consent of Borrowers.

(b)     From and after the date on which the conditions described above have been met, (i) such Assignee shall be deemed automatically to have become a party hereto and, to the extent that rights and obligations hereunder have been assigned to such Assignee pursuant to an assignment agreement between Lender and the Assignee, shall have the rights and obligations of Lender hereunder and (ii) Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights (other than its indemnification rights) and obligations hereunder. Upon the request of the Assignee (and, as applicable, Lender) pursuant to an effective assignment agreement, Borrowers shall execute and deliver to the Assignee (and, as applicable, Lender) a note in the principal amount of the Assignee's pro rata share of the Revolving Commitment (and, as applicable, a note in the principal amount of the pro rata share of the Revolving Commitment retained by Lender plus the principal amount of the Term Loan retained by Lender). Each such note shall be dated the effective date of such assignment. Upon receipt by Lender of such note, Lender shall return to Borrower any prior note held by it.

(c)     Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release Lender from any of its obligations hereunder or under any other Loan Document or substitute any such pledgee or assignee for Lender as a party hereto.

18.1.2.    Participations. Lender may at any time sell to one or more Persons participating interests in its Loans, Revolving Loan Commitment or other interests hereunder (any such Person, a "**Participant**"). In the event of a sale by Lender of a participating interest to a Participant, (a) Lender's obligations hereunder shall remain unchanged for all purposes, (b) Borrowers shall continue to deal solely

-38-

and directly with Lender in connection with Lender's rights and obligations hereunder and (c) all amounts payable by Borrowers shall be determined as if Lender had not sold such participation and shall be paid directly to Lender. Borrowers agree that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement and with respect to any Letter of Credit to the same extent as if the amount of its participating interest were owing directly to it as Lender under this Agreement; provided that such right of set-off shall be subject to the obligation of each Participant to share with Lender, and Lender agrees to share with each Participant, on a pro rata basis. Borrowers also agree that each Participant shall be entitled to the benefits of Section 4.2 or 4.4 as if it were Lender (provided that on the date of the participation no Participant shall be entitled to any greater compensation pursuant to Section 4.2 or 4.4 than would have been paid to Lender on such date if no participation had been sold.

18.2.    Customer Identification - USA Patriot Act Notice.

Lender (for itself and not on behalf of any other party) hereby notifies the Loan Parties that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "USA Patriot Act"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow Lender, as applicable, to identify the Loan Parties in accordance with the Act.

18.3.    Indemnification by Borrowers:

IN CONSIDERATION OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY LENDER AND THE AGREEMENT TO EXTEND THE COMMITMENT PROVIDED HEREUNDER, EACH BORROWER (TO THE EXTENT PROVIDED OR AUTHORIZED IN THE ORDERS) HEREBY AGREES TO INDEMNIFY, EXONERATE AND HOLD LENDER AND EACH OF THE OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES AND AGENTS OF LENDER (EACH A "LENDER PARTY") FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES, INCLUDING ATTORNEY COSTS (COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"), INCURRED BY LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (A) [RESERVED], (B) THE USE, HANDLING, RELEASE, EMISSION, DISCHARGE, TRANSPORTATION, STORAGE, TREATMENT OR DISPOSAL OF ANY HAZARDOUS MATERIAL AT ANY PROPERTY OWNED OR LEASED BY ANY LOAN PARTY, (C) ANY VIOLATION OF ANY ENVIRONMENTAL LAWS WITH RESPECT TO CONDITIONS AT ANY PROPERTY OWNED OR LEASED BY ANY LOAN PARTY OR THE OPERATIONS CONDUCTED THEREON, (D) THE INVESTIGATION, CLEANUP OR REMEDIATION OF OFFSITE LOCATIONS AT WHICH ANY LOAN PARTY OR THEIR RESPECTIVE PREDECESSORS ARE ALLEGED TO HAVE DIRECTLY OR INDIRECTLY DISPOSED OF HAZARDOUS MATERIALS OR (E) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BY ANY OF LENDER PARTIES, EXCEPT FOR ANY SUCH INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE LENDER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, EACH BORROWER HEREBY AGREES TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES WHICH IS PERMISSIBLE

-39-

UNDER APPLICABLE LAW. ALL OBLIGATIONS PROVIDED FOR IN THIS SECTION 18.3 SHALL SURVIVE REPAYMENT OF THE LOANS, CANCELLATION OF THE NOTES, EXPIRATION OR TERMINATION OF THE LETTERS OF CREDIT, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE COLLATERAL DOCUMENTS AND TERMINATION OF THIS AGREEMENT.

 18.4. <u>Notice.</u>

 All written notices and other written communications with respect to this Agreement shall be sent by ordinary, certified or overnight mail, by telecopy or delivered in person, and in the case of Lender shall be sent to it at [**120 South LaSalle Street, Suite 200, Chicago, Illinois 60603, attention: _____, facsimile number: (312) ___-_____**], and in the case of Borrowers shall be sent to Borrowers at their principal place of business set forth on <u>Schedule 11.2</u> hereto or as otherwise directed by Borrower Representative in writing. All notices shall be deemed received upon actual receipt thereof or refusal of delivery.

 18.5. <u>Modification and Benefit of Agreement.</u>

 This Agreement and the other Loan Documents may not be modified, altered or amended except by an agreement in writing signed by Borrower or such other Person who is a party to such other Loan Document and Lender.

 18.6. <u>Headings of Subdivisions.</u>

 The headings of subdivisions in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the provisions of this Agreement.

 18.7. <u>Power of Attorney.</u>

 Each Borrower acknowledges and agrees that its appointment of Lender as its attorney and agent-in-fact for the purposes specified in this Agreement is an appointment coupled with an interest and shall be irrevocable until all of the Obligations (other than contingent indemnity and reimbursement Obligations for which no claim has been made, other Obligations that by their terms survive termination of this Agreement and obligations in respect of outstanding Letters of Credit that have been Cash Collateralized) are satisfied and paid in full and this Agreement is terminated.

 18.8. <u>Confidentiality.</u>

 Lender hereby agrees to use commercially reasonable efforts to assure that any and all information relating to any Borrower which is (i) furnished by any Borrower to Lender (or to any Affiliate of Lender); and (ii) non-public, confidential or proprietary in nature, shall be kept confidential by Lender or such Affiliate in accordance with applicable law; provided, however, that such information and other credit information relating to any Borrower may be distributed by Lender or such Affiliate to Lender's or such Affiliate's directors, managers, officers, employees, attorneys, Affiliates, assignees, participants, auditors, agents and regulators, and upon the order of a court or other governmental agency having jurisdiction over Lender or such Affiliate, to any other party. In addition, such information and other credit information may be distributed by Lender to potential participants or assignees of any portion of the Obligations, provided, that such potential participant or assignee agrees in writing to follow the confidentiality requirements set forth herein. Each Borrower and Lender further agree that this provision shall survive the termination of this Agreement. Notwithstanding the foregoing, Borrowers hereby

-40-

consent to Lender publishing a tombstone or similar advertising material relating to the financing transaction contemplated by this Agreement.

### 18.9.    Counterparts.

This Agreement, any of the other Loan Documents, and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which counterparts together shall constitute but one agreement.

### 18.10.    Electronic Submissions.

Upon not less than thirty (30) days' prior written notice (the "**Approved Electronic Form Notice**"), Lender may permit or require that any of the documents, certificates, forms, deliveries or other communications, authorized, required or contemplated by this Agreement or the other Loan Documents, be submitted to Lender in Approved Electronic Form (as hereafter defined), subject to any reasonable terms, conditions and requirements in the applicable Approved Electronic Forms Notice. For purposes hereof, "**Electronic Form**" means e-mail, e-mail attachments, data submitted on web-based forms or any other communication method that delivers machine readable data or information to Lender, and "**Approved Electronic Form**" means an Electronic Form that has been approved in writing by Lender (which approval has not been revoked or modified by Lender) and sent to Borrower in an Approved Electronic Form Notice. Except as otherwise specifically provided in the applicable Approved Electronic Form Notice, any submissions made in an applicable Approved Electronic Form shall have the same force and effect that the same submissions would have had if they had been submitted in any other applicable form authorized, required or contemplated by this Agreement or the other Loan Documents.

### 18.11.    Waiver of Jury Trial; Other Waivers.

(a)    **EACH BORROWER AND LENDER EACH HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY ANY BORROWER OR LENDER OR WHICH, IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP BETWEEN BORROWER AND LENDER.  IN NO EVENT SHALL LENDER BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.**

(b)    Each Borrower hereby waives, to the maximum extent permitted by law, demand, presentment, protest and notice of nonpayment, and further waives the benefit of all valuation, appraisal and exemption laws.

(c)    Each Borrower hereby waives, to the maximum extent permitted by law, the benefit of any law that would otherwise restrict or limit Lender or any Affiliate of Lender in the exercise of its right, which is hereby acknowledged and agreed to, to set-off against the Obligations, without notice at any time hereafter, any indebtedness, matured or unmatured, owing by Lender or such Affiliate of Lender to any Borrower, including, without limitation any Deposit Account at Lender or such Affiliate.

(d)    **EACH BORROWER HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL RIGHTS TO NOTICE AND HEARING OF ANY KIND PRIOR TO**

61086372_3

**THE EXERCISE BY LENDER OF ITS RIGHTS TO REPOSSESS THE COLLATERAL OF BORROWER WITHOUT JUDICIAL PROCESS OR TO REPLEVY, ATTACH OR LEVY UPON SUCH COLLATERAL, PROVIDED THAT IN THE EVENT THAT LENDER SEEKS TO ENFORCE ITS RIGHTS HEREUNDER BY JUDICIAL PROCESS OR SELF HELP, LENDER SHALL PROVIDE BORROWERS WITH SUCH NOTICES AS ARE REQUIRED BY LAW.**

Lender's failure, at any time or times hereafter, to require strict performance by any Borrower of any provision of this Agreement or any of the other Loan Documents shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by Lender of an Event of Default under this Agreement or any default under any of the other Loan Documents shall not suspend, waive or affect any other Event of Default under this Agreement or any other default under any of the other Loan Documents, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character. No delay on the part of Lender in the exercise of any right or remedy under this Agreement or any other loan Document shall preclude other or further exercise thereof or the exercise of any right or remedy. None of the undertakings, agreements, warranties, covenants and representations of any Borrower contained in this Agreement or any of the other Loan Documents and no Event of Default under this Agreement or default under any of the other Loan Documents shall be deemed to have been suspended or waived by Lender unless such suspension or waiver is in writing, signed by a duly authorized officer of Lender and directed to Borrowers specifying such suspension or waiver.

18.12.   Choice of Governing Laws; Construction; Forum Selection.

This Agreement and the other Loan Documents are submitted by Borrowers to Lender for Lender's acceptance or rejection at Lender's principal place of business as an offer by Borrowers to borrow monies from Lender now and from time to time hereafter, and shall not be binding upon Lender or become effective until accepted by Lender, in writing, at said place of business. If so accepted by Lender, this Agreement and the other Loan Documents shall be deemed to have been made at said place of business. **EXCEPT TO THE EXTENT SUPERCEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS, INCLUDING, WITHOUT LIMITATION, THE LEGALITY OF THE INTEREST RATE AND OTHER CHARGES, BUT EXCLUDING PERFECTION OF THE SECURITY INTERESTS IN COLLATERAL LOCATED OUTSIDE OF THE STATE OF ILLINOIS, WHICH SHALL BE GOVERNED AND CONTROLLED BY THE LAWS OF THE RELEVANT JURISDICTION IN WHICH SUCH COLLATERAL IS LOCATED.** If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or remaining provisions of this Agreement.

