## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| IPC International Corporation, *et al.*[1] | ) Case No. 13-12050 (MFW) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## MOTION OF THE DEBTORS FOR ORDERS: (1)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF ASSETS USED IN THE DEBTORS' STANDING GUARD AND PATROL BUSINESS, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SUCH SALE OF ASSETS, (C) AUTHORIZING PAYMENT OF THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES RELATED TO SUCH SALE, AND (E) APPROVING THE FORM AND MANNER OF RELATED NOTICE; AND (2)(A) AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SUCH SALE

The above-captioned debtors and debtors in possession (together, the "Debtors"), by and through their undersigned counsel, hereby move (this "Bidding Procedures and Sale Motion") the Court, pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") and rules 2002, 6003, 6004, 6006, 9006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of the Bidding Procedures Order (as defined below) and the Sale Order (as defined below) to facilitate the sale of substantially all of the assets used to operate the Debtors' standing guard and patrol business (as defined below, the "Subject Assets") to Universal Protection Services or any other successful bidder at any Auction (hereinafter defined) to be held in accordance with the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: IPC International Corporation (2698); and The Security Network Holdings Corporation (7985).

proposed bidding procedures described herein. Facts and circumstances supporting the relief requested hereby are set forth in detail in the *Declaration of Scott M. Strong in Support of First Day Pleadings* (the "First Day Declaration") filed on the date hereof and incorporated herein by reference.

In further support of this Bidding Procedures and Sale Motion, the Debtors further represent as follows.

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and rule-based predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, and 365 and Bankruptcy Rules 2002, 6003, 6004, 6006, 7004, 9006, 9007, and 9014.

## BACKGROUND

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date of the filing of this motion, no official committees have been appointed or designated.

## SUMMARY OF RELIEF REQUESTED

4.      The Debtors seek entry of: (a) an order (the "Bidding Procedures Order") substantially in the form attached hereto as **Exhibit A** (i) setting the time, date, and place of a

hearing (the "Sale Hearing") to consider the sale (the "Sale") of substantially all of the Debtors' assets used to operate their standing guard and patrol business to Universal Protection Service ("UPS") or to the qualified bidder with the highest or otherwise best bid at an auction (the "Auction") to be conducted at a date to be determined by this Court, (ii) approving the Bidding Procedures (as defined and described below) for the conduct of the Auction, (iii) approving the Break-Up Fee and Expense Reimbursement (each as defined below), and (iv) approving the Assumption and Assignment Procedures (as defined below); and (b) an order in form and substance acceptable to the Debtors and UPS or other High Bidder (defined below), substantially in the form attached hereto as **Exhibit B** (the "Sale Order") approving (i) the Sale, to either UPS under that certain Asset Purchase Agreement dated as of August 9, 2013 (the "Purchase Agreement") between UPS and Debtor IPC International Corporation ("IPC"), a copy of which is attached hereto as **Exhibit C**, or to the qualified bidder with the highest or otherwise best bid at the Auction (including, possibly, UPS, the "High Bidder"), in either case free and clear of all liens, claims, encumbrances, interests, and liabilities other than those expressly assumed (including, without limitation, successor liability), other than permitted encumbrances and expressly assumed liabilities; (ii) the assumption and assignment of executory contracts and unexpired leases identified in the purchase agreement of the High Bidder; and (iii) a finding of good faith under section 363(m) of the Bankruptcy Code.  Specifically, and in accordance with Local Rule 6004, the Debtors highlight the following with regard to the Bidding Procedures and the Sale, respectively:

a.   With regard to the Bidding Procedures:

| Notable Provision | Location in Motion, Order or Agreement | Justification for Provision |
|---|---|---|
| Bidder Qualification Provisions | Bidding Procedures Subsection B | Among other things, increasing the likelihood of a value-maximizing Auction |
| Bid Qualification Provisions | Bidding Procedures Subsection D | |
| Bid Protection Provisions | Paras 11-12 and 22 – 30 of the Motion and Purchase Agreement Section 5.8 | Among other things, increasing the likelihood of their participation and a value-maximizing Auction |
| Permits Modification of the Procedures regarding the auction or bidding without further Court approval | Bidding Procedures Subsection G | Among other things, increasing the likelihood of a value-maximizing Auction |
| Closing with Back-up Bidder: | Bid Procedures Section A(1)(5) and Purchase Agreement Section 5.8 | Among other things, increasing the likelihood of active participation in a value-maximizing Auction |

b.   With regard to the Sale:

| Notable Provisions | Location in Motion, Order or Agreement | Justification for Provision |
|---|---|---|
| Sale to Insider | N/A | N/A |
| Agreements with Management | The Debtors' founder, chairman and CEO, Howard Kaplan, will be retained by UPS during a transition period in accordance with a transition services agreement to be entered into between UPS and Mr. Kaplan. The Debtors do not anticipate that their other members of senior management (other than those involved with customer relations) will be hired by UPS. | To facilitate transition and thereby accentuate the value of the Debtors' assets |
| Private Sale/No Competitive Bidding | N/A | N/A |

| Good Faith Deposit | Para. 10 of the Motion and Section 2.6 of the Purchase Agreement | N/A |
|---|---|---|
| Record Retention | Section 7.1 of the Purchase Agreement | N/A |
| Sale of Avoidance Actions | Section 2.1 of the Purchase Agreement | To accentuate the value of the Debtors' assets with regard to assumed contracts |
| Use of Proceeds | Section 5.12 of the Purchase Agreement and para. 9 of the Motion | To accentuate the value of the Debtors' assets as a going concern |
| Successor Liability Findings | Purchase Agreement page 8 and at Para 49 | To accentuate the value of the Debtors' assets |
| Assumption and Assignment of Executory Contracts and Unexpired Leases | Paras. 51- 55 of the Motion | To accentuate the value of the Debtors' assets |
| Relief From Rule 6004-H | Para 56 of the Motion | |

5.      Consummation of the Sale in an expeditious manner is critical in these Chapter 11 Cases. The Debtors have determined in the sound exercise of their business judgment, after considering all alternatives, that the best interests of their creditors, customers and employees would be served by a going concern sale of the Debtors' business free and clear of liens, claims and encumbrances.   Moreover, the Debtors do not have the financial wherewithal to continue operations without additional financing. The Debtors' prepetition senior secured lender has agreed to provide debtor-in-possession financing for the purpose of facilitating the sale of IPC's business and assets as a going concern, subject to approval of, among other things, the relief requested herein. As set forth in the Debtors' motion seeking approval of debtor-in-possession financing, the Debtors do not believe that they will be able to secure alternate debtor-in-possession financing over the objection of their existing senior secured lenders.

6.      The prompt Sale to UPS or another High Bidder will maximize the value of the Debtors' standing guard and patrol business, allow the Debtors to pay off their senior secured

PAC 1118395v.2

indebtedness, and provide the Debtors with sufficient liquidity to provide for administration of the balance of their estates for the benefit of all of their stakeholders. Most, if not all, of the Debtors' customer contracts (by far the largest generators of value for the Debtors and their most valuable assets) may be terminated on 30 days notice to the Debtors. For this reason, it is critically important that the Debtors' customers know that their contracts will be honored and that they will have uninterrupted security services in place for the 2013 holiday season and beyond through the prompt and orderly transition to UPS or any other successful bidder at any Auction.  In the absence of such assurance, the Debtors may well begin to experience material customer attrition.

7.      UPS is a third party, not comprised of insiders of the Debtors, with no affiliation to the Debtors.[2]  UPS is a strategic, industry buyer, with a robust balance sheet and a proven track record of operating businesses not dissimilar to the Debtors' standing guard and patrol business. The relief requested in this Bidding Procedures and Sale Motion will result in the preservation of the Debtors' business, continued service to their customers, and the continued employment of most of the Debtors' 4,500 employees nationwide, will maximize the value of the Debtors' assets, and is thus in the best interests of the Debtors' creditors and all other parties in interest in these Chapter 11 Cases, and thus such relief should be granted.

8.      The Debtors expressly reserve the right to modify the relief requested in this Bidding Procedures and Sale Motion prior to or at any hearing thereon.

## THE PURCHASE AGREEMENT AND PROPOSED BID PROTECTIONS

**A.      The Purchase Agreement**

---

[2]     The Debtors' founder, chairman and CEO, Howard Kaplan, will be retained by UPS during a transition period in accordance with a transition services agreement to be entered into between UPS and Mr. Kaplan. The Debtors do not anticipate that their other members of senior management (other than those involved with customer relations) will be hired by UPS.

6

9.      Pursuant to the Purchase Agreement, UPS has agreed to purchase substantially all of the Debtors' assets used in operation of the Debtors' standing guard and patrol business, all as more fully described in Section 2.1 of the Purchase Agreement (the "Subject Assets"). Under the Purchase Agreement, UPS shall pay a purchase price that includes: (a) $21,250,000 cash; (b) the assumption of specified obligations of IPC under certain contracts with customers of its standing guard and patrol business, as amended pursuant to the Purchase Agreement (other than the obligation to establish the "General Liability Fund" as provided in Section 5.12 of the Purchase Agreement); and (c) assumption of specified liabilities of IPC under certain capital equipment leases and other leases and contracts designated by UPS (valued at $[2.9] million) (all executory contracts and unexpired leases of the Debtors to be assumed by UPS in connection with the Sale, the "Assumed Contracts"), all as described in greater detail in Sections 2.1, 2.3 and 2.5 of the Purchase Agreement.  Other than liabilities described under and specifically listed in Section 2.3 of the Purchase Agreement, UPS is not assuming any of the Debtors' pre-closing liabilities.

10.      Prior to the Petition Date, and in accordance with Section 2.6 of the Purchase Agreement, UPS remitted a deposit in the amount of $250,000 (the "Deposit") to The PrivateBank & Trust Company, in its capacity as escrowee (the "Escrow Agent").  The terms of the deposit escrow are set forth in Section 2.6 of the Purchase Agreement and the form of Deposit Escrow Agreement attached to the Purchase Agreement as Exhibit C, and are summarized as follows:  (a) if the Sale is consummated to UPS in accordance with the Purchase Agreement, the Deposit shall be remitted to or for the benefit of the Debtors' estates and credited against the cash purchase price to be paid by UPS; (b) if the Purchase Agreement is terminated by the Debtors pursuant to Section 11.2(g) of the Purchase Agreement, the Deposit shall be remitted to or for the benefit of the Debtors' estates [and UPS shall pay to the Debtors the

Liquidated Damages Amount in accordance with Section 11.3(d) of the Purchase Agreement]; and (c) if the Purchase Agreement is terminated for any reason other than by the Debtors pursuant to Section 11.2(g) of the Purchase Agreement, the Deposit shall be remitted to UPS.

**B.     Bid Protections in the Purchase Agreement**

11.     The Purchase Agreement provides various bid protections to UPS, including in the form of a Break-Up Fee (as defined in the Purchase Agreement) in the amount of $600,000 and Expense Reimbursement (as defined in the Purchase Agreement) up to $250,000, both of which the Debtors request authority to pay in the event either: (a) UPS is not the High Bidder (as defined below) at the Auction and the Sale is consummated with an alternative High Bidder (applies to both the Break-Up Fee and Expense Reimbursement); or (b) UPS is not the High Bidder (as defined below) at the Auction, regardless of whether a Sale to an alternate bidder is consummated (applies only to Expense Reimbursement). The Purchase Agreement also effectively provides that the Bidding Procedures must require that any competing bids include consideration that exceeds the aggregate purchase price as set forth in Section 2.5 of the Purchase Agreement by the amount of $950,000, i.e. the sum of (i) the Break-Up Fee, (ii) the maximum amount of the Expense Reimbursement, and (iii) an initial overbid of $100,000. The Purchase Agreement also requires that subsequent bidding increments be in the amount of at least $100,000.

12.     The Debtors request that the Court specifically approve in the Bidding Procedures Order sections 5.8(a) of the Purchase Agreement, which sections govern payment of the Break-Up Fee and the Expense Reimbursement.

8

**PROPOSED BIDDING PROCEDURES AND
ASSUMPTION AND ASSIGNMENT PROCEDURES**

13.    While the Debtors believe that the Purchase Agreement is fair and reasonable, the Debtors believe that, in the event a higher or otherwise better offer is received for the Subject Assets, the best interests of their estates are served by conducting a public Auction to identify the highest or otherwise best offer for the Subject Assets. Accordingly, the Debtors will seek approval of the Purchase Agreement only in the event that either an Auction does not occur (due to a lack of other Qualified Bids, as defined below) or the Auction occurs but does not yield an offer that is higher or otherwise better than the Purchase Agreement. To determine if a higher or otherwise better offer exists, the Debtors seek the Court's approval of the following bidding procedures (the "Bidding Procedures"), which also are attached as **Addendum 1** to the proposed Bidding Procedures Order.[3]

**Bidding Procedures**

**A.    The Bidding Process**

Set forth below is the general process to be employed by the Debtors to conduct an Auction to consider any bids in competition with the Purchase Agreement with respect to the proposed Sale of the Subject Assets:

1.    Any person interested in making an offer to purchase the Subject Assets shall comply with these procedures.

2.    The Debtors shall only consider Qualifying Bids (as defined below).

3.    If the Debtors do not receive a Qualifying Bid other than the Purchase Agreement prior to the Bid Deadline (as defined below), then the Auction will not be held and the offer of UPS to acquire the Subject Assets under the Purchase Agreement shall constitute the highest or otherwise best Qualifying Bid (the "High Bid").

4.    If the Debtors receive a Qualifying Bid other than the Purchase Agreement prior to the Bid Deadline, then the Debtors shall select a Qualifying Bid as the High

---

[3]    To the extent the description of the Bidding Procedures set forth herein differs from those set forth in Addendum 1 to the Bidding Procedures Order, the terms of Addendum 1 to the Bidding Procedures Order shall control.

Bid after the Debtors have conducted the Auction and considered, among other things, the total consideration to be received by their estates as well as other financial and contractual terms relevant to the proposed Sale, including those factors affecting the speed and certainty of consummating the proposed Sale.

5.      Upon failure to consummate the proposed Sale because of a breach on the part of the High Bidder after an order entered at the Sale Hearing, the Debtors shall be permitted to select the next highest or otherwise best bid to be the High Bid and to consummate such transaction without further order of the Bankruptcy Court, as further set forth in section 5.8(c) of the Purchase Agreement.

6.      If the High Bidder fails to consummate the Sale, and such failure is the result of a breach by the High Bidder, such High Bidder's Good Faith Deposit (as defined below) shall be forfeited to the Debtors as set forth in section 2.6 of the Purchase Agreement and the High Bidder shall pay to the Debtors the Liquidated Damages Amount (as defined in the Purchase Agreement), and, except to the extent provided in such bidders' marked agreement (or the Purchase Agreement), the High Bidder's liability to the Debtors shall be limited to the sum of the Good Faith Deposit and the Liquidated Damages Amount.

7.      The Good Faith Deposits of all Qualified Bidders shall be retained by the Debtors and held in escrow in an interest bearing account and all Qualified Bids will remain open, notwithstanding Bankruptcy Court approval of a Sale pursuant to the terms of a High Bid by a Qualified Bidder, until the earlier of (a) the closing of the Sale of the Subject Assets, and (b) the date that is sixty (60) days after the entry of the Sale Order (or such later date specified in the Qualified Bid) (the "Return Date"); provided, however, that any Qualified Bidder shall have thirty (30) days after the date that it is informed by Seller that Seller is prepared to close the Transaction with it to determine whether any Material Adverse Effect (as defined in the Purchase Agreement) shall have occurred after the date of the completion of the Auction, unless and until such 30-day period is waived by such Qualified Bidder. On the Return Date, the Debtors shall return the Good Faith Deposits of all Qualified Bidders, except the High Bidder, with any accrued interest.

## B.      Participation Requirements

1.      Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the sale process, each person (a "Potential Bidder") shall deliver to the Debtors, and Debtors shall promptly deliver to the Lender:

a.      an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

b.      current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Subject Assets, current audited

financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtors and the Lender, demonstrating such Potential Bidder's ability to close the proposed transaction and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed and assigned.

2.  A "Qualifying Bidder" is (a) UPS and, if applicable, (b) a Potential Bidder that delivers the documents described in subparagraphs 1(a) and 1(b) above and that the Debtors and the Lender determine is reasonably likely (based on the availability of financing, experience and other considerations) to submit a *bona fide* offer and to be able to consummate the proposed Sale if selected as the High Bidder. Two or more Potential Bidders may be deemed a Qualifying Bidder if such Potential Bidders, considered in the aggregate, otherwise meet the foregoing criteria.

3.  The Debtors and the Lender shall determine whether a Potential Bidder is a Qualifying Bidder and shall provide written notice of their determination to such Potential Bidder and to each then existing Qualifying Bidder.

## C.   Due Diligence

Subject to the Debtors' receipt of an executed confidentiality agreement in form and substance satisfactory to them, the Debtors shall afford each Potential Bidder due diligence access to the Subject Assets. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below).

## D.   Bid Deadline and Requirements

1.  A "Qualifying Bid" is (a) the offer of UPS to acquire the Subject Assets pursuant to the Purchase Agreement and, if applicable, (b) another Qualifying Bidder's offer to acquire the Subject Assets if such offer was received prior to the Bid Deadline and if such offer included each of the following (collectively, a "Bid Package"):

    a.  An executed copy of an asset purchase agreement (including schedules and exhibits, the "Qualifying Bidder Purchase Agreement"): (A) containing substantially the same or better terms as those set forth in the Purchase Agreement (B) marked to reflect changes to the Purchase Agreement (C) irrevocable until the earlier of 110 days after the Petition Date or two business days after a proposed Sale is consummated (D) for the purchase of substantially all of the Subject Assets, "as is, where is," in exchange for a cash purchase price that exceeds the Purchase Price (as such term is defined in the Purchase Agreement) by at least $950,000 (representing the sum of the maximum amount of the Expense Reimbursement, the Break-Up Fee, and a $100,000 initial bid increment, the "Minimum Cash Amount") and the assumption or otherwise

11

equivalent value of at least the Assumed Liabilities (as such term is defined in the Purchase Agreement). Executed copies of two or more asset purchase agreements may be deemed a Qualifying Bidder Purchase Agreement if, considered in the aggregate, such asset purchase agreements otherwise meet the foregoing criteria.

b.      A provision requiring payment of the Break-Up Fee and Expense Reimbursement directly to UPS upon the consummation of the sale contemplated by such bid.

c.      Financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtors to allow the Debtors to serve such information within one (1) business day after such receipt on counterparties to any executory contracts and unexpired leases being assumed and assigned in connection with the proposed transaction that have requested, in writing, such information.

d.      A good faith cash deposit (the "Good Faith Deposit") in the amount equal to 5% of the value of such bid payable to such party as the Debtors may determine in the form of a bank or certified check (or other form acceptable to the Debtors in their sole discretion), which Good Faith Deposit shall be held in escrow (by the Escrow Agent, as such term is defined in the Purchase Agreement) pending its use in accordance with these Bidding Procedures or the Return Date.

e.      A written statement that the bid is conditioned solely upon an order of the Bankruptcy Court approving the proposed transaction becoming final and not subject to appeal, and that such bid specifically is not conditioned upon: (A) obtaining financing or other financing contingencies; or (B) the outcome of unperformed due diligence by the bidder or any other contingencies.

f.      In the event that UPS' bid is not the successful bid at the Auction, the bid of UPS or any other bidder that is the first runner-up to the successful bidder shall remain binding upon UPS or such other bidder under the terms of the Purchase Agreement or the purchase agreement submitted by such other bidder as a back-up bid until the date that is 110 days following the Petition Date; provided, that UPS or such other runner-up bidder shall have thirty (30) days after the date that it is informed by Seller that Seller is prepared to close the Sale with it to determine whether any "Material Adverse Effect" (as defined in the Purchase Agreement) shall have occurred after the date of the completion of the Auction, unless and until such 30-day period is waived by UPS or such other bidder.

2.      In order to be considered, Bid Packages must be received on or before 4:00 p.m., prevailing eastern time, on September 16, 2013 (the "Bid Deadline") and, except

as may be instructed otherwise with respect to the Good Faith Deposit, should be delivered to: (a) Livingstone Partners LLC, 443 N. Clark St., Suite 200, Chicago, IL 60654, Attn: Joseph Greenwood; and (b) Proskauer Rose LLP, 70 W. Madison St., Suite 3800, Chicago, IL 60602, Attn: Brandon W. Levitan.

3.      The Debtors, promptly upon receipt of each Bid Package, shall distribute a copy of such Bid Package by electronic mail to counsel for UPS, counsel to PrivateBank & Trust Co. (the "<u>Lender</u>"), and counsel to any committee appointed under Section 1102 of the Bankruptcy Code.

4.      After the Bid Deadline, the Debtors and the Lender shall determine which Qualifying Bid represents the then highest or otherwise best value to the Debtors (the "<u>Initial Bid</u>"). At least 24 hours prior to the Auction, the Debtors shall distribute copies of the Initial Bid to each Qualifying Bidder.

## E.      Auction

If the Debtors receive a Qualifying Bid other than that of UPS, than the Debtors will conduct the Auction. The Auction, if necessary, shall take place at the offices of Proskauer Rose, LLP, 70 W. Madison St., Chicago, IL 60602 on September 18, 2013, commencing at 10:00 a.m. prevailing central time. Subject to the "Reservation of Rights" set forth below, the Auction shall be governed by the following procedures:

1.      Only a Qualifying Bidder who has submitted a Qualifying Bid (including UPS) shall be eligible to attend and participate at the Auction.

2.      Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale.

3.      The Auction shall begin with the Initial Bid (which, as a Qualifying Bid, will provide for at least the Minimum Cash Amount) and proceed in minimum additional increments of $100,000.

4.      Each bid at the Auction must meet each of the criteria of a Qualifying Bid, other than the requirement that it be received prior to the Bid Deadline.

5.      The amount of the Expense Reimbursement and Break-Up Fee may be added to and deemed a part of any bid of UPS.

6.      All bids shall be placed on the record, which shall either be transcribed or videotaped, and each bidder shall be informed of the terms of the previous bid.

7.      The Auction shall continue until there is only one offer that the Debtors and the Lender determine is the High Bid. In determining which Qualifying Bid to select as the High Bid, the Debtors and the Lender may consider, among other things: (a) the amount of the purchase price; (b) the form of consideration being offered; (c) the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof; and (d) the net benefit to the Debtors' estates and their creditors.

13

The Debtors shall present the High Bid to the Bankruptcy Court for approval at the Sale Hearing.

8.    The Debtors, after consultation with the Lender and in their reasonable discretion, may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order; provided, however, that the Debtors may not, without the consent of UPS and the Lender, modify: (a) the dates set for the Bid Deadline, the Auction, or the Sale Hearing; (b) the definition of "Minimum Cash Amount"; (c) the process for identifying the Initial Bid in Section D(4) of these bidding procedures; or (c) Sections E(1), E(5), or the last sentence of Section E(7) of these bidding procedures.

**F.    Sale Hearing**

The Debtors request that the Sale Hearing take place on or before September 25, 2013 at a time to be established by this Court. With the consent of the High Bidder, the Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date at the Sale Hearing. At the Sale Hearing, the Debtors shall present the High Bid to the Bankruptcy Court for approval.

**G.    Reservation of Rights**

In addition to their rights set forth in Section E(8) of these bidding procedures, the Debtors may, with the consent of UPS and in consultation with the Lender, modify these Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the proposed Sale of their assets if in their reasonable judgment such modifications would be in the best interest of the Debtors' estates and promote an open and fair sale process, so long as such modifications and/or additional terms are consistent with the provisions of the Purchase Agreement.

14.    To facilitate and effect the Sale of the Subject Assets to UPS, and likely any other High Bidder, the Debtors seek authorization to assume and assign certain contracts and unexpired leases in connection with the Sale. The Purchase Agreement identifies (or provides a mechanism to identify) executory contracts and unexpired leases of which it requires assignment, and it is likely that any other High Bidder also will require the Debtors to assume and assign to it certain executory contracts and unexpired leases in order to continue the operations of the Debtors' standing guard and patrol business. In order to provide counterparties with adequate notice of such assumption and proposed cure amounts (the "Cure Amounts"), the Debtors

14

propose the following procedures (the "<u>Assumption & Assignment Procedures</u>"), which also are attached as **Addendum 2** to the proposed Bidding Procedures Order.[4]

**Assumption and Assignment Procedures**

1. Within three business days after approval of these Assumption and Assignment Procedures, the Debtors shall file a schedule of cure obligations (the "<u>Contract and Cure Schedule</u>") listing the executory contracts and unexpired leases proposed to be assigned (the "<u>Assumed Contracts</u>") and the amount, if any, that the Debtors propose to pay to cure such Assumed Contracts pursuant to section 365 of the Bankruptcy Code (the "<u>Cure Amounts</u>").