To induce Lender to accept this Agreement, Borrowers irrevocably agree that, subject to Lender's sole and absolute election, **ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE OR, IF SUCH COURT NO LONGER HAS JURSIDICTION, COURTS HAVING SITUS WITHIN THE CITY OF CHICAGO, STATE OF ILLINOIS. BORROWERS HEREBY WAIVE PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREE THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWERS BY CERTIFIED OR REGISTERED MAIL,**

**RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWERS AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.   BORROWERS HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST ANY BORROWER BY LENDER IN ACCORDANCE WITH THIS SECTION.**

SECTION 19      NONLIABILITY OF LENDER

The relationship between Borrowers on the one hand and Lender on the other hand shall be solely that of borrower and lender.  Lender has no fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Loan Parties, on the one hand, and Lender, on the other hand, in connection herewith or therewith is solely that of debtor and creditor.  Lender undertakes no responsibility to any Loan Party to review or inform any Loan Party of any matter in connection with any phase of any Loan Party's business or operations.  Borrowers agree, on behalf of themselves and each other Loan Party, that Lender shall have no liability to any Loan Party (whether sounding in tort, contract or otherwise) for losses suffered by any Loan Party in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought.  **NO LENDER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF ANY INFORMATION OR OTHER MATERIALS OBTAINED THROUGH INTRALINKS OR OTHER SIMILAR INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT, NOR SHALL ANY LENDER PARTY HAVE ANY LIABILITY WITH RESPECT TO, AND BORROWERS ON BEHALF OF THEMSELVES AND EACH OTHER LOAN PARTY, HEREBY WAIVE, RELEASE AND AGREE NOT TO SUE FOR ANY SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF THEIR ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE).**  Borrowers acknowledge that they have been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party.  No joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Loan Parties and Lender.

SECTION 20      BORROWER REPRESENTATIVE

(a)      Each Borrower hereby irrevocably appoints and constitutes the Borrower Representative as its agent to request and receive the proceeds of advances in respect of the Loans (and to otherwise act on behalf of such Borrower pursuant to this Agreement and the other Loan Documents) from Lender in the name or on behalf of each such Borrower.  Lender may disburse such proceeds to the bank account of Borrower Representative (or any one or more of the Borrowers) without notice to any other Borrower or any other Person.

(b)      Each Borrower hereby irrevocably appoints and constitutes the Borrower Representative as its agent to (i) receive statements of account and all other notices from Lender with respect to the Obligations or otherwise under or in connection with this Agreement and the other Loan Documents, (ii) execute and deliver Notices of Borrowing, Compliance Certificates and all other notices, certificates and documents to be executed and/or delivered by any Borrower under this Agreement or the

-43-

other Loan Documents; and (iii) otherwise act on behalf of such Borrower pursuant to this Agreement and the other Loan Documents.

(c)     The authorizations contained in this Section 20 are coupled with an interest and shall be irrevocable, and Lender may rely on any notice, request, information supplied by the Borrower Representative, every document executed by the Borrower Representative, every agreement made by the Borrower Representative or other action taken by the Borrower Representative in respect of any Borrower as if the same were supplied, made or taken by such Borrower. Without limiting the generality of the foregoing, the failure of one or more Borrowers to join in the execution of any writing in connection herewith shall not relieve any Borrower from obligations in respect of such writing.

(d)     No purported termination of the appointment of Borrower Representative as agent shall be effective without the prior written consent of Lender.

SECTION 21     JOINT AND SEVERAL LIABILITY

(a)     Notwithstanding anything to the contrary contained herein, all Obligations of each Borrower hereunder shall be joint and several obligations of Borrowers.

(b)     Notwithstanding any provisions of this Agreement to the contrary, it is intended that the joint and several nature of the Obligations of Borrowers and the liens and security interests granted by Borrowers to secure the Obligations, not constitute a "**Fraudulent Conveyance**" (as defined below). Consequently, Lender and Borrowers agree that if the Obligations of a Borrower, or any liens or security interests granted by such Borrower securing the Obligations would, but for the application of this sentence, constitute a Fraudulent Conveyance, the Obligations of such Borrower and the liens and security interests securing such Obligations shall be valid and enforceable only to the maximum extent that would not cause such Obligations or such lien or security interest to constitute a Fraudulent Conveyance, and the Obligations of such Borrower and this Agreement shall automatically be deemed to have been amended accordingly. For purposes hereof, "**Fraudulent Conveyance**" means a fraudulent conveyance under Section 548 of the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time.

(c)     Each Borrower assumes responsibility for keeping itself informed of the financial condition of the each other Borrower, and any and all endorsers and/or guarantors of any instrument or document evidencing all or any part of such other Borrower's Obligations and of all other circumstances bearing upon the risk of nonpayment by such other Borrowers of their Obligations and each Borrower agrees that Lender shall not have any duty to advise such Borrower of information known to Lender regarding such condition or any such circumstances or to undertake any investigation not a part of its regular business routine. If Lender, in its sole discretion, undertakes at any time or from time to time to provide any such information to a Borrower, Lender shall not be under any obligation to update any such information or to provide any such information to such Borrower on any subsequent occasion.

(d)     Lender is hereby authorized, without notice or demand and without affecting the liability of a Borrower hereunder, to, at any time and from time to time, (i) renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to another Borrower's Obligations or otherwise modify, amend or change the terms of any promissory note or other agreement, document or instrument now or hereafter executed by a Borrower and delivered to Lender; (ii) accept partial payments on a Borrower's Obligations; (iii) take and hold security or collateral for the payment of another Borrower's Obligations hereunder or for the payment of any guaranties of another Borrower's

Obligations or other liabilities of another Borrower and exchange, enforce, waive and release any such security or collateral; (iv) apply such security or collateral and direct the order or manner of sale thereof as Lender, in its sole discretion, may determine; and (v) settle, release, compromise, collect or otherwise liquidate a Borrower's Obligations and any security or collateral therefor in any manner, without affecting or impairing the obligations of the other Borrowers. Lender shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from a Borrower or any other source, and such determination shall be binding on such Borrower. All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of a Borrower's Obligations as Lender shall determine in its sole discretion without affecting the validity or enforceability of the Obligations of the other Borrowers.

(e)    Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (i) the absence of any attempt to collect a Borrower's Obligations from any Borrower or any guarantor or other action to enforce the same; (ii) the waiver or consent by Lender with respect to any provision of any instrument evidencing Borrowers' Obligations, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Borrower and delivered to Lender; (iii) failure by Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for Borrowers' Obligations; or (iv) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (other than the payment in full of the Obligations, other than contingent indemnification and reimbursement Obligations for which no claim has been made, Obligations that by their terms survive termination of this Agreement and Obligations in respect of outstanding Letters of Credit that are Cash Collateralized).

(f)    Until such time as all Obligations (other than contingent indemnification and reimbursement Obligations for which no claim has been made, Obligations that by their terms survive termination of this Agreement and Obligations in respect of outstanding Letters of Credit that are Cash Collateralized) have been paid in full and this Agreement is terminated, no payment made by or for the account of a Borrower including, without limitations, (i) a payment made by such Borrower on behalf of another Borrower's Obligations or (ii) a payment made by any other Person under any guaranty, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or Person or from or out of such other Borrower's or Person's property and such Borrower shall not exercise any right or remedy against such other Borrower or Person or any property of such other Borrower or Person by reason of any performance of such Borrower of its joint and several obligations hereunder.

-45-

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

THE SECURITY NETWORK HOLDINGS CORP.

By _____

Title _____

THE PRIVATEBANK AND TRUST COMPANY

By _____

Title _____

IPC INTERNATIONAL CORPORATION

By _____

Title _____

Signature Page to Post Petition Loan and Security Agreement

## EXHIBIT A – COMPLIANCE CERTIFICATE

Attached to and made a part of that certain Post Petition Loan and Security Agreement, as it may be amended in accordance with its terms from time to time, including all exhibits attached thereto (the "**Agreement**") dated as of August __, 2013 between THE SECURITY NETWORK HOLDINGS CORP., IPC INTERNATIONAL CORPORATION ("**Borrowers**") and THE PRIVATEBANK AND TRUST COMPANY ("**Lender**").

This Certificate is submitted pursuant to Section 9.4 of the Agreement.

The undersigned hereby certifies to Lender that as of the date of this Certificate:

1.     The undersigned is the _____ of Borrowers.

2.     There exists no event or circumstance which is or which with the passage of time, the giving of notice, or both would constitute an Event of Default, as that term is defined in the Agreement, or, if such an event of circumstance exists, a writing attached hereto specifies the nature thereof, the period of existence thereof and the action that Borrowers have taken or propose to take with respect thereto.

3.     No material adverse change in the condition, financial or otherwise, business, property, or results of operations of Borrowers has occurred since [**date of last Compliance Certificate/last financial statements delivered prior to closing**], or, if such a change has occurred, a writing attached hereto specifies the nature thereof and the action that Borrowers have taken or propose to take with respect thereto.

4.     Borrowers are in compliance with the representations, warranties and covenants in the Agreement, or, if Borrowers are not in compliance with any representations, warranties or covenants in the Agreement, a writing attached hereto specifies the nature thereof and the action that Borrowers have taken or propose to take with respect thereto.

5.     The financial statements of Borrowers being concurrently delivered herewith have been prepared in accordance with generally accepted accounting principles consistently applied over the periods applicable thereto, subject in the case of unaudited financial statements to the absence of footnotes and customary year-end adjustments.

Exhibit A – Page 1

6.    Attached hereto is a true and correct calculation of the financial covenants contained in Section 14 of the Agreement.

THE SECURITY NETWORK HOLDINGS CORP.


By _____

Its _____

IPC INTERNATIONAL CORPORATION


By _____

Its _____

Exhibit A – Page 2

**EXHIBIT B - NOTICE OF BORROWING**

Exhibit B – Page 1

61086372_3

**EXHIBIT C – COMMERCIAL TORT CLAIMS**

**[COMPANY TO PROVIDE]**

61086372_3

### Schedule 1 – Permitted Liens

| Jurisdiction | File # | Borrower | Secured Party | Collateral | Filing Date |
|---|---|---|---|---|---|
| Illinois | 013257183 | IPC International Inc. 3000 Lakeside Dr. Suite 309-8 Bannockburn, IL 60015 | Court Square Leasing Corp. 14 Great Valley Parkway Suite 100 Malvern, PA 19355 | Equipment Lease | 5/15/2008 |
| Illinois | 013351112 | IPC International Inc. 3000 Lakeside Dr. Suite 309-8 Bannockburn, IL 60015 | CIT Communications Finance Corp. 1 CIT Drive Livingston, NJ 07039 | Equipment Lease | 6/13/2008 |
| Illinois | 014864288 | IPC International Corp. 2111 Waukegan Rd. Suite 100 Bannockburn, IL 60015 | CIT Technology Financing Services, Inc. Jacksonville, FL 32256 | Equipment Lease | 12/21/2009 |
| Illinois | 017236342 | IPC International Inc. 3000 Lakeside Dr. Suite 309-8 Bannockburn, IL 60015 | Xerox Financing Services, Inc. 45 Glover Ave Norwalk, CT 06856 | Equipment Lease | 4/26/2012 |