2. Upon filing the Contract and Cure Schedule, a copy of the Contract and Cure Schedule, the Bidding Procedures and Sale Motion (including all exhibits thereto), the Notice of Auction and Sale Hearing, the Bidding Procedures Order, the Bidding Procedures, and the Assumption and Assignment Procedures (collectively, a "<u>Cure Package</u>"), will be served on each of the counterparties to the Assumed Contracts listed on the Contract and Cure Schedule.

3. Any objections ("<u>Assignment Objections</u>") to the assumption and assignment of any Assumed Contract, including, but not limited to, objections relating to adequate assurance of future performance or to the proposed Cure Amount set forth in the Contract and Cure Schedule, must be filed with the Bankruptcy Court and served upon the Notice Parties no later than: (a) 10 days prior to Sale Hearing; and (b) in the case of Additional Contracts (as defined below), ten (10) days after receipt of a Cure Package (as applicable, the "<u>Assignment Objection Deadline</u>").

4. Any counterparty to an Assumed Contract failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred from: (a) objecting to the Cure Amount set forth on the Contract and Cure Schedule with respect to its Assumed Contract; (b) seeking from the Debtors, the High Bidder, or any assignee under the Sale any amounts (in addition to the proposed Cure Amount) arising under its Assumed Contract prior to the closing of the Sale; and (c) objecting to the assumption and assignment of its Assumed Contract in connection with the Sale.

5. In the event that the Debtors and any objecting counterparty to an Assumed Contract are unable to resolve consensually an Assignment Objection prior to the date that is 3 days before the Sale Hearing, the Debtors shall provide notice to the Court of such dispute and request that the Bankruptcy Court hear and determine such Assignment Objection at the Sale Hearing.

---

[4] To the extent the description of the Assumption and Assignment Procedures set forth herein differs from those set forth in <u>Addendum 2</u> to the Bidding Procedures Order, the terms of <u>Addendum 2</u> to the Bidding Procedures Order shall control.

PAC 1118395v.2

6.  Except as may otherwise be agreed to by all parties to an Assumed Contract, the cure of any defaults under Assumed Contracts necessary to permit assumption and assignment thereof in accordance with section 365 of the Bankruptcy Code shall be by: (a) payment of the undisputed Cure Amount; and/ or (b) establishment of a reserve with respect to any disputed Cure Amount. The party responsible for paying Cure Amounts shall be as set forth in the Purchase Agreement or, if applicable, in an agreement between the High Bidder and the Debtors.

7.  The Purchase Agreement provides, and the agreement from another bidder may also provide, for the High Bidder to add Assumed Contracts to or remove Assumed Contracts from the Contract and Cure Schedule at any time up until ten (10) days after the closing of the Sale. As the Debtors are advised by the High Bidder that they desire to assume and assign an executory contract or unexpired lease, the Debtors shall file an amended or supplemental Contract and Cure Schedule adding such contracts or leases thereto (any such added contract, an "Additional Contract") or removing Assumed Contracts therefrom, and shall provide notice of such removal of such Assumed Contracts or assumption and assignment of Additional Contracts to each affected counterparty to such contracts and leases.

15.    The Debtors believe that the proposed Assumption and Assignment Procedures will provide the counterparties to the Assumed Contracts a full and fair opportunity to be heard with respect to issues concerning the proposed assumption and assignment of the Assumed Contracts, whether to UPS or another High Bidder.

**B.    Notice of Auction and Sale Hearing**

16.    The Debtors request that the Court schedule the Sale Hearing on or prior to September 25, 2013. The Debtors further request that the objection deadline, with respect to the Sale of the Subject Assets, be at least five days prior to such hearing.

17.    On or before three (3) business days after entry of the Bidding Procedures Order, or as soon thereafter as such parties can be identified, the Debtors will cause (a) a notice in substantially the form annexed as **Addendum 3** to the Bidding Procedures Order (the "Notice of Auction and Sale Hearing") and (b) a copy of the Bidding Procedures Order to be sent by first-class mail postage prepaid, to the following: (i) the Office of the United States Trustee; (ii)

16

counsel for any statutory committee in the Chapter 11 Cases, if and when appointed; (iii) the Lender; (iv) all taxing authorities and other governmental agencies having jurisdiction over any of the Subject Assets, including the Internal Revenue Service; (v) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (vi) all persons known or reasonably believed to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon any of the Subject Assets; (vii) the non-debtor parties to the Executory Contracts and Unexpired Leases and any parties who are known to claim interests therein; (viii) all persons known or reasonably believed to have expressed an interest in acquiring some or all of the Subject Assets within the six months prior to the Petition Date; (ix) the Attorneys General in the States where the Subject Assets are located; (x) the United States Environmental Protection Agency; and (xi) any applicable state environmental agency.[5]

18.     Electronic notification of this Bidding Procedures and Sale Motion, the Bidding Procedures Order, and the Notice of Auction and Sale Hearing also will be posted on the Court's electronic case filing (ECF) website, http://ecf.deb.uscourts.gov and any case management website maintained by the Debtors. On or before three (3) business days after entry of the Bidding Procedures Order, the Debtors will: (a) serve the Notice of Auction and Sale Hearing on all known creditors of the Debtors; and (b) subject to applicable submission deadlines, publish the substance of the Notice of Auction and Sale Hearing once in one or more publications the Debtors deem appropriate.

## AUTHORITY FOR REQUESTED RELIEF

**A.      This Court Has the Authority to Approve the Procedures Requested.**

---

[5]     The Notice of Auction and Sale Hearing will direct parties to contact the Debtors' counsel for more information and will provide that any party in interest that wishes to obtain a copy of any related document, subject to any necessary confidentiality agreement, may make a request in writing as specified in the Notice of Auction and Sale Hearing.

19.     Courts have indicated that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See*, *e.g.*, *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

18

20.    Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate").

21.    Here, the proposed Bidding Procedures and Assumption and Assignment Procedures are reasonable, appropriate, and an exercise of the Debtors' proper business judgment under the circumstances. These procedures will serve to maximize the value of the Debtors' standing guard and patrol business by expediting the sale process and providing certainty of treatment to the Debtors' customers, which is necessary to avoid customer attrition and resulting diminution in value of the Debtors' assets. The proposed procedures also increase the likelihood that the Debtors will receive the greatest possible consideration for the Subject Assets by ensuring a competitive and fair bidding process.

**B.    The Initial and Subsequent Overbids are Appropriate.**

22.    One important component of the Bidding Procedures is the "overbid" provision, pursuant to which: (a) any initial offer for the Subject Assets must be in an amount that is at least $950,000 more than the Purchase Price offered by UPS; and (b) any subsequent overbid must be in an increment of $100,000. The initial overbid amount is comprised of the $600,000 Break-Up Fee, the maximum amount of Expense Reimbursement ($250,000), and an initial overbid increment of $100,000.  The overbid amount is approximately [3.93]% of the $[24,150,000] aggregate initial Purchase Price under the Purchase Agreement. The subsequent overbid amount of $100,000 is less than 0.5% of the initial Purchase Price.

19

23.    The initial overbid serves at least two important purposes. First, the $100,000 portion of the initial overbid compensates the Debtors for the risk that they assume in foregoing a known, willing, and able purchaser for a new potential acquirer. Of course this additional amount also increases the net proceeds that would be received by the estates (after deducting the Break-Up Fee and the actual Expense Reimbursement incurred and paid to UPS) in the event of a prevailing overbid. Second, the balance of the overbid assures that the Debtors are not harmed by payment of the reasonable and necessary costs of the Break-Up Fee and the Expense Reimbursement. As discussed below, these amounts are reasonable and necessary to compensate UPS for its diligence costs and the risks it incurred in serving as a stalking horse bidder – benefits that directly accrue to the Debtors and their estates.

24.    Case law supports minimum overbids that are up to 10% of the initial purchase price as fair and reasonable. As the court stated in *In re Wintex, Inc.*, 158 B.R. 540 (D. Mass. 1992):

> A debtor may avoid the increased costs and complexity associated with considering additional bids unless the additional bids are high enough to justify their pursuit. The 10% increase requirement is one example of a reasonable litmus test.

*Id.* at 543. *See e.g.*, *Fin. News Network*, 126 B.R. 152, 154 (S.D.N.Y. 1991) (requiring minimum overbids to exceed purchaser's offer of $105 million by at least $10 million (9.5%)); *In re Colony Hill Assoc.*, 111 F.3d 269 (2d Cir. 1997) (requiring minimum overbids to exceed purchaser's initial offer of $7.5 million by at least $650,000 (8.6%)); *In re Tempo Tech. Corp.*, 202 B.R. 363, 369 (D. Del. 1996) (requiring minimum overbids of $1.4 million in cash where original purchase price was $150,000 cash plus $3 million in stock of the purchaser and $500,000 of assumed liabilities).

25.     Here, the initial overbid amount of 3.14% and the subsequent overbid requirement of less than 0.5% (in each case, of the stalking horse Purchase Price) are reasonable and should be approved.

## C.     The Break-Up Fee and Expense Reimbursement Are Appropriate and Should Be Approved.

26.     In order to compensate UPS for the time, effort, expense, and risk that it has incurred and will incur in negotiating, documenting, and seeking to consummate the Sale under the Purchase Agreement, as set forth above, the Bidding Procedures provide that if UPS is not the High Bidder, then UPS will be entitled to a Break-Up Fee of $600,000 and Expense Reimbursement for out-of-pocket expenses (including attorneys' fees) up to $250,000 (together, the "Bid Protections"). Accordingly, the maximum aggregate amount of the Bid Protections ($850,000) is less than 4% of the initial Purchase Price. Approval of the Bidding Procedures, including the Bid Protections, is a condition to UPS going forward with the Sale under the Purchase Agreement.

27.     Bid Protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the... corporation ha(s) a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values.

*Integrated Res.*, 147 B.R. at 659-60 (emphasis in original).  Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking."  *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); *see also Integrated Res.*, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders

would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence"). For these reasons, sellers of assets often employ termination or break-up fee and other bidding protections in order to encourage the making of bids. *See In re S.N.A. Nut Co.*, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995).

28.     The Bid Protections provide multiple direct benefits to the Debtors' estates. First, the stalking horse bid of UPS establishes a minimum bid for the Subject Assets that assures a minimum level of cash proceeds. Second, the floor provided by UPS's bid should promote competitive bidding, by providing a target and range of expected purchase price that will allow other bidders to prepare adequately for the Auction. Third, the Purchase Price set forth in the Purchase Agreement is an indicator of value that allows potential bidders to self select whether to participate in the auction process. This prevents the Debtor from having to deal with myriad "potential" bidders who, without this indicative market value, would have inundated the Debtor with requests for information (and would have forced the Debtor incur substantial professional fees and other costs) that would not have led to their participation in the Auction. Fourth, the certainty of the Purchase Agreement strengthens the bargaining position of the Debtors with respect to other bidders. Fifth, and perhaps most importantly in these Chapter 11 Cases, the existence of the Purchase Agreement provides certainty and comfort to the Debtors' customers, most (if not all) of whom have the ability to terminate their contracts on 30 days' notice. If the Bid Protections are not approved and UPS is no longer committed to purchase the Subject Assets (subject to higher and better offers), then it is highly likely that many of the Debtors' customers would terminate their contracts to the devastation of the Debtors and their other stakeholders.

29.     It is also significant that the ability of stalking horse purchases to obtain bid protections (and have them approved by the Court) is inherently beneficial to the bankruptcy process at large. The UPS Purchase Agreement is a sophisticated purchase agreement negotiated at arms length that is specifically tailored to this transaction. The availability of the Purchase Agreement reduces transactions costs and facilitates the Auction process for other bidders, greatly increasing the likelihood of their participation and a value-maximizing Auction. Similarly, the diligence conducted by UPS to date will allow other potential bidders easy access to organized information that will enable them to quickly and confidently form competing bids. Although these are sunk costs to both UPS and the Debtors (prior to approval of the Bid Protections), UPS likely would not have engaged in this process, with its significant benefits to the Debtors' estates, if there was not a high level of certainty that the Court would approve reasonable bid protections. Chapter 11 cases provide a robust and efficient market whereby assets that otherwise may be undervalue are exposed to the rigors of a transparent and efficient market. Accordingly, it is important for these cases specifically, and the bankruptcy process generally, that these reasonable Bid Protections be approved.

**D.     The Auction, Hearing, and Notice Procedures are Appropriate and Should Be Approved.**

30.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with twenty-one (21) days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), the Debtors are required to notify their creditors of the proposed sale of the Subject Assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the sale, and the deadline for filing any objections. The Debtors wish to proceed to the Auction and Sale Hearing as expeditiously as applicable law and the Court's calendar will allow, but still will give the requisite notice of the Sale.

**E.    The Sale of the Subject Assets to the High Bidder is Within the Sound Business Judgment of the Debtors and Should be Approved.**

31.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991).

32.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtor has obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates. Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

33.    A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business

reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

34.     The Debtors submit that their decision to proceed with the Sale of the Subject Assets, subject to the Auction and the Bidding Procedures, is based upon sound business judgment and should be approved.

35.     The prompt sale of the Subject Assets presents the best opportunity to maximize the value for the estates in light of the need to manage and transition the Debtors' customer contracts (the single most value type of Subject Asset) to a buyer. Moreover, the Debtors believe that the Bidding Procedures are the best method by which they can obtain the best price for the Subject Assets and provide interested parties with accurate and reasonable notice of the Sale. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction and service the Debtors' existing customers, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Subject Assets by helping ensure a competitive and fair bidding process.

36.     For reasons explained elsewhere herein, the Debtors believe the sale of the Subject Assets must occur quickly in order to preserve and maximize value in these Chapter 11 Cases, and that every day spent in chapter 11 increases the risk of business loss and value deterioration. Absent a prompt sale pursuant to the procedures and timelines proposed, the

Debtors believe that the going concern value of the Subject Assets will be significantly compromised. Moreover, the Debtors' precarious cash position and the terms of its DIP financing facility and consensual use of cash collateral require that the Sale occur on the timeline set forth above. The Debtors further believe that a targeted sale process is most likely to achieve the highest and best price for the Subject Assets and will do so in an efficient and timely manner, enabling the Subject Assets to emerge successfully from these cases. The Debtors respectfully submit that the relief sought by this Motion not only is reasonable, but necessary, to maximize the value of their estates for the benefit of the Debtors and their stakeholders.

37.     In addition, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Subject Assets in the past six months. Accordingly, the proposed sale of the Subject Assets satisfies the second prong of the *Abbotts Dairies* standard.

**F.      The Sale Is Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code.**

38.     The Debtors request that the Court find that each of the High Bidder and any potential back-up bidder upon the conclusion of the Auction is a good faith purchaser entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Subject Assets.

39.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) ... of this section of a sale . . . of property does not affect the validity of a sale ... under such authorization to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. §363(m).

40.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose their interest in the Subject Assets if the order allowing the sale is reversed on appeal. By their terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets.

41.     Additionally, the United States Court of Appeals for the Third Circuit has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365. *See Krebs Chrysler-Plymouth, Inc. v. Valley Motors. Inc.*, 141 F.3d 490, 497-98 (3d Cir. 1998). In *Krebs*, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." *Id.* at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in *Krebs* concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in *Krebs*, the Assumed Contracts (most importantly, the customer contracts) are contracts that may be assumed, assigned and/or transferred pursuant to section 365 of the Bankruptcy Code. In light of *Krebs*, the Debtors respectfully submit that section 363(m) applies to protect the High Bidder and any potential back-up bidder upon the conclusion of the Auction with respect to the Subject Assets, specifically including contracts with customers.

42.     As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide assurances that both the Debtors and all Qualified Bidders will act in good faith in negotiating the sale of the Subject Assets.

43.     Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). *See also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

44.     Here, the sale of the Subject Assets and the assignment and/or transfer of the Assumed Contracts, which will be designated by any High Bidder, is or will be in good faith.[6] As discussed throughout this motion, and as will be further demonstrated at the Sale Hearing, any sale agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel. No known potential bidder for the Subject Assets is an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, and all

---

[6]     The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for the High Bidder. Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. Moreover, the Debtors will not choose as the High Bidder **or back-up bidder** any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and would be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

negotiations have been and will continue to be conducted on an arms length, good faith basis. Moreover, there is no evidence of fraud or collusion in terms of the proposed sale.

45.    With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Under the circumstances, the High Bidder and any back-up bidder should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

**G.    The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code.**

46.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of their property free and clear of any and all liens, claims, or interests in such property if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a *bona fide* dispute; or (e) the party asserting the lien, claim, or, interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

47.    Any lien, claim, encumbrance, or interest in the Debtors' assets (other than permitted encumbrances and expressly assumed liabilities) may be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto. *See In re Circus Time, Inc.*, 5 B.R. at 7. Moreover, each of the parties that may hold such liens on the Subject Assets: (a) may consent the Sale; or (b) may be able to be compelled to accept a monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code. Because the Debtors expect that they will satisfy one or more

of the requirements of section 363(f), as will be demonstrated at the Sale Hearing, approving the sale of the Subject Assets free and clear of all liens, claims, and other interests is warranted.

48.    Without limiting the generality of the foregoing, the Debtor's sale of the Subject Assets shall be free and clear of all liens (as defined in section 101(37) of the Bankruptcy Code, whether consensual, statutory, possessory, judicial or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code including, without limitation, successor liability claims), Claims (as defined in the Purchase Agreement), Encumbrances (except for the Permitted Encumbrances, as both terms are defined in the Purchase Agreement), Liabilities (except for Assumed Liabilities, as both terms are defined in the Purchase Agreement), Excluded Liabilities (as defined in the Purchase Agreement), adverse interests, obligations, and interests, of any kind or nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or after the Petition Date, and whether imposed by agreement, understanding, law, equity or otherwise, accruing, including, without limitation, any liability arising from any of the following: (a) any employment obligation, including, without limitation, wages, vacation, commission, severance, and health care and insurance; (b) any employment or labor agreements, consulting agreements, severance agreements, change-in-control agreements, or other similar agreements to which the Debtors are or was a party; (c) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any employee stock benefit plans, employee stock ownership plans, 401(k) plans, and pension plans of the Debtors; (d) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, and any obligations with respect

thereto that arise from the Employee Retirement Income Security Act of 1974, as amended, the

Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and

Employment Act of 1967, as amended, the Federal Rehabilitation Act of 1973, the National

Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the

Worker Adjustment and Retraining Notification Act; (e) workers' compensation, occupational

disease or unemployment or temporary disability insurance claims; (f) environmental liabilities,

debts, claims or obligations which may be asserted on any basis, including, without limitation,

under the Comprehensive Environmental Response, Compensation and Liability Act or any other

environmental, health, and safety requirements; (g) any bulk sales or similar law; (h) any

litigation by or against the Debtors, including, without limitation, *Chavez v. IPC International*

*Corporation*, commenced in the Superior Court of the State of California, County of Los

Angeles, Case No. BC491803 and removed to the United States District Court for the Central

District of California, Case No. 2:12-cv-08754-DOC-RNB and *Stano v. IPC International*

*Corporation*, commenced in the Superior Court of the State of California, County of Orange,

Case No. 30-2011-00521358-CU-OE-CXC and removed to the United States District Court for

the Central District of California, Case No. 8:12-cv-00088-DOC-RNB; (i) any federal, state,

local and foreign taxes, charges, fees, imposts, levies or other assessments, including, without

limitation, income, gross receipts, excise, severance, employment, sales, use, transfer, license,

payroll, franchise, occupation, premium, windfall profits, environmental, customs duties, capital

stock, profits, stamp, withholding, Social Security, unemployment, disability, real property,

personal property, registration, value added, alternative or add on minimum, estimated or other

taxes, charges, fees, imposts, levies or other assessments, estimated, or any other tax, charge,

impost, levy or assessment of any kind whatsoever, including any interest, penalties or additions

thereto, whether disputed or not; and (j) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, including any statute, rule, regulation, order, decree, administrative or judicial doctrine or other laws based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

49.     The Sale Order shall provide that, among other things, any party seeking to assert any lien, claim, or interest in or arising from the Debtor's assets, including, without limitation, any claim or liability set forth in the foregoing section, which have been extinguished by the Sale Order by operation of Section 363(f) of the Bankruptcy Code, as discussed above, shall be enjoined and forever barred from pursuing such lien, claim, or interest against the Subject Assets and against the High Bidder or any of its successors, assigns and affiliates.

## H.     Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Approved.

50.     To facilitate and effectuate the sale of the Subject Assets, the Debtors seek authority to assume, assign and/or transfer Assume Contracts, to the extent required by the High Bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign their executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's

business judgment); *Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

51.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtor has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

52.     The High Bidder will want to take assignment of certain executory contracts and unexpired leases that are Subject Assets. The Debtors believe that they or the High Bidder can and will demonstrate that all requirements for assumption, assignment and/or transfer of the Assumed Contracts will be satisfied at the Sale Hearing. The Debtors, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Subject Assets. Further, for the reasons stated throughout this motion, the Debtors, in exercising their sound business judgment, believe that selling the Subject Assets (including rights under Assumed Contracts by assumption and assignment thereof) would be in the best interests of their estates.

53.     The Assumption and Cure Procedures, if approved, will provide assurance that all counterparties to Assumed Contracts will have notice and opportunity to be heard with respect to

34

such assumption and assignment. Under those procedures, counterparties to Assumed Contracts will receive notice of assignment and assumption proposed, related Cure Amounts, and opportunity to object or otherwise be heard. As set forth in those procedures, the Debtors request that unless the non-debtor party to an Assumed Contract files and serves an Assignment Objection on or before the Assignment Objection Deadline, such non-debtor party should be forever barred from: (a) objecting to the Cure Amount set forth on the Contract and Cure Schedule with respect to its Assumed Contract, (b) seeking from the Debtors, the High Bidder, or any assignee under the Sale any amounts (in addition to the proposed Cure Amount) arising under its Assumed Contract prior to the closing of the Sale, or (c) objecting to the assumption and assignment of its Assumed Contract in connection with the Sale.

54.     Thus, the Debtors request that the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases be approved.

**I.     Relief from the Ten-Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

55.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease ... is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

56.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h)

35

and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of their intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

57.    Accordingly, the Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

58.    Notice of this Motion has been given to (collectively, the "Notice Parties"): (a) the Office of the United States Trustee (the "U.S. Trustee"); (b) the creditors on each of the Debtors' lists of twenty (20) largest unsecured creditors; (c) counsel to the Prepetition Secured Lender; (d) all known parties with liens of record on assets of the Debtors as of the Petition Date; (e) all financial institutions at which the Debtors maintain deposit accounts; (f) the Internal Revenue Service; (g) the Illinois Department of Revenue; and (h) all other parties requesting notice pursuant to Bankruptcy Rule 2002. In addition, the Notice of Auction and Sale Hearing, the Bidding Procedures Order, and the Notice of Assumption and Assignment will be served as set forth in paragraphs 18 and 19 above. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

59.    The Debtors request that if a Notice Party fails to timely file and serve an objection to this Motion, such Notice Party will be deemed to have consented to the relief requested herein.

## CONCLUSION

36

WHEREFORE, the Debtors respectfully request: (1) entry of the proposed Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**; (2) entry of the Sale Order, substantially in the form attached hereto as **Exhibit B**; and (3) such other and further relief as the Court deems just and proper.

Dated: August 9, 2013
      Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ Etta R. Mayers*
Jeremy W. Ryan (DE Bar No. 4057)
Etta R. Mayers (DE Bar No. 4164)
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, DE 19899-0951
Telephone:  (302) 984-6000
Facsimile:   (302) 658-1192

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

-and-
**PROSKAUER ROSE LLP**
Paul V. Possinger
Brandon W. Levitan
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois  60602
Telephone: (312) 962-3550
Facsimile: (312) 962-3551

*Proposed Counsel for the Debtors and Debtors in Possession*

PAC 1118395v.2

# **EXHIBIT A**

**Proposed Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IPC International Corporation, *et al.*[1] | ) | Case No. 13-12050 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Re: Docket Nos. ___** |

**ORDER: (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF ASSETS
USED IN THE DEBTORS' STANDING GUARD AND PATROL BUSINESS,
(B) SCHEDULING THE AUCTION, (C) SCHEDULING THE SALE HEARING,
(D) AUTHORIZING PAYMENT OF THE BREAK-UP FEE AND EXPENSE
REIMBURSEMENT, (E) APPROVING THE DEPOSIT ESCROW AGREEMENT,
(F) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES RELATED TO
THE SALE, AND (G) APPROVING THE FORM OF AUCTION AND SALE NOTICE**

Upon the Debtors' Motion for Orders: (1)(A) Approving Bidding Procedures for the Sale of Assets Used in the Debtors' Standing Guard and Patrol Business, (B) Scheduling the Auction and Hearing to Consider Such Sale of Assets, (C) Authorizing Payment of the Break-Up Fee and Expense Reimbursement, (D) Approving Assumption and Assignment Procedures Related to Such Sale, (E) Approving the Deposit Escrow Agreement, and (F) Approving the Form of and Manner of Related Notice; and (2)(A) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; and (B) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Such Sale [Docket No. __] (the "Motion")[2]; notice of the Motion being proper and sufficient and all interested parties having been afforded an opportunity to be heard with respect to the Motion;

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: IPC International Corporation (2698); and The Security Network Holdings Corporation (7985).