**Schedule 11.2 - Locations**

| Location | Address and Contact Information |
|---|---|
| Headquarters | 2111 Waukegan Rd.<br>Bannockburn, IL 60015 |
| West Coast Operations | 909 N. Sepulveda<br>Suite 370<br>El Segundo, CA 90245 |
| Storage Facilities | 151 S. Pfingsten Rd.<br>Unit R<br>Deerfield, IL 60015 |
| The Private Bank –<br><br>• Operating Account #2207705<br>• Deposit Sweep Account #2267048<br>• Accounts Payable Account #7702271<br>• Payroll Account for Field Employees #7702289<br>• Payroll Account for Corporate Employees #2207713<br>• Money Market Account #3165207 | 120 South LaSalle Street<br>Chicago, IL 60603<br>Phone – 312-564-6969 |
| US Bank - Payroll Account for California Employees #154980218189 | PO Box 1800<br>Saint Paul, MN<br>55101-0800<br>Phone – (800) 673-3555 |
| Adrian Mall | 1357 South Main Street<br>Adrian, MI 49221<br>Phone – (517) 263-0685<br>Fax – (517) 265-2278 |
| Ala Moana Center | 1450 Ala Moana Blvd.<br>Honolulu, HI 96814<br>Phone – (808) 946-2811<br>Fax – (808) 955-2193 |
| Alamo Quarry Market | 255 East Basse Road<br>Suite 400<br>San Antonio, TX 78209<br>Phone – (210) 825-8885<br>Fax – (210) 824-9559 |
| Alexandria Mall | 3437 Masonic Drive<br>Alexandria, LA 71301<br>Phone – (318) 448-0227<br>Fax – (318) 442-9849 |

| Location | Address and Contact Information |
|---|---|
| Almeda Mall | 555 Almeda Mall<br>Houston, TX 77075<br>Phone – (713) 993-0123<br>Fax – (713) 993-0103 |
| Arboretum of South Barrington | 100 W. Higgins Road<br>South Barrington, IL 60010<br>Phone – (847) 426-6200<br>Fax – (847) 426-6266 |
| Ashtabula Towne Square | 3315 N. Ridge East<br>Unit 700<br>Ashtabula, OH 44004<br>Phone – (440) 998-2020<br>Fax – (440) 992-4875 |
| Aventura Commons | 21265 Biscayne Blvd<br>Miami, FL 33180<br>Phone – (305) 854-2800<br>Fax – (305) 859-8300 |
| Aventura Mall | 19501 Biscayne Blvd.<br>Suite 400<br>Aventura, FL 33180<br>Phone – (305) 933-5548<br>Fax – (305) 935-4185 |
| Avenue Viera, The | 2261 Towne Center Avenue<br>Suite 113<br>Viera, FL 32940<br>Phone – (321) 634-5390<br>Fax – (321) 634-5391 |
| Aviation Mall | 578 Aviation Road<br>Queensbury, NY 12804<br>Phone – (518) 793-8818<br>Fax – (518) 793-9295 |
| Bay Plaza Shopping Center | 1430 E. Plaza Blvd<br>National City, CA 91950<br>Phone – (619) 770-5505 |
| Beachwood Place | 26300 Cedar Road<br>Beachwood, OH 44122<br>Phone – (216) 464-3698<br>Fax – (216) 464-7939 |
| Bel Air Mall | 3299 Bel Air Mall<br>Mobile, AL 36606 |

| Location | Address and Contact Information |
|---|---|
|  | Phone – (251) 478-1893<br>Fax – (251) 476-5722 |
| Berkshire Mall | 655 Cheshire Road<br>Lanesborough, MA 01237<br>Phone – (413) 445-4400<br>Fax – (413) 442-3854 |
| Best on the Boulevard | 3810-3910 S. Maryland Parkway<br>Las Vegas, NV 89119<br>Phone – (480) 507-2700<br>Fax – (480) 507-2712 |
| Beverly Center | 8500 Beverly Blvd.<br>Suite 150A<br>Los Angeles, CA 90048<br>Phone – (310) 854-0071<br>Fax – (310) 854-6376 |
| Biltmore Square Mall | 800 Brevard Road<br>Asheville, NC 28806<br>Phone – (828) 667-2310<br>Fax – (828) 665-1857 |
| Birchwood Mall | 4350 24th Avenue<br>Box 4350<br>Fort Gratiot, MI 48059<br>Phone – (810) 385-7900<br>Fax – (810) 385-9184 |
| Boyer Company, The (Boyer Phase II & Office Towers) | UT |
| Branson Landing | 100 Branson Landing Blvd<br>Branson, MO 65616<br>Phone – (417) 239-3002<br>Fax – (417) 239-3006 |
| Bridgepark Plaza | Ladera Ranch, CA 92675 |
| Bridgewater Commons | 400 Commons Way<br>Bridgewater, NJ 08807-2808<br>Phone – (908) 218-1166<br>Fax – (908) 218-1722 |
| Buena Park Downtown | 8308 on the Mall<br>Buena Park, CA 90620<br>Phone – (714) 503-5000<br>Fax – (714) 761-0748 |
| Burbank Empire Center | 345 E Colorado Blvd. |

| **Location** | **Address and Contact Information** |
|---|---|
| | Pasadena, CA 91101<br>Phone – (310) 541-2242 |
| Burr Ridge Village Center | 701 Village Center Drive<br>Burr Ridge, IL 60527<br>Phone – (630) 654-2782<br>Fax – (630) 325-5408 |
| Calhoun Square | 3001 Hennepin Avenue<br>Minneapolis, MN 55408<br>Phone – (612) 824-1240<br>Fax – (612) 824-4930 |
| Camarillo Village Square | CA 93030<br>Camarillo, CA |
| Carmel Country Plaza | 12750 Carmel Country Plaza<br>San Diego, CA 92130<br>Phone – (858) 350-2600<br>Fax – (858) 350-2620 |
| Carmel Mountain Plaza | 11602-12174 Carmel Mountain Road<br>San Diego, CA 92128<br>Phone – (858) 350-2600<br>Fax – (858) 350-2620 |
| Central Mall Ft. Smith | 5111 Rogers Ave.<br>Ft. Smith, AR 72903<br>Phone – (479) 452-1866<br>Fax – (479) 452-3751 |
| Central Mall Lawton | 200 SW C Avenue<br>Lawton, OK 73501<br>Phone – (580) 355-7792<br>Fax – (580) 248-4081 |
| Central Mall Port Arthur | 3100 Highway 365<br>Port Arthur, TX 77642<br>Phone – (409) 727-5592<br>Fax – (409) 727-5781 |
| Central Mall Texarkana | 2400 Richmond Road<br>Box 8<br>Texarkana, TX 75503<br>Phone – (903) 838-4669<br>Fax – (903) 838-0619 |
| Centre at Glen Burnie | 6711 Ritchie Highway<br>Glen Burnie, MD 21061 |

| Location | Address and Contact Information |
|---|---|
|  | Phone – (410) 766-6529<br>Fax – (410) 766-0823 |
| Century III Mall | 3075 Clairton Road<br>West Mifflin, PA 15123<br>Phone – (412) 653-1222<br>Fax – (412) 655-0202 |
| Century Square | 100 48 Hawthorne Blvd<br>Inglewood, CA 90304 |
| Cerritos Towne Center | 12731 Towne Center Drive<br>Cerritos, CA 90703<br>Phone – (562) 938-1722<br>Fax – (562) 938-1744 |
| Champlain Centre | 60 Smithfield Blvd<br>Plattsburgh, NY 12901<br>Phone – (518) 561-8660<br>Fax – (518) 561-8682 |
| Cherry Creek Shopping Center | 3000 East First Avenue<br>Denver, CO 80206<br>Phone – (303) 388-2522<br>Fax – (303) 388-8203 |
| Chino Spectrum Marketplace | 3808 Grand Avenue<br>Suite B<br>Chino, CA 91710<br>Phone – (909) 902-5555<br>Fax – (909) 902-5559 |
| Chino Spectrum Towne Center | 3808 Grand Ave.<br>Suite B<br>Chino, CA 91710<br>Phone – (909) 902-5555<br>Fax – (909) 902-5559 |
| Christiana Mall | 715 Christiana Mall<br>Newark, DE 19702<br>Phone – (302) 731-9816<br>Fax – (302) 731-9950 |
| Christown Spectrum Mall | 1703 W. Bethany Home Road<br>Management Office<br>Phoenix, AZ 85015<br>Phone – (602) 249-0670<br>Fax – (602) 246-8690 |

| Location | Address and Contact Information |
|---|---|
| Citadel Crossing | Colorado Springs, CO 80909 |
| Citadel Guest Services, The | 750 Citadel Drive East<br>Suite 3114<br>Colorado Springs, CO 80909<br>Phone – (719) 591-2900<br>Fax – (719) 597-4839 |
| Citadel, The | 750 Citadel Drive East<br>Suite 3114<br>Colorado Springs, CO 80909<br>Phone – (719) 591-2900<br>Fax – (719) 597-4839 |
| City Creek Center | 50 E. South Temple<br>Suite 70<br>Salt Lake City, UT 84111<br>Phone – (801) 238-5320<br>Fax – (801) 238-5321 |
| City Creek Reserve | 15 East South Temple<br>Suite 800<br>Salt Lake City, UT 84150 |
| City of West Palm Beach City Hall | 401 Clematis St<br>West Palm Beach, FL 33401 |
| City of West Palm Beach City Hall | 200 2nd Street<br>West Palm Beach, FL 33401 |
| City of West Palm Beach City Parking | 500 Banyan Boulevard<br>West Palm Beach, FL 33401 |
| City of West Palm Beach Library | 411 Clematis Street<br>West Palm Beach, FL 33401 |
| CityNorth | 5315 E. High Street<br>Suite 123<br>Phoenix, AZ 85054<br>Phone – (480) 319-8700<br>Fax – (480) 513-3240 |
| CityPlace Office Tower | 525 Okeechobee Blvd<br>West Palm Beach, FL 33401 |
| CityScape | 1 East Washington Street<br>Phoenix, AZ 85004<br>Phone – (602) 772-3900 |

| **Location** | **Address and Contact Information** |
|---|---|
| | Fax – (602) 772-3933 |
| Clearview Mall | 101 Clearview Circle<br>Butler, PA 16001<br>Phone – (724) 285-5721<br>Fax – (724) 285-9935 |
| Clifton Park Center Mall | 22 Clifton Country Road<br>Clifton Park, NY 12065<br>Phone – (518) 371-7010<br>Fax – (518) 371-0208 |
| CMI Center | 10400 Little Patuxent Pkwy<br>Suite 1000<br>Columbia, MD 21044<br>Phone – (410) 992-3605<br>Fax – (410) 730-6363 |
| College Square Mall | 1 College Square Mall<br>Cedar Falls, IA 50613<br>Phone – (319) 277-3636<br>Fax – (319) 277-7184 |
| Colonie Center | 131 Colonie Center<br>Albany, NY 12205<br>Phone – (518) 459-9020<br>Fax – (518) 459-2147 |
| Colony Square Mall | 3575 Maple Avenue<br>Zanesville, OH 43701<br>Phone – (740) 454-3255<br>Fax – (740) 454-8801 |
| Columbia Mall | 2800 S Columbia Mall<br>Grand Forks, ND 58201<br>Phone – (701) 746-8383<br>Fax – (701) 772-3537 |
| Columbia Mall - MO | 2300 Bernadette Dr<br>Columbia, MO 65203<br>Phone – (573) 445-8458<br>Fax – (573) 445-3219 |
| Conestoga Mall | 3404 W. 13th Street<br>Grand Island, NE 68803<br>Phone – (308) 382-4210<br>Fax – (308) 382-5851 |
| Corte Madera Town Center | 100 Corte Madera Town Center |

| Location | Address and Contact Information |
|---|---|
| | Corte Madera, CA 94925<br>Phone – (415) 924-2961<br>Fax – (415) 924-7062 |
| Country Club Center | 19950 West Country Club Dr<br>Aventura, FL 33180<br>Phone – (305) 682-1354 |
| Country Club Plaza | 18454 NW 67th Avenue<br>Hialeah, FL 33015<br>Phone – (305) 505-0264 |
| Courtyard by Marriott@ Aventura | 2825 NE 191 Street<br>Aventura, FL 33180<br>Phone – (305) 937-0805<br>Fax – (305) 937-0806 |
| Coventry Mall | Route 724 & 100<br>Pottstown, PA 19465<br>Phone – (610) 327-0700<br>Fax – (610) 327-8392 |
| Crestwood Mall | 109 Crestwood Plaza<br>St. Louis, MO 63126<br>Phone – (314) 962-2395<br>Fax – (314) 962-2384 |
| Crossgates Mall | 1 Crossgate Mall Road<br>Albany, NY 12203<br>Phone – (518) 869-3522<br>Fax – (518) 869-9683 |
| Crossroads Center | 2060 Crossroads Blvd.<br>Suite 124<br>Waterloo, IA 50702<br>Phone – (319) 234-1788<br>Fax – (319) 234-5102 |
| Crossroads Center-VA | 5800-5880 Leesburg Pike<br>Falls Church, VA 22041 |
| Crossroads, The | 6650 South Westnedge Avenue<br>Portage, MI 49024<br>Phone – (269) 327-3500<br>Fax – (269) 327-5119 |
| Currie Park | 401 Clematis Street<br>West Palm Beach, FL 33401 |
| Dadeland Station | 8312 South Dixie Highway |