[2]   Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the Motion.

upon review and consideration of (1) the Motion, (2) objections to the Motion, if any, (3) arguments of counsel and evidence proffered or adduced at the hearing on the Motion (the "<u>Hearing</u>"), and (4) the docket and proceedings in the above-captioned cases (the "<u>Chapter 11 Cases</u>"); and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and other parties in interest:

**THE COURT FINDS THAT:[3]**

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these Chapter 11 Cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

The statutory and rule-based predicates for the relief sought in the Motion are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6006, 9007 and 9014, and Local Rule 6004-1.

Notice of the Motion and Hearing having been given to the following parties is sufficient in light of the circumstances and the nature of the relief requested in the Motion: (1) the United States Trustee; (2) the Debtors' senior secured lenders; (3) all parties known or reasonably believed to have asserted an encumbrance on any of the Assets; (4) the counterparties to each of the Assumed Contracts; (5) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Assets; (6) all taxing authorities having jurisdiction over any of the Assets; (7) the attorneys general in the states where the Assets are located; (8) the United States Environmental Protection Agency and comparable state agencies where the Assets

---

[3]     Regardless of the heading under which they appear, any (1) findings of fact that constitute conclusions of law shall be conclusions of law and (2) conclusions of law that constitute findings of fact shall be findings of fact. All findings of fact and conclusions of law announced by the Court at the Hearing in relation to the Motion are incorporated herein to the extent not inconsistent herewith.

PAC 1118395v.2

are located; (9) the Debtors' twenty largest creditors (on a consolidated basis); and (10) all parties that have requested personal notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").

The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court granting certain of the relief requested in the Motion, including approval of: (1) the Bidding Procedures attached hereto as **Addendum 1**, (2) the Break-Up Fee and the Expense Reimbursement referenced in the Bidding Procedures and set forth in the stalking horse Purchase Agreement, (3) the Assumption and Assignment Procedures attached hereto as **Addendum 2**, and (4) the Notice of Auction and Sale Hearing attached hereto as **Addendum 3**.

The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling a subsequent Sale Hearing to consider granting other relief requested in the Motion, including approval of the Sale and the transfer of the Assets to the High Bidder free and clear of all liens, claims, interests and encumbrances (other than permitted encumbrances and expressly assumed liabilities) pursuant to section 363(f) of the Bankruptcy Code.

The Break-Up Fee and the Expense Reimbursement (together, the "Bid Protections") are essential inducements and conditions relating to the Purchaser's entry into, and continuing obligations under, the Purchase Agreement. Unless the Purchaser is assured that the Bid Protections will be available, the Purchaser is unwilling to remain obligated to consummate the Sale or otherwise be bound under the Purchase Agreement (including the obligations to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated by the Bidding Procedures). The Bid Protections induced Purchaser to submit a bid

that will serve as a minimum or floor bid at the Auction on which the Debtors, their creditors and other bidders can rely. The Purchaser has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Assets will be received. Accordingly, the Bid Protections provide an actual benefit to the Debtors' estates, are necessary to preserve the Debtors' estates, represent the best method for maximizing value for the benefit of the Debtors' estates, and are reasonable and appropriate under the circumstances.

The form and scope of the Notice of Auction and Sale Hearing is reasonably calculated to provide all interested parties with timely and proper notice of the Sale, the Sale Hearing, the Bidding Procedures, and the Auction.

The notice to counterparties of Assumed Contracts provided in accordance with the Assumption and Assignment Procedures is reasonably calculated to provide all counterparties to the Assumed Contracts with proper notice of the potential assumption and assignment of their executory contract or unexpired lease and any Cure Amounts associated therewith.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

The Motion is granted as set forth herein.

All objections to the relief requested in the Motion that have not been withdrawn, waived or settled as announced to the Court at the Hearing or by stipulation filed with the Court, are overruled except as otherwise set forth herein. This Order shall be valid, binding and enforceable on all parties in interests and fully effective immediately upon entry.

The Bidding Procedures, in the form attached hereto as **Addendum 1**, are approved and shall govern all bids and bid proceedings relating to the Assets. The Debtors are authorized to take any and all actions necessary and/or appropriate to implement the Bidding Procedures.

The deadline for submitting a Qualified Bid is _____ (the "Bid Deadline").

As provided in the Bidding Procedures, the Debtors shall conduct the Auction on _____ at _____ __.m. at _____ if more than one Qualified Bid is timely received.

The Notice of Auction and Sale Hearing is approved in all respects. All parties in interest shall receive or be deemed to have received good and sufficient notice of all relief sought in the Motion, including, but not limited to, the Auction, the Bid Deadline, the Bidding Procedures, the Sale Hearing, the Sale, and the assumption and assignment of the Assumed Contracts if, within three Business Days of the entry of this Order, the Debtors: (a) serve the Notice of Auction and Sale Hearing on the Notice Parties listed in Paragraph C of this Order and all known creditors of the Debtors, and (b) publish notice of the Sale, the time and place of the Auction, and time and place of the Sale Hearing, in the National Edition of the Wall Street Journal and such other publications (if any, although none are required) as the Debtors determine will promote the marketing and sale of the Assets.

The Sale Hearing shall be conducted on [___], 2013 at [___], prevailing central time. The Debtors shall seek entry of an order at the Sale Hearing approving and authorizing the Sale to the High Bidder on terms and conditions substantially consistent with the Purchase Agreement, as amended or modified. Subject to the Bidding Procedures, the Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

Objections to the relief requested in the Motion not granted herein, including approval of the Sale (other than for objections to Cure Costs or the provision of adequate assurance of future performance under Assumed Contracts by the High Bidder) of the Assets free and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code, must: (a) be made in writing and filed on the docket in the Chapter 11 Cases no later that

[_____] (the "<u>Objection Deadline</u>"); (b) state the basis of such objection with specificity, (c) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules; and (d) be served upon the Debtors and Notice Parties such as to be received on or before 4:00 p.m., prevailing eastern time, on the Objection Deadline.

The Break-up Fee and the Expense Reimbursement provisions of sections [_____] of the Purchase Agreement are approved in all respects and shall be paid to the Purchaser in accordance with and subject to the terms and conditions set forth in the Purchase Agreement at the time and in the manner provided in the Purchase Agreement. In accordance with section [____] of the Purchase Agreement, the obligations to pay the Break-Up Fee and the Expense Reimbursement shall constitute administrative expenses of the Debtors' estates under section 503(b)(1) of the Bankruptcy Code and, to the extent that the Purchaser is not the High Bidder, then any High Bid shall be deemed to provide for payment of the Break-Up Fee and the Expense Reimbursement to be made directly by the High Bidder to the Purchaser upon consummation of the Sale contemplated by such High Bid. The Purchaser shall not waive the right to payment of the Break-Up Fee or the Expense Reimbursement by bidding or rebidding at the Auction. If payment of the Break-Up Fee and/or Expense Reimbursement is required under the terms of the Purchase Agreement, the Debtors are authorized to take all necessary steps and directed, without need for any application, motion or further order of this Court, to pay the Break-Up Fee and Expense Reimbursement to the Purchaser upon the terms set forth in the Purchase Agreement.

The Deposit Escrow Agreement is approved and the Debtors are authorized and directed to execute and perform under the Deposit Escrow Agreement. The Deposit Escrow Agreement is deemed assumed (to the extent that it is an executory contract under section 365 of the

Bankruptcy Code).

The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable.

All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Order shall govern.

This Court shall retain jurisdiction to resolve any dispute relating to the interpretation of the terms and conditions of the Purchase Agreement and this Order. To the extent any provisions of this Order shall be inconsistent with the Motion, the terms of this Order shall control.

Dated: _____, 2013        _____
       Wilmington, Delaware        Mary F. Walrath
                            United States Bankruptcy Judge

PAC 1118395v.2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IPC International Corporation, *et al.*[1] | ) | Case No. 13-12050 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ADDENDUM 1**
**TO BIDDING PROCEDURES ORDER [DOCKET No. __]**

**BIDDING PROCEDURES**
(IN CONNECTION WITH THE AUCTION AND SALE OF ASSETS
USED IN THE DEBTORS' STANDING GUARD AND PATROL BUSINESS)

Set forth below is the general process to be employed by the Debtors with respect to the proposed Sale of all or substantially all of the Debtors' assets used in the operation of the Debtors' standing guard and patrol business (as defined below, the "Assets"), pursuant to the purchase agreement (the "Purchase Agreement") between **[UPS or its designee]** (the "Purchaser") and the Debtors or pursuant to a similar, marked agreement with another Qualified Bidder (as defined below).

These Bidding Procedures have been approved by order of the Bankruptcy Court [Docket No. __] (the "Bidding Procedures Order") after hearing on Debtors' Motion for Orders: (1)(A) Approving Bidding Procedures for the Sale of Assets Used in the Debtors' Standing Guard and Patrol Business, (B) Scheduling the Auction and Hearing to Consider Such Sale of Assets, (C) Authorizing Payment of the Break-Up Fee and Expense Reimbursement, (D) Approving the Escrow Deposit Agreement, (E) Approving Assumption and Assignment Procedures Related to Such Sale, and (F) Approving the Form of and Manner of Related Notice; and (2)(A) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; and (B) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Such Sale [Docket No. __] (the "Sale and Bidding Procedures Motion")[2].

**For copies of the Purchase Agreement, Bidding Procedures Order, Sale and Bidding Procedures Motion, or other documents or information in these cases, please contact counsel to the Debtors at (312) 962-3500 or visit [claims agent web page].**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: IPC International Corporation (2698); and The Security Network Holdings Corporation (7985).

[2]   Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the Bidding Procedures and Sale Motion.

## BIDDING PROCEDURES

### A.    The Bidding Process

Set forth below is the general process to be employed by the Debtors to conduct an Auction to consider any bids in competition with the Purchase Agreement with respect to the proposed Sale of the Subject Assets:

1.    Any person interested in making an offer to purchase the Subject Assets shall comply with these procedures.

2.    The Debtors shall only consider Qualifying Bids (as defined below).

3.    If the Debtors do not receive a Qualifying Bid other than the Purchase Agreement prior to the Bid Deadline (as defined below), then the Auction will not be held and the offer of UPS to acquire the Subject Assets under the Purchase Agreement shall constitute the highest or otherwise best Qualifying Bid (the "High Bid").

4.    If the Debtors receive a Qualifying Bid other than the Purchase Agreement prior to the Bid Deadline, then the Debtors shall select a Qualifying Bid as the High Bid after the Debtors have conducted the Auction and considered, among other things, the total consideration to be received by their estates as well as other financial and contractual terms relevant to the proposed Sale, including those factors affecting the speed and certainty of consummating the proposed Sale.

5.    Upon failure to consummate the proposed Sale because of a breach on the part of the High Bidder after an order entered at the Sale Hearing, the Debtors shall be permitted to select the next highest or otherwise best bid to be the High Bid and to consummate such transaction without further order of the Bankruptcy Court, as further set forth in section 5.8(c) of the Purchase Agreement.

6.    If the High Bidder fails to consummate the Sale, and such failure is the result of a breach by the High Bidder, such High Bidder's Good Faith Deposit (as defined below) shall be forfeited to the Debtors as set forth in section 2.6 of the Purchase Agreement and the High Bidder shall pay to the Debtors the Liquidated Damages Amount (as defined in the Purchase Agreement), and, except to the extent provided in such bidders' marked agreement (or the Purchase Agreement), the High Bidder's liability to the Debtors shall be limited to the sum of the Good Faith Deposit and the Liquidated Damages Amount.

7.    The Good Faith Deposits of all Qualified Bidders shall be retained by the Debtors and held in escrow in an interest bearing account and all Qualified Bids will remain open, notwithstanding Bankruptcy Court approval of a Sale

pursuant to the terms of a High Bid by a Qualified Bidder, until the earlier of (a) the closing of the Sale of the Subject Assets, and (b) the date that is sixty (60) days after the entry of the Sale Order (or such later date specified in the Qualified Bid) (the "Return Date"); provided, however, that any Qualified Bidder shall have thirty (30) days after the date that it is informed by Seller that Seller is prepared to close the Transaction with it to determine whether any Material Adverse Effect (as defined in the Purchase Agreement) shall have occurred after the date of the completion of the Auction, unless and until such 30-day period is waived by such Qualified Bidder. On the Return Date, the Debtors shall return the Good Faith Deposits of all Qualified Bidders, except the High Bidder, with any accrued interest.

## B.    Participation Requirements

8.    Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the sale process, each person (a "Potential Bidder") shall deliver to the Debtors, and Debtors shall promptly deliver to the Lender:

g.    an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

h.    current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Subject Assets, current audited financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtors and the Lender, demonstrating such Potential Bidder's ability to close the proposed transaction and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed and assigned.

9.    A "Qualifying Bidder" is (a) UPS and, if applicable, (b) a Potential Bidder that delivers the documents described in subparagraphs 1(a) and 1(b) above and that the Debtors and the Lender determine is reasonably likely (based on the availability of financing, experience and other considerations) to submit a *bona fide* offer and to be able to consummate the proposed Sale if selected as the High Bidder. Two or more Potential Bidders may be deemed a Qualifying Bidder if such Potential Bidders, considered in the aggregate, otherwise meet the foregoing criteria.

10.    The Debtors and the Lender shall determine whether a Potential Bidder is a Qualifying Bidder and shall provide written notice of their determination to such Potential Bidder and to each then existing Qualifying Bidder.

## C.    Due Diligence

Subject to the Debtors' receipt of an executed confidentiality agreement in form and substance satisfactory to them, the Debtors shall afford each Potential Bidder due diligence

access to the Subject Assets. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below).

**D.    Bid Deadline and Requirements**

11.    A "<u>Qualifying Bid</u>" is (a) the offer of UPS to acquire the Subject Assets pursuant to the Purchase Agreement and, if applicable, (b) another Qualifying Bidder's offer to acquire the Subject Assets if such offer was received prior to the Bid Deadline and if such offer included each of the following (collectively, a "<u>Bid Package</u>"):

i.    An executed copy of an asset purchase agreement (including schedules and exhibits, the "<u>Qualifying Bidder Purchase Agreement</u>"): (A) containing substantially the same or better terms as those set forth in the Purchase Agreement (B) marked to reflect changes to the Purchase Agreement (C) irrevocable until the earlier of 110 days after the Petition Date or two business days after a proposed Sale is consummated (D) for the purchase of substantially all of the Subject Assets, "as is, where is," in exchange for a cash purchase price that exceeds the Purchase Price (as such term is defined in the Purchase Agreement) by at least $950,000 (representing the sum of the maximum amount of the Expense Reimbursement, the Break-Up Fee, and a $100,000 initial bid increment, the "<u>Minimum Cash Amount</u>") and the assumption or otherwise equivalent value of at least the Assumed Liabilities (as such term is defined in the Purchase Agreement). Executed copies of two or more asset purchase agreements may be deemed a Qualifying Bidder Purchase Agreement if, considered in the aggregate, such asset purchase agreements otherwise meet the foregoing criteria.

j.    A provision requiring payment of the Break-Up Fee and Expense Reimbursement directly to UPS upon the consummation of the sale contemplated by such bid.

k.    Financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtors to allow the Debtors to serve such information within one (1) business day after such receipt on counterparties to any executory contracts and unexpired leases being assumed and assigned in connection with the proposed transaction that have requested, in writing, such information.

l.    A good faith cash deposit (the "<u>Good Faith Deposit</u>") in the amount equal to 5% of the value of such bid payable to such party as the Debtors may determine in the form of a bank or certified check (or other form acceptable to the Debtors in their sole discretion), which Good Faith Deposit shall be held in escrow (by the Escrow Agent, as such term is defined in the Purchase Agreement) pending its use in accordance with

these Bidding Procedures or the Return Date.

m.    A written statement that the bid is conditioned solely upon an order of the Bankruptcy Court approving the proposed transaction becoming final and not subject to appeal, and that such bid specifically is not conditioned upon: (A) obtaining financing or other financing contingencies; or (B) the outcome of unperformed due diligence by the bidder or any other contingencies.

n.    In the event that UPS' bid is not the successful bid at the Auction, the bid of UPS or any other bidder that is the first runner-up to the successful bidder shall remain binding upon UPS or such other bidder under the terms of the Purchase Agreement or the purchase agreement submitted by such other bidder as a back-up bid until the date that is 110 days following the Petition Date; provided, that UPS or such other runner-up bidder shall have thirty (30) days after the date that it is informed by Seller that Seller is prepared to close the Sale with it to determine whether any "Material Adverse Effect" (as defined in the Purchase Agreement) shall have occurred after the date of the completion of the Auction, unless and until such 30-day period is waived by UPS or such other bidder.

12.    In order to be considered, Bid Packages must be received on or before 4:00 p.m., prevailing eastern time, on September 16, 2013 (the "Bid Deadline") and, except as may be instructed otherwise with respect to the Good Faith Deposit, should be delivered to: (a) Livingstone Partners LLC, 443 N. Clark St., Suite 200, Chicago, IL 60654, Attn:   Joseph Greenwood; and (b) Proskauer Rose LLP, 70 W. Madison St., Suite 3800, Chicago, IL 60602, Attn: Brandon W. Levitan.

13.    The Debtors, promptly upon receipt of each Bid Package, shall distribute a copy of such Bid Package by electronic mail to counsel for UPS, counsel to PrivateBank & Trust Co. (the "Lender"), and counsel to any committee appointed under Section 1102 of the Bankruptcy Code.

14.    After the Bid Deadline, the Debtors and the Lender shall determine which Qualifying Bid represents the then highest or otherwise best value to the Debtors (the "Initial Bid"). At least 24 hours prior to the Auction, the Debtors shall distribute copies of the Initial Bid to each Qualifying Bidder.

## E.    Auction

If the Debtors receive a Qualifying Bid other than that of UPS, than the Debtors will conduct the Auction. The Auction, if necessary, shall take place at the offices of Proskauer Rose, LLP, 70 W. Madison St., Chicago, IL 60602 on September 18, 2013, commencing at 10:00 a.m. prevailing central time. Subject to the "Reservation of Rights" set forth below, the Auction shall be governed by the following procedures:

15.    Only a Qualifying Bidder who has submitted a Qualifying Bid (including

UPS) shall be eligible to attend and participate at the Auction.

16.    Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale.

17.    The Auction shall begin with the Initial Bid (which, as a Qualifying Bid, will provide for at least the Minimum Cash Amount) and proceed in minimum additional increments of $100,000.

18.    Each bid at the Auction must meet each of the criteria of a Qualifying Bid, other than the requirement that it be received prior to the Bid Deadline.

19.    The amount of the Expense Reimbursement and Break-Up Fee may be added to and deemed a part of any bid of UPS.

20.    All bids shall be placed on the record, which shall either be transcribed or videotaped, and each bidder shall be informed of the terms of the previous bid.

21.    The Auction shall continue until there is only one offer that the Debtors and the Lender determine is the High Bid. In determining which Qualifying Bid to select as the High Bid, the Debtors and the Lender may consider, among other things: (a) the amount of the purchase price; (b) the form of consideration being offered; (c) the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof; and (d) the net benefit to the Debtors' estates and their creditors. The Debtors shall present the High Bid to the Bankruptcy Court for approval at the Sale Hearing.

22.    The Debtors, after consultation with the Lender and in their reasonable discretion, may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order; provided, however, that the Debtors may not, without the consent of UPS and the Lender, modify: (a) the dates set for the Bid Deadline, the Auction, or the Sale Hearing; (b) the definition of "Minimum Cash Amount"; (c) the process for identifying the Initial Bid in Section D(4) of these bidding procedures; or (c) Sections E(1), E(5), or the last sentence of Section E(7) of these bidding procedures.

## F.    Sale Hearing

The Sale Hearing shall take place on September 25, 2013 at a time to be established by this Court. With the consent of the High Bidder, the Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date at the Sale Hearing. At the Sale Hearing, the Debtors shall present the High Bid to the Bankruptcy Court for approval.

**G.    Reservation of Rights**

In addition to their rights set forth in Section E(8) of these bidding procedures, the Debtors may, with the consent of UPS and in consultation with the Lender, modify these Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the proposed Sale of their assets if in their reasonable judgment such modifications would be in the best interest of the Debtors' estates and promote an open and fair sale process, so long as such modifications and/or additional terms are consistent with the provisions of the Purchase Agreement.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IPC International Corporation, *et al.*[1] | ) | Case No. 13-12050 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ADDENDUM 2
TO BIDDING PROCEDURES ORDER [DOCKET No. __]**

<u>**ASSUMPTION AND ASSIGNMENT PROCEDURES**</u>
(IN CONNECTION WITH THE SALE OF ASSETS
USED IN THE DEBTORS' STANDING GUARD AND PATROL BUSINESS)

These Assumption and Assignment Procedures have been approved by order of the Bankruptcy Court [Docket No. __] (the "<u>Bidding Procedures Order</u>") after hearing on Debtors' Motion for Orders: (1)(A) Approving Bidding Procedures for the Sale of Assets Used in the Debtors' Standing Guard and Patrol Business, (B) Scheduling the Auction and Hearing to Consider Such Sale of Assets, (C) Authorizing Payment of the Break-Up Fee and Expense Reimbursement, (D) Approving the Deposit Escrow Agreement, (E) Approving Assumption and Assignment Procedures Related to Such Sale, and (F) Approving the Form of and Manner of Related Notice; and (2)(A) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; and (B) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Such Sale [Docket No. __] (the "<u>Sale and Bidding Procedures Motion</u>")[2].

**For copies of the Purchase Agreement, Bidding Procedures Order, Sale and Bidding Procedures Motion, or other documents or information in these cases, please contact counsel to the Debtors at (312) 962-3500 or visit [claims agent web page].**

Pursuant to the Sale and Bidding Procedures Motion and section 365 of the Bankruptcy Code, the Debtors have requested: (1) authority to assume and assign certain executory contracts and unexpired leases (the "<u>Assumed Contracts</u>") to any High Bidder; and (2) that, upon such assumption and assignment, the Debtors shall be relieved of any liability under such Assumed Contracts arising after the closing of the Sale.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: IPC International Corporation (2698); and The Security Network Holdings Corporation (7985).

[2]    Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the Bidding Procedures and Sale Motion.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

1.    Within three business days after approval of these Assumption and Assignment Procedures, the Debtors shall file a schedule of cure obligations (the "Contract and Cure Schedule") listing the executory contracts and unexpired leases proposed to be assigned (the "Assumed Contracts") and the amount, if any, that the Debtors propose to pay to cure such Assumed Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amounts").

2.    Upon filing the Contract and Cure Schedule, a copy of the Contract and Cure Schedule, the Bidding Procedures and Sale Motion (including all exhibits thereto), the Notice of Auction and Sale Hearing, the Bidding Procedures Order, the Bidding Procedures, and the Assumption and Assignment Procedures (collectively, a "Cure Package"), will be served on each of the counterparties to the Assumed Contracts listed on the Contract and Cure Schedule.

3.    Any objections ("Assignment Objections") to the assumption and assignment of any Assumed Contract, including, but not limited to, objections relating to adequate assurance of future performance or to the proposed Cure Amount set forth in the Contract and Cure Schedule, must be filed with the Bankruptcy Court and served upon the Notice Parties no later than: (a) 10 days prior to Sale Hearing; and (b) in the case of Additional Contracts (as defined below), ten (10) days after receipt of a Cure Package (as applicable, the "Assignment Objection Deadline").

4.    Any counterparty to an Assumed Contract failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred from: (a) objecting to the Cure Amount set forth on the Contract and Cure Schedule with respect to its Assumed Contract; (b) seeking from the Debtors, the High Bidder, or any assignee under the Sale any amounts (in addition to the proposed Cure Amount) arising under its Assumed Contract prior to the closing of the Sale; and (c) objecting to the assumption and assignment of its Assumed Contract in connection with the Sale.

5.    In the event that the Debtors and any objecting counterparty to an Assumed Contract are unable to resolve consensually an Assignment Objection prior to the date that is 3 days before the Sale Hearing, the Debtors shall provide notice to the Court of such dispute and request that the Bankruptcy Court hear and determine such Assignment Objection at the Sale Hearing.