| Location | Address and Contact Information |
|---|---|
| | Miami, FL 33143<br>Phone – (305) 854-2800<br>Fax – (305) 859-8300 |
| Decatur Mall | 1801 Beltline Rd SW<br>Decatur, AL 35601<br>Phone – (256) 350-0453<br>Fax – (256) 350-0599 |
| Del Monte Center | 1410 Del Monte Center<br>Monterey, CA 93940<br>Phone – (831) 373-2705<br>Fax – (831) 373-8675 |
| Desert Ridge Marketplace | 21001 N. Tatum Blvd.<br>Suite 36-1155<br>Phoenix, AZ 85050<br>Phone – (480) 513-7586<br>Fax – (480) 563-1829 |
| DeVargas Center | 564 North Guadalupe Street<br>Santa Fe, NM 87501<br>Phone – (505) 982-2655<br>Fax – (505) 988-5227 |
| District at Green Valley Ranch, The | 2225 Village Walk Drive<br>Suite 171<br>Henderson, NV 89052<br>Phone – (702) 564-8595<br>Fax – (702) 270-9249 |
| District at Howell Mill | 1801 Howell Mill Road NW<br>Atlanta, GA 30318 |
| District at Tustin Legacy, The | 2437 Park Avenue<br>Tustin, CA 92782<br>Phone – (714) 259-9090<br>Fax – (714) 259-9091 |
| Dolphin Mall | 11401 NW 12th Street<br>Miami, FL 33172<br>Phone – (305) 599-3000<br>Fax – (305) 436-9000 |
| Downtown Dadeland | 7283 SW 90th Way<br>Management Office<br>Miami, FL 33156<br>Phone – (305) 670-9964<br>Fax – (305) 670-5179 |
| Downtown Development Authority | 301 Clematis Street |

| Location | Address and Contact Information |
|---|---|
| | Suite 200<br>West Palm Beach, FL 33401 |
| East Town Mall | 2350 East Mason Street<br>Green Bay, WI 54302<br>Phone – (920) 468-8500<br>Fax – (920) 468-8889 |
| Eastland Center | 18000 Vernier Road<br>Harper Woods, MI 48225<br>Phone – (313) 371-1501<br>Fax – (313) 371-3511 |
| Eastpoint Mall | 7839 Eastpoint Mall<br>Baltimore, MD 21224<br>Phone – (410) 284-0934<br>Fax – (410) 284-3766 |
| Elverta Crossing | 8013 Elverta Road<br>Antelope, CA 95843 |
| Enclave, The | 400 Enclave Circle<br>Costa Mesa, CA 92626<br>Phone – (714) 662-7070<br>Fax – (714) 662-7075 |
| EpiCentre | 2010 E. Trade Street<br>Suite C-446B<br>Charlotte, NC 28202 |
| Fair Oaks | 11750 Fair Oaks<br>Fairfax, VA 22033<br>Phone – (703) 359-8302<br>Fax – (703) 591-6548 |
| Fairlane Town Center | 18900 Michigan Avenue<br>Dearborn, MI 48126<br>Phone – (313) 593-1370<br>Fax – (313) 593-0572 |
| Faneuil Hall | 4 South Market Building<br>Boston, MA 02109<br>Phone – (617) 523-1300<br>Fax – (617) 523-1779 |
| Fashion Island | 401 Newport Center Drive<br>Suite A-150<br>Newport Beach, CA 92660<br>Phone – (949) 720-3300 |

| Location | Address and Contact Information |
|---|---|
|  | Fax – (949) 720-3350 |
| Fifth & Alton | 560 Lenox Ave<br>Miami Beach, FL 33139<br>Phone – (305) 854-2800<br>Fax – (305) 859-8300 |
| Findlay Village Mall | 1800 Tiffin Avenue<br>Findlay, OH 45840<br>Phone – (419) 422-8732<br>Fax – (419) 422-2683 |
| Five Points Mall | 1129 North Baldwin Avenue<br>Marion, IN 46952 |
| Flagler Landing | 325 Clematis Street<br>Suite 202<br>West Palm Beach, FL 33401 |
| Fort Craig Medical Centers | 900 S Main Street<br>Corona, CA 92882 |
| Frederick Towne Mall | U.S. Route 40 West<br>Frederick, MD 21702<br>Phone – (301) 662-9300<br>Fax – (301) 662-9339 |
| Front Range Village | 2720 Council Tree Avenue<br>Suite 160<br>Fort Collins, CO 80525<br>Phone – (970) 226-9050<br>Fax – (970) 226-8750 |
| Galleria at Crystal Run | 1 Galleria Drive<br>Suite 142<br>Middletown, NY 10941<br>Fax – (315) 422-2717 |
| Galleria at Fort Lauderdale | 2414 E. Sunrise Blvd.<br>Ft. Lauderdale, FL 33304<br>Phone – (954) 564-1036<br>Fax – (954) 566-9976 |
| Galleria of Mount Lebanon, The | 1500 Washington Road<br>Pittsburgh, PA 15228<br>Phone – (412) 561-4000<br>Fax – (412) 561-6486 |
| Galleria Towers, The | 2700 Post Oak Blvd<br>Suite 200 |

| Location | Address and Contact Information |
|---|---|
| | Houston, TX 77056<br>Phone – (713) 621-9010<br>Fax – (713) 621-9035 |
| Gardens on El Paseo, The | 73-545 El Paseo Ave. Bld. E<br>Suite 2500<br>Palm Desert, CA 92260<br>Phone – (760) 862-1990<br>Fax – (760) 862-1884 |
| Gateway Village | 28207-28313 Newhall Ranch Road<br>Valencia, CA 91355 |
| Gateway, The | 62 1/2 Rio Grande Street<br>Salt Lake City, UT 84101<br>Phone – (801) 456-2000 |
| Genesee Valley Shopping Center | 3341 S. Linden Road<br>Flint, MI 48507<br>Phone – (810) 732-4006<br>Fax – (810) 732-4343 |
| Glenbrook Square | 4201 Coldwater Blvd<br>Fort Wayne, IN 46805<br>Phone – (260) 483-2119<br>Fax – (260) 483-7756 |
| Glendale Costco | 5850 W. Bell Road<br>Glendale, AZ 85308<br>Phone – (480) 461-0050<br>Fax – (480) 461-1687 |
| Glendale Fashion Center | 249 (F) North Glendale<br>Glendale, CA 91206<br>Phone – (562) 938-1722<br>Fax – (562) 938-1744 |
| Golden Triangle Mall | 2201 S. I - 35 E<br>Denton, TX 76205<br>Phone – (940) 566-6024<br>Fax – (940) 382-1990 |
| Golf Mill Shopping Center | 239 Golf Mill Center<br>Niles, IL 60714<br>Phone – (847) 699-1070<br>Fax – (847) 699-1593 |
| Grand Lakes Marketplace | SE Corner Grand Parkway and Frye Road<br>Katy, TX 77449 |

| <u>Location</u> | <u>Address and Contact Information</u> |
|---|---|
| Grande Promenade Shopping Center | 230 E. WT Harris Blvd.<br>Charlotte, NC 28202 |
| Great Lakes Crossing Outlets | 4000 Baldwin Road<br>Auburn Hills, MI 48326<br>Phone – (248) 454-5010<br>Fax – (248) 745-8719 |
| Greeley Mall | 2050 Greeley Mall<br>Greeley, CO 80631<br>Phone – (970) 356-4255<br>Fax – (970) 356-2506 |
| GreenStreet | 1201 Fannin Street<br>Suite 325<br>Houston, TX 77002<br>Phone – (832) 320-1201<br>Fax – (832) 320-1202 |
| Greenville Mall - NC | 714 SE Greenville Blvd<br>Greenville, NC 27858<br>Phone – (252) 756-1748<br>Fax – (252) 756-8722 |
| Groves Shopping Center | 1020-1180, 1310, 1320 W. Elliott Road<br>Tempe, AZ 85284 |
| Gunston Plaza | 7700 Gunston Plaza Drive<br>Lorton, VA 22079<br>Phone – (301) 374-2261 |
| Hampshire Mall | 367 Russell Street<br>Hadley, MA 01035<br>Phone – (413) 586-5700<br>Fax – (413) 586-2807 |
| Hampton Inn @ Aventura Mall | 1000 S. Federal Hwy<br>Hallandale Beach, FL 33009<br>Phone – (954) 874-1111<br>Fax – (954) 874-1112 |
| Hanover Mall | 1775 Washington Street<br>Hanover, MA 02339<br>Phone – (781) 826-7386<br>Fax – (781) 826-1575 |
| Harborplace Galleria and Tower | 200 East Pratt Street<br>4th Floor Mgmt Ofc<br>Baltimore, MD 21202 |

| **Location** | **Address and Contact Information** |
|---|---|
| | Phone – (410) 332-4191<br>Fax – (410) 547-7317 |
| Harborplace Pavilion | 200 East Pratt Street<br>Baltimore, MD 21202 |
| Harrisburg Mall | 3351 Paxton Street<br>Harrisburg, PA 17111<br>Phone – (717) 564-0980<br>Fax – (717) 564-4935 |
| Hayden North | 12228 N. Cave Creek Road<br>Phoenix, AZ 85022<br>Phone – (480) 461-0050<br>Fax – (480) 461-1687 |
| Hedwig Village | 9429/9401 Katy Freeway<br>Houston, TX 77024 |
| Highland Mall | 6001 Airport Blvd          Suite 1199<br>Austin, TX 78752<br>Phone – (512) 454-9656<br>Fax – (512) 452-1463 |
| Hilltop Mall | 2200 Hilltop Mall Road<br>Richmond, CA 94806<br>Phone – (510) 223-6900<br>Fax – (510) 223-1453 |
| Holiday Village Mall | 1200 10th Avenue S.<br>Great Falls, MT 59405<br>Phone – (406) 727-2089<br>Fax – (406) 761-6944 |
| Hollywood Regis Community Center | 7320 Hawthorn Avenue<br>Los Angeles, CA 90046 |
| Holyoke Mall at Ingleside | 50 Holyoke Street<br>Holyoke, MA 01041-1780<br>Phone – (413) 536-1441<br>Fax – (413) 536-5740 |
| Hotel Icon | 220 Main Street<br>Houston, TX 77002 |
| Houston County Galleria | 2922 Watson Blvd.<br>Centersville, GA 31028<br>Phone – (478) 953-9631 |

| Location | Address and Contact Information |
|---|---|
| | Fax – (478) 953-5512 |
| Hudson Valley Mall | 1300 Ulster Avenue<br>Box 310<br>Kingston, NY 12401<br>Phone – (315) 471-4420<br>Fax – (315) 471-6659 |
| Independence Mall | 101 Independence Mall Way<br>Kingston, MA 02364<br>Phone – (781) 585-8900<br>Fax – (781) 585-8999 |
| International Plaza | 2223 N. Westshore Blvd.<br>Suite 2000<br>Tampa, FL 33607<br>Phone – (813) 342-3780<br>Fax – (813) 342-3788 |
| Inwood Village | 5370 W. Lovers Lane<br>Suite 326<br>Dallas, TX 75209-4253<br>Phone – (214) 350-2500<br>Fax – (972) 202-7122 |
| Irvine Spectrum Center | 71 Fortune Drive<br>Suite 970<br>Irvine, CA 92618<br>Phone – (949) 789-9180<br>Fax – (949) 789-9184 |
| Isles at Wellington Community Association, Inc. | 4325 Isles Vista Blvd.<br>Wellington, FL 33449<br>Phone – (561) 795-5667<br>Fax – (561) 795-4392 |
| Jersey Gardens | 651 Kapkowski Road<br>Elizabeth, NJ 07201-2923<br>Phone – (908) 436-3005<br>Fax – (908) 436-3010 |
| Kendall Village Center | 8521 SW 124th Ave<br>Miami, FL 33183<br>Phone – (305) 854-2800<br>Fax – (305) 859-8300 |
| Kendall Village West | 12405 SW 88 Street<br>Miami, FL 33133<br>Phone – (305) 854-2800 |