6.    Except as may otherwise be agreed to by all parties to an Assumed Contract, the cure of any defaults under Assumed Contracts necessary to permit assumption and assignment thereof in accordance with section 365 of the Bankruptcy Code shall be by: (a) payment of the undisputed Cure Amount; and/ or (b) establishment of a reserve with respect to any disputed Cure Amount. The party responsible for paying Cure Amounts shall be as set forth in the Purchase Agreement or, if applicable, in an agreement between the High Bidder and the

Debtors.

7. The Purchase Agreement provides, and the agreement from another bidder may also provide, for the High Bidder to add Assumed Contracts to or remove Assumed Contracts from the Contract and Cure Schedule at any time up until ten (10) days after the closing of the Sale. As the Debtors are advised by the High Bidder that they desire to assume and assign an executory contract or unexpired lease, the Debtors shall file an amended or supplemental Contract and Cure Schedule adding such contracts or leases thereto (any such added contract, an "Additional Contract") or removing Assumed Contracts therefrom, and shall provide notice of such removal of such Assumed Contracts or assumption and assignment of Additional Contracts to each affected counterparty to such contracts and leases.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IPC International Corporation, *et al.*[1] | ) | Case No. 13-12050 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ADDENDUM 3
TO BIDDING PROCEDURES ORDER [DOCKET No. __]**

**NOTICE OF BID DEADLINE, AUCTION, AND SALE HEARING**
(IN CONNECTION WITH THE SALE OF ASSETS
USED IN THE DEBTORS' STANDING GUARD AND PATROL BUSINESS)

        **PLEASE TAKE NOTICE** that on July __, 2013, the above-captioned debtors and debtors in possession (the "Debtors") filed a motion (the "Sale and Bidding Procedures Motion") seeking approval of, among other things: (1) auction and bidding procedures (the "Bidding Procedures") in connection with the sale of substantially all of their assets used in the operation of their standing guard and patrol business (the "Assets"); (2) procedures to determine cure amounts and deadlines for objections to the assumption and assignment of certain contracts and leases by the Debtors; and (3) related relief with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). By order dated _____ ___, 2013 [Docket No. ___] (the "Bidding Procedures Order"), the Bankruptcy Court: (a) granted, in part, the Sale and Bidding Procedures Motion; (b) approved the Bidding Procedures, which procedures are attached as **Addendum 1** to the Bidding Procedures Order; and (c) approved procedures relating to the assumption and assignment of executory contracts and unexpired leases (the "Assumption and Assignment Procedures"), which procedures are attached as **Addendum 2** to the Bidding Procedures Order.

        **PLEASE TAKE FURTHER NOTICE** that all interested parties are invited to submit a Qualified Bid and to make offers to purchase the Assets in accordance with the terms of the Bidding Procedures and the Bidding Procedures Order, copies of which may be included herewith. The deadline to submit bids (the "Bid Deadline") is **[____], 2013 at 4:00 p.m. (central)**.

        **PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures Order, the Debtors intend to conduct an auction (the "Auction") for the sale of the Assets at the offices of [_____], or at such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: IPC International Corporation (2698); and The Security Network Holdings Corporation (7985).

**PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court has scheduled a hearing on **[                    ], 2013 at [    ] (central)** (the "Sale Hearing"), at which the Debtors intend to seek the Bankruptcy Court's approval of the sale of the Assets to the bidder(s) submitting the highest, best or otherwise financially superior offer at the Auction (collectively, the "High Bidder"). The Sale Hearing will be held before the Honorable [_____], at the United States Bankruptcy Court for the Northern District of Delaware, Eastern Division, 219 S. Dearborn St., __th Floor, Courtroom No. [__], Chicago, IL 60604.

**PLEASE TAKE FURTHER NOTICE** that All Qualified Bids must be submitted no later than 5:00 p.m. (central) on _____ __, 2013 (the "Bid Deadline") by delivery to Proskauer Rose LLP, 70 West Madison Street, Chicago, Illinois 60602, (Attn. Brandon W. Levitan) , with copies to: (1) [UPS Counsel]; and (2) [_____].

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the complete terms and conditions of the Sale and Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order, which shall control in the event of any conflict. The Debtors encourage parties in interest to review such documents in their entirety. Copies of these pleadings may be obtained: (1) by written request to counsel to the Debtors, Proskauer Rose LLP, 70 West Madison Street, Chicago, Illinois 60602, (Attn. Brandon W. Levitan); and (2) on the website of the Debtors' claims agent at http://www.[_____].

Dated: _____ __, 2013

## **EXHIBIT B**

**Form of Proposed Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| IPC International Corporation, *et al.*[1] | ) Case No. 13-12050 (MFW) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |
| | ) **Re: Docket No. ___** |

**ORDER (A) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR**
**OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND**
**(B) AUTHORIZING AND APPROVING THE ASSUMPTION**
**AND ASSIGNMENT OF EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES IN CONNECTION WITH SUCH SALE**

On October __, 2013, at approximately _____, a hearing was held to consider and approve the sale of substantially all of the Debtors' assets in their standing guard and patrol business and related relief, including the assumption and assignment of contracts and leases, set forth in the *Motion of the Debtors For Orders: (1)(A) Approving Bidding Procedures For the Sale of Assets Used in the Debtor's Standing Guard and Patrol Business, (B) Scheduling an Auction and Hearing to Consider Such Sale of Assets, (C) Authorizing Payment of the Break-Up Fee and Expense Reimbursement, (D) Approving Assumption and Assignment Procedures Related to Such Sale, and (E) Approving the Form and Manner of Related Notice; and (2)(A) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (B) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Such Sale* (the "Motion").  Appearances were as reflected on the record.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: IPC International Corporation (2698); and The Security Network Holdings Corporation (7985).

The Court having read and considered the Motion, the declarations and other evidence filed in support of the Motion, any and all objections to the Motion, the [Order Approving the Bidding Procedures] (the "<u>Bidding Procedures Order</u>"), the report of the auction conducted in accordance with the Bidding Procedures Order, the papers, pleadings and other documents on file in this Chapter 11 case, and the Court having heard the representations and arguments of counsel and the testimony proffered at the hearing, and after due deliberation thereon, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

B.    Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O).

D.    The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "<u>Bankruptcy Code</u>") and rules 2002, 6003, 6004, 6006, 9006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>").

E.    Proper, timely, adequate, and sufficient notice of the Motion, the Auction and Sale Hearing (as defined in the Motion), the Sale (as defined in the Motion), the Bidding Procedures Order, the Bidding Procedures (as defined in the Motion), and the Assumption and Assignment Procedures (as defined in the Motion) has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and rules 2002, 6003, 6004, 6006, 7004, 9006, 9007, and 9014 of the Bankruptcy Rules, and no other or further notice of the Motion, the

Auction and Sale Hearing, the Sale, the Bidding Procedures Order, the Bidding Procedures, or the Assumption and Assignment Procedures is required or necessary under the circumstances. Without limiting the generality of the foregoing, each of the following parties has (i) received proper, timely, adequate, and sufficient notice of the Motion, the Auction and Sale Hearing, the Sale, the Bidding Procedures Order, the Bidding Procedures, and the Assumption and Assignment Procedures and (ii) had a reasonable opportunity to object and to be heard with respect to the Sale and the Motion and the relief requested therein (including the assumption and assignment of the Assumed Contracts): (a) all Persons (as defined in the Asset Purchase Agreement dated as of August 9, 2013 (the "APA") by and between Universal Protection Service, LLC ("Universal") and the Debtors)[1] who are known to possess or assert a lien, Claim (as defined in the APA), or Encumbrance (as defined in the APA) against the Debtors or against or interest in any of the Assets (including all parties adverse to the Debtors in litigation); (b) all Persons with liens of record on the Debtors' Assets as of the Petition Date; (c) all creditors of each of the Debtors; (d) the Internal Revenue Service; (e) the Social Security Administration; (f) all applicable Governmental Authorities (as defined in the APA); (g) all applicable federal, state, and local Governmental Authorities with taxing authority; (h) all non-debtor counterparties to the Assumed Contracts (as defined in the APA) and all parties known to claim any interest therein; (i) the Office of the United States Trustee; (j) PrivateBank & Trust Company, in its capacity as the Debtors' prepetition senior secured lender (the "Lender"); (k) counsel to the Lender; (l) all financial institutions at which the Debtors maintain deposit accounts; (m) all other Persons required by any order of the Court, the Bankruptcy Code, or the Bankruptcy Rules; (n) all

---

[1]        A true and correct copy of the APA is attached to this Order as Exhibit A.

interested Persons of any of the Debtors; and (o) all Persons that have requested noticed pursuant to Bankruptcy Rule 2002.

F.      Without limiting the generality of the foregoing paragraph, in accordance with the Bidding Procedures Order and the Bidding Procedures, each non-debtor counterparty to the Assumed Contracts has properly and timely received a copy of the Contract and Cure Schedule (as defined in the Bidding Procedures), the Motion (including all exhibits thereto), the Notice of Auction and Sale Hearing, the Bidding Procedures Order, the Bidding Procedures, and the Assumption and Assignment Procedures.

G.      Attached as Exhibit B to this Order is a list of all of the Assumed Contracts that the Debtors will assume and assign in conjunction with the Sale.

H.      Universal has provided adequate assurance of future performance with respect to each of the Assumed Contracts, as required by sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  The Debtors have, to the extent necessary, satisfied all of the requirements of section 365(b)(1) of the Bankruptcy Code in connection with the assumption of the Assumed Contracts, and all of the requirements of section 365(f)(2) of the Bankruptcy Code in connection with the assignment of the Assumed Contracts to Universal.

I.      The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders.  The Debtors undertook substantial marketing efforts, and conducted the Sale (including the Auction) without collusion and in accordance with the Bidding Procedures Order.  The Debtors (i) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Assets, (ii) provided potential purchasers, upon request, sufficient information to enable them to

make an informed judgment on whether to bid on the Assets, and (iii) considered any bids submitted in accordance with the Bidding Procedures Order.

J.    Pursuant to the Bidding Procedures Order, the Debtors conducted the Auction on October __, 2013, commencing at _____ __.m. prevailing central time and concluding at ____ prevailing central time, at the offices of Proskauer Rose, LLP, 70 W. Madison Street, Chicago, Illinois 60602, for the Assets in accordance with the terms of the Motion and the Bidding Procedures Order.

K.    Prospective bidders for the Assets were Universal, _____.

L.    The Debtors and Universal have complied with the Bidding Procedures Order.

M.    After the conclusion of the bidding, the Debtors and the Lender determined that Universal's bid of _____ constituted the highest and best bid received for the Assets and the best overall offer made in connection with the Assets.

N.    After execution of the APA and upon the Debtors' filing of their Chapter 11 petitions, Universal deposited with the Escrow Agent (as defined in the APA) a cash deposit in the amount of $250,000, which is included in Universal's bid.

O.    The Court determines that (i) the Sale to Universal under the APA constitutes the highest and otherwise best and most certain offer for the Assets, (ii) Universal is the successful bidder for the Assets, and (iii) the purchase price resulting from the Auction of the Assets constitutes fair consideration and reasonably equivalent value for the Sale under the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, the Bankruptcy Code, and the laws of the United States, any state, territory, possession thereof or the District of Columbia. Consummation of the Sale in accordance with this Order and the terms of the APA, Ancillary Documents (as defined in the APA), and all other documents entered into in connection

therewith (the "<u>Transaction Documents</u>") is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

P.      The Debtors have exercised sound and proper business judgment in determining to (i) sell the Assets to Universal, (ii) enter into each of the Transaction Documents, including, without limitation, the APA, and (iii) assume and assign to Universal the Assumed Contracts pursuant to section 365 of the Bankruptcy Code.  Entry into the APA, entry into the agreements contemplated thereby, assumption and assignment to Universal of the Assumed Contracts, and consummation of the Sale constitute a good and sufficient exercise by the Debtors of their sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.  The Court finds that the Debtors have articulated both (a) good, sufficient, and sound business purposes and justifications and (b) compelling circumstances for the Sale of the Assets to Universal pursuant to section 363(b) prior to, and outside of, a plan of organization.   Additionally, (I) the Transaction Documents, including, without limitation, the APA, constitute the highest and best offer for the Assets, (II) the Transaction Documents, including, without limitation the APA, and the closing of the Transactions (as defined in the APA) will present the best opportunity to realize the value of the Assets and avoid further decline and devaluation of the Assets, (III) there is a risk of deterioration of the value of the Assets if the Sale is not consummated promptly, and (IV) the Transaction Documents, including, without limitation, the APA, will provide a greater recover for the Debtors' creditors than would be provided by any other presently available alternative.

Q.      The Debtors have demonstrated compelling circumstances for the consummation of the Sale outside of the ordinary course of business under section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization in that, among other things, the immediate

approval by this Court of the Sale is necessary and appropriate to maximize the value of the Debtors' estates.   Entry of an order approving the Sale and the Transaction Documents is a necessary condition precedent to the Debtors' and Universal's obligations under the APA.   The Sale does not constitute a *de facto* plan of reorganization (or liquidation) for the Debtors because the Sale does not and will not (i) impair or restructure existing debt of, or equity interest in, the Debtors, (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors, (iii) circumvent any Chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests, or extend debt maturities.

R.      To the extent that the execution and delivery of the APA or any other documents contemplated thereby, or the consummation of the Transactions in accordance with this Order results in a violation or breach of, or constitutes a default under any of the following: (i) the certificate of incorporation, as amended, the bylaws, or other organizational instruments of any of the Debtors; (ii) any term or provision of any contract or agreement; and (iii) any other commitment or restriction to which any of the Debtors is a party, such violation, breach or default shall be excused and the Transactions shall remain fully valid.

S.      The Debtors have full power and authority to execute, deliver, and perform each of the Transaction Documents and all other documents necessary and appropriate to effect the Sale approved by this Order, and to perform the Transactions.   No other consents or approvals, other than those expressly provided for in the Transaction Documents and herein, are required for the Debtors to consummate the Sale.

T.      The transfer of the Assets as set forth in the Transaction Documents (i) are or will be legal, valid, and effective transfers of property of the bankruptcy estates of the Debtors and

(ii) vest or will vest in Universal all right, title, and interest of the Debtors in and to all of the Assets, free and clear of all liens (as defined in section 101(37) of the Bankruptcy Code, whether consensual, statutory, possessory, judicial or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code including, without limitation, successor liability claims), Claims, Encumbrances (except for the Permitted Encumbrances, as both terms are defined in the APA), Liabilities (except for Assumed Liabilities, as both terms are defined in the APA), Excluded Liabilities (as defined in the APA), adverse interests, obligations, and interests, of any kind or nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or after the Petition Date, and whether imposed by agreement, understanding, law, equity or otherwise, accruing, except as otherwise expressly provided in the APA (collectively, "Interests").

U.       Universal would not have entered into the APA and the other Transaction Documents and would not consummate the Sale, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Assets to Universal were not free and clear of all liens, claims, encumbrances, and Interests, except as otherwise expressly provided in the APA, or if Universal would, or in the future could, be liable for any of the liens, claims, encumbrances, and Interests of the Assets, except as otherwise expressly provided in the APA.

V.       Universal asserts that it will not consummate the Transactions unless such Transaction Documents specifically provide, and the Court specifically orders, that none of Universal or its affiliates, members or shareholders or the Assets be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or

indirectly, any liability, including any Interest or Excluded Liability other than the Assumed Liabilities (as defined in the APA).

W.      The Debtors may sell and transfer, and Universal may purchase, the Assets free and clear of any lien, claim, encumbrance, and Interest in such property of an entity other than the Debtors' estates because, in each case, one or more of the standards set forth in sections 363(f)(1) through (5) of the Bankruptcy Code has been satisfied.  Each holder of any lien, claim, encumbrance, or Interest against the Debtors, or any of them, their estates, or any of the Assets: (i) has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such Interest; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Those holders of liens, claims, encumbrances, or Interests who did not object, or who withdrew their objections, to the Motion and the Sale are deemed, subject to the terms of this Order, to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  All holders of liens, claims, encumbrances, and Interests are adequately protected by having their liens, claims, encumbrances, and Interests attach to the proceeds ultimately attributable to the Assets against or in which such liens, claims, encumbrances, and Interests are asserted, subject to the terms of such liens, claims, encumbrances, and Interests, with the same validity, force, and effect, and in the same order of priority, that such liens, claims, encumbrances, and Interests had prior to the Sale, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

X.      The Transaction Documents were not entered into for the purpose of hindering, delaying or defrauding creditors of the Debtors.  The Transactions are not fraudulent transfers or

fraudulent conveyances under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.

Y.      Except with respect to the Assumed Liabilities and for the obligations to pay the consideration for the Assets as described in this Order, the APA, the Bill of Sale (as defined in the APA), and such other Transaction Documents, the transfer of the Assets to Universal under the applicable Transaction Documents shall not result in Universal, or any of its affiliates, successors or assigns, having any liability or responsibility (i) for any lien, claim, encumbrance, Interest, or any other obligation of or against the Debtors, and neither Universal, nor any of its affiliates, successors and assigns, shall, as a result of the Sale or any action taken in connection with the Sale, be deemed to (a) be a successor (or other similarly situated party) to the Debtors (or any of them) or (b) have, *de facto* or otherwise, merged with or into the Debtors, or (ii) to the Debtors or to third parties except as is expressly set forth in the Transaction Documents. Without limiting the effect or scope of the foregoing, to the fullest extent permitted by law, the transfer of the Assets from the Debtors to Universal does not and will not subject Universal, or any of its affiliates, successors or assigns, or any of their respective properties (including the Assets) to any liability for liens, claims, encumbrances, or Interests against the Debtors or liens, claims, encumbrances, or Interests of the Debtors in such Assets by reason of such transfer under the laws of the United States or any state, territory or possession thereof, or the District of Columbia, applicable to such Transactions including, without limitation, any bulk-transfer laws, successor liability or similar theories.

Z.      The conveyance of the Assets pursuant to the Sale does not amount to a consolidation, merger or *de facto* merger of Universal and the Debtors and/or Debtors' estates. There is not a substantial continuity between Universal and the Debtors.  There is no continuity

of enterprise between the Debtors and Universal.  Universal is not a mere continuation of the Debtors or the Debtors' estates.  Universal does not constitute a successor to the Debtors or the Debtors' estates.

AA.    Except as expressly provided for in the Transaction Documents or this Order, if at all, Universal is not acquiring or assuming any liability, warranty or other obligation of the Debtors.  The transfer of the Assets to Universal will not subject Universal to any liability whatsoever (including, without limitation, any successor liability) with respect to the operation of the Debtors' businesses prior to the Closing (as defined in the APA), including, without limitation, any liability arising from any of the following: (i) any employment obligation, including, without limitation, wages, vacation, commission, severance, and health care and insurance; (ii) any employment or labor agreements, consulting agreements, severance agreements, change-in-control agreements, or other similar agreements to which the Debtors are or was a party; (iii) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any employee stock benefit plans, employee stock ownership plans, 401(k) plans, and pension plans of the Debtors; (iv) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, as amended, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act; (v) workers' compensation, occupational disease or unemployment

or temporary disability insurance claims; (vi) environmental liabilities, debts, claims or obligations which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any other environmental, health, and safety requirements; (vii) any bulk sales or similar law; (viii) any litigation by or against the Debtors, including, without limitation, *Chavez v. IPC International Corporation*, commenced in the Superior Court of the State of California, County of Los Angeles, Case No. BC491803 and removed to the United States District Court for the Central District of California, Case No. 2:12-cv-08754-DOC-RNB and *Stano v. IPC International Corporation*, commenced in the Superior Court of the State of California, County of Orange, Case No. 30-2011-00521358-CU-OE-CXC and removed to the United States District Court for the Central District of California, Case No. 8:12-cv-00088-DOC-RNB; (ix) any federal, state, local and foreign taxes, charges, fees, imposts, levies or other assessments, including, without limitation, income, gross receipts, excise, severance, employment, sales, use, transfer, license, payroll, franchise, occupation, premium, windfall profits, environmental, customs duties, capital stock, profits, stamp, withholding, Social Security, unemployment, disability, real property, personal property, registration, value added, alternative or add on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, estimated, or any other tax, charge, impost, levy or assessment of any kind whatsoever, including any interest, penalties or additions thereto, whether disputed or not; and (x) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, including any statute, rule, regulation, order, decree, administrative or judicial doctrine or other laws based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.  For

the avoidance of doubt, the liabilities set forth in this paragraph are included in the defined term "Interests" for all purposes herein.

BB.    All of the actions taken by the Debtors and Universal, and their respective officers, directors, employees, counsel, financial advisors and other professionals in connection with the negotiation, execution, delivery, and consummation of the Sale and the Transaction Documents, and each of the Transactions, have been conducted at arm's length and have been in good faith, and Universal is a good faith purchaser of the Assets and assignee of the Assumed Contracts within the meaning of section 363(m) of the Bankruptcy Code and, with respect to the acquisition of the Assets and assignment of the Assumed Contracts, is entitled to all of the benefits of section 363(m) of the Bankruptcy Code, because, among other things: (i) the Debtors were free to deal with any other party in connection with the Sale; (ii) Universal complied with the provisions of the Bidding Procedures Order; (iii) the selection of Universal as the successful bidder was the result of the competitive bidding process set forth in the Bidding Procedures Order; (iv) no common identity of directors, incorporators or controlling stockholders exists between Universal and any of the Debtors, and Universal is not holding itself out to the public as a continuation of the Debtors; (v) Universal did not have any unfair advantage over any other bidder and did not attempt to take advantage of any other bidder; (vi) Universal has no fiduciary duties to the Debtors; (vii) Universal is not related to the Debtors; (viii) each of the Transaction Documents was vigorously negotiated, proposed and entered into by the Debtors and Universal without collusion, without fraud, in good faith, and from arm's length bargaining positions; (ix) the purchase price was not controlled by an agreement between potential and actual bidders within the meaning of section 363(n) of the Bankruptcy Code; (x) neither the Debtors nor any party to any Transaction Document has engaged in any conduct contemplated by the Transaction

Documents to be avoided as contemplated by section 363(n) of the Bankruptcy Code; (xi) all elements of the Sale and the Transaction Documents have been disclosed to all competing bidders and all persons that received notice of the Motion; (xii) there are no terms of the Sale not reflected in the Transaction Documents; and (xiii) the purchase price is fair and adequate based on, among other things, Debtors' marketing efforts and the spirited Auction and competitive bidding process.

CC.     In the absence of a stay pending appeal, Universal will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing and consummating the Sale at any time after the entry of this Order, and accordingly, such closing and consummation in the face of an appeal will not deprive Universal of its status as a good faith purchaser. Without limiting the generality of the foregoing, the reversal or modification on appeal of the authorization provided herein to consummate the Sale or any portion thereof, shall not affect the validity of the Sale. Universal is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

DD.     Universal may close and consummate the Sale in accordance with the Transaction Documents, notwithstanding that this Order has not become a final order, and, therefore, any party objecting to this Order must exercise due diligence in filing an appeal and obtaining a stay pending such appeal as in the absence of a stay pending appeal, the reversal or modification on appeal of the authorization provided herein to consummate the Sale or any portion thereof shall not affect the validity of the Sale.

EE.     There is no legal or equitable reason to delay the Sale.

FF.     Good cause exists to grant all relief provided herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      Findings A through FF, inclusive, set forth above are hereby incorporated in this Order as if set forth in full herein.

2.      The Motion is granted in all respects except, if at all, as provided herein.  All oppositions and objections of all kinds that have not been withdrawn or settled are overruled with prejudice.

3.      The Debtors are authorized and directed to (a) sell the Assets to Universal, as the party with the highest and otherwise best and most certain offer at the Auction, in an amount equal to the purchase price determined at the Auction, and on the terms set forth in this Order and the Transaction Documents, including, without limitation the APA, and (b) assume the Assumed Contracts and assign such Assumed Contracts to Universal.