| Location | Address and Contact Information |
|---|---|
| | Fax – (305) 859-8300 |
| Kendallgate Shopping Center | 11900 SW 88th St<br>Miami, FL 33186<br>Phone – (305) 854-2800<br>Fax – (305) 854-8300 |
| Killeen Mall | 2100 S W.S. Young Drive<br>Killeen, TX 76543<br>Phone – (254) 699-2211<br>Fax – (254) 690-2073 |
| Kings' Shops | 250 Waikolola Beach Drive<br>Waikolola, HI 96738<br>Phone – (808) 886-8811 |
| Lake Elsinore Outlets | 17600 Collier Avenue<br>Suite A100<br>Lake Elsinore, CA 92530<br>Phone – (951) 245-0087<br>Fax -- (951) 245-4229 |
| Lakeshore Mall | 150 Pearl Nix Parkway<br>Gainesville, GA 30501-3563<br>Phone – (770) 535-8877<br>Fax – (972) 248-0871 |
| Lakeside Mall | 14000 Lakeside Circle<br>Sterling Heights, MI 48313<br>Phone -- (586) 247-1590<br>Fax – (586) 247-0762 |
| Lansing Mall | 5330 West Saginaw Highway<br>Lansing, MI 48917<br>Phone – (517) 321-0145<br>Fax -- (517) 321-9685 |
| Lantana Plaza | 5812 Jog Road<br>Lake Worth, FL 33467<br>Phone – (504) 904-8500<br>Fax – (504) 904-8547 |
| Loma Santa Fe Plaza | 905-993 Lomas Santa Fe Drive<br>San Diego, CA 92075<br>Phone – (858) 350-2600<br>Fax – (858) 350-2620 |
| Long Beach Marketplace, The | 6475 Pacific Coast Highway<br>Long Beach, CA 90803 |

| Location | Address and Contact Information |
|---|---|
|  | Phone -- (949) 475-4588<br>Fax -- (949) 475-4585 |
| Long Beach Towne Center | 7575 Carson Boulevard<br>Long Beach, CA 90808<br>Phone -- (562) 938-1722<br>Fax -- (562) 938-1744 |
| Lufkin Mall | 4600 S. Medford Drive<br>Lufkin, TX 75901<br>Phone -- (936) 639-1284<br>Fax -- (936) 639-1481 |
| MacArthur Center | 300 Monticello Avenue<br>Norfolk, VA 23510<br>Phone -- (757) 627-6502<br>Fax -- (757) 627-6624 |
| Main Street Village | 2555 Main Street<br>Irvine, CA 92614 |
| Malibu Lumber Yard | 3939 Cross Creek Road<br>Malibu, CA 90265 |
| Mall at Green Hills | 2126 Abbott Martin Road<br>Suite 171<br>Nashville, TN 37215<br>Phone -- (615) 298-5478<br>Fax -- (615) 383-4373 |
| Mall at Partridge Creek, The | 17420 Hall Road<br>Clinton Township, MI 48038<br>Phone -- (586) 416-3839<br>Fax -- (586) 226-0820 |
| Mall at Short Hills, The | 1200 Morris Turnpike<br>Suite A-001<br>Short Hills, NJ 07078<br>Phone -- (973) 376-7359<br>Fax -- (973) 376-2976 |
| Mall at Wellington Green, The | 10300 West Forest Hill Blvd.<br>Suite 2000<br>Wellington, FL 33414<br>Phone -- (561) 227-6901<br>Fax -- (561) 227-6920 |
| Mall at Whitney Field, The | 100 Commercial Road<br>Leominster, MA 01453 |

| Location | Address and Contact Information |
| --- | --- |
|  | Phone – (978) 537-7500<br>Fax – (978) 840-4620 |
| Mall de las Aguilas | 455 South Bibb Street<br>Eagle Pass, TX 78852<br>Phone – (830) 773-5302<br>Fax – (830) 773-9026 |
| Mall in Columbia, The | 10300 Little Patuxent Parkway<br>Columbia, MD 21044-3341<br>Phone – (410) 730-3300<br>Fax – (410) 730-8155 |
| Mall of Abilene | 4310 Buffalo Gap Road<br>Abilene, TX 79606<br>Phone – (325) 698-4351<br>Fax – (325) 698-4171 |
| Manassas Mall | 8300 Sudley Rd<br>Manassas, VA 20109<br>Phone – (703) 368-7232<br>Fax – (703) 368-7229 |
| Mandalay Village | 529-687 Channel Island Blvd<br>Port Hueneme, CA 93041 |
| Manhattan Village Mall | 1200 Rosecrans Avenue<br>Suite 201<br>Manhattan Beach, CA 90266<br>Phone – (310) 426-6313<br>Fax – (310) 426-9899 |
| Market Common, The | 4017 Deville Street<br>Myrtle Beach, SC 29577<br>Phone – (843) 839-3500<br>Fax – (843) 839-3502 |
| Market Place Shopping Center | 2000 North Neil Street<br>Champaign, IL 61820<br>Phone – (217) 356-2700<br>Fax – (217) 359-3385 |
| Marq*E Entertainment Center | 7620 Katy Freeway<br>Suite 350<br>Houston, TX 77024<br>Phone – (713) 623-6800<br>Fax – (713) 623-6804 |
| Marriott Residence Inn@Aventura Mall | 19900 West Country Club Drive |

| Location | Address and Contact Information |
|---|---|
| | Aventura, FL 33180<br>Phone – (768) 528-1001<br>Fax – (768) 528-1002 |
| Marshall Town Center | 2500 S. Center Street<br>Marshalltown, IA 50158<br>Phone – (641) 752-6200<br>Fax – (641) 752-6063 |
| Martinsburg Mall | 800 Foxcroft Avenue<br>Martinsburg, WV 25401<br>Phone – (304) 264-1420<br>Fax – (304) 264-4608 |
| Meadow Glen Mall | 3850 Mystic Valley Parkway<br>Medford, MA 02155<br>Phone – (781) 395-1010<br>Fax – (781) 391-9402 |
| Meadows Marketplace | SW Corner Grand Parkway and Frye Road<br>Katy, TX 77494 |
| Memorial Mall | 3347 Kohler Memorial Drive<br>Sheboygan, WI 53081<br>Phone – (920) 452-2731<br>Fax – (920) 452-1510 |
| Mercer Mall | 261 Mercer Mall Road<br>Suite 322<br>Bluefield, WV 24701<br>Phone – (304) 327-2507<br>Fax – (304) 327-8504 |
| Mesa Pavilions | 1229 S. Power Road<br>Mesa, AZ 85206<br>Phone – (480) 461-0050<br>Fax – (480) 461-1687 |
| Mesa Riverview | 1061 N. Dobson Road<br>Mesa, AZ 85201<br>Phone – (480) 461-0050<br>Fax – (480) 461-1687 |
| Mesilla Valley Mall | 700 South Telshor Blvd<br>Las Cruces, NM 88011<br>Phone – (505) 522-1001 |
| Metro Square | 2782 W. Peoria Avenue<br>Phoenix, AZ 85029 |

| Location | Address and Contact Information |
|---|---|
| Metrocenter | 9617 North Metro Parkway West<br>Phoenix, AZ 85051 |
| Mission Viejo Freeway Center | 25222 El Paso Road<br>Misson Viejo, CA 92691 |
| Mondawmin Mall | 2401 Liberty Heights Avenue<br>Baltimore, MD 21215<br>Phone – (410) 523-4917<br>Fax – (410) 383-8959 |
| Montana, The | 301 East Colorado Blvd<br>Suite 300<br>Pasadena, CA 91101<br>Phone – (626) 585-6700<br>Fax – (626) 449-1455 |
| Montclair Plaza | 5060 Montclair Plaza Lane<br>Montclair, CA 91763<br>Phone – (909) 626-2501<br>Fax – (909) 624-6195 |
| Montecito Crossing | 6700 N. Durango Drive<br>Las Vegas, NV 89149<br>Phone – (480) 507-2700<br>Fax – (480) 507-2712 |
| Moreno Valley at TownGate Properties | CA<br>Phone – (949) 723-7100<br>Fax – (949) 723-1141 |
| Moreno Valley Mall | 22500 Town Circle<br>Suite 1206<br>Moreno Valley, CA 92553<br>Phone – (951) 653-1177<br>Fax – (951) 653-1711 |
| Myrtle Beach Mall | 10177 N Kings Hwy<br>Myrtle Beach, SC 29572<br>Phone – (843) 272-4040<br>Fax – (843) 272-4090 |
| Napleton Hyundai | 2707 Okeechobee Blvd<br>West Palm Beach, FL 33409 |
| Napleton's Autopark & North Palm Hyundai | 3701 Northlake Blvd.<br>Lake Park, FL 33404 |
| Neshaminy Mall | 707 Neshaminy Mall |

| Location | Address and Contact Information |
|---|---|
| | Bensalem, PA 19020<br>Phone – (215) 357-6100<br>Fax – (215) 357-4317 |
| North Grand Mall | 2801 Grand Avenue<br>Ames, IA 50010<br>Phone – (515) 232-3679<br>Fax – (847) 277-9940 |
| North Mountain Village | 3421 W. Thunderbird Road<br>Peoria, AZ 85053<br>Phone – (480) 461-0050<br>Fax – (480) 461-1687 |
| North Shore Square Mall | 150 North Shore Blvd.<br>Suite 2020<br>Slidell, LA 70460<br>Phone – (985) 646-0661<br>Fax – (985) 649-1415 |
| Northbrook Court | 2171 Northbrook Court<br>Northbrook, IL 60062<br>Phone – (847) 498-8161<br>Fax – (847) 498-5194 |
| Northlake Mall-NC | 6801 Northlake Mall Drive<br>Charlotte, NC 28216<br>Phone – (704) 921-2005<br>Fax – (704) 921-2009 |
| Northland Center | 21500 Northwestern Hwy<br>Suite 1212<br>Southfield, MI 48075<br>Phone – (248) 569-6272<br>Fax – (248) 569-0861 |
| Northwest Arkansas | 4201 North Shiloh Drive<br>Fayetteville, AR 72703<br>Phone – (479) 521-6162<br>Fax – (479) 521-0306 |
| Northwood Village Business District | 200 2nd Street<br>West Palm Beach, FL 33402 |
| Nu Vista Living at Wellington Green | 10330 Devonshire Blvd.<br>Wellington, FL 33414<br>Phone – (561) 795-6100<br>Fax – (561) 795-6268 |
| Oakbrook Center | 100 Oakbrook Center |

| Location | Address and Contact Information |
|---|---|
|  | Oak Brook, IL 60523<br>Phone – (630) 573-0700<br>Fax – (630) 573-0710 |
| Owings Mills Town Center | 10300 Mill Run Circle<br>Owings Mill, MD 21117<br>Phone – (410) 363-7000<br>Fax – (410) 363-7999 |
| Pacific Asia Museum | 48 North Los Robles Avenue<br>Pasadena, CA 91101<br>Phone – (626) 449-2742 |
| Palisades Center | 1000 Palisades Center Drive<br>West Nyack, NY 10994<br>Phone – (845) 348-1005<br>Fax – (845) 348-1774 |
| Palladium at CityPlace | 700 South Rosemary Avenue<br>Suite 200<br>West Palm Beach, FL 33401<br>Phone – (561) 820-0074<br>Fax – (561) 366-1001 |
| Palm Beach Mall | 1801 Palm Beach Lakes Blvd.<br>Suite 526<br>West Palm Beach, FL 33401<br>Phone – (561) 683-9187<br>Fax – (561) 683-9266 |
| Palm Beach Post, The | PO Box 105376<br>Atlanta, GA 30348 |
| Palms at Town and Country | 8372 Mills Dr.<br>Miami, FL 33183<br>Phone – (305) 274-7982 |
| Paramus Park | 700 Paramus Park<br>Paramus, NJ 07652<br>Phone – (201) 261-6108<br>Fax – (201) 261-8729 |
| Parc Condos | #5 South 500 West<br>Salt Lake City, UT 84101 |
| Park City Center | 142 Park City Center<br>Lancaster, PA 17601<br>Phone – (717) 393-3851<br>Fax – (717) 392-8577 |