4.      The Debtors are authorized to sell the Assets to Universal, and the Sale, assumption by the Debtors of the Assumed Contracts, and assignment of such Assumed Contracts to Universal shall be and are, pursuant to section 363(f) of the Bankruptcy Code, except as expressly provided in the APA, free and clear of all liens (as defined in section 101(37) of the Bankruptcy Code, whether consensual, statutory, possessory, judicial or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code including, without limitation, successor liability claims), Claims, Encumbrances (except for the Permitted Encumbrances), Liabilities (except for Assumed Liabilities), Excluded Liabilities, adverse interests, obligations, and interests, of any kind or nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or after the Petition Date, and whether imposed by

agreement, understanding, law, equity or otherwise, accruing, including, without limitation, any liability arising from any of the following: (a) any employment obligation, including, without limitation, wages, vacation, commission, severance, and health care and insurance; (b) any employment or labor agreements, consulting agreements, severance agreements, change-in-control agreements, or other similar agreements to which the Debtors are or was a party; (c) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any employee stock benefit plans, employee stock ownership plans, 401(k) plans, and pension plans of the Debtors; (d) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, as amended, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act; (e) workers' compensation, occupational disease or unemployment or temporary disability insurance claims; (f) environmental liabilities, debts, claims or obligations which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any other environmental, health, and safety requirements; (g) any bulk sales or similar law; (h) any litigation by or against the Debtors, including, without limitation, *Chavez v. IPC International Corporation*, commenced in the Superior Court of the State of California, County of Los Angeles, Case No. BC491803 and removed to the United States District Court for the Central District of California, Case No. 2:12-

cv-08754-DOC-RNB and *Stano v. IPC International Corporation*, commenced in the Superior Court of the State of California, County of Orange, Case No. 30-2011-00521358-CU-OE-CXC and removed to the United States District Court for the Central District of California, Case No. 8:12-cv-00088-DOC-RNB; (i) any federal, state, local and foreign taxes, charges, fees, imposts, levies or other assessments, including, without limitation, income, gross receipts, excise, severance, employment, sales, use, transfer, license, payroll, franchise, occupation, premium, windfall profits, environmental, customs duties, capital stock, profits, stamp, withholding, Social Security, unemployment, disability, real property, personal property, registration, value added, alternative or add on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, estimated, or any other tax, charge, impost, levy or assessment of any kind whatsoever, including any interest, penalties or additions thereto, whether disputed or not; and (j) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, including any statute, rule, regulation, order, decree, administrative or judicial doctrine or other laws based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.  Any of the foregoing liens, claims, encumbrances, or interests or any other liens, claims, encumbrances, or Interests in or to either the Assets or Assumed Contracts are to attach to the net sales proceeds of the Assets in the preexisting order of priority.

5.      Any party seeking to assert any lien, claim, encumbrance, or Interest against, in, or to either the Assets, the Assumed Contracts, or Universal shall be enjoined and forever barred from pursuing such lien, claim, encumbrance, or Interest against the Assets and against Universal or any of its affiliates, successors or assigns.  The terms of this Order shall be binding upon the

Debtors, their estates, all creditors, all parties asserting a lien, claim, encumbrance, or Interest in the Assets or Assumed Contracts, and the respective successor and assigns of any of the foregoing, including, but not limited to, any trustee appointed in the Debtors' Chapter 11 cases or any subsequent Chapter 7 case or cases.

6.      The provisions of the APA relating to the assumption and assignment of the Assumed Contracts are valid and binding, in full force and effect, and enforceable in accordance with their terms and upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, Universal shall be fully and irrevocably vest with all of the Debtors' right, title and interest of each of the Assumed Contracts.

7.      Pursuant to the APA and section 365 of the Bankruptcy Code, Universal shall assume all Assumed Liabilities.

8.      The Debtors are authorized, pursuant to section 365 of the Bankruptcy Code, to assume and assign to Universal the Assumed Contracts, which assumption and assignment, without any further order of this Court being required, shall occur upon Closing.  Except as otherwise may be agreed to by the Debtors and any counterparty to any of the Assumed Contracts in accordance with the Assignment and Assumption Procedures, the Debtors shall promptly cure or provide adequate assurance that it will promptly cure the Assumed Customer Contracts by paying the applicable Cure Amounts in accordance with section 365(b) of the Bankruptcy Code.

9.      Any provision in any of the Assumed Contracts that purports to declare a breach, default, or payment right as a result of the assignment or change of control in respect of the Debtors is unenforceable.  All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the Closing (without giving effect to any acceleration

clauses or any default provision of the kind mentioned in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured upon payment of the Cure Amounts.

10.    No sections or provisions of any of the Assumed Contracts that purports to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor counterparty to the Assumed Contracts as a result of the Debtor's assumption and assignment to Universal of the Assumed Contracts shall have any force and effect with respect to the Transactions and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.    No assignment of any of the Assumed Contracts pursuant to the terms of the APA shall in any respect constitute a default under any of the Assumed Contracts.    Universal shall enjoy the rights and benefits under the Assumed Contracts as of the applicable date of assumption without the necessity of obtaining such non-debtor counterparty's written consent to the assumption or assignment thereof.

11.    This Order is and shall be effective as a determination that, upon the closing of the Sale, except as expressly provided in the APA, all liens, claims, encumbrances, and Interests existing against any of the Assets and any of the Assumed Contracts conveyed to Universal, including, without limitation, the liens, claims, encumbrances, and Interests held by the Lender, LaSalle Bank N.A., LaSalle National Bank, LaSalle Bank National Association, Bank of America, N.A., Konica Minolta Business Solutions U.S.A., Inc., Court Square Leasing Corporation, CIT Communications Finance Corporation, CIT Technology Financing Services, Inc., and Xerox Financial Services, have been and hereby are adjudged and declared to be unconditionally released, discharged, extinguished, and terminated.    Upon the closing of the

Sale, all liens, claims, encumbrances, and Interests of record existing against any of the Assets, including, without limitation, the liens, claims, encumbrances, and Interests held by the Lender, LaSalle Bank N.A., LaSalle National Bank, LaSalle Bank National Association, Bank of America, N.A., Konica Minolta Business Solutions U.S.A., Inc., Court Square Leasing Corporation, CIT Communications Finance Corporation, CIT Technology Financing Services, Inc., and Xerox Financial Services, shall be forthwith deemed removed and stricken, except as expressly provided in the APA. In furtherance of the foregoing, Universal is authorized to file or record any necessary documents reflecting the extinguishment of such liens, claims, encumbrances, and Interests without the need to obtain any consent or signature(s) from any releasing party, including, without limitation, UCC termination statements with the secretary of state of the applicable state(s). Notwithstanding the foregoing provisions of this paragraph, this Order shall constitute conclusive evidence of the unconditional release, discharge, termination, and extinguishment of all liens, claims, encumbrances, and Interests existing against any of the Assets, including, without limitation, the liens, claims, encumbrances, and Interests held by the Lender, LaSalle Bank N.A., LaSalle National Bank, LaSalle Bank National Association, Bank of America, N.A., Konica Minolta Business Solutions U.S.A., Inc., Court Square Leasing Corporation, CIT Communications Finance Corporation, CIT Technology Financing Services, Inc., and Xerox Financial Services.

12.     This Order shall be binding upon and govern the acts of all entities and Governmental Authorities, including, all filing agents, filing officers, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments,

or who may be required to report or insure any title or state of title in or to the Assets.  Each and every Governmental Authority, and any other person or entity is hereby authorized and directed to accept any and all documents and instruments in connection with or necessary to consummate the Sale.

13.     Except with respect to enforcing the terms of the Transaction Documents, including, without limitation, the APA, the Bidding Procedures Order, or this Order, no person shall take any action to prevent, enjoin or otherwise interfere with the consummation of the Sale.

14.     Any and all Assets in the possession or control of any person or entity, including any vendor, supplier, attorney or employee of the Debtors shall be transferred to Universal free and clear of all liens, claims, encumbrances, and Interests and shall be delivered and deemed delivered at the time of Closing to Universal.

15.     The Debtors and Universal are entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code with respect to the Sale, the assumption and assignment of the Assumed Contracts, and all Transactions approved in this Order.

16.     The Sale, the terms and conditions of the Transaction Documents and the Transactions (including, without limitation, the consideration provided in respect thereof) are fair and reasonable and, to the extent permitted by law, shall not be avoided pursuant to section 363(n) of the Bankruptcy Code or otherwise.

17.     At the Closing, the Debtors are authorized and directed to sell, assign, transfer, convey and deliver all of the Debtors' right, title, and interest in, to and under the Assets to Universal in accordance with the terms of the Transaction Documents, including, without limitation, the APA.

18.     The Debtors are authorized and directed to execute and deliver, and empowered to fully perform under, consummate and implement, this Order, the Transaction Documents, including, without limitation, the APA, and all documents required by the Transaction Documents to be delivered at the Closing or thereafter.

19.     The automatic stay imposed by section 362 is hereby modified to the extent necessary to implement the provisions of this Order and the terms of the Transaction Documents, including without limitation, the APA.

20.     This Court retains jurisdiction to (a) enforce and implement the terms and provisions of the Transaction Documents, (b) resolve any disputes arising under or related to the Transaction Documents, and (c) interpret, implement, and enforce the provisions of this Order.

21.     Nothing contained in any plan of reorganization (or liquidation) confirmed in these cases or the order of confirmation confirming any plan of reorganization (or liquidation) shall conflict with or deviate from the provisions of the Transaction Documents or the terms of this Order.

22.     The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered confirming any plan of reorganization of the Debtors, appointing a Chapter 11 trustee, or converting the Debtors' cases, or any of them, from Chapter 11 cases to a case or cases under Chapter 7 of the Bankruptcy Code.

23.     This Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and their creditors, Universal, and its successor and assigns, and upon any superseding trustee in the Debtors' bankruptcy cases, or, in the event of (a) the appointment of a Chapter 11 trustee, upon the Chapter 11 trustee, or (b) the conversion to a Chapter 7 case, upon the Chapter 7 trustee.  The Debtors and Universal shall be entitled to enforce the terms and

provisions of this Order. This Order and the Transaction Documents shall be binding in all respects upon (i) all Persons who are known to possess or assert a lien, Claim, or Encumbrance against the Debtors or against or interest in any of the Assets (including all parties adverse to the Debtors in litigation), (ii) all Persons with liens of record on the Debtors' Assets as of the Petition Date, (iii) all creditors of each of the Debtors (whether known or unknown), (iv) the Internal Revenue Service, (v) the Social Security Administration, (vi) all applicable Governmental Authorities, (vii) all applicable federal, state, and local Government Authorities with taxing authority, (viii) all non-debtor counterparties to the Assumed Contracts and all parties known to claim any interest therein, (ix) the Office of the United States Trustee, (x) the Lender, (xi) all financial institutions at which the Debtors maintain deposit accounts, (xii) all interested Persons of any of the Debtors (whether known or unknown), (xiii) any statutory committee formed in the Debtors' cases, (xiv) all successors and assigns of the Debtors and their affiliates and subsidiaries, (xv) and any trustees, examiners, "responsible persons", foreign representatives or other fiduciaries appointed in the Debtors' bankruptcy cases or the bankruptcy cases of Debtors' affiliates and subsidiaries, or upon appointment of a Chapter 11 trustee or conversion to a Chapter 7 under the Bankruptcy Code. The Transaction Documents shall not be subject to rejection or avoidance under any circumstances.

24.     The failure to specifically include or make reference to any particular provision of the Transaction Documents, including, without limitation, the APA, or any other document contemplated thereby or in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Transaction Documents, including, without limitation, the APA, and the other document contemplated thereby are authorized and approved in their entirety.

25.     This Court hereby requests the aid and recognition of any court, tribunal, regulatory, administrative or other Governmental Authority to give effect to this Order and to assist the Debtors and Universal and their respective agents in carrying out the terms of the Order.   All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Debtors and Universal as may be necessary or desirable to give effect to this Order or to assist the Debtors and Universal and their respective agents in carrying out the terms of this Order.   The Debtors and Universal are hereby authorized and empowered to apply to any court, tribunal, regulatory, administrative or other Governmental Authority, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

26.     To the extent any inconsistency between the Transaction Documents, including, without limitation, the APA, and this Order, this Order shall control and prevail.

27.     The findings of fact set forth above (whether in the text or in the footnotes) and conclusions of laws stated herein constitute this Court's findings of facts and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein pursuant to Bankruptcy Rule 9014. Any findings of fact contained herein shall be construed as conclusions of law and conclusions of law contained herein shall be construed as findings of fact when appropriate.

28.     The fourteen (14) day stay of order provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby waived.

29.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a)(1). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014, rule 54(b) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7054, and any other applicable rule or law, the Court expressly finds that there

is no just reason for the delay in implementation of the Order, waives any stay, and expressly directs entry of the Order as set forth herein.

30.    No further notice or Court appearances shall be necessary to effectuate any of the foregoing.

Dated: _____, 2013
          Wilmington, Delaware

_____
Mary F. Walrath
United States Bankruptcy Judge

## EXHIBIT C

**UPS Stalking Horse Purchase Agreement**

# ASSET PURCHASE AGREEMENT

## DATED AS OF AUGUST 9, 2013

## BY AND BETWEEN

## IPC INTERNATIONAL CORPORATION AND

## THE SECURITY NETWORK HOLDING CORP.

## AS SELLERS

## AND

## UNIVERSAL PROTECTION SERVICE, LLC

## AS PURCHASER

Exhibits
Exhibit A – Assignment and Assumption Agreement
Exhibit B – Bill of Sale
Exhibit C – Deposit Escrow Agreement
Exhibit D – Form of Lien Release
Exhibit E – GL Fund Escrow Agreement
Exhibit F – Non-Competition and Non-Solicitation Agreement
Exhibit G – Form of Proposed Sale Order

Schedules
Schedule 1.1(a) – Excluded Tangible Property
Schedule 1.1(b) – Permitted Encumbrances (presumably none)
Schedule 2.1(a) – List of Acquired Vehicles
Schedule 2.3(a) – Customers
Schedule 2.3(b) – Assumed Equipment Leases
Schedule 2.5 – Purchase Price Adjustment Formula
Schedule 2.7 – Purchase Price Allocation
Schedule 3.3 – Conflicts
Schedule 3.4 –Consents
Schedule 3.6 – Exceptions to Title
Schedule 3.7 – Cure Amounts
Schedule 3.8 – Litigation
Schedule 3.12(a) – Tax Delinquencies
Schedule 3.12(b) - Jurisdictions
Schedule 3.12(c ) –Tax Audits and Investigations
Schedule 3.13 – Known Creditors and Claimants
Schedule 8.1(b) –Employees on Long Term Disability

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made as of this 9th day of August, 2013, by and between Universal Protection Service, LLC, a Delaware limited liability company ("Purchaser"), and IPC International Corporation, an Illinois corporation ("Seller") and The Security Network Holding Corp., a Delaware corporation("Parent").

## W I T N E S S E T H:

WHEREAS, Seller is presently engaged in the Business (as defined below), and Parent is the holder of 100% of the issued and outstanding equity interests in Seller;

WHEREAS, Seller and Parent intend to file voluntary Petitions (as defined below) for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (each as defined below) shortly after this Agreement is executed;

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell, transfer and assign to Purchaser, the Assets (as defined below) in accordance with this Agreement and in accordance with and subject to the Bid Procedures, the Bid Procedures Order and the Sale Order (each as defined below), pursuant to sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, Seller, as debtor and debtor-in-possession, will continue in the possession of its assets and in the management of the Business pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants, promises and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## SECTION 1
## INTERPRETATION

1.1.    Definitions.  Whenever used in this Agreement, unless there is something in the subject matter or context inconsistent therewith, the following words and phrases shall have the respective meanings ascribed to them as follows.

"Administrative Expenses" are claims allowed under section 503 of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person.  For purposes of this definition "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means a transaction or series of transactions involving a sale, transfer or other disposition of all or any material portion of the Assets to another purchaser or purchasers other than the Purchaser.

"Ancillary Agreements" means, together, the Assignment and Assumption Agreement, the Bill of Sale, the Deposit Escrow Agreement, the Customer Contract Amendments, the GL Fund Escrow Agreement and the Non-Competition Agreement.

"Annualized Three-Month Revenue" means the Seller's Revenue for the three month period ending on the last day of the calendar month prior to the Closing Date, excluding Revenue during such period from any contract or other source that any customer has either terminated or given oral or written notice of its intent to cancel or terminate or materially reduce an order for services from Seller (but only to the extent such Revenue has not been replaced by additional contracts or other sources during such three-month period), annualized by multiplying such Revenue by four.

"Assets" means those assets set forth in Section 2.1.

"Assignment and Assumption Agreement" means that certain assignment and assumption agreement to be executed at Closing with respect to the Assumed Contracts, substantially in the form attached hereto as Exhibit A.

"Assumed Contracts" means the Assumed Customer Contracts (as amended by the Customer Contract Amendments) and the Assumed Equipment Leases.

"Assumed Customer Contracts" means the contracts between Seller and its customers as listed on Schedule 2.3(a) hereto, to the extent that Purchaser elects to assume such contracts in accordance with Section 2.3.

"Assumed Equipment Leases" means the capitalized personal property lease contracts listed on Schedule 2.3(b) hereto, to the extent that Purchaser elects to assume such contracts in accordance with Section 2.3.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" means an auction in connection with the sale of the Assets, as described in the Bid Procedures Order.

"Avoidance Actions" means all causes of action arising under chapter 5 of the Bankruptcy Code.

"Bankruptcy Case" means the chapter 11 case of Seller filed in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bid Procedures" means bid procedures to be approved by the Bankruptcy Court pursuant to the Bid Procedures Order on substantially the terms and conditions described in the definition of Bid Procedures Order, provided that the Bid Procedures shall be in form and substance reasonably acceptable to the Purchaser, the Seller and the Lender.

"Bid Procedures Order" means the order of the Bankruptcy Court approving the Bid Procedures in form and substance reasonably acceptable to Purchaser, Seller and Lender including, without limitation: (a) the approval of the Break-Up Fee and Expense Reimbursement as provided in Section 5.8 hereof; (b) a minimum initial overbid at any Auction of $100,000 in excess of the sum of the amounts of the Purchase Price, the Break-up Fee and the Expense Reimbursement; (c) minimum subsequent bid increments at any Auction of $100,000; (d) any competing bidder must agree to close a transaction on substantially the same or better terms as those set forth in this Agreement; (e) the requirement that any competing bidder deposit with Seller at least five (5) days prior to the Sale Hearing cash equal to five percent (5%) of the competing bidder's purchase price and provide evidence of financial ability to close the transaction; (f) the requirement that any competing bidder submit a purchase agreement substantially similar to this Agreement in order to be a qualified bidder at the Auction (including a redline showing the changes to this Agreement and a clean version executed by the competing bidder); (g) the requirement that only qualified bidders may appear and bid on the Assets at any Auction; and (h) the requirement that, if Purchaser is not the prevailing bidder at the Auction, Purchaser's final bid as set forth herein (and as modified at the Auction) shall constitute a back-up bid on the terms set forth in Section 5.8(c).

"Bill of Sale" means that certain bill of sale to be executed at Closing with respect to the Assets other than the Assumed Contracts, substantially in the form attached hereto as Exhibit B.

"Break-Up Fee" means an amount equal to $600,000 which shall, subject to Bankruptcy Court approval, be afforded the protections, and be paid, as set forth in this Agreement.

"Business" means the standing guard and patrol business of Seller.

"Business Day" means a day other than a Saturday, Sunday or any other day on which the principal national banks located in the City of New York are not open for business during normal banking hours.

"COBRA" has the meaning set forth in Section 8.2(b).

"Claim" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, known or unknown.

"Clearance Certificates" has the meaning set forth in Section 10.7.

"Closing" has the meaning set forth in Section 11.1.

"Closing Date" has the meaning set forth in Section 11.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contracts" means all commitments, contracts, leases, licenses, agreements and understandings, written or oral, relating to the Assets or the operation of the Business to which Seller is a party or by which Seller or any of the Assets is bound.

"Cure Amounts" means all amounts payable in connection with the cure of defaults under any of the Assumed Contracts.

"Customer Contract Amendments" means amendments to the Assumed Customer Contracts in form and substance reasonably acceptable to Purchaser and Seller to be executed with counterparties to the Assumed Customer Contracts prior to the Closing Date and which shall, among other things, limit the obligations of Seller and Purchaser to counterparties to Assumed Customer Contracts with respect to indemnity and defense of general liability claims, as set forth in any Assumed Customer Contracts, to the amount of the General Liability Fund.

"Deposit Escrow Agreement" has the meaning set forth in Section 2.6.

"Employee" means any employee of Seller as of the Closing Date.

"Employee Benefit Plan" means each plan, program, policy, payroll practice, or Contract providing for compensation, bonuses, vacation pay or paid time off, severance, performance or incentive pay, stock or equity-related awards, health and welfare insurance, expense reimbursement, fringe benefits or other employee benefits or perquisites of any kind, whether formal or informal, funded or unfunded, written or oral, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, that is sponsored, maintained or contributed to by Seller or any of its Affiliates, or to which Seller is a party or may have any direct or contingent Liability.

"Encumbrances" means, with respect to any Asset, any mortgage, deed of trust, pledge, security interest, lien, charge, lease, claim, encumbrance, option, right of first refusal, imperfection of title, covenant, encroachment, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, state of facts or any other restrictions or third party rights.

"Environmental Law" means any Federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction, decree or legally binding judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, natural resources, or health and safety, including those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"Escrow Agent" means The PrivateBank and Trust Company as escrow agent only (and not as Seller's senior secured lender).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means all Contracts other than the Assumed Contracts.

"Excluded Liabilities" means all of the obligations, debts and Liabilities of, and Claims, causes of action, and judgments against, Seller other than the Assumed Liabilities.

"Excluded Tangible Property" means all weapons and other equipment, office supplies, furniture, furnishings and fixtures located at Seller's corporate offices at 2111 Waukegan Road, Bannockburn, Illinois as of the Closing as listed on Schedule 1.1(a).

"Expense Reimbursement" means all reasonable costs and expenses of Purchaser incurred in connection with the negotiation, execution and delivery of this Agreement and the negotiation and consummation of the transactions contemplated hereby, including, without limitation, attorneys' fees and expenses, and due diligence fees and expenses, in the amount of up to $250,000 which shall, subject to Bankruptcy Court approval, be afforded the protections, and be paid, as set forth in this Agreement.

"Former Employee" means any employee of the Seller who ceased to work for the Seller prior to the Closing Date.

"General Liability Fund" means an escrow account and fund to be established by Seller with Escrow Agent for satisfaction of all indemnity obligations of Seller to counterparties to Assumed Customer Contracts, as amended by the Customer Contract Amendments, arising prior to the Closing, pursuant to Section 5.12.

"GL Fund Escrow Agreement" has the meaning set forth in Section 5.12.

"Governmental Authority" means any United States federal, state or local government or any foreign government, or political subdivision thereof, or any multinational organization or authority or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body.

"Hazardous Materials" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"Intellectual Property" means all intellectual property and proprietary rights of any kind related to the Business or related to any other brand owned by the Seller, including the following: (i) trademarks, service marks, trade names, slogans, logos, trade

-5-

dress, internet domain names, uniform resource identifiers, rights in design, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including any registration and applications for any of the foregoing); (iv) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, and methodologies; (v) computer software, computer programs, and databases (whether in source code, object code or other form); and (vi) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith.

"Law" means any federal, state, local or foreign statute, law, code, ordinance, order, rule or regulation or any common law requirement.

"Lender" means The Private Bank and Trust Company, in its capacity as Seller's senior secured lender.

"Liability" means any debt, liability, obligation, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

"Liquidated Damages Amount" means $2,750,000.

"Material Adverse Effect" means any event, circumstance, change, occurrence, fact or state of facts that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the (i) Business, (ii) Assets, properties, condition (financial or otherwise) or results of operations of the Seller, or (iii) the ability of Seller to consummate the transactions contemplated by this Agreement or any Ancillary Document or perform its obligations hereunder or thereunder; provided, however, that in determining whether there has been a Material Adverse Effect, any effect to the extent attributable to any of the following shall be disregarded:  (A) any change in financial or capital markets, including interest rates or currency exchange rates; (B) the announcement or existence of this Agreement or the Transactions, provided that as a result thereof, Annualized Three Month Revenue is no less than seventy-five percent (75%) of Seller's Revenue for the twelve month period ending June 30, 2013; or (C) the commencement of the Bankruptcy Cases, provided that as a result thereof, Annualized Three Month Revenue is no less than seventy-five percent (75%) of Seller's Revenue for the twelve month period ending June 30, 2013.

"Material Contract" means any Contract that is material to the Business or requires annual payments by or to Seller of more than (i) $500,000 with respect to Contracts with customers, and (ii) $250,000 with respect to Contracts with vendors or equipment lessors.

"Non-Competition Agreement" means that certain Non-Competition and Non-Solicitation Agreement to be executed at Closing by Howard Kaplan in the form of Exhibit F.

"Organizational Documents" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation or organization and any joint venture, limited liability company, operating or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice.

"Parent" has the meaning set forth in the preamble.

"Permits" means any permits, qualifications, certificates, licenses, franchises, consents, orders and registrations, together with all modifications, supplements and extensions thereof, of all United States federal, state and local Governmental Authorities that are necessary for Seller to own the Assets and operate the Business.

"Permitted Encumbrances" means those Encumbrances set forth on Schedule 1.1.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Petition Date" means the date on which each of the Seller and the Parent files a Petition.

"Petition" means a voluntary petition for relief under chapter 11 of the Bankruptcy Code filed in the District of Delaware.

"Pre-Closing Period" has the meaning set forth in Section 5 2.

"Providing Party" has the meaning set forth in Section 7.1(c).

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Deposit Amount" has the meaning set forth in Section 2.6.

"Requesting Party" has the meaning set forth in Section 7.1(c).