| Location | Address and Contact Information |
|---|---|
| Park Plaza- CA | 990 N. Western Avenue<br>San Pedro, CA 90732<br>Phone – (949) 398-8750<br>Fax – (949) 398-8755 |
| Park West | 9744 W Northern Ave<br>Suite 1360<br>Peoria, AZ 85345<br>Phone – (623) 877-0096<br>Fax – (623) 877-8047 |
| Parks, The | 18000 Spectrum<br>Irvine, CA 92618 |
| Pearlridge Center | 98-1005 Moanalua Road<br>Suite 231<br>Aiea, HI 96701<br>Phone – (808) 488-0981<br>Fax – (808) 488-9456 |
| Perkins Rowe | 10202 Perkins Rowe<br>Suite 195<br>Baton Rouge, LA 70810<br>Phone – (225) 767-2000<br>Fax – (225) 767-2004 |
| Peru Mall | 3940 Route 251<br>Suite E-1<br>Peru, IL 61354<br>Phone – (815) 223-1079<br>Fax – (815) 223-7197 |
| Phillips Point | 777 South Flagler Drive<br>West Palm Beach, FL 33401<br>Phone – (561) 833-7337 |
| Pico Rivera Marketplace | Pico Rivera, CA 90660 |
| Pico Rivera Towne Center | 8500 Washington Blvd<br>Pico Rivera, CA 90660<br>Phone – (562) 938-1722<br>Fax – (562) 938-1744 |
| Piemonte at Ontario Center | 4150 East 4th Street          Suite G<br>Ontario, CA 91764<br>Phone – (909) 418-2144<br>Fax – (909) 418-2059 |

| Location | Address and Contact Information |
|---|---|
| Pier Shops at Caesars, The | One Atlantic Ocean<br>Suite 4111<br>Atlantic City, NJ 08401<br>Phone – (609) 345-3100<br>Fax – (609) 343-3181 |
| Pinnacle at Turkey Creek | 11251 Parkside Drive<br>Knoxville, TN 37934<br>Phone – (865) 675-0120<br>Fax – (865) 675-0136 |
| Pinnacle Hills Promenade | 2203 Promenade Blvd<br>Suite 8100<br>Rogers, AR 72758<br>Phone – (479) 936-2160<br>Fax – (479) 936-5920 |
| Pinnacle Tutwiler Farm | 5000 Pinnacle Square<br>Trussville, AL 35235 |
| Plaza Antonio | Rancho Santa Margarita, CA 92688 |
| Plaza at Preston Center | 8383 Preston Center Plaza Drive<br>Suite 330<br>Dallas, TX 75225<br>Phone – (469) 232-0000 |
| Plaza de Hacienda | 1807 N Hacienda Blvd<br>La Puente, CA 91744 |
| Plaza Del Sol | 3137 W. Indian School Road<br>Phoenix, AZ 85017 |
| Plaza Frontenac | 17010 S. Lindbergh<br>Suite 92<br>Frontenac, MO 63131<br>Phone – (314) 432-5820<br>Fax – (314) 432-0437 |
| Poca Fiesta | 1164 W. Southern Avenue<br>Mesa, AZ 85210<br>Phone – (480) 461-0050<br>Fax – (480) 461-1687 |
| Poinsettia Village | 7140 Agenda Encinas<br>Carlsbad, CA 92009<br>Phone – (619) 297-3381<br>Fax – (619) 294-8291 |

| Location | Address and Contact Information |
|---|---|
| Potrero Center | 2300 16th Street<br>San Francisco, CA 94103<br>Phone – (650) 992-8687<br>Fax – (650) 992-1945 |
| Poughkeepsie Galleria | 2001 South Road<br>Poughkeepsie, NY 12601<br>Phone – (845) 297-7600<br>Fax – (845) 297-2504 |
| Prado, The | 600 South Dixie Highway<br>West Palm Beach, FL 33401 |
| Prince Kuhio Plaza | 111 E. Puainako Street<br>Hilo, HI 96720<br>Phone – (808) 959-3555<br>Fax – (808) 959-3655 |
| Princetonland | 4201 Quaker Bridge Road<br>West Windsor, NJ 08550<br>Phone – (410) 964-5443<br>Fax – (410) 964-5273 |
| Promenade on the Peninsula | 550 Deep Valley Drive<br>Suite 101<br>Rolling Hills Estates, CA 90274<br>Phone – (310) 541-0688<br>Fax – (310) 377-6062 |
| Promenade Shops at Centerra, The | 5971 Sky Pond Drive<br>Suite OFC<br>Loveland, CO 80538<br>Phone – (707) 280-7465 |
| Promenade Shops at Orchard Valley | 1422 Grove Street<br>Manteca, CA 95336<br>Phone – (901) 531-8710<br>Fax – (901) 507-5536 |
| Pueblo Mall | 3429 Dillon Drive<br>Pueblo, CO 81008<br>Phone – (719) 544-3454<br>Fax – (719) 545-5404 |
| Puente Hills Mall | 1600 Azusa Avenue<br>Suite 248A<br>City of Industry, CA 91748<br>Phone – (626) 912-8777 |

| Location | Address and Contact Information |
|---|---|
| | Fax – (626) 913-2719 |
| Queen Ka'ahumanu Center | 275 W. Ka'ahumanu Ave<br>Suite 1200<br>Kahului, HI 96732<br>Phone – (808) 877-3369<br>Fax – (808) 877-5992 |
| Rancho Carmel Plaza | 10175 Rancho Carmel Drive<br>San Diego, CA 92128<br>Phone – (858) 350-2600<br>Fax – (858) 350-2620 |
| Rancho San Diego Towne Center | SEC Jamacha Road & Campo RD<br>San Diego, CA 92114 |
| Randhurst Mall | 55 E. Euclid Ave.<br>Suite #450<br>Mt. Prospect, IL 60056<br>Phone – (847) 259-0500<br>Fax – (847) 259-0228 |
| Redlands Town Center | 10000 Alabama Street<br>Redlands, CA 92374 |
| Regency Square | 1420 N. Parham Road<br>Richmond, VA 23229<br>Phone – (804) 740-1518<br>Fax – (804) 740-4763 |
| River Falls Mall | 951 E Lewis & Clark Pkwy<br>Clarksville, IN 47129<br>Phone – (502) 817-2122<br>Fax – (502) 284-6347 |
| Rivercenter | 849 E. Commerce St.<br>San Antonio, TX 78205<br>Phone – (210) 225-0689<br>Fax – (210) 222-1743 |
| Rivertown Crossings | 37000 Rivertown Parkway<br>Grandville, MI 49418<br>Phone – (616) 257-7600<br>Fax – (616) 257-0507 |
| Rock Hill Galleria | 2301 Dave Lyle Blvd<br>Rock Hill, SC 29730<br>Phone – (803) 324-1711 |

| Location | Address and Contact Information |
|---|---|
| Rosedale Center Guest Services | 10 Rosedale Center<br>Roseville, MN 55113 |
| Rosedale Shopping Center | 10 Rosedale Center<br>Roseville, MN 55113<br>Phone – (651) 638-3553<br>Fax – (651) 638-3599 |
| Sacramento Zoo | 3930 West Land Park Drive<br>Sacramento, CA 95822<br>Phone – (916) 808-5888<br>Fax – (916) 264-5887 |
| Salem Center | 401 Center Street NE<br>Salem, OR<br>Phone – (503) 399-9676<br>Fax – (503) 364-1284 |
| Salmon Run Mall | 21182 Salmon Run Mall Loop West<br>Watertown, NY 13601<br>Phone – (315) 788-9210<br>Fax – (315) 788-8821 |
| San Francisco Zoo | 1 Zoo Road<br>San Francisco, CA 94132<br>Phone – (415) 264-2701<br>Fax – (415) 681-2039 |
| Sangertown Square | Routes 5 & 5A<br>New Hartford, NY 13413<br>Phone – (315) 797-8520<br>Fax – (315) 797-0608 |
| Santa Rosa Mall | 300 Mary Esther Blvd<br>Suite 112<br>Mary Esther, FL 32569<br>Phone – (850) 244-2172<br>Fax – (850) 244-1303 |
| Santee Trolley Square | 9824 Mission Gorge Road<br>Suite B<br>Santee, CA 92071 |
| Savannah Mall | 14045 Abercorn St.<br>Box 3<br>Savannah, GA 31419<br>Phone – (912) 927-4919<br>Fax – (912) 927-0430 |
| Scripps Ranch Shopping Center | 9840 Hibert Street |

| Location | Address and Contact Information |
|---|---|
|  | San Diego, CA 92131 |
| Sequoia Mall | 3303 S. Mooney Blvd.<br>Visalia, CA 93277<br>Phone – (559) 732-5681<br>Fax – (559) 732-1639 |
| Serramonte Center | 3 Serramonte Center<br>Daly City, CA 94015<br>Phone – (650) 992-8687<br>Fax – (650) 992-1945 |
| Severance Town Center | 3640 Mayfield Road<br>Cleveland Heights, OH 44118<br>Phone – (216) 381-5762 |
| Shenango Valley Mall | 3303 E State St.<br>Hermitage, PA 16148<br>Phone – (724) 346-4565<br>Fax – (724) 346-0805 |
| Shirokiya | 1450 Ala Moana Blvd<br>Suite 2250<br>Honolulu, HI 96814 |
| Shoppes at EastChase, The | 7274 EastChase Parkway<br>Montgomery, AL 36117<br>Phone – (334) 279-6046<br>Fax – (334) 356-3738 |
| Shoppes at River Crossing | 5080 Riverside Drive<br>Macon, GA 31210<br>Phone – (478) 254-2941<br>Fax – (478) 254-2945 |
| Shoppingtown Mall | Mall Management Office<br>3649 Erie Boulevard East<br>Dewitt, NY 13214<br>Phone – (315) 446-9160<br>Fax – (315) 410-1555 |
| Shops at Briargate, The | 1885 Briargate Parkway<br>Suite 503<br>Colorado Springs, CO 80920<br>Phone – (719) 265-6264<br>Fax – (719) 268-0738 |
| Shops at Evergreen Walk | 501 Evergreen Way<br>Suite 503 |

| Location | Address and Contact Information |
|---|---|
| | South Windsor, CT 06074<br>Phone – (860) 432-3398<br>Fax -- (860) 435-3484 |
| Shops at Fallen Timbers, The | 6832 Russell Road<br>Maumee, OH 43537<br>Phone – (419) 878-6255<br>Fax – (419) 878-2659 |
| Shops at Highland Village, The | 1701 Shoal Creek<br>Suite 245<br>Highland Village, TX 75077<br>Phone – (214) 618-6525<br>Fax – (972) 668-2989 |
| Shops at Ithaca Mall, The | 40 Catherwood Road<br>Ithaca, NY 14850-1056<br>Phone – (607) 257-5338<br>Fax – (607) 257-6754 |
| Shops at Wailea | 3750 Wailea Alanui Drive<br>Kihei, HI 96753<br>Phone – (808) 891-6770<br>Fax – (808) 891-6772 |
| Shops at West End, The | 1621 West End Blvd<br>Minneapolis, MN 55416<br>Phone – (763) 450-0554<br>Fax – (763) 450-0559 |
| Shops at White Oak Village | 4501 South Labumum Avenue<br>Richmond, VA 23231<br>Phone – (804) 364-9516 |
| Shops at Willow Bend, The | 6121 West Park Boulevard<br>Suite 1000<br>Plano, TX 75093<br>Phone – (972) 202-7115<br>Fax – (972) 202-7122 |
| Shops of Grand Avenue, The | 161 West Wisconsin Avenue<br>Milwaukee, WI 53221<br>Phone – (414) 224-0655 |
| Silver City Galleria | 2 Galleria Mall Drive<br>Taunton, MA 02780<br>Phone – (508) 823-0005<br>Fax – (508) 823-1199 |
| Solana Beach Towne Center | 622-685 San Rodolfo Dr<br>Solana Beach, CA 92075 |