"Required Customers" means the counterparties listed on Schedule 2.3(a) hereto that are designated by asterisk (*).

"Revenue" means recurring amounts billed to customers of the Business in the Ordinary Course of Business

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement or an Alternative Transaction.

"Sale Motion" means the motion, in form and substance reasonably acceptable to Seller, Purchaser and Lender, filed by Seller pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code to obtain entry of the Bid Procedures Order and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser, Seller and Lender authorizing and approving the sale of the Assets to Purchaser and the assumption and assignment of the Assumed Contracts on the terms and conditions set forth herein: provided that the Sale Order submitted to the Bankruptcy Court for approval shall be in the form of Exhibit G, and shall, without limitation, (i) authorize and direct Seller to sell the Assets to Purchaser free and clear of all Encumbrances (except Permitted Encumbrances), Claims, Liabilities and interests (except Assumed Liabilities) of any kind whatever and every type and description, including without limitation any obligations to Seller's vendors, trade creditors, Employees, Former Employees, taxing authorities, other government agencies, secured creditors, other lien creditors, (ii) contain a finding of good faith under Bankruptcy Code Section 363(m), (iii) authorize the assumption by Seller and assignment to Purchaser of Assumed Customer Contracts with the Required Customers, (iv) order that Purchaser is absolved of and immune from any and all successor liability, including, without limitation, successor liability for any and all Taxes, including, without limitation, payroll taxes, income taxes, and sales taxes, and any and all employee obligations, including, without limitation, wages, vacation pay, severance, ESOP liability, 401(k) liability (except as set forth in Section 8.3), COBRA liability (except as set forth in Section 8.2(b)), health care liability, any pending class action lawsuits (including, without limitation, the actions styled as *Chavez v. IPC International Corporation, et al.* and *Stano v. IPC International Corporation, et al.*, both pending in the U.S. District Court for the Central District of California), (v) enjoin all Persons from asserting against the Purchaser any Claim, Liability or Encumbrance against Seller, including, without limitation, all Claims, Liabilities and Encumbrances referenced in the Sale Order, (vi) a waiver of the stays provided under Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, and (vii) provide that any Person who does not timely object to the relief requested in the Sale Motion shall be deemed to consent to the relief requested in the Sale Motion or set forth in the Sale Order; and which form of Sale Order shall be entered by the Bankruptcy Court with such changes to the foregoing as are reasonably acceptable to Purchaser, Seller and Lender.

"Seller" has the meaning set forth in the preamble.

-8-

"Subsidiary" means, with respect to any Person, any corporation or other business entity, whether or not incorporated, of which more than fifty percent (50%) of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors or managers, or other persons performing similar functions with respect to such entity, are held, directly or indirectly, by such Person.

"Tax" or "Taxes" means  (i) all federal, state, local and foreign taxes, charges, fees, imposts, levies or other assessments, including income, gross receipts, excise, severance, employment, sales, use, transfer, license, payroll, franchise, occupation, premium, windfall profits, environmental, customs duties, capital stock, profits, stamp, withholding, Social Security, unemployment, disability, real property, personal property, registration, value added, alternative or add on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, estimated, or any other tax, charge, impost, levy or assessment of any kind whatsoever, including any interest, penalties or additions thereto, whether disputed or not, and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability, successor liability, operation of law (including Treasury Regulation 1.1502-6) or otherwise.

"Tax Return" means any declaration, report, return, information return, filing, claim for refund or other information or statement relating to Taxes, including any schedules or attachments thereto, and any amendments to any of the foregoing supplied or required to be supplied to a taxing authority in connection with Taxes.

"Termination Date" has the meaning set forth in Section 11.2(d).

"Transactions" mean the transactions contemplated by this Agreement, the Ancillary Agreements and all other transactions and agreements contemplated hereby and thereby.

"Transfer Taxes" has the meaning set forth in Section 12.1.

"Transferred Employees" has the meaning set forth in Section 8.1(c).

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any other similar statutes or regulations of any jurisdiction relating to any plant closing or mass layoff.

## SECTION 2
## PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS

2.1.    Sale of Assets. Subject to the terms and conditions of this Agreement, at Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall purchase from Sellers, all of Seller's right, title and interest in all assets and Contracts relating to the Business other than the Excluded Assets (the "Assets"), free and clear of all Encumbrances other than the Permitted Encumbrances, including without limitation the following assets:

(a)    all tangible personal property located at Seller's corporate office at 2111 Waukegan Road, Bannockburn, Illinois, except the Excluded Tangible Personal Property,

and all other tangible personal property owned and used by Seller in the Business, including, without limitation, all equipment, computers (including without limitation servers, desktop computers, and laptop computers of Seller's sales people or otherwise), office supplies, vehicles (including without limitation all vehicles listed on Schedule 2.1(a) and all automobiles, golf carts, two-wheeled self-balancing electric vehicles, and bicycles), uniforms and cellular phones relating to the Business, other than the Excluded Tangible Property, provided that Purchaser shall have 30 days after the Closing Date to remove any such tangible property acquired hereunder from Seller's corporate office at 2111 Waukegan Road, Bannockburn, Illinois, and provided further, that, at no cost to Purchaser and subject to reasonable compensation to Purchaser for actual fees and expenses incurred by Purchaser in connection therewith, Seller shall be entitled to reasonable use of such tangible property as required to perform its remaining duties as a debtor-in-possession and to dispose of its remaining assets;

(b)     all interests of Seller in the Assumed Contracts;

(c)     all interests of Seller in the Assumed Equipment Leases and any and all deposits made by Seller with respect to the Assumed Equipment Leases;

(d)     all books and records, customer files, files, data, reports, computer codes and sourcing data, supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, personnel records and other records of Seller that relate to the Business;

(e)     all marketing, advertising and promotional materials, and all source codes, passwords, telephone numbers, urls, websites, domain names, and Intellectual Property relating to the Business, and Seller's registered trademarks, including, without limitation, Seller's legal name and any and all of Seller's trade names relating to the Business, whether or not such names are registered trademarks;

(f)     all goodwill associated with the Business and/or the Assets;

(g)     all Avoidance Actions against counterparties to Assumed Contracts; and

(h)     all Permits that relate to the Business that are assignable by Seller pursuant to applicable nonbankruptcy law or regulation.

2.2.     Excluded Assets.  The following assets of Seller are excluded and are not a part of the sale and purchase contemplated by this Agreement (collectively, the "Excluded Assets"):

(a)     all cash and cash equivalents;

(b)     all accounts receivable;

(c)     any Contracts other than the Assumed Contracts;

(d)     any Intellectual Property, except as specifically provided in Sections 2.1(e) and (f);

(e)    all Avoidance Actions that are not otherwise Assets as described in Section 2.1;

(f)    all rights, claims and causes of action of Seller that do not relate to the Business;

(g)    all corporate minute books, stock transfer books, the corporate seal of Seller and all other corporate books and records relating to Seller's organization and existence;

(h)    any shares of stock or other equity interests in any Subsidiary of Seller;

(i)    all prepaid expenses and deposits, including, without limitation, any such prepaid expenses and deposits with liability and workers' compensation insurance carriers; and

(j)    the Excluded Tangible Property.

2.3.    Assumed Liabilities.    Schedule 2.3(a) and Schedule 2.3(b) hereto set forth the potential Assumed Customer Contracts and potential Assumed Equipment Leases that Purchaser may elect to assume or request Seller to assume and assign to Purchaser at the Closing. Purchaser shall have the option, but not the requirement, to take an assignment of Seller's general excess and liability insurance policy, subject to additional compensation by Purchaser to Seller for any unused premium(s) prepaid by Seller, to the extent such prepaid premium inures to the benefit of Purchaser.  After execution of this Agreement, Purchaser may add to and remove from Schedules 2.3(a) and 2.3(b) Assumed Customer Contracts and Assumed Equipment Leases, provided, that no such changes to these Schedules shall result in a reduction of the Purchase Price, and provided further, that, as to any item(s) added, the assignment of such items shall not be a condition to Purchaser's obligation to close pursuant to Sections 10 and 11 herein.  No less than ten (10) days prior to the Sale Hearing, Purchaser shall designate which of such Contracts it wishes to have Seller assume and assign to Purchaser (as modified by any subsequent election by Purchaser not to take assignment of such Contracts, the "Assumed Contracts"); provided that with respect to any customer Contract that Seller enters into after execution of this Agreement, (i) Seller shall provide notice thereof to Purchaser at the time Seller enters into such Contract, and (ii) Purchaser shall have until the later of the Closing or ten (10) days prior to the Sale Hearing to designate such contract as an Assumed Customer Contract.  A Schedule of Assumed and Assumed and Assigned Contracts and any Cure Amounts relating thereto shall be filed by Seller with the Bankruptcy Court prior to the Sale Hearing and served on the counterparties to the Assumed Contracts in accordance with the Bid Procedures Order.  Up until the Closing, Purchaser may elect not to take assignment of any previously designated Assumed Customer Contracts and Assumed Equipment Leases.  Effective as of the Closing Date, Purchaser shall assume and thereafter in due course pay, fully satisfy, discharge and perform only (i)the Liabilities of Seller arising after the Closing under the Assumed Contracts and (ii) the following Liabilities of Seller (collectively, the "Assumed Liabilities"):

(a)    all Cure Amounts with respect to the Assumed Customer Contracts, as amended by the Customer Contract Amendments, other than the obligation to establish

the General Liability Fund, which obligation shall be Seller's in accordance with <u>Section 5.12</u>; and

      (b)     all Cure Amounts with respect to the Assumed Equipment Leases.

<u>provided</u>, <u>however</u>, that the Assumed Liabilities shall not include (x) any Liability of Sellers arising at any time under the Assumed Contracts as a result of any breach thereof, default thereunder, or misrepresentation or fraud of Sellers in connection therewith or (y) any Liability of Sellers with respect to any Tax.

    2.4.   <u>Excluded Liabilities</u>.  Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Assets shall be or become liable for or subject to, any of the Excluded Liabilities, including, but not limited to, the following liabilities, which shall be and remain Liabilities of Sellers:

      (a)     Liabilities which are not Assumed Liabilities, including but not limited to all accounts payable, accrued expenses, Taxes, Claims asserted in litigation against Seller, obligations to Lender, and other Liabilities of the Business not specifically set forth in <u>Section 2.3</u> or <u>Section 8.2(d)</u> and any claims under sections 503 and 507 of the Bankruptcy Code;

      (b)     Liabilities for Cure Amounts relating to Assumed Customer Contracts;

      (c)     Liabilities associated with any Excluded Assets;

      (d)     Liabilities associated with any and all indebtedness of Seller;

      (e)     Liabilities arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions that occurred, or arise from events that occurred, prior to the Closing Date;

      (f)     penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any actual or alleged violation by Seller of any Law or breach by Seller of any Contract;

      (g)     all Liabilities for Taxes, including without limitation (A) any Taxes arising as a result of the operation of the Business or ownership or operation of the Assets prior to Closing, (B) any Taxes that will arise as a result of the sale of the Assets pursuant to this Agreement and (C) any deferred Taxes of any nature;

      (h)     Liabilities arising out of or resulting from layoffs or termination of Employees or Former Employees by Seller at or prior to Closing (including without limitation all accrued and unpaid vacation, payroll taxes, related expenses, and/or the consummation of the Transactions sufficient in the aggregate to require notice under the WARN Act, as well as any other Liabilities to any of Seller's Employees or Former Employees under Seller's employee stock option plan;

-12-

      

(i)     all Liabilities for expenses (i) relating to the negotiation and preparation of this Agreement and (ii) relating to the Transactions, in each case to the extent incurred by Seller and including those related to legal counsel, accounting, brokerage and investment advisors fees and disbursements;

(j)     Liabilities relating to the establishment of the General Liability Fund;

(k)     any Liability under any Assumed Contract that arises after the Closing but that arises out of or relates to any breach, occurrence or circumstance that occurred prior to the Closing; and

(l)     all Liabilities with respect to any Employee Benefit Plans, except for any Liabilities, if any, that are expressly assumed under Section 8.2.

The parties hereto acknowledge that Purchaser is not agreeing to assume any Liability of Seller whether related to the Assets or Business or otherwise, other than the Assumed Liabilities, and that nothing in this Agreement shall be construed as an agreement otherwise.

2.5.    Purchase Price.  The aggregate purchase price for the Assets (the "Purchase Price") shall equal $21,250,000 plus the assumption of the Assumed Liabilities; provided, that in the event that Annualized Three Month Revenue is less than ninety percent (90%) but more than 75% of Seller's Revenue for the twelve month period ending on June 30, 2013, then the cash component of the Purchase Price shall be reduced in accordance with Schedule 2.5.  If Annualized Three Month Revenue is less than 75% of Seller's Revenue for the twelve month period ending on June 30, 2013, Section 10.8 shall apply.  Three (3) Business Days prior to the Closing, Seller shall provide Purchaser with a written statement prepared in good faith setting forth Seller's calculation of Annualized Three Month Revenue, and shall provide Purchaser full access to Seller's books and records for purposes of verifying the foregoing statement.

2.6.    Purchaser Deposit.  Simultaneously with the execution of this Agreement, the Seller, Purchaser, and Escrow Agent are entering into the Deposit Escrow Agreement in the form of Exhibit C (the "Deposit Escrow Agreement"), pursuant to which Purchaser will, upon Seller's filing of the Bankruptcy Case, deposit with Escrow Agent the sum of $250,000 by certified check or wire transfer of immediately available funds (the "Purchaser Deposit Amount"), to be released by the Escrow Agent and delivered to either Purchaser or Seller in accordance with the provisions of the Deposit Escrow Agreement and the terms of this Agreement as follows:

(a)     If the Closing shall occur, the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be applied in accordance with Section 11.1(b) below towards the cash portion of the Purchase Price payable by Purchaser under Section 2.5 hereof;

(b)     If this Agreement is terminated by Seller pursuant to Section 11.2(g), the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be delivered to Seller and Purchaser shall pay to Seller the Liquidated Damages Amount payable pursuant to Section 11.3(d); and

-13-

(c)    If this Agreement is terminated or the Transaction does not close with Purchaser for any reason other than termination by Seller pursuant to Section 11.2(g), the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be returned to Purchaser in lieu of any and all other remedies that Purchaser may otherwise have against Seller on account of, and in full satisfaction of, any breach, violation or default by Seller under this Agreement.

2.7.    Allocation of Purchase Price.  The Purchase Price and any liability or other amount properly included in the amount realized by Sellers or cost basis to Purchaser with respect to the sale and purchase of the Assets (the "Tax Purchase Price"), as determined for United States federal income tax purposes pursuant to Treasury Regulations § 1.1060-1(c) shall be allocated for such purposes in the manner specified in Schedule 2.7 hereto, and consistent with any allocation made pursuant to Section 12.1.  Except as required otherwise pursuant to a final determination (within the meaning of Section 1313(a) of the Code or corresponding provision of state, local or foreign Tax law), the parties shall make consistent use of the allocation as agreed or determined pursuant to this Section 2.7 for all Tax purposes and in all filings, declarations and reports with the IRS and other taxing authorities in respect thereof, including the reports required to be filed under Section 1060 of the Code.  In any action related to the determination of any Tax, neither Purchaser nor Sellers shall contend or represent that such allocation is not correct.

2.8.    Sale at Closing Date.  The sale, transfer, assignment, conveyance and delivery by Seller of the Assets to Purchaser, and the assumption by Purchaser of the Assumed Liabilities as provided herein and in the Ancillary Agreements, shall be effected on the Closing Date by:  (a) the execution and delivery by Seller and Purchaser of the Assignment and Assumption Agreement with respect to the Assumed Contracts and the Assumed Liabilities; and (b) the execution and delivery by Seller to Purchaser of the Bill of Sale with respect to all of the Assets other than the Assumed Contracts.

2.9.    Excluded Assets and Liabilities.  Notwithstanding anything to the contrary contained herein, Purchaser shall not purchase any of the Excluded Assets nor assume any liability for any of the Excluded Liabilities.

## SECTION 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows:

3.1.    Organization and Good Standing.  Seller is (a) validly existing and in good standing under the laws of the jurisdiction of its organization and (b) duly qualified to do business and in good standing in each jurisdiction in which the ownership, use or leasing of its assets and properties, or the conduct or nature of its business, makes such qualification necessary, except for such failures to be so qualified and in good standing which, individually or in the aggregate, could not be reasonably expected to have a Material Adverse Effect.

3.2.    Authorization.  Subject to entry of the Sale Order, Seller has all requisite power and authority to execute and deliver, and carry out its obligations under, this Agreement and the

-14-

Ancillary Agreements and consummate the Transactions. Each of this Agreement and the Ancillary Agreements has been or will be duly executed and delivered by Seller and, assuming due authorization, execution and delivery by Purchaser, constitutes or will constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, subject to entry of the Sale Order.

3.3.    No Conflicts.  Subject to entry of the Sale Order and other than as set forth on Schedule 3.3 hereto, the execution, delivery and performance by Seller of this Agreement and each of the Ancillary Agreements and the consummation by Seller of the Transactions shall not, with or without the giving of notice or lapse of time (a) violate any provision of the Organizational Documents of Seller, (b) violate any Law to which Seller is subject, (c) conflict with, result in any violation of any term or condition of, result in a breach or termination of, or constitute a default under any Contract to which Seller is a party or result in the creation of any Encumbrance upon any of the Assets (including any Assumed Contract) or (d) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which Seller is a party or by which Seller is bound, except in each case as would not have a Material Adverse Effect.

3.4.    Consents and Approvals.  Subject to entry of the Sale Order and other than as set forth on Schedule 3.4 hereto, the execution, delivery and performance by Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not require the consent or approval of, or filing with, any Governmental Authority.

3.5.    Compliance with Law.  Seller is in compliance with its Organizational Documents and with all Laws relating to the Assets, including all Environmental Laws, except as would not have a Material Adverse Effect on Seller or the Assets.

3.6.    Title to Assets.  Except as set forth in Schedule 3.6 hereto, Seller is the owner of the Assets as of the date hereof.  Subject to entry of the Sale Order, Seller has, and at the Closing Purchaser shall receive, good, valid and marketable title to the Assets, free and clear of any and all Encumbrances except for the Permitted Encumbrances.

3.7.    Cure Amounts.  Schedule 3.7, which shall be completed ten (10) days prior to the Bankruptcy Court hearing to approve the Bid Procedures, will set forth the monetary Cure Amounts currently set forth on Seller's books and records with respect to all of the Assumed Contracts.

3.8.    Litigation.  Except as set forth in Schedule 3.8 hereto, no lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to the Seller's knowledge, has been threatened against Seller which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions or which, if adversely determined, would have a Material Adverse Effect on the Assets.

3.9.    Material Contracts.  True and complete copies (including all amendments) of each of the Material Contracts have been made available by Seller to Purchaser in Seller's data room. Except as has not had or would not have a Material Adverse Effect, or as would be cured

-15-

pursuant to this Agreement or the Sale Order, neither Seller nor, to the Seller's knowledge, any other party to any Material Contract is in material default, violation or failure to perform under any Material Contract. To the Seller's knowledge, no party to any of the Material Contracts has threatened or is intending to cancel, terminate, materially alter, or not renew any of the Material Contracts.

3.10.   No Broker or Finder.   Except for Livingstone Partners, no broker, finder or financial advisor has been engaged by Seller in connection with the Transactions. Any amounts due Livingstone Partners shall be paid by Seller.

3.11.   Assets Necessary for the Business and the Assets; Seller Engages in No Other Business.   Seller owns all assets necessary to operate or service, or used in the operation or servicing of, the Business and the Assets. Seller's Affiliates do not own any assets necessary to operate or service, or used in the operation or service of, the Business or the Assets. Seller is engaged in no business other than the Business.

3.12.   Taxes.   For purposes of the following representations, the term "Seller" shall be construed to refer also to each predecessor-in-interest of each Seller and each other entity or person for whose liability for Taxes such Seller has or may have Liability or responsibility.

(a)      Seller has filed or caused to be filed on a timely basis all Tax Returns and all reports with respect to Taxes that are or were required to be filed pursuant to applicable Laws by Seller or with respect to the activities, Assets, income or operations of Seller. All Tax Returns and reports with respect to Taxes filed by Seller are true, correct and complete in all respects. Seller has timely paid all Taxes related to the Assets, Business, income and operations of Seller that have or may have accrued or become due for all periods covered by the Tax Returns or that will have accrued or become due as of Closing, or pursuant to any assessment received by Seller, except such Taxes, if any, as are listed in Schedule 3.12(a). Except as provided in Schedule 3.12(a), Seller currently is not the beneficiary of any extension of time within which to file any Tax Return related to the Business or Assets.

(b)      Seller has delivered or made available to Purchaser copies of all Tax Returns related to the Business or Assets filed since December 31, 2008. Schedule 3.12(b) sets forth each state, county, local municipal, domestic or foreign jurisdiction or Governmental Authority in or with which, with respect to the Business or Assets, Seller (i) files, or is or has been required to file, a Tax Return, (ii) is required to register for any Tax purpose, (iii) is or has been liable for any Tax on a "nexus" basis at any time, (iv) is qualified to do business, (iv) owns or regularly uses property, (v) has any employee or in which any employee is regularly present, or (vi) has any agent, representative or distributor.

(c)      No claim has ever been made or is expected to be made by any Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction. Schedule 3.12(c) contains a complete list of all audits, examinations and investigations with respect to Taxes or Tax Returns of Seller or related to the Business or Assets that have been audited or currently

are under audit and a complete description of any and all deficiencies or other amounts that were paid or are currently being contested. All such deficiencies or other amounts proposed as a result of such audits have been paid, reserved against, or settled without further liability (or are being contested in good faith by appropriate proceedings as described in Schedule 3.12(c)). Except as provided in Schedule 3.12(c), there is no dispute or claim concerning any Taxes related to the Business or Assets either (i) claimed or raised by any Governmental Authority in writing or (ii) as to which Seller has knowledge. Except as described in Schedule 3.12(c), Seller has not given or been requested to give waivers or extensions (or is or would be subject to a waiver or extension given by any other Person) of any statute of limitations relating to the assessment or payment of Taxes with respect to the Business or Assets. There is no Encumbrance on any of the Assets that arose in connection with any failure (or alleged failure) to pay any Tax, and Seller has no knowledge of any basis for assertion of any claims attributable to Taxes which, if adversely determined, would result in any such Encumbrance.

(d)     Seller (i) has not been a member of an Affiliated Group filing a consolidated federal income Tax Return and (ii) does not have any Liability for the Taxes of any Person under Treasury Regulation §1.1502-6 or similar law, as a transferee or successor, by Contract, or otherwise

(e)     No power of attorney with respect to Taxes has been executed by any Seller or filed with any Governmental Authority with respect to Seller.

(f)     Seller has complied in all material respects with all provisions of Tax law relating to withholding, payment and remittance of Taxes and information reporting with respect thereto, and Seller has, within the time and in the manner prescribed by Tax law, paid over to the proper Governmental Authorities all amounts required.

(g)     There is no Tax ruling, request for ruling or settlement, compromise, closing or Tax collection agreement in effect or pending which does or could affect the liability of Seller or Purchaser for Taxes with respect to the Assets or Business for any period after the Closing Date.

(h)     Seller has never claimed a credit for research and experimentation expenditures under Section 41 of the Code, any predecessor provision, or any corresponding or similar provision of state, local or foreign law.

(i)     No provisions of any Assumed Contracts are properly treated for United States federal income tax purposes as an entity (including without limitation a partnership) or as indebtedness.

(j)     No Asset is (i) "tax exempt use property" within the meaning of Section 168(h)(1) of the Code or Section 470(c)(2) of the Code, (ii) tax-exempt bond financed property within the meaning of Section 168(g) of the Code, or (iii) subject to a lease under IRC Section 7701(h) or any predecessor provision.

08/09/2013 1:29 pm

(k)     Seller has never been a party to a "reportable transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(1).  Seller has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code.

3.13.  <u>Creditors</u>.  All Persons who are known to possess or assert a Claim against Seller or against or interest in any of the Assets (including all parties adverse to Seller in litigation) are set forth on <u>Schedule 3.13</u>.

3.14.  <u>Disclaimer of Other Representations and Warranties</u>.  Except as expressly set forth in this <u>Section 3</u>, Seller makes no representation or warranty, statutory, express or implied, at law or in equity, in respect of Seller, the Assets or the Business, and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express or implied that extend beyond the warranties contained in this Agreement. Purchaser hereby acknowledges and agrees that, except to the extent specifically set forth in this <u>Section 3</u>, Purchaser is purchasing the Assets on an "as-is, where-is" basis and "with all faults."

## SECTION 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

4.1.  <u>Organization and Good Standing</u>.  Purchaser is a Delaware limited liability company, duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has full corporate power and authority to enter into and carry out its obligations under this Agreement.