| Location | Address and Contact Information |
|----------|-------------------------------|
| | Phone – (858) 350-2600<br>Fax – (858) 350-2620 |
| South Coast Marketplace | 2701-2841 W. MacArthur Blvd<br>Santa Ana, CA 92704<br>Phone – (714) 545-1400<br>Fax – (714) 545-4222 |
| South Park Mall - TX | 2310 Southwest Military Drive<br>#136<br>San Antonio, TX 78224<br>Phone – (210) 921-0534<br>Fax – (210) 921-0628 |
| Southbay Market Place | 3400 Highland Avenue<br>National City, CA 91950<br>Phone – (858) 350-2600<br>Fax – (858) 350-2620 |
| Southbridge Mall | 100 South Federal Avenue<br>Mason City, IA 50401<br>Phone – (614) 423-6688<br>Fax – (641) 423-1705 |
| Southgate Plaza | 4542 Florin Road<br>Sacramento, CA 95823<br>Phone – (916) 422-2525 |
| Southland Center | 23000 Eureka Road<br>Taylor, MI 48180<br>Phone – (734) 374-2800<br>Fax – (734) 374-2524 |
| Southland Mall - LA | 5953 West Park Avenue<br>Houma, LA 70364<br>Phone – (985) 876-4765<br>Fax – (985) 851-6753 |
| St. Ann Place | 2107 North Dixie Highway<br>West Palm Beach, FL 33407 |
| St. Louis Galleria | 1155 Saint Louis Galleria<br>St. Louis, MO 63117<br>Phone – (314) 863-5500<br>Fax -- (314) 863-1415 |
| St. Louis Union Station | 1820 Market Street<br>Suite 500<br>St. Louis, MO 63103-2274 |

| Location | Address and Contact Information |
|---|---|
| | Phone – (314) 421-6699<br>Fax – (314) 421-3314 |
| Stamford Town Center | 100 Greyrock Place<br>Stamford, CT 06901<br>Phone – (203) 653-9930<br>Fax – (203) 359-9942 |
| Staten Island Mall | 2655 Richmond Avenue<br>Staten Island, NY 10314<br>Phone – (718) 761-6666<br>Fax – (718) 494-6766 |
| StoneCrest at Piper Glen | 7852 Rea Road<br>Charlotte, NC 28277 |
| Stony Point Fashion Park | 9200 Stony Point Parkway<br>Richmond, VA 23235<br>Phone – (804) 267-2740<br>Fax – (804) 267-2750 |
| Stratford Square | 152 Stratford Square<br>Bloomingdale, IL 60108<br>Phone – (630) 351-9400<br>Fax – (630) 351-9769 |
| Streets of West Chester, The | 9465 Civic Center Blvd<br>West Chester, OH 45069<br>Phone – (513) 759-6800<br>Fax – (513) 759-6888 |
| Streets, The | 19350 Northwest Emma Way<br>Hillsboro, OR 97124-9004<br>Phone – (503) 533-0561<br>Fax – (503) 533-0761 |
| Summit at Birmingham, The | 214 Summit Blvd.<br>Suite 150<br>Birmingham, AL 35243<br>Phone – (205) 967-0111<br>Fax – (205) 967-2522 |
| Summit Sierra | 13925 S. Virginia<br>Suite 212<br>Reno, NV 89511<br>Phone – (775) 853-7800<br>Fax – (775) 853-7807 |
| Sunset Mall | 4001 Sunset Drive<br>Suite 1182 |

| **Location** | **Address and Contact Information** |
|---|---|
| | San Angelo, TX 76904<br>Phone – (325) 949-1947<br>Fax – (325) 944-9110 |
| Sunvalley Shopping Center | 1 Sunvalley Mall<br>Concord, CA 94520<br>Phone – (925) 825-0400<br>Fax – (925) 825-1392 |
| Tallahassee Mall | Public Safety Office<br>2415 North Monroe Street<br>Tallahassee, FL 32303<br>Phone – (850) 385-7145<br>Fax – (850) 385-6203 |
| Tanger Outlet Center - San Marcos | 4015 IH 35<br>Suite 805<br>San Marcos, TX 78666<br>Phone – (512) 396-7446<br>Fax – (512) 396-7449 |
| Tanger Outlets Houston/Galveston | 5885 Gulf Freeway<br>Suite 630<br>Texas City, TX 77591<br>Phone – (281) 534-4200<br>Fax – (281) 534-7433 |
| Tanger Outlets Westgate | 6800 N 95th Ave<br>Glendale, AZ 85605<br>Phone – (623) 877-9500 |
| Taubman Prestige Outlets Chesterfield | 17017 N. Outer 40 Drive<br>Chesterfield, MO 63005<br>Phone – (248) 914-2695 |
| Temecula Town Center | 27548 Ynez Road<br>Suite I-9<br>Temecula, CA 92591<br>Phone – (951) 676-7490<br>Fax – (591) 676-7593 |
| Tempe Marketplace | 2000 E. Rio Salado Parkway<br>Suite # 1150<br>Tempe, AZ 85281<br>Phone – (480) 966-9338<br>Fax – (480) 966-5445 |
| The District | UT |

| Location | Address and Contact Information |
|---|---|
| Tivoli Village at Queensridge | 440 S. Rampart Blvd<br>#B-130<br>Las Vegas, NV 89145<br>Phone – (702) 534-0000<br>Fax – (702) 534-0001 |
| Town & Country Center | 445 E Palatine Road<br>Arlington Heights, IL 60004 |
| TownMall of Westminster | 400 North Center Street<br>Attn: Mall Management Office<br>Westminster, MD 21157<br>Phone – (410) 857-0300<br>Fax – (410) 857-4043 |
| Towson Town Center | 825 Delaney Valley Road<br>Towson, MD 21204<br>Phone – (410) 583-6601<br>Fax – (410) 321-7054 |
| Trump National Golf Club | 115 Eagle Tree Terrace<br>Jupiter, FL 33477 |
| Twelve Oaks Mall | 27500 Novi Road<br>Novi, MI 48377<br>Phone – (248) 348-9438<br>Fax – (248) 348-9411 |
| Twin Peaks Mall | 1250 South Hover St<br>Longmont, CO 80501<br>Phone – (303) 651-6454<br>Fax – (303) 772-4916 |
| Tysons Galleria | 2001 International Drive<br>McLean, VA 22102<br>Phone – (703) 827-7700<br>Fax – (703) 827-0976 |
| Underground Atlanta | 50 Upper Alabama Street<br>Suite 007<br>Atlanta, GA 30303<br>Phone – (404) 523-2311<br>Fax – (404) 523-0507 |
| Union Station | Mall Management<br>40 Massachusetts Avenue, NE<br>Washington, DC 20002-4225<br>Phone – (202) 289-1908 |

| Location | Address and Contact Information |
|---|---|
| | Fax – (202) 289-4945 |
| University Mall - IL | P.O. Box 3187<br>1237 East Main Street<br>Carbondale, IL 62901<br>Phone – (618) 529-3681<br>Fax – (618) 457-7056 |
| University Park Village | 1612 S University Dr<br>Suite 410<br>Fort Worth, TX 76107<br>Phone – (817) 332-5700 |
| Valdosta Mall | 1700 Norman Drive<br>Valdosta, GA 31601<br>Phone – (229) 242-0457 |
| Vallco Shopping Mall | 10123 N. Wolfe Road<br>Suite 1095<br>Cupertino, CA 95014<br>Phone – (408) 777-3081<br>Fax – (408) 725-0370 |
| Vero Beach Outlet | 1824 94th Drive<br>Vero Beach, FL 32966 |
| Victor Valley Town Center | NEC of Bear Valley Road & Hesperia Road<br>Victorville, CA 92392<br>Phone – (661) 964-0100<br>Fax – (661) 274-0302 |
| Village at Leesburg | 1602 Village Market Blvd.<br>Leesburg, VA 20175<br>Phone – (571) 291-2288 |
| Village of Cross Keys, The | 5100 Falls Road<br>c/o The Gatehouse<br>Baltimore, MD 21210<br>Phone – (410) 323-1000<br>Fax – (410) 377-0876 |
| Village, The | 25 Prism<br>Irvine, CA 92618<br>Phone – (949) 720-5600 |
| Walden Galleria | One Walden Galleria<br>Buffalo, NY 14225<br>Phone -- (716) 681-7600<br>Fax – (716) 681-1773 |

| Location | Address and Contact Information |
|---|---|
| Ward Centers | Suite 200<br>Honolulu, HI 96814<br>Phone – (808) 591-8411<br>Fax – (808) 596-4919 |
| Water Treatment Plant | 1009 Banyan Blvd<br>West Palm Beach, FL 33401 |
| Waterfront, The | 101 South Flagler Drive<br>West Palm Beach, FL 33401 |
| West Oaks Mall | 9401 West Colonial Drive<br>Suite 728<br>Ocoee, FL 34761-6903<br>Phone – (407) 294-1494<br>Fax – (407) 294-0706 |
| Westchester Commons | 15786 Wc Main St<br>Midlothian, VA 23113<br>Phone – (804) 379-9292 |
| Westdale Mall | 2600 Edgewood Road SW<br>Cedar Rapids, IA 52404<br>Phone – (319) 396-0740<br>Fax – (319) 396-0350 |
| Westfarms | 500 Westfarms Mall<br>Farmington, CT 06032<br>Phone – (860) 561-3420<br>Fax – (860) 521-8682 |
| Westgate City Center | 6770 North Sunrise Blvd<br>Suite G-220<br>Glendale, AZ 85305<br>Phone – (623) 385-7500<br>Fax – (623) 385-7501 |
| Westgate Mall - TX | 7701 I-40 West<br>Suite 140<br>Amarillo, TX 79121<br>Phone – (806) 358-7221<br>Fax – (806) 353-5424 |
| Westland Mall - IA | 550 S. Gear Avenue<br>West Burlington, IA 52655<br>Phone – (847) 277-9930<br>Fax – (847) 277-9940 |
| Westward Shopping Center | 2421 Okeechobee Blvd |

| Location | Address and Contact Information |
|---|---|
|  | West Palm Beach, FL 33409<br>Phone – (504) 904-8500<br>Fax – (504) 904-8547 |
| Westwood Mall | 1850 West Michigan Avenue<br>Jackson, MI 49202<br>Phone – (517) 787-1170<br>Fax – (517) 787-5421 |
| Whalers Village | 2435 Kaanapali Pkwy<br>Lahaina, HI 96761<br>Phone – (808) 661-4567<br>Fax – (808) 661-8584 |
| White Marsh Mall | 8200 Perry Hall Blvd<br>Baltimore, MD 21236<br>Phone – (410) 931-7100<br>Fax – (410) 931-7120 |
| Willowbrook Mall - NJ | 1400 Willowbrook Blvd<br>Wayne, NJ 07470<br>Phone -- (973) 785-1616<br>Fax – (973) 785-8632 |
| Woodbridge Center | 250 Woodbridge Center Drive<br>Woodbridge, NJ 07095<br>Phone – (732) 636-4777<br>Fax – (732) 636-0417 |
| Youth Empowerment Center | 723 39th Street<br>West Palm Beach, FL 33407 |
| Yuma Palms | 1305 South Yuma Palms Parkway<br>Suite L-03<br>Yuma, AZ 85365<br>Phone – (928) 329-4559<br>Fax – (928) 329-6528 |
| Chick-fil-A | 6275 Lantana Road<br>Greenacres, FL 33463<br>Phone – (561) 296-4689<br>Fax – (561) 296-4694 |
| CityCentre | 800 Town and Country Way<br>Suite 200<br>Houston, TX 77024-3920<br>Phone -- (713) 629-5200<br>Fax -- (713) 463-4625 |
| Crossings at Fox Run | 45 Gosling Road |