4.2.  <u>Authorization</u>.  Purchaser has all requisite power and authority to execute and deliver and carry out its obligations under this Agreement and the Ancillary Agreements, and consummate the Transactions, and is not under any prohibition or restriction, contractual, statutory or otherwise, against doing so.  Each of this Agreement and the Ancillary Agreements has been or will be duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery by Seller, constitutes or will constitute the legal, valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other Laws affecting the rights of creditors generally and by general principles of equity (regardless of whether enforcement is considered in a proceeding at law or in equity).

4.3.  <u>No Conflicts</u>.  The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the Transactions shall not, with or without the giving of notice or lapse of time, (a) violate any provision of the Organizational Documents of Purchaser, (b) violate any Law to which Purchaser is subject, or (c) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which Purchaser is a party or by which Purchaser is bound.

4.4.  <u>Consents and Approvals</u>.  Subject to entry of the Sale Order, the execution, delivery and performance by Purchaser of this Agreement and the Ancillary Agreements and the

-18-

consummation of the Transactions do not require the consent or approval of, or filing with, any Governmental Authority.

4.5.  <u>Litigation</u>.  No lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to Purchaser's knowledge, has been threatened against Purchaser which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions or would otherwise have a material adverse effect on Purchaser's ability to finance or otherwise consummate the Transactions.

4.6.  <u>No Broker or Finder</u>.  No broker, finder or financial advisor has been engaged by Purchaser in connection with the Transactions.

4.7.  <u>Financing</u>.  Purchaser has sufficient funds, in an aggregate amount necessary to pay the Purchase Price and to perform the Assumed Liabilities and to consummate all of the other transactions contemplated by this Agreement and the Ancillary Documents to which it is a party.

4.8.  **"AS IS" TRANSACTION**.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN <u>SECTION 3</u> OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ASSETS OR THE BUSINESS.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ASSETS.  PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ASSETS OR THE BUSINESS AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>SECTION 3</u> HEREOF, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.  ACCORDINGLY, PURCHASER WILL ACCEPT THE ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

4.9.  <u>Disclaimer of Other Representations and Warranties</u>.  Except as expressly set forth in this <u>Section 4</u>, Purchaser makes no representation or warranty, statutory, express or implied, at law or in equity, in respect of Purchaser, and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express or implied that extend beyond the warranties contained in this Agreement.

**SECTION 5**
**CERTAIN COVENANTS OF SELLER**

5.1.  <u>Provision of Records</u>.  Seller shall arrange at Purchaser's cost as soon as practicable following the Closing Date for transportation to Purchaser of the documents in the possession of Seller relating to the Assets, to the extent not previously delivered in connection with the Transactions, but excluding documents relating to the Excluded Assets or the Excluded

-19-

Liabilities.  Prior to the Closing Date, Seller shall make available to Purchaser review of the documents in the possession of Seller relating to the Assets.

5.2.    Conduct of Business Pending the Closing.  From the date hereof through the Closing Date or the earlier termination of this Agreement (the "Pre-Closing Period"), except as may be expressly permitted or contemplated by this Agreement, ordered by the Bankruptcy Court, or as otherwise agreed to in writing by Purchaser, Seller shall continue to operate its Business in the Ordinary Course of Business (it being understood that such ordinary course may take into account the fact that the Business is to be operated while in bankruptcy) and as a debtor and debtor-in-possession in the Bankruptcy Case.  Without limiting the generality of the foregoing, during the Pre-Closing Period, except as may be expressly permitted or contemplated by this Agreement or as otherwise agreed to in writing by Purchaser, Seller shall not, to the extent that any of the following shall have a Material Adverse Effect on the Assets:

(a)    conduct the Business and operate and maintain the Assets other than in the Ordinary Course of Business;

(b)    fail to use its commercially reasonable efforts to preserve the goodwill of and relationships with customers, suppliers, vendors, lessors, licensors, licensees, contractors, distributors, agents, Employees and others having business dealings with the Business;

(c)    sell (including by sale-leaseback), lease, transfer, license, mortgage or otherwise dispose of, encumber or subject to any Encumbrance, any Assets or interests therein;

(d)    fail to maintain in full force and effect insurance covering the Business and the Assets;

(e)    except as consented to by Purchaser,  modify, amend, supplement or terminate any Assumed Contract, except in the Ordinary Course of Business; or

(f)    authorize any of, or commit or agree to take any of, the foregoing actions.

5.3.    Access to Information.  Upon reasonable notice by Purchaser, Purchaser and its representatives shall have reasonable access during normal business hours during the Pre-Closing Period, or the earlier termination of this Agreement in accordance with its terms, to the Assets and documents relating thereto, and to Seller's Employees and business premises, and during such period Seller shall furnish to Purchaser, at Purchaser's expense, all information concerning the Assets as Purchaser may reasonably request.  Seller shall provide or cause to be provided to Purchaser, at Purchaser's expense, such copies or extracts of documents relating to the Assets as Purchaser may reasonably request.  Any inspections, examinations and audits shall be conducted during normal business hours by Purchaser's employees or agents upon reasonable advance notice. Prior to communicating with Seller's Employees, Purchaser shall obtain Seller's written consent.

5.4.  <u>Cooperation with Purchaser</u>.  During the Pre-Closing Period, or the earlier termination of this Agreement in accordance with its terms, Seller shall work and cooperate with Purchaser to obtain required approvals and third-party consents.

5.5.  <u>Bankruptcy Action</u>.

(a)  Consistent with the provisions of <u>Section 7.1(a)</u>, but not later than three Business Days after the date hereof, Seller shall file a Petition for relief under chapter 11 of the Bankruptcy Code in the District of Delaware.  On the Petition Date, Seller shall file, together with other customary "first day" motions, the Sale Motion with the Bankruptcy Court.

(b)  Seller shall comply with all of the obligations of Seller under the Bid Procedures Order (after entry of such Order by the Bankruptcy Court) and the Sale Order (after the entry of such Order by the Bankruptcy Court.)

(c)  Seller shall comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code in connection with obtaining approval of the Transactions contemplated by this Agreement.  Seller shall serve on all required Persons in the Bankruptcy Case, in the manner specified in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (including, without limitation, Rules 6004(c), 7004 and 9014(b)), including (i) all Persons who are known to possess or assert a Claim against Seller or against or interest in any of the Assets (including all parties adverse to Seller in litigation), (ii) the Internal Revenue Service, (iii) all applicable Government Authorities, (iv) all applicable state and local Government Authorities with taxing authority, (v) all other Persons required by any order of the Bankruptcy Court, the Bankruptcy Code, or the Federal Rules of Bankruptcy Procedure, (vi) all parties to Assumed Contracts, and (vii) any other Persons that Purchaser reasonably may request, any notice of the Sale Motion, the Sale Hearing, the Bid Procedures Order, the Sale Order, and all objection deadlines in accordance with the Bid Procedures Order and any applicable local rules of the Bankruptcy Court.

5.6.  <u>Bid Procedures Order</u>.  Seller shall use its commercially reasonable efforts to obtain entry of the Bid Procedures Order by the Bankruptcy Court no later than twenty (20) days following the Petition Date.

5.7.  <u>Sale Order</u>.  The Sale Order shall, among other things, and subject to such revisions as are reasonably acceptable to Seller, Purchaser and Lender:  (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Excluded Liabilities, successor liability, Encumbrances (other than Permitted Encumbrances), Claims and interests (as used in the Bankruptcy Code), and (iii) the performance by Seller of its obligations under this Agreement; (b) authorize and empower Seller to assume and assign to the Purchaser the Assigned Contracts; and (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and grant the Purchaser the protections of section 363(m) of the Bankruptcy Code.  Without limiting the generality of the foregoing, the Sale Order shall also, subject to such revisions as are

-21-

reasonably acceptable to Seller, Purchaser and Lender:  (i) order that Purchaser is absolved of and immune from any and all successor liability, including without limitation successor liability for any and all Taxes, including, without limitation, payroll taxes, income taxes, and sales taxes, and any and all employee obligations, including, without limitation, wages, vacation pay, severance, ESOP liability, 401(k) liability (except as set forth in Section 8.3), COBRA liability (except as set forth in Section 8.2(b)), health care liability, any pending class action lawsuits (including, without limitation, the actions styled as *Chavez v. IPC International Corporation, et al.* and *Stano v. IPC International Corporation, et al.*, both pending in the U.S. District Court for the Central District of California), (v) enjoin all Persons from asserting against the Purchaser any Claim, Liability or Encumbrance against Seller, including, without limitation, all Claims, Liabilities and Encumbrances referenced in the Sale Order, (vi) a waiver of the stays provided under Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, and (vii) provide that any Person who does not timely object to the relief requested in the Sale Motion shall be deemed to consent to the relief requested in the Sale Motion or set forth in the Sale Order.  The Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of:  (x) demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.  In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, Seller shall use reasonable efforts to defend such appeal.

5.8.    <u>Stalking Horse Bidder Matters</u>.

(a)    In the event that this Agreement is terminated pursuant to <u>Section 11.2(l)</u> and Seller closes an Alternative Transaction, Seller shall pay to Purchaser, upon the closing of the Alternative Transaction, the Break-Up Fee and the Expense Reimbursement, which shall be treated as Administrative Expenses in the Bankruptcy Cases.  Notwithstanding anything in the prior sentence indicating that Purchaser is entitled to payment of the Expense Reimbursement only if Seller closes an Alternative Transaction, in the event that Purchaser is willing to close the Transactions as contemplated in this Agreement, is not in breach of any of its obligations hereunder and all conditions set forth in <u>Section 9</u> hereof have been satisfied or waived, but Purchaser nonetheless is not the successful Bidder at the Auction in accordance with the Bid Procedures Order, Seller shall pay to Purchaser, upon the termination of this Agreement, the Expense Reimbursement in cash, which shall be treated as an Administrative Expense in the Bankruptcy Cases, regardless of whether an Alternate Transaction is consummated.

(b)    Notwithstanding <u>Section 5.8(a)</u>, Seller's agreement to pay the Break-Up Fee and Expense Reimbursement is subject to Bankruptcy Court approval of this Agreement, including approval of payment of the Break-Up Fee and Expense Reimbursement, which approval shall be requested as part of the Bid Procedures Order pursuant to the Sale Motion.

(c)    In the event that Purchaser's bid as set forth in this Agreement (and as may be modified to increase the Purchase Price at the Auction) is not the successful bid at

-22-

the Auction, Purchaser's final bid shall remain binding upon Purchaser as a back-up bid until the deadline set forth in Section 11.2(d); provided, however, that Purchaser shall have thirty (30) days after the date that it is informed by Seller that Seller is prepared to close the Transaction with Purchaser to determine whether any Material Adverse Effect shall have occurred after the date of the completion of the Auction, unless and until such 30-day period is waived by Purchaser.

5.9.    Release of Encumbrances.  Seller's obligation to deliver the Assets free and clear of any Encumbrances (other than Permitted Encumbrances), Claims, Liabilities and interests (as used in the Bankruptcy Code) shall be limited to (i) Seller's efforts to obtain the Sale Order that provides for the delivery of the Assets free and clear of any Excluded Liabilities, successor liability, Encumbrances (other than Permitted Encumbrances), Claims and interests (as used in the Bankruptcy Code), and (ii) delivery of a Lien Release executed by Lender, in the form of Exhibit D hereto.  If Purchaser desires to have any Encumbrances released and discharged other than by means of the Sale Order or a Lien Release executed by Lender, Purchaser, at its sole cost and expense, shall obtain such releases or discharges; provided that Seller shall cooperate with Purchaser in effectuating a release of Encumbrances, including without limitation, Seller's authorization under this Agreement to Purchaser to file termination statements and take any other steps Purchaser deems appropriate in Purchaser's sole and absolute discretion.

5.10.    Assignability of Certain Contracts.  To the extent that the assignment to the Purchaser of any Assumed Contract pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or any right or interest therein unless and until such consent is obtained; provided, however, that the Parties will use their commercially reasonable efforts, before and after the Closing, to obtain all such consents; provided, further, that if any such consents are not obtained prior to the Closing Date, Seller and the Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide the Purchaser with the benefits and obligations of any such Contract and the Purchaser shall be responsible for performing all obligations under such Contract required to be performed by Seller on or after the Closing Date to the extent set forth in this Agreement.  Notwithstanding anything to the contrary in this Section 5.10, the Sale Order shall authorize the assumption by Seller and assignment to Purchaser of Assumed Customer Contracts with the Required Customers.

5.11.    Customer Contract Amendments.  Seller shall use its reasonable best efforts to obtain execution of the Customer Contract Amendments with respect to the Assumed Customer Contracts before and after the Closing Date.  Notwithstanding anything to the contrary in this Section 5.11, the Sale Order shall authorize the assumption by Seller and assignment to Purchaser of Assumed Customer Contracts with the Required Customers.

5.12.    General Liability Fund.  Simultaneously with the execution of this Agreement, the Seller, Purchaser, Lender and Escrow Agent are entering into the GL Fund Escrow Agreement in the form of Exhibit E (the "GL Fund Escrow Agreement"), pursuant to which (i) Escrow Agent will disburse funds in the General Liability Fund in accordance with the exclusive instructions of Purchaser, and (ii) Lender will waive any and all contractual and statutory security interests and

-23-

lien rights in the General Liability Fund. Upon and after the Closing, Seller shall deposit the General Liability Fund with Escrow Agent, for the purpose of satisfying Seller's indemnification and defense obligations to counterparties to Assumed Customer Contracts, as amended by the Customer Contract Amendments, arising prior to Closing, in accordance with this Section 5.12. If the General Liability Fund has not been exhausted as of the time that all possible liabilities that are to be paid from the General Liability Fund have been resolved, then the remaining balance in the General Liability Fund shall be applied first to satisfy any amounts owed to or claims held by the Lender, and then any remaining balance after payment in full to the Lender shall be remitted to Seller or its designee. Upon resolution of all claims that would be entitled to payment from the General Liability Fund, any remaining balance in the General Liability Fund shall be applied first to satisfy any amounts owed to or claims held by the Lender, and then any remaining balance after payment in full to the Lender shall be remitted to Seller or its designee. The General Liability Fund shall be funded as follows: (a) upon Closing, Purchaser shall pay $5,000,000 of the cash Purchase Price to be paid pursuant to Section 2.5 directly to the General Liability Fund; (b) up to $2,000,000 shall be paid by Seller to the General Liability Fund from proceeds of Excluded Assets, any other property of Seller's estate, and the assets of Seller's corporate affiliates (including, without limitation, IPC International Realty Company, LLC) within sixty (60) days after the Closing Date, after payment to the Lender of $6,000,000 from such proceeds of Excluded Assets and Lender's other collateral; and (c) up to $1,500,000 shall be paid by Seller to the General Liability Fund from proceeds of Excluded Assets, any other property of Seller's estate, and the assets of Seller's corporate affiliates (including, without limitation, IPC International Realty Company, LLC) after satisfaction of (i) all Claims of the Lender; (ii) all Claims against Seller having priority under sections 503 and 507 of the Bankruptcy Code, including post-Closing administrative expenses of Seller's chapter 11 estate, and (iii) a distribution in an amount agreed to by Seller and Purchaser for the benefit of holders of any other Claims against Seller; provided, however, that in the event that the Purchase Price is reduced in accordance with Section 2.5, then the General Liability Fund shall be reduced by an amount equal to the percentage by which the Purchase Price is reduced (the reduction amount divided by the original Purchase Price) multiplied by $7,000,000, all of which reduction amount shall be subtracted from payment set forth in subsection (b) above. The terms pursuant to which the General Liability Fund shall be used to satisfy Seller's defense and indemnification obligations to the counterparties to Assumed Customer Contracts, as amended by the Customer Contract Amendments shall be set forth in the Customer Contract Amendments; *provided* that the General Liability Fund shall be managed exclusively by Purchaser or its designee, including any third party administrator.

5.13. Rejected Contracts. Seller shall not reject any Assumed Contract in any bankruptcy proceeding following the date of this Agreement without the prior written consent of the Purchaser.

5.14. Alternative Transaction. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller and the Bankruptcy Court of higher or otherwise better competing bids. From and after the date hereof until the earlier of (a) the date on which the Bankruptcy Court enters the Bid Procedures Order, or as otherwise agreed to in writing by Purchaser, or (b) the termination of this Agreement (the "Exclusivity Period"), neither the Seller nor any of its Affiliates or representatives shall directly or indirectly (i) negotiate, initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers

-24-

related to the Assets, the Business or an Alternative Transaction or (ii) provide any confidential information regarding the Seller or any of the Assets or the Business to any Person other than the Purchaser, except to the extent expressly permitted herein; provided, that Seller may disclose such information to representatives of the Lender and any statutorily-appointed committee of creditors. During the Exclusivity Period, the Seller will promptly (and in all events within 24 hours) inform and provide a summary to Purchaser of any other offer, proposal or expression of interest for the Seller, the Business or the Assets or any portion thereof that Seller or any of Affiliates or representatives may receive. Nothing contained herein shall be construed to prohibit the Seller and its representatives from soliciting, considering, negotiating, agreeing to or otherwise taking action in furtherance of, any Alternative Transaction after the entry of the Bid Procedures Order; *provided, however*, neither the Seller nor any of its Affiliates or their respective representatives shall provide any confidential information to any bidders without appropriate assurances of confidentiality.

5.15.   <u>Tax Clearance Certificates</u>.   Seller shall notify (or, with respect to any jurisdiction that imposes the notification obligation on Purchaser, shall cooperate with Purchaser in notifying) all of the taxing authorities in the jurisdictions that impose Taxes on Seller or where Seller has a duty to file Tax Returns of the transactions contemplated by this Agreement in the form and manner required by such taxing authorities, if the failure to make such notifications or receive any available tax clearance certificate (or similar document) could subject the Purchaser to any withholding obligation or liability to pay Taxes of Seller. If any taxing authority asserts that Seller is liable for any Tax, Seller shall make such arrangements as reasonably acceptable to Purchaser as may be necessary to cause such liability to be satisfied and such clearance certificates or similar documents to be issued on or before Closing.

5.16.   <u>Use of IPC Name</u>.   From and after the Closing, Seller shall not use the name "IPC" or any derivation thereof except as necessary to wind down its affairs and the Bankruptcy Case.

5.17.   <u>Further Assurances</u>.   Upon the request of Purchaser, Seller shall, at Purchaser's expense, forthwith execute and deliver such documents and otherwise cooperate with Purchaser as Purchaser or its counsel may reasonably request to effectuate the purposes of this Agreement.

## SECTION 6
## CERTAIN COVENANTS OF PURCHASER.

6.1.   <u>Performance with Respect to the Assets and the Assumed Contracts</u>.   Purchaser agrees that, from and after the Closing Date, it shall (a) assume all Assumed Liabilities, and (b) take all actions necessary to satisfy its obligations and liabilities with respect to the Assumed Liabilities (including, without limitation, under the terms and conditions of each Assumed Contract).

6.2.   <u>Cure Amounts</u>.   Purchaser shall pay all Cure Amounts with respect to the Assumed Equipment Leases within ten (10) Business Days from the Closing Date in accordance with the Sale Order.

6.3.    <u>Further Assurances</u>.    Upon the request of Seller, Purchaser shall, at Seller's expense, forthwith execute and deliver such documents and otherwise cooperate with Seller as Seller or its counsel may reasonably request to effectuate the purposes of this Agreement.

### SECTION 7
### CERTAIN MUTUAL COVENANTS

7.1.    <u>Mutual Cooperation</u>.

(a)    Upon execution of this Agreement and prior to Seller filing the Bankruptcy Case, Seller and Purchaser agree to meet together with Seller's customers to discuss the assumption and assignment of some or all of such customers' Contracts, including provisions for Customer Contract Amendments.  Seller and Purchaser expect that this process shall last approximately three (3) Business Days.

(b)    Seller, on one hand, and Purchaser, on the other hand, shall promptly give notice to the other upon becoming aware that any action is pending or threatened by or before any Governmental Authority with respect to the Transactions.  Seller, on the one hand, and Purchaser, on the other hand, (i) shall cooperate with each other in connection with the prosecution, investigation or defense of any such action, (ii) shall supply promptly all information requested by the other, by any such Governmental Authority or by any party to any such action that is legally required to be produced, and (iii) shall each use commercially reasonable efforts to cause any such action to be determined as promptly as practicable and in a manner which does not impact adversely on, and is consistent with, the Transactions.

(c)    After the Closing Date, each of Seller and Purchaser shall use commercially reasonable efforts to provide to the other party to this Agreement (the "<u>Requesting Party</u>") such records and information and to make available to the Requesting Party such employees or other personnel, in each case as may be reasonably requested in writing by the Requesting Party, for the purpose of assisting the Requesting Party in responding to governmental inquiries, making required governmental filings or defending or prosecuting any action or other proceeding involving any Person other than the party providing such information or records or making available such employees or other personnel (the "<u>Providing Party</u>") and in resolving all claims, preparing all tax returns, and handling all matters necessary to administer and close the Bankruptcy Cases; <u>provided</u>, <u>however</u>, that no Providing Party shall be required to (i) incur any out-of-pocket expenses, (ii) provide information, records or employees or other personnel under circumstances which the Providing  Party believes in its sole reasonable determination may expose it to liability to any Person or may prejudice any commercial, legal or other interest of the Providing Party, or (iii) take any action that in the Providing Party's reasonable determination unreasonably interferes with its business.

(d)    After the Closing Date, Seller and Purchaser shall cooperate and in good faith attempt to reach agreement on collection of accounts receivable owed by counterparties to Assumed Customer Contracts (as modified by Customer Contract Amendments), balancing Seller's interest in maximizing accounts receivable collections

-26-

against Purchaser's interest in maintaining an ongoing contractual relationship with the counterparties to the Assumed Customer Contracts (as modified by Customer Contract Amendments); *provided, however,* that, if the parties fail to reach agreement with respect to collection of accounts receivable, the collection of such accounts receivable shall remain under the control and discretion of Seller.

7.2.    Approvals and Filings.  Subject to the terms and conditions of this Agreement, including the possible closing of an Alternative Transaction, each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws and regulations to consummate and make effective the Transactions, including using commercially reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, and effecting all necessary registrations and filings.  Purchaser shall make or cause to be made all filings and submissions under Laws applicable to Purchaser, if any, as may be required for the consummation of the Transactions.  Seller shall make or cause to be made all such other filings and submissions under Laws applicable to Seller, if any, as may be required for the consummation of the Transactions.  Purchaser, on the one hand, and Seller, on the other hand, shall coordinate and cooperate in exchanging such information and reasonable assistance as may be requested by either of them in connection with the filings and submissions contemplated by this Section 7.2.  Purchaser, on the one hand, and Seller, on the other hand, shall each promptly provide the other or its counsel with copies of all filings made by such party with any Governmental Authority in connection with this Agreement and the Ancillary Agreements and the Transactions.

7.3.    Public Statements.  The parties shall consult with each other prior to issuing any press release or making any public announcement with respect to this Agreement, the Ancillary Agreements, or the Transactions (including the financial terms hereunder and thereunder), and shall not issue any such press release or public announcement prior to such consultation or to which the other party shall reasonably object, except as may be required by Law or judicial process.  Purchaser shall not make any statement to, or otherwise communicate (whether orally or in writing) with, any Employee or customer of or supplier to Seller regarding this Agreement, the Ancillary Agreements or the Transactions except for any statement or communication with respect to which the Seller shall have previously consented in writing.  The provisions of Section 7.1(a) in this Agreement shall constitute such written consent to communicate with Seller's customers on the terms set forth in Section 7.1(a).

7.4.    Notification of Certain Matters.  Seller shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to Seller, of (a) any notice or other communication from any Person alleging that the consent or other agreement of such Person which is or may be required in connection with the transactions contemplated by this Agreement or the Ancillary Documents, including, without limitation, any Customer Contract Amendment, will not, or is not likely to, be obtained prior to Closing, (b) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court and (c) the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by Seller or the Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this

-27-

Agreement.  To the extent permitted by applicable Law, Seller shall give prompt notice to the Purchaser of (x) any notice of any alleged violation of Law applicable to Seller, or (y) the commencement of any Action by any Governmental Body with respect to the Business or that any such Action, to the knowledge of Seller, is contemplated.

## SECTION 8
## EMPLOYEE MATTERS

8.1.    Employment.

(a)    Upon the Closing, Seller shall pay to all Employees in the Business all (i) wages, salaries, and commissions, and (ii) accrued but unpaid or unused vacation, severance and sick leave pay, and all other amounts to which such Employees are due, provided, however, Seller's obligation to pay amounts described in the foregoing subsection (ii) from the Purchase Price at Closing shall be limited to $800,000 in the aggregate, with any remaining balance of such amounts due to Employees to be paid from unencumbered assets of Seller's estate in accordance with 11 U.S.C § 507.