| **Location** | **Address and Contact Information** |
|---|---|
|  | Newington, NH 03801<br>Phone – (781) 273-5555 |
| Four Peaks Plaza | Fountain Hills, AZ 85269<br>Phone – (480) 507-2700<br>Fax – (480) 507-2712 |
| Georgetown Park Mall | 3222 M Street, N.W.<br>Washington, DC 20007<br>Phone – (202) 342-8190<br>Fax -- (202) 342-1458 |
| Glynn Place Mall | 219 Mall Blvd<br>Brunswick, GA 31252<br>Phone – (912) 267-6964<br>Fax – (912) 267-1439 |
| London Square | 13550 SW 120th Street<br>Miami, FL 33186<br>Phone – (305) 274-7982<br>Fax – (305) 274-4482 |
| Mall St. Matthews | 5000 Shelbyville Road<br>Louisville, KY 40207-3342<br>Phone – (502) 893-0312<br>Fax – (502) 897-5849 |
| Marion Centre | 1509 Marion-Waldo Road<br>Marion, OH 43302<br>Phone – (740) 389-5785<br>Fax – (740) 389-4148 |
| Northgate Mall | 9501 Colerain Avenue<br>Cincinnati, OH 45251<br>Phone – (513) 385-7065<br>Fax – (513) 385-5603 |
| Owings Mills Corporate Center | 10451 Mill Run Circle<br>Owings Mill, MD 21117<br>Phone – (410) 992-6526<br>Fax – (410) 363-7999 |
| Oxmoor Center | 7900 Shelbyville Road<br>Louisville, KY 40222<br>Phone – (502) 426-3002<br>Fax – (502) 425-3417 |
| Promenade at Town Center | 27003-27103 McBean Parkway<br>Valencia, CA 91355<br>Phone – (310) 886-7768 |

| Location | Address and Contact Information |
|---|---|
| | Fax – (310) 886-3969 |
| Quarry Village | 300 E. Basse Road<br>San Antonio, TX 78209<br>Phone – (210) 386-2444<br>Fax – (210) 222-1743 |
| Scottsdale Quarter | 15169 North Scottsdale Road<br>Scottsdale, AZ 85254<br>Phone – (480) 270-8120<br>Fax – (480) 270-8138 |
| Shops at Dos Lagos, The | 2780 Cabot Drive<br>Suite 140<br>Corona, CA 92883<br>Phone – (214) 561-8800<br>Fax – (214) 283-1600 |
| Shops of Saddle Creek, The | 7509 Poplar Avenue<br>Suite # 1<br>Germantown, TN 38138<br>Phone – (901) 753-4265<br>Fax – (901) 753-4484 |
| Towson Commons | 1 W. Pennsylvania Avenue<br>Suite 95<br>Towson, MD 21204<br>Phone – (410) 583-0110<br>Fax – (410) 583-6792 |
| Village Mall | 1627-53 Opelika Road<br>Auburn, AL 36830<br>Phone – (334) 821-8368<br>Fax – (334) 826-6737 |

## Schedule 11.6 – State of Organization

| Entity | State of Incorporation | State Organization Number |
|---|---|---|
| IPC International Corporation | Illinois | 51473779 |
| The Security Network Holdings Corp. | Delaware | 4428095 |

**<u>Schedule 11.7 – Pending Litigation</u>**

None

## Schedule 11.9 -- Affiliate Transactions

None

**Schedule 11.10 – Trade Names**

| Borrower | Trade Names |
|---|---|
| The Security Network Holdings Corp. | None |
| IPC International Corp. | d/b/a IPC International Corporation of Puerto Rico, IPC International Corp. d/b/a IPC International Corporation of Illinois, IPC International Corp. d/b/a Illinois Protection Corporation, IPC International Corp. d/b/a Investigative & Protective Companies International Corporation, IPC International Realty Company, LLC, Uniformity, Inc., and IPC Technologies |

## Schedule 11.14 – Other Indebtedness

| Type of Debt | Creditor | Amount |
|---|---|---|
| Capital Lease – Vehicle *** | Arnie Yusim Leasing Inc. | Approx. $3,105,000 outstanding |
| Capital Lease – Vehicle *** | Emkay Inc. | Approx. $4,000 outstanding |
| [Subordinated Debt] | [Howard Kaplan] | To Be Confirmed |
| [Subordinated Debt] | [Donald Lantz] | To Be Confirmed |

*** These items are included for informational purposes only and do not constitute an admission that capital leases constitute indebtedness for borrowed money.

## Schedule 11.16 – Subsidiaries and Affiliates

| Borrower | Subsidiaries, Affiliates and Parents |
|---|---|
| The Security Network Holdings Corporation | <ul><li>IPC International Realty Company, LLC (subsidiary)</li><li>Uniformity, Inc. (subsidiary)</li><li>IPC Technologies, Inc. (indirect subsidiary)</li><li>IPC International Corporation (subsidiary)</li></ul> |
| IPC International Corporation | <ul><li>IPC International Realty Company, LLC (affiliate)</li><li>Uniformity, Inc. (affiliate)</li><li>IPC Technologies, Inc. (subsidiary)</li><li>The Security Network Holdings Corp. (parent)</li></ul> |

**<u>Schedule 17.1 – Closing Document Checklist</u>**

# EXHIBIT B

# Security Network Holdings

DIP Budget Summary

Weekly Cash Flow Forecast - For Weeks Ended 8/8/13 through 11/1/13

(000s)

**DIP Order Budget**

| Period Ending | Cash Flow 8/9/13 | Cash Flow 8/16/13 | Cash Flow 8/23/13 | Cash Flow 8/30/13 | Cash Flow 9/6/13 | Cash Flow 9/13/13 | Cash Flow 9/20/13 | Cash Flow 9/27/13 | Cash Flow 10/4/13 | Cash Flow 10/11/13 | Cash Flow 10/18/13 | Cash Flow 10/25/13 | Cash Flow 11/1/13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Revolver | 6,687.8 | 8,011.6 | 8,921.2 | 7,793.9 | 7,332.4 | 7,822.9 | 8,953.3 | 7,762.7 | 7,758.3 | 7,745.3 | 9,014.3 | 7,300.6 | 8,424.2 | 6,687.8 |
| Cash Inflow | 1,026.1 | 1,999.7 | 3,615.3 | 3,177.0 | 1,921.6 | 1,599.7 | 3,479.3 | 2,811.9 | 2,460.4 | 1,405.9 | 3,303.5 | 2,987.6 | 3,163.3 | 32,951.1 |
| Total Cash Receipts | 1,026.1 | 1,999.7 | 3,615.3 | 3,177.0 | 1,921.6 | 1,599.7 | 3,479.3 | 2,811.9 | 2,460.4 | 1,405.9 | 3,303.5 | 2,987.6 | 3,163.3 | 32,951.1 |
| Cash Outflow (1) | 1,847.2 | 304.5 | 791.3 | 2,530.0 | 2,123.6 | 2,730.1 | 1,925.5 | 2,775.2 | 2,240.0 | 2,674.9 | 1,589.9 | 3,821.1 | 2,175.6 | 27,528.8 |
| Total Operating Cash Outflow | 1,847.2 | 304.5 | 791.3 | 2,530.0 | 2,123.6 | 2,730.1 | 1,925.5 | 2,775.2 | 2,240.0 | 2,674.9 | 1,589.9 | 3,821.1 | 2,175.6 | 27,528.8 |
| Net Cash From Operations | (821.1) | 1,695.1 | 2,824.0 | 647.0 | (202.0) | (1,130.4) | 1,553.8 | 36.6 | 220.4 | (1,269.0) | 1,713.7 | (833.5) | 987.8 | 5,422.3 |
| **Non-Operating Cash Expenditures (1)** | | | | | | | | | | | | | | |
| Adequate Protection Pre-petition Taxes (2) | 246.0 | 2,574.7 | 1,646.8 | 185.4 | 96.2 | - | 63.2 | 32.2 | - | - | - | - | 95.7 | 4,940.3 |
| Restructuring Expenses | 250.0 | 30.0 | 50.0 | - | - | - | 375.0 | - | - | - | - | 355.0 | - | 1,060.0 |
| Deferred Professional Fees | - | - | - | - | - | - | (75.0) | - | - | - | - | (65.0) | - | (140.0) |
| Pre-Petition Interest | 6.7 | - | - | - | 17.9 | - | - | - | - | - | - | - | - | 24.6 |
| Post-Petition Interest | - | - | - | - | 49.3 | - | - | - | 82.4 | - | - | - | 67.5 | 199.3 |
| Pre-Petition Vehicle Leases | - | - | - | - | 33.3 | - | - | - | - | - | - | - | - | 33.3 |
| Post-Petition Vehicle Leases | - | - | - | - | 91.7 | - | - | - | 125.0 | - | - | - | 125.0 | 341.7 |
| Non-operating expenses subtotal | 502.7 | 2,604.7 | 1,696.8 | 185.4 | 288.5 | - | 363.2 | 32.2 | 207.4 | - | - | 290.0 | 288.2 | 6,459.2 |
| Change in Revolver | (1,323.9) | (909.5) | 1,127.2 | 461.6 | (490.5) | (1,130.4) | 1,190.6 | 4.4 | 13.0 | (1,269.0) | 1,713.7 | (1,123.5) | 699.5 | (1,036.9) |
| Ending Revolver | 8,011.6 | 8,921.2 | 7,793.9 | 7,332.2 | 7,822.9 | 8,953.3 | 7,762.7 | 7,758.3 | 7,745.3 | 9,014.3 | 7,300.6 | 8,424.2 | 7,724.6 | 7,724.6 |
| **Sales** | | | | | | | | | | | | | | |
| IPC | 2,695.4 | 2,388.7 | 2,388.7 | 2,388.7 | 2,695.4 | 2,388.7 | 2,388.7 | 2,388.7 | 2,695.4 | 2,388.7 | 2,388.7 | 2,388.7 | 2,388.7 | 31,973.3 |
| Uniformity | 28.5 | 28.5 | 28.5 | 28.5 | 28.5 | 28.5 | 28.5 | 28.5 | 28.5 | 28.5 | 28.5 | 28.5 | 28.5 | 370.0 |
| Total Net Sales | 2,723.9 | 2,417.2 | 2,417.2 | 2,417.2 | 2,723.9 | 2,417.2 | 2,417.2 | 2,417.2 | 2,723.9 | 2,417.2 | 2,417.2 | 2,417.2 | 2,417.2 | 32,343.3 |

**Footnotes:**

1) Total Disbursements can be broken into the following categories:

| | 8/9/13 | 8/16/13 | 8/23/13 | 8/30/13 | 9/6/13 | 9/13/13 | 9/20/13 | 9/27/13 | 10/4/13 | 10/11/13 | 10/18/13 | 10/25/13 | 11/1/13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll | 1,258.0 | 2,469.7 | 1,347.9 | 2,491.2 | 1,347.0 | 2,452.8 | 1,341.0 | 2,452.8 | 1,389.1 | 2,458.4 | 1,343.3 | 2,503.4 | 1,337.8 | 24,192.3 |
| Insurance | 79.1 | 220.2 | 622.1 | 40.6 | 455.8 | 153.8 | 101.8 | 40.6 | 455.8 | 92.9 | 40.6 | 770.5 | 455.8 | 3,529.7 |
| Rent | 105.0 | - | - | - | 105.0 | - | - | - | 105.0 | - | - | - | - | 315.0 |
| Other Payables | 881.9 | 219.3 | 518.1 | 183.6 | 410.4 | 123.6 | 845.9 | 314.0 | 388.4 | 123.6 | 205.9 | 837.3 | 575.9 | 5,627.9 |
| Interest | 26.0 | - | - | - | 67.3 | - | - | - | 82.4 | - | - | - | 67.5 | 243.2 |
| Principal | - | - | - | - | 26.7 | - | - | - | 26.7 | - | - | - | 26.7 | 80.0 |
| Total Disbursements | 2,349.9 | 2,909.2 | 2,488.1 | 2,715.4 | 2,412.1 | 2,730.1 | 2,288.7 | 2,807.4 | 2,447.4 | 2,674.9 | 1,589.9 | 4,111.1 | 2,463.8 | 33,998.0 |

2) Pre-petition Payroll / Taxes include the following (post-petition represents split-payments:

| | Pre-Petition | Post-Petition | Total |
|---|---|---|---|
| Payroll | 4,204.2 | 3,943.2 | 8,147.4 |
| Unemployment Taxes | 320.7 | 130.0 | 450.7 |
| Sales Taxes | 415.3 | 274.4 | 689.7 |
| Total | 4,940.3 | 4,347.6 | 9,287.9 |