(b)    Purchaser shall offer continued employment, on substantially similar terms as set forth in the Assumed Customer Contracts (if applicable), commencing upon the Closing, to any or all of the Employees who are (i) actively at work in connection with the Business, (ii) on short-term disability or workers' compensation in connection with the Business, or (iii) on a leave of absence approved by Seller in connection with the Business, but not including any Employee on long-term disability or on a leave of absence with no prior agreement or understanding to return to employment with the Seller at the end of such disability or leave; provided, that (A) Purchaser shall be entitled to make individual hiring decisions based on its own evaluations of each Employee's fitness to perform his or her duties (including, without limitation, any background and drug tests authorized by law and whether Employees are validly licensed to perform their duties, and any other objective criteria that would make them qualified under Purchaser's employment policies and practices), (B) Purchaser shall be entitled to make individual hiring decisions (including the decision not to hire) with respect to management and management support personnel located at Seller's corporate office at 2111 Waukegan Road, Bannockburn, Illinois, and (C) Purchaser shall not be required to employ any Employee employed at a location that is not subject to an Assumed Customer Contract. Employees who accept such offer of employment will be referred to in this Agreement as "Transferred Employees."  Schedule 8.1(b) sets forth all Employees who are on long-term disability or leave who have a prior arrangement or understanding to return to employment when such leave or disability ends.

(c)    Except as described in the following sentence of this Section 8.1(c), the employment of each Transferred Employee with Purchaser will commence immediately upon the Closing.  In the case of any individual who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of such individual with Purchaser will commence upon his or her return to active work, and such individual will become a Transferred Employee as of such date.

(d)    Nothing contained in <u>Section 8.1</u> shall confer any Liability to or for any Employee on the Purchaser.

8.2.    <u>Employee Benefit Matters</u>.

(a)    As of the Closing, all of the Transferred Employees will cease participation in any of the Employee Benefit Plans that such Transferred Employees participated in immediately prior to the Closing.

(b)    In accordance with Treasury Regulation Section 54.4980B-9 Q&A-7, on or after the Closing Date, Purchaser will assume all liability for providing and administering all required notices and benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("<u>COBRA</u>") to all Transferred Employees.  Seller will have no COBRA liability or obligations to such Transferred Employees after the Closing Date.

(c)    Purchaser and Seller intend to use the "standard procedure" under Revenue Procedure 2004-34, whereby each of the Purchaser and the Seller report on Forms W-2 only those wages paid to the Transferred Employees for the portion of the calendar year 2013 that such Transferred Employees were employed by the Purchaser and Seller respectively.

8.3.    <u>401(k) Plan Accounts</u>. As soon as practicable following the Closing Date, each Transferred Employee will be permitted to elect a distribution of his or her account balance in Seller's 401(k) plan  and will be permitted to rollover his or her account balances in such plan (or any portion thereof) that consist of an "eligible rollover distribution" (within the meaning of Code Section 401(a)(31)(D)) to a 401(k) plan maintained by Purchaser subject to the terms and conditions of Purchaser's 401(k) plan  and excluding the ability to rollover any existing employee 401(k) account loans under Seller's 401(k) plan.

8.4.    <u>Compliance with WARN Act</u>.  With respect to the Transferred Employees, Purchaser will have full responsibility for liabilities under the WARN Act caused by Purchaser after the Closing Date.  Seller shall have full responsibility for liabilities for all other WARN Act liabilities relating to the periods prior to or on the Closing Date, including without limitation the termination of Employees to occur immediately prior to the Closing and all prior terminations.

**SECTION 9**
**CONDITIONS TO SELLER'S OBLIGATIONS**

The obligations of Seller to consummate the Transactions are subject to the satisfaction (unless waived in writing by Seller) of each of the following conditions on or prior to the Closing Date:

9.1.    <u>Representations and Warranties</u>.  The representations and warranties of Purchaser contained in this Agreement that are not qualified by materiality or a Material Adverse Effect shall be true and correct in all material respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Purchaser contained in this Agreement that are qualified by materiality or a Material Adverse Effect shall be true and correct in all respects on and as of the

-29-

Closing Date, except to the extent expressly made as of an earlier date, in which case they shall be true and correct as of such earlier date.

9.2.    Compliance with Agreements.  Purchaser shall have performed and complied in all material respects with all covenants and conditions under this Agreement and the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date.

9.3.    Approvals; No Injunctions.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing.

9.4.    Purchaser's Closing Deliveries and Obligations.  Purchaser shall have delivered all items and satisfied all obligations pursuant to Sections 11.1(b) and 11.1(c).

9.5.    Auction.  If an Auction occurs, Purchaser shall either be the successful bidder at the Auction in accordance with the Bid Procedures Order, or shall have become the back-up bidder and shall be informed by Seller that Seller is prepared to close the Transaction with Purchaser, pursuant to and subject to the conditions set forth in the Bid Procedures Order and Section 5.8(c) hereof.

9.6.    Entry of the Sale Order.  The Bankruptcy Court shall have entered the Sale Order.

## SECTION 10
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligation of Purchaser to consummate the Transactions is subject to the satisfaction (unless waived in writing by Purchaser) of each of the following conditions on or prior to the Closing Date:

10.1.    Representations and Warranties.  The representations and warranties of the Seller contained in this Agreement that are not qualified by materiality or a Material Adverse Effect shall be true and correct in all material respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of the Seller contained in this Agreement that are qualified by materiality or a Material Adverse Effect shall be true and correct in all respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case they shall be true and correct as of such earlier date.

10.2.    Compliance with Agreements.  Seller shall have performed and complied in all material respects with all covenants and conditions under this Agreement and the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date.

10.3.    Approvals; No Injunctions.  The consents, approvals, Permits (to the extent assigned pursuant to Section 2.1(h)), and regulatory and licensing requirements set forth on Schedule 3.4 shall have been obtained or provided by an order of the Bankruptcy Court.  Such consents, approvals or Permits shall be in full force and effect on the Closing Date.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any

-30-

statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing.

10.4.   <u>Seller's Closing Deliveries and Obligations</u>.   Seller shall have delivered all items and satisfied all obligations pursuant to <u>Section 11.1(a)</u>.

10.5.   <u>Auction</u>.   Purchaser shall be the successful bidder at the Auction in accordance with the Bid Procedures Order, if and to the extent any such Auction takes place.

10.6.   <u>Entry of the Sale Order</u>.   The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed pending appeal or otherwise, whether by operation of law or order of a court.

10.7.   <u>Clearance Certificates</u>.   Purchaser shall have received all clearance certificates or similar documents that may be required by any federal, state, local or other taxing authority in order to relieve Purchaser of any obligations to withhold any portion of the Purchase Price or other potential liability on the part of Purchaser with respect to any Taxes of Seller (the "<u>Clearance Certificates</u>").

10.8.   <u>Maintenance of Revenue</u>.   <u>Annualized Three Year </u>Revenue shall be no less than seventy-five percent (75%) of Seller's Revenue for the twelve month period ending June 30, 2013.  Three (3) Business Days prior to the Closing, Seller shall provide Purchaser with a written statement prepared in good faith setting forth Seller's calculation of Annualized Three Month Revenue, and shall provide Purchaser full access to Seller's books and records for purposes of verifying the foregoing statement.

10.9.   <u>Required Customers</u>.   Seller shall assume and assign Assumed Customer Contracts, as amended by respective Customer Contract Amendments, to Purchaser, with Required Customers that collectively account for, at a minimum, the aggregate Revenue for such Required Customers as disclosed by Seller to Purchaser on August 2, 2013, <u>less</u> $5,000,000.

10.10.   <u>No Material Adverse Effect</u>.   There shall have been no Material Adverse Effect (including as a result of any litigation or termination of existing material Contracts or leases) in the business, assets, condition (financial or otherwise), results of operations, cash flows, or prospects of the Assets being acquired.

**SECTION 11**
**CLOSING; TERMINATION**

11.1.   <u>The Closing</u>.   The Closing of the purchase by Purchaser from Seller and sale by Seller to Purchaser of the Assets (the "<u>Closing</u>") shall be held on the second (2nd) Business Day after the satisfaction or waiver of the conditions set forth in <u>Sections 9</u> and <u>10</u> of this Agreement (excluding those conditions which by their nature are to be satisfied as part of the Closing), or at such other time as the parties hereto may agree (the "<u>Closing Date</u>").  The Closing shall be held at the offices of Proskauer Rose LLP, 70 West Madison, Suite 3800, Chicago, Illinois 60602 or at such other location as the parties hereto may agree.  At the Closing, all of the transactions provided for in <u>Section 2</u> hereof shall be deemed to be consummated on a concurrent and simultaneous basis.

-31-

(a)     Seller's Deliveries at Closing.   At the Closing, Seller shall deliver (or cause to be delivered) to Purchaser the following:

(i)     the duly executed Assignment and Assumption Agreement;

(ii)     the duly executed Bill of Sale;

(iii)     the duly executed GL Fund Escrow Agreement duly executed by Seller and Escrow Agent;

(iv)     the Non-Competition Agreement duly executed by Howard Kaplan;

(v)     a certified copy of the Sale Order and case docket reflecting that the Sale Order is in effect and not stayed;

(vi)     certified resolutions of the board of directors of Seller approving and authorizing the Transactions;

(vii)     an officer's certificate, executed by a duly authorized officer of Seller, to the effect that all conditions to Closing set forth in Section 10.1 and Section 10.2 have been satisfied;

(viii)     Clearance Certificates from at least 90% of the jurisdictions listed on Schedule 3.12(b);

(ix)     an affidavit executed by Seller stating that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code;

(x)     Customer Contract Amendments with respect to, at a minimum, Assumed Customer Contracts with the Required Customers sufficient to satisfy the condition set forth in Section 10.9, and assignment of, at a minimum, Assumed Customer Contracts with the Required Customers sufficient to satisfy the condition set forth in Section 10.9, and the Assumed Equipment Leases;

(xi)     the Lien Release described in Section 5.9 executed by Lender;

(xii)     a statement by Seller certifying that the conditions set forth in Sections 10.8 and 10.9 have been met; and

(xiii)     such other documents as Purchaser or its counsel shall reasonably require in order to effect the Transactions.

(b)     Purchaser's Payment of Purchase Price.   At the Closing, Purchaser shall deliver (or cause to be delivered) the Purchase Price (less the Purchaser Deposit Amount, inclusive of all accrued interest and investment income thereon (which shall be released by the Escrow Agent to Seller in accordance with Section 2.6)) pursuant to Section 2.5 and Section 5.12.   For clarification, (i) accrued interest and investment income on the

-32-

Purchaser Deposit Amount (as well as the principal of the Purchaser Deposit Amount) shall be credited to Purchaser and applied to the Purchase Price, and (ii) Purchaser shall transmit $5,000,000 of the funds to be paid on Closing directly to the General Liability Fund.

(c)    Purchaser's Deliveries to Seller at Closing.  At the Closing, Purchaser shall deliver (or cause to be delivered) to Seller the following:

(i)    the duly executed Assignment and Assumption Agreement;

(ii)    the duly executed GL Fund Escrow Agreement;

(iii)    certified resolutions of the governing body of Purchaser approving and authorizing the Transactions;

(iv)    a certificate, executed by a duly authorized officer of Purchaser, to the effect that all conditions to Closing set forth in Section 9.1 and Section 9.2 have been satisfied; and

(v)    such other documents as Seller or its counsel shall reasonably require in order to effect the Transactions.

11.2.    Termination.  Anything in this Agreement to the contrary notwithstanding, this Agreement and the Transactions may be terminated in any of the following ways at any time before the Closing and in no other manner, subject to the provisions hereof:

(a)    at any time by mutual written consent of Purchaser and Seller;

(b)    by Purchaser, if the Bankruptcy Court has not entered the Bid Procedures Order on or before thirty (30) days following the Petition Date, provided however, that Purchaser shall only be permitted to terminate this Agreement pursuant to this Section 11.2(b) if Purchaser is not then itself in material breach of any of its representations, warranties, covenants or agreement contained herein or in the Bid Procedures Order;

(c)    by Purchaser, if (i) the Auction has not concluded on or before sixty-five (65) days following the Petition Date; or (ii) the Sale Order has not been entered by the Bankruptcy Court on or before seventy (70) days following the Petition Date, provided however, that Purchaser shall only be permitted to terminate this Agreement pursuant to this Section 11.2(c) if Purchaser is not then itself in material breach of any of its representations, warranties, covenants or agreement contained herein or in the Bid Procedures Order;

(d)    by Purchaser, if the Closing shall not have occurred on or before one hundred ten (110) days following the Petition Date, or such later date as Seller and Purchaser agree or is necessary due solely to the scheduling and availability of the Bankruptcy Court (the "Termination Date"); provided, however, that Purchaser may not terminate this Agreement pursuant to this Section 11.2(d) if it has been designated as a back-up bidder in accordance with Section 5.8(c) hereof; and provided further, that

-33-

Purchaser may not terminate this Agreement pursuant to this Section 11.2(d), if the Closing shall not have occurred on or before the Termination Date due to a breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser;

(e)  by Seller, if any condition to the obligations of Seller set forth in Section 9 shall have become incapable of fulfillment (including failure of Purchaser to be the successful bidder at the Auction) other than as a result of a material breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

(f)  by Purchaser, if any condition to the obligations of Purchaser set forth in Section 10 shall have become incapable of fulfillment (including failure of Purchaser to be the successful bidder at the Auction) other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(g)  by Seller, if Purchaser is in breach in any respect of any of its representations made in this Agreement that are qualified by materiality or Material Adverse Effect or in material breach in any respect of any of its representations not so qualified, or is in violation or default in any material respect of any of its covenants or agreements in this Agreement, if such breach, violation or default has not been cured or waived within ten (10) days following receipt of written notice from Seller specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction;

(h)  by Seller, if in compliance with the terms of the Bid Procedures Order;

(i)  by Purchaser, if the Seller is in breach in any respect of any of its representations made in this Agreement that are qualified by materiality or Material Adverse Effect or in material breach in any respect of any of its representations not so qualified, or is in violation or default in any material respect of any of its covenants or agreements in this Agreement, if such breach, violation or default has not been cured or waived within ten (10) days following receipt of written notice from Purchaser specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction;

(j)  by Seller or Purchaser, if there shall be in effect (i) a stay of the Sale Order that is in effect on the Termination Date, or (ii) a final non-appealable order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence);

(k)  by Purchaser, if, as a result of an order of the Bankruptcy Court, the Bankruptcy Case is converted to Chapter 7 and a Chapter 7 trustee is appointed with respect to Seller; or

-34-

(l)     automatically, if Purchaser is not the successful bidder at the Auction, upon the earlier to occur of (i) Seller closing or consummating an Alternative Transaction, or (ii) the 60th day after entry of the Sale Order.

11.3.   Effects of Termination.

(a)     If this Agreement is terminated pursuant to Section 11.2, this Agreement (other than Section 11.3 (Effects of Termination), Section 2.6 (Purchaser Deposit), Section 5.8 (Stalking-Horse Bidder Matters), Section 13 (Expenses, Employees, Attorneys' Fees and Brokers' Fees), Section 14.12 (Notices), and Section 14.6 (Governing Law; Jurisdiction), each of which shall remain in full force and effect, shall forthwith become null and void and neither party hereto shall have any liability or further obligation to any other party hereto, except as provided in this Section 11.3.

(b)     Notwithstanding anything in Section 11.3(a) to the contrary, (x) if this Agreement is terminated by Seller pursuant to Section 11.2(g), Section 2.6(b) shall remain in full force and effect, and (y) if this Agreement is terminated for any reason other than by Seller pursuant to Section 11.2(g), Section 2.6(c) shall remain in full force and effect.

(c)     In all cases, Seller's liability to Purchaser under or arising from this Agreement is and shall be limited to Seller's return to Purchaser of the Purchaser Deposit Amount and, as applicable pursuant to Section 5.8 hereof, the Break-Up Fee and the Expense Reimbursement.

(d)     In the event the Agreement is terminated by Seller pursuant to Section 11.2(g), the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be delivered to Seller, and, in addition, Purchaser shall pay to Seller the Liquidated Damages Amount. Purchaser and Seller agree that, in the event of termination of the Agreement pursuant to Section 11.2(g), the amount of Seller's damages would be difficult to establish with specificity and thus these payments shall constitute liquidated damages and shall not be deemed a penalty. In all cases, Purchaser's liability to Seller under or arising from this Agreement shall be limited to the sum of the Purchaser Deposit Amount plus the Liquidated Damages Amount.

## SECTION 12
## TAXES

12.1.   Transfer Taxes Related to Purchase of Assets.   Purchaser and Seller shall cooperate in preparing, executing and filing Tax Returns with respect to sales, use, transfer, recording, stamp and other similar Taxes (collectively, "Transfer Taxes") relating to the purchase and sale of the Assets, and also shall cooperate to minimize or avoid any Transfer Taxes that might be imposed to the extent permitted by applicable Law (such as, for example and not by way of limitation, Purchaser providing Seller with a copy of Purchaser's resale certificate, or such other instruments as will relieve Purchaser or Seller from liability for any transfer Tax). Seller shall pay all such Transfer Taxes incurred in connection with the purchase and sale of the Assets. In connection therewith, Seller hereby authorizes Purchaser to remit a portion of the

-35-

Purchase Price equal to such Transfer Taxes, directly to the appropriate Governmental Authority for any other amounts of such Taxes prior to the due date thereof. At or before Closing, Sellers and Purchaser shall execute and deliver an agreement between them regarding allocation of Purchase Price (and any other consideration required to be taken into account for purposes of determining the amounts of such Transfer Taxes) with respect to Assets subject to such Transfer Taxes.

12.2. <u>Cooperation</u>. Purchaser and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Assets as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any tax audit, for the preparation for any tax protest, for the prosecution or defense of any suit or other proceeding relating to tax matters and for the answer of any governmental or regulatory inquiry relating to tax matters. Purchaser agrees to retain possession of all tax files, books and records delivered to Purchaser by Seller for a period of at least five years from the Closing Date. If Purchaser determines to destroy or discard any of such files, books or records after the end of such five-year period, Purchaser shall give Seller reasonable notice thereof and shall allow Seller to take possession of such files, books and records at Seller's expense. From and after the Closing Date, Purchaser agrees that it shall provide reasonable access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to such files, books and records as Seller may reasonably deem necessary to prepare for, file, prove, answer, prosecute or defend any claim, suit, inquiry or other proceeding, related to Taxes in connection with the Assets.

## SECTION 13
## ATTORNEYS' FEES AND BROKERS' FEES; EXPENSES

Except for the Break-Up Fee and the Expense Reimbursement, each party shall be responsible for the payment of its own attorneys', brokers' and other fees and expenses in connection with the Transactions.

## SECTION 14
## MISCELLANEOUS

14.1. <u>Sale of Assets Subject to Bankruptcy Court Approval</u>. Except for Section 5.14 and Seller's obligation to return the Purchaser Deposit under Section 2.6(c), this Agreement, the sale of the Assets hereunder, and the Seller's obligations and ability to perform under this Agreement is conditioned and contingent upon Bankruptcy Court entry of the Bid Procedures Order and of the Sale Order.

14.2. <u>Survival of Representations and Warranties</u>. Until the Closing, all representations and warranties herein shall be operative and in full force and effect. All representations and warranties and covenants contained herein shall terminate and shall not survive the Closing except for the covenants contained in Sections 2.7, 5.1, 5.9, 5.10, 5.11, 5.12, 5.13, 5.16, 5.17, 6, 7, 8, 12, 13, 14.4 and 14.12.

14.3.    Entirety of Agreement; Amendments and Waivers.  This Agreement (including all schedules and exhibits hereto), together with the Ancillary Agreements and certificates delivered hereunder, state the entire agreement of the parties with respect to the subject matter hereof, merge all prior negotiations, agreements and understandings, if any, and state in full all representations, warranties, covenants and agreements which have induced this Agreement. Each of Seller and Purchaser otherwise makes no other representations or warranties including any implied representations or warranties. Each party agrees that in dealing with third parties no contrary representations shall be made.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

14.4.    Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties without the prior written consent of the other party except, in the case of Purchaser, to an Affiliate (but only if such Affiliate becomes a party to this Agreement and agrees to be bound by the representations, warranties, covenants and obligations herein and Purchaser guarantees such Affiliate's obligations herein and; provided, however, that no such assignment shall relieve Purchaser of its obligations assigned to an Affiliate hereunder).

14.5.    Successors and Assigns; No Third Party Beneficiaries.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective heirs, personal representatives, legatees, successors and permitted assigns.

14.6.    Governing Law; Jurisdiction.   This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware applicable to contracts made and to be entirely performed therein and the Bankruptcy Code.  In the event of any controversy or claim arising out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (a) submits to the exclusive jurisdiction of the Bankruptcy Court, (b) waives any objection which it may have at any time to the laying of venue of any action or proceeding brought in the Bankruptcy Court, (c) waives any claim that such action or proceeding has been brought in an inconvenient forum, and (d) agrees that service of process or of any other papers upon such party by registered mail at the address to which notices are required to be sent to such party under Section 14.12 shall be deemed good, proper and effective service upon such party.

14.7.    Gender and Number.  In this Agreement, words importing the singular include the plural and vice versa and words importing a specific gender include all genders.

-37-

14.8.   Headings.   The division of this Agreement into Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

14.9.   Construction.   In this Agreement (a) words denoting the singular include the plural and vice versa, (b) "it" or "its" or words denoting any gender include all genders, (c) the word "including" shall mean "including without limitation," whether or not expressed, (d) any reference to a statute shall mean the statute and any regulations thereunder in force as of the date of this Agreement or the Closing Date, as applicable, unless otherwise expressly provided, (e) any reference herein to a Section, Exhibit or Schedule refers to a Section of, or Exhibit or Schedule to, this Agreement, unless otherwise stated, (f) any reference to "knowledge" shall mean, with respect to Seller the actual knowledge of Howard Kaplan, Scott Strong and Donald Lantz, and with respect to Purchaser the actual knowledge of Steve Jones, Brian Cescolini, and Scott Savoie, and (g) when calculating the period of time within or following which any act is to be done or steps taken, the date which is the reference day in calculating such period shall be excluded and if the last day of such period is not a Business Day, then the period shall end on the next day which is a Business Day.

14.10.   Severability.   If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by Law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument unless enforcing this Agreement or any other instrument referred to herein without the provision(s) held to be valid, illegal or unenforceable would frustrate the purpose and intent of the parties.

14.11.   Negotiated Agreement.   Each of Seller and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its representatives drafted such provision.

14.12.   Notices.   All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), one Business Day after delivery to such courier; (c) if sent by facsimile transmission before 5:00 p.m. in New York, when transmitted and receipt is confirmed; (d) if sent by facsimile transmission after 5:00 p.m. in New York and receipt is confirmed, on the following Business Day; (e) if otherwise actually personally delivered, when delivered; and (f) if delivered by electronic mail, upon receipt, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

     Purchaser:            Universal Protection Service, LLC
                                 1551 N. Tustin Ave, Suite 650
                                 Santa Ana, CA 92705

Attention:  Steven Jones
Facsimile No.  714-619-9701

with a copy to:                 Sheppard Mullin Richter & Hampton LLP
                                333 South Hope Street, 43rd Floor
                                Los Angeles, CA 90071-1422
                                Attention: Stephen La Sala, Esq. & Alan M. Feld, Esq.
                                Facsimile No. 213-620-1398


Seller:                         IPC International Corporation
                                2111 Waukegan Road
                                Bannockburn, Illinois 60015-1830
                                Facsimile:  (847) 940-0647
                                Attention:  Howard L. Kaplan, President & CEO

with a copy to:                 Proskauer Rose LLP
                                Three First National Plaza
                                70 West Madison, Suite 3800
                                Chicago, Illinois 60602
                                Facsimile:  (312) 962-3551
                                Attention:  Paul Possinger, Esq.

Any party hereto may change its address for service from time to time by notice given to other party hereto in accordance with the foregoing.

14.13.  <u>Counterparts; Facsimile Copies</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signed facsimile copies of this Agreement shall legally bind the parties to the same extent as original documents.

**[Remainder of Page Intentionally Left Blank]**

1113/39664-001 current/37894814v8                                08/09/2013 1:29 pm

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first above written.

<strong><u>SELLER</u>:</strong>

**IPC INTERNATIONAL CORPORATION**

By: _[signature]_
Name: HOWARD L. KAPLAN
Title: PRESIDENT/CEO

**<u>PARENT</u>:**

**THE SECURITY NETOWRK HOLDING CORP.**

By: _[signature]_
Name: HOWARD L. KAPLAN
Title: CHAIRMAN

**PURCHASER:**

**UNIVERSAL PROTECTION SERVICE, LLC**

By: _____

Name: Brian K. Cescolini

Title: Chairman

## EXHIBIT D

**UPS Deposit Escrow Agreement**