# EXHIBIT A

---

**POST PETITION LOAN AND SECURITY AGREEMENT**

**DATED AS OF AUGUST 13, 2013**

**BETWEEN**

**THE PRIVATEBANK AND TRUST COMPANY**

**THE LENDER,**

**AND**

**THE SECURITY NETWORK HOLDINGS CORP.,
IPC INTERNATIONAL CORPORATION**

**THE BORROWERS**

---



**THE PRIVATEBANK**

61086372_4

# TABLE OF CONTENTS

Page

SECTION 1    DEFINITIONS. ........................................................................................1
   1.1    Definitions.........................................................................................................1

SECTION 2    LOANS....................................................................................................11
   2.1    Repayment of Existing Obligations. ...............................................................11
   2.2    Revolving Loans. .............................................................................................11
   2.3    [Intentionally Omitted.] ...................................................................................11
   2.4    [Intentionally Omitted.] ...................................................................................11
   2.5    Borrowing Procedures......................................................................................11
   2.6    Repayments......................................................................................................12
   2.7    Notes. ...............................................................................................................12
   2.8    Recordkeeping. ................................................................................................12

SECTION 3    LETTERS OF CREDIT. ...........................................................................12
   3.1    General Terms...................................................................................................12
   3.2    Letter of Credit Procedures. .............................................................................13

SECTION 4    INTEREST, FEES AND CHARGES...........................................................14
   4.1    Interest Rate. ....................................................................................................14
   4.2    Fees And Charges. ...........................................................................................14
   4.3    Taxes. ...............................................................................................................14
   4.4    Maximum Interest. ...........................................................................................15

SECTION 5    COLLATERAL. .......................................................................................15
   5.1    Grant of Security Interest to Lender.................................................................15
   5.2    Other Security. .................................................................................................16
   5.3    Possessory Collateral. ......................................................................................16
   5.4    Electronic Chattel Paper. .................................................................................16
   5.5    Super Priority Nature of Obligations and Lender's Liens..................................17

SECTION 6    PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY
              INTERESTS THEREIN. ...............................................................................17

SECTION 7    POSSESSION OF COLLATERAL AND RELATED MATTERS.................17

SECTION 8    COLLECTIONS. ......................................................................................18
   8.1    Lockbox and Lockbox Account. ......................................................................18
   8.2    Lender's Rights. ...............................................................................................18
   8.3    Application of Proceeds....................................................................................19
   8.4    Account Statements..........................................................................................19

SECTION 9    COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND
              SCHEDULES. ...............................................................................................19
   9.1    Weekly Reports.................................................................................................19
   9.2    Monthly Reports. ..............................................................................................20
   9.3    Budget Variance Report....................................................................................20

9.4     Financial Statements. ...................................................................................20
9.5     Other Information. ........................................................................................20

SECTION 10    TERMINATION. ..........................................................................20

SECTION 11    REPRESENTATIONS AND WARRANTIES. ................................21
11.1    Financial Statements and Other Factual Information....................................21
11.2    Locations. ....................................................................................................21
11.3    Loans by Borrower........................................................................................22
11.4    Accounts and Inventory. ...............................................................................22
11.5    Liens. ...........................................................................................................22
11.6    Organization, Authority and No Conflict.......................................................22
11.7    Litigation. .....................................................................................................22
11.8    Compliance with Laws and Maintenance of Permits.....................................23
11.9    Affiliate Transactions....................................................................................23
11.10   Names and Trade Names. ..............................................................................23
11.11   Equipment.....................................................................................................23
11.12   Enforceability.................................................................................................23
11.13   Solvency........................................................................................................23
11.14   Indebtedness..................................................................................................24
11.15   Margin Security and Use of Proceeds............................................................24
11.16   Subsidiaries and Affiliates. ...........................................................................24
11.17   No Defaults. ..................................................................................................24
11.18   Employee Matters. ........................................................................................24
11.19   Intellectual Property......................................................................................24
11.20   Environmental Matters. .................................................................................24
11.21   ERISA Matters. .............................................................................................25
11.22   Investment Company Act...............................................................................25
11.23   Anti-Terrorism Laws.....................................................................................25
11.24   Reorganization Matters. ................................................................................26

SECTION 12    AFFIRMATIVE COVENANTS.....................................................26
12.1    Maintenance of Records................................................................................26
12.2    Notices. ........................................................................................................26
12.3    Compliance with Laws and Maintenance of Permits.....................................27
12.4    Inspection and Audits....................................................................................28
12.5    Insurance.......................................................................................................28
12.6    Collateral.......................................................................................................29
12.7    Use of Proceeds.............................................................................................29
12.8    Taxes.............................................................................................................29
12.9    Intellectual Property......................................................................................30
12.10   Checking Accounts and Cash Management Services. ....................................30
12.11   USA Patriot Act, Bank Secrecy Act and Office of Foreign Asset Control.............30

SECTION 13    NEGATIVE COVENANTS.............................................................30
13.1    Guaranties. ...................................................................................................31
13.2    Indebtedness..................................................................................................31
13.3    Liens..............................................................................................................31
13.4    Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary
Course of Business..................................................................................................31

-ii-

13.5    Dividends and Distributions....................................................................31
13.6    Investments; Loans. ..............................................................................31
13.7    Fundamental Changes, Line of Business. ...............................................32
13.8    Equipment. ...........................................................................................32
13.9    Affiliate Transactions............................................................................32
13.10   Settling of Accounts..............................................................................32
13.11   Application to the Bankruptcy Court. ....................................................32
13.12   Modifications to Orders. .......................................................................33

SECTION 14    FINANCIAL COVENANTS. ...............................................................33
14.1    Compliance with DIP Budget. ...............................................................33

SECTION 15    DEFAULT.............................................................................................33
15.1    Payment.................................................................................................33
15.2    Breach of this Agreement and the other Loan Documents. ......................33
15.3    Breaches of Other Obligations................................................................34
15.4    Breach of Representations and Warranties. ............................................34
15.5    Loss of Collateral. .................................................................................34
15.6    Levy, Seizure or Attachment..................................................................34
15.7    Bankruptcy Defaults. ............................................................................34
15.8    Criminal Proceedings.............................................................................35
15.9    Change of Control..................................................................................36

SECTION 16    REMEDIES UPON AN EVENT OF DEFAULT. ..................................36
16.1    Acceleration ..........................................................................................36
16.2    Other Remedies......................................................................................36

SECTION 17    CONDITIONS PRECEDENT. ..............................................................37
17.1    Conditions to Initial Loans.....................................................................37
17.2    Conditions to All Loans..........................................................................37

SECTION 18    MISCELLANEOUS...............................................................................37
18.1    Assignments; Participations....................................................................37
18.2    Customer Identification - USA Patriot Act Notice. .................................38
18.3    Indemnification by Borrowers: ...............................................................38
18.4    Notice....................................................................................................39
18.5    Modification and Benefit of Agreement. ................................................39
18.6    Headings of Subdivisions........................................................................39
18.7    Power of Attorney..................................................................................40
18.8    Confidentiality. ......................................................................................40
18.9    Counterparts...........................................................................................40
18.10   Electronic Submissions...........................................................................40
18.11   Waiver of Jury Trial: Other Waivers. ....................................................41
18.12   Choice of Governing Laws; Construction; Forum Selection.....................41

SECTION 19    NONLIABILITY OF LENDER..............................................................42

SECTION 20    BORROWER REPRESENTATIVE ......................................................43

SECTION 21    JOINT AND SEVERAL LIABILITY....................................................43

-iii-

EXHIBIT A – COMPLIANCE CERTIFICATE

EXHIBIT B – NOTICE OF BORROWING

EXHIBIT C – COMMERCIAL TORT CLAIMS

EXHIBIT D – FORM OF REVOLVING NOTE

SCHEDULE 1 – PERMITTED LIENS

SCHEDULE 11.2 – LOCATIONS

SCHEDULE 11.6 – STATE OF ORGANIZATION

SCHEDULE 11.7 – PENDING LITIGATION

SCHEDULE 11.9 – AFFILIATE TRANSACTIONS

SCHEDULE 11.10 – TRADE NAMES

SCHEDULE 11.14 – OTHER INDEBTEDNESS

SCHEDULE 11.16 – SUBSIDIARIES AND AFFILIATES

SCHEDULE 17.1 – CLOSING DOCUMENT CHECKLIST

61086372_4

## POST PETITION LOAN AND SECURITY AGREEMENT

THIS POST PETITION LOAN AND SECURITY AGREEMENT (as amended, modified or supplemented from time to time, this "**Agreement**") made this 13th day of August, 2013 by and between THE PRIVATEBANK AND TRUST COMPANY ("**Lender**"), 120 South LaSalle Street, Suite 200, Chicago, Illinois 60603, and THE SECURITY NETWORK HOLDINGS CORP., a Delaware corporation ("**SNHC**"), and IPC INTERNATIONAL CORPORATION, an Illinois corporation ("**IPC**", and together with SNHC, each a "**Borrower**" and collectively, the "**Borrowers**").

## W I T N E S S E T H :

WHEREAS, Borrowers, IPC International Realty Company, LLC ("**Realty**"), IPC Technologies, Inc. ("**IPCT**"), Uniformity, Inc. ("**Uniformity**"), and The Privatebank and Trust Company, as administrative agent for the Lenders and as a Lender are parties to a Credit Agreement dated as of August 31, 2009 (as amended and supplemented from time to time, the "**Existing Credit Agreement**");

WHEREAS, pursuant to the Existing Credit Agreement, Lender has made revolving loans to Borrowers, Realty, IPCT and Uniformity in the outstanding principal amount of $7,055,749.80 ("**Existing Revolving Loans**"), a term loan in the outstanding principal amount of $4,373,333.28 ("**Existing Mortgage Term Loan**"), a term loan in the outstanding principal amount $7,017,836.54 ("**Existing ESOP Term Loan**"), and has issued letters of credit in an outstanding face amount of $2,381,865.00 ("**Existing Letters of Credit**", together with the Existing Revolving Loans, Existing Mortgage Loan, Existing ESOP Term Loan, Existing Letters of Credit and all accrued and unpaid interest, fees and expenses, collectively referred to as the "**Existing Obligations**");

WHEREAS, Borrowers have requested that Lender make available to Borrowers a revolving credit facility (the "**Revolving Facility**") in a maximum principal amount at any time outstanding of up to Twelve Million Dollars ($12,000,000), the proceeds of which shall be used by Borrowers exclusively for the following purposes: (a) to repay the Existing Revolving Loans; (b) for the generation of receivables and other lawful purposes as permitted under this Agreement and in accordance with the DIP Budget (which may include certain prepetition expenses approved by the Bankruptcy Court provided that the incurrence or payment thereof is not otherwise violative of this Agreement, the Orders, any other order of the Bankruptcy Court or applicable law); (c) to pay fees required to be paid to the Office of the United States Trustee; and (d) to pay any of the Obligations or the Existing Obligations.

NOW, THEREFORE, in consideration of any Loan (including any Loan by renewal or extension) hereafter made to Borrowers by Lender, or any Letter of Credit issued for the account of Borrowers, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Borrowers, the parties agree as follows:

SECTION 1    DEFINITIONS.

1.1    Definitions.

When used herein the following terms shall have the following meanings:

"**Account**" shall have the meaning ascribed to such term in the UCC.

"**Account Debtor**" shall have the meaning ascribed to such term in the UCC.

"**Affiliate**" of any Person shall mean (i) any other Person which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, such

61086372_4

Person, (ii) any other Person which beneficially owns or holds five percent (5%) or more of the voting control or equity interests of such Person, (iii) any other Person of which five percent (5%) or more of the voting control or equity interest of which is beneficially owned or held by such Person, or (iv) any officer or director of such Person. Unless expressly stated otherwise herein, Lender shall not be deemed an Affiliate of any Loan Party.

"**Avoidance Actions**" shall mean causes of action under Section 5 of the Bankruptcy Code.

"**Bank Product Agreements**" shall mean those certain agreements pursuant to which Lender or its Affiliates provide any of the Bank Products to any Loan Party.

"**Bank Product Obligations**" shall mean all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by the Loan Parties to Lender or its Affiliates pursuant to or evidenced by the Bank Product Agreements and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that a Loan Party is obligated to reimburse to Lender as a result of Lender purchasing participations or executing indemnities or reimbursement obligations with respect to the Bank Products provided to the Loan Parties pursuant to the Bank Product Agreements.

"**Bank Products**" shall mean any service provided to, facility extended to, or transaction entered into with, any Loan Party by Lender or its Affiliates, including, without limitation, (a) deposit accounts, (b) cash management services, including, without limitation, controlled disbursement, lockbox, electronic funds transfers (including, without limitation, book transfers, fedwire transfers, ACH transfers), online reporting and other services relating to accounts maintained with Lender or its Affiliates, and (c) debit cards and credit cards.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code (11 U.S.C. §§ 101 et.seq.), as amended from time to time, and any successor statute.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Chapter 11 cases.

"**Base Rate**" shall mean at any time the greater of (a) the Federal Funds Rate plus 0.5%, and (b) the Prime Rate.

"**Bid Procedures Motion**" shall mean a motion, in form and substance reasonably satisfactory to the Lender, for approval of bidding and sale procedures for the sale of all or substantially all of the Loan Parties' assets.

"**Borrower Representative**" shall mean IPC International Corporation.

"**Budget Variance Report**" means a report separated into line items for each category of receipt or disbursement, in each case, certified by an officer of the Borrowers, in form satisfactory to Lender in its reasonable discretion, to be delivered on a weekly basis and showing comparisons of the actual results for the immediately prior week against the DIP Budget. For the avoidance of doubt, nothing herein shall affect, impair or in any way modify the Borrowers' obligations under <u>Section 14.1</u>.

-2-

"**BSA**" shall have the meaning set forth in <u>Section 12.11</u>.

"**Business Day**" shall mean any day on which Lender is open for commercial banking business in Chicago, Illinois.

"**Capital Expenditures**" shall mean with respect to any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including expenditures for capitalized lease obligations) by Borrowers and their Subsidiaries during such period that are required by generally accepted accounting principles, consistently applied, to be included in or reflected by the property, plant and equipment or similar fixed asset accounts (or intangible accounts subject to amortization) on the balance sheet of Borrowers and their Subsidiaries.

"**Carve-Out**" shall have the meaning provided therefor in the Orders.

"**Cash Collateralize**" means to deliver cash collateral to Lender, to be held as cash collateral for outstanding Letters of Credit, pursuant to documentation reasonably satisfactory to Lender. Derivatives of such term have corresponding meanings.

"**Chapter 11 Cases**" shall mean each of the voluntary cases commenced under Chapter 11 of the Bankruptcy Code by the Borrowers on the Petition Date.

"**Chattel Paper**" shall have the meaning ascribed to such term in the UCC.

"**Closing Date**" shall have the meaning set forth in Section 17.1.

"**Collateral**" shall mean all of the property of Borrowers described in <u>Section 5.1</u> hereof, together with all other real or personal property of any Loan Party or any other Person now or hereafter pledged to Lender to secure, either directly or indirectly, repayment of any of the Obligations.

"**Commercial Tort Claims**" shall have the meaning ascribed to such term in the UCC.

"**Committee**" shall mean the official committee of unsecured creditors in the Chapter 11 Cases.

"**Deposit Accounts**" shall have the meaning ascribed to such term in the UCC.

"**Dilution**" shall mean, with respect to any period, the percentage obtained by dividing (i) the sum of non-cash credits against Accounts (including, but not limited to returns, adjustments and rebates) of Borrowers for such period, plus pending or probable, but not yet applied, non-cash credits against Accounts of Borrowers for such period, as determined by Lender in its Permitted Discretion by (ii) gross invoiced sales of Borrowers for such period.

"**DIP Budget**" means a budget, acceptable to the Lender in its sole discretion (subject to the last sentence of this definition), as amended, supplemented or otherwise modified from time to time with Lender's prior written consent in Lender's sole discretion containing line items of sufficient detail to reflect all anticipated receipts and disbursements of the Borrowers on a calendar weekly basis from the Petition Date through and including November 1, 2013. The DIP Budget, which has been approved by and is acceptable to the Lender on the date of this Agreement, is attached hereto as <u>Exhibit I</u>.

"**Documents**" shall have the meaning ascribed to such term in the UCC.

-3-

**"Electronic Chattel Paper"** shall have the meaning ascribed to such term in the UCC.

**"Eligible Account"** shall mean an Account owing to IPC which is acceptable to Lender in its Permitted Discretion for lending purposes. Without limiting Lender's discretion, Lender shall, in general, consider an Account to be an Eligible Account if it meets, and so long as it continues to meet, the following requirements:

      (i)      it is genuine and in all respects what it purports to be;

      (ii)      it is owned by IPC and IPC has the right to subject it to a security interest in favor of Lender or assign it to Lender and, subject to the entry of the Orders, the priorities set forth in the Interim Order or the Final Order, as applicable, and the Carve-Out, it is subject to a first priority perfected security interest in favor of Lender and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Liens;

      (iii)      it arises from (A) the performance of services by IPC in the ordinary course of its business, and such services have been fully performed; or (B) the sale or lease of Goods by IPC in the ordinary course of its business, and (x) such Goods have been completed in accordance with the specifications (if any) agreed to by IPC with the Account Debtor and delivered to the Account Debtor, (y) such Account Debtor has not refused to accept, returned (prior to the expiration of the underlying lease, with respect to leased Goods) or offered to return (prior to the expiration of the underlying lease, with respect to leased Goods), any of the Goods which are the subject of such Account; and (z) IPC has possession of, or has delivered to Lender (at Lender's request) shipping and delivery receipts evidencing delivery of such Goods;

      (iv)      it is evidenced by an invoice rendered to the Account Debtor thereunder, is due and payable within thirty (30) days after the date of the invoice and does not remain unpaid ninety (90) days past the invoice date thereof; provided, however, that if and for so long as more than twenty five percent (25%) of the aggregate dollar amount of invoices owing by a particular Account Debtor remain unpaid ninety (90) days after the respective invoice dates thereof then all Accounts owing by that Account Debtor shall be deemed ineligible;

      (v)      it is a valid, legally enforceable and unconditional obligation of the Account Debtor thereunder, and it shall not be an Eligible Account to the extent of any setoff, counterclaim, credit, allowance or adjustment by such Account Debtor, or if it is subject to any claim by such Account Debtor denying liability thereunder in whole or in part;

      (vi)      it does not arise out of a contract or order which fails in any material respect to comply with the requirements of applicable law;

      (vii)      the Account Debtor thereunder is not a director, officer, employee or agent of Borrower, or a Subsidiary, Parent or Affiliate of a Borrower;

      (viii)      it is not an Account with respect to which the Account Debtor is the United States of America or any state or local government, or any department, agency or instrumentality thereof, unless IPC assigns its right to payment of such Account to Lender pursuant to, and in full compliance with, the Assignment of Claims Act of 1940, as amended, or any comparable state or local law, as applicable;

      (ix)      it is not an Account with respect to which the Account Debtor is located in a state which requires the Borrower to whom such Account is due, as a precondition to

-4-

commencing or maintaining an action in the courts of that state, either to (A) receive a certificate of authority to do business and be in good standing in such state; or (B) file a notice of business activities report or similar report with such state's taxing authority, unless (x) such Borrower has taken one of the actions described in clauses (A) or (B); (y) the failure to take one of the actions described in either clause (A) or (B) may be cured retroactively by such Borrower at its election; or (z) such Borrower has proven, to Lender's reasonable satisfaction, that it is exempt from any such requirements under any such state's laws;

        (x)     the Account Debtor is located within the United States of America or Canada;

        (xi)    it is not an Account with respect to which the Account Debtor's obligation to pay is subject to any repurchase obligation or return right, as with sales made on a bill-and-hold, guaranteed sale, sale on approval, sale or return or consignment basis;

        (xii)   it is not an Account (A) with respect to which any representation or warranty contained in Section 11.4 of this Agreement is untrue; or (B) which violates any of the covenants of Borrowers contained in this Agreement; and

        (xiii)   it is not an Account with respect to which the prospect of payment or performance by the Account Debtor is or will be impaired, as determined by Lender in its Permitted Discretion.

"**Eligible Unbilled Accounts**" shall mean Accounts which otherwise satisfy the criteria for Eligible Accounts except that such Accounts have not been billed and invoiced to the Account Debtor.

"**Environmental Laws**" shall mean all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental matters, as now or at any time hereafter in effect, applicable to any Borrower's business or facilities owned or operated by any Borrower, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes into the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

"**Equipment**" shall have the meaning ascribed to such term in the UCC.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, modified or restated from time to time.

"**Event of Default**" shall have the meaning specified in Section 15 hereof.

"**Excluded Taxes**" shall mean taxes based upon, or measured by, Lender's (or a branch of Lender's) overall net income, overall net receipts, or overall net profits (including franchise taxes imposed in lieu of such taxes), but only to the extent such taxes are imposed by a taxing authority (a) in a jurisdiction in which Lender is organized, (b) in a jurisdiction which Lender's principal office is located, or (c) in a jurisdiction in which Lender's lending office (or branch) in respect of which payments under this Agreement are made is located.

"**Federal Funds Rate**" shall mean for any day, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Lender from three Federal funds brokers of recognized standing selected by Lender.  Lender's determination of such rate shall be binding and conclusive absent manifest error.

"**Final Order**" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to Lender, in its sole discretion, and from which no appeal or motion to reconsider has been timely filed and such order is not in any respect subject to a stay pending appeal (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Lender and Borrowers, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain credit, incur (or guaranty) indebtedness, and grant liens under this Agreement and the other Loan Documents, as the case may be, and provides for the permanent super priority of the Lender's claims contemplated by this Agreement.

"**Fiscal Year**" shall mean each twelve (12) month accounting period of Borrowers, which ends on December 31 of each year.

"**Fixtures**" shall have the meaning ascribed to such term in the UCC.

"**FRB**" shall mean the Board of Governors of the Federal Reserve System or any successor thereto.

"**GAAP**" shall mean generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" shall have the meaning ascribed to such term in the UCC.

"**Goods**" shall have the meaning ascribed to such term in the UCC.

"**Hazardous Materials**" shall mean any hazardous, toxic or dangerous substance, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including, without limitation any that are or become classified as hazardous or toxic under any Environmental Law).

"**indebtedness for borrowed money**" shall mean indebtedness of any Borrower incurred in connection with any loan or borrowing of money from any Person (other than Lender).

-6-

"**Instruments**" shall have the meaning ascribed to such term in the UCC.

"**Interim Order**" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing under Bankruptcy Rule 4001(c) or such other procedure as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to Lender, and all extensions, modifications and amendments in its sole discretion, thereto, in form and substance satisfactory to Lender and Borrower, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain Credit, incur (or guaranty) indebtedness, and grant liens under this Agreement and the other Loan Documents, as the case may be, and provides for interim super priority of the Lender's claims contemplated by this Agreement.

"**Inventory**" shall have the meaning ascribed to such term in the UCC.

"**Investment Property**" shall have the meaning ascribed to such term in the UCC.

"**L/C Application**" shall mean with respect to any request for the issuance of a Letter of Credit, a letter of credit application in the form being used by the L/C Issuer at the time of such request for the type of Letter of Credit requested.

"**L/C Issuer**" shall mean Lender, in its capacity as the issuer of Letters of Credit hereunder, any Affiliate of Lender that may issue Letters of Credit hereunder, and each of their successors and assigns.

"**Lender Party**" shall have the meaning set forth in Section 18.3 hereof.

"**Letter of Credit**" shall mean any Letter of Credit issued on behalf of a Borrower in accordance with this Agreement.

"**Letter of Credit Obligations**" shall mean, as of any date of determination, the sum of (i) the aggregate undrawn face amount of all Letters of Credit, and (ii) the aggregate unreimbursed amount of all drawn Letters of Credit not already converted to Loans hereunder.

"**Letter-of-Credit Right**" shall have the meaning ascribed to such term in the UCC.

"**Loan Documents**" shall mean all agreements, instruments and documents, including, without limitation, guaranties, mortgages, trust deeds, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements, Bank Product Agreements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of any Loan Party and delivered to Lender or to any parent, Affiliate or Subsidiary of Lender in connection with the Obligations or the transactions contemplated hereby, as each of the same may be amended, modified or supplemented from time to time.

"**Loan Party**" shall mean each Borrower and each other Person who is or shall become primarily or secondarily liable for any of the Obligations in compliance with the Loan Documents.

"**Loans**" shall mean the Revolving Loans and all other loans and advances made by Lender to or on behalf of a Borrower hereunder.

"**"Lockbox**" and **Lockbox Account**" shall have the meanings specified Section 8.1 hereof.

-7-

"**Master Letter of Credit Agreement**" shall mean the Master Letter of Credit dated as of August 25, 2009 between IPC and Lender.

"**Material Adverse Effect**" shall mean (i) a material adverse change in, or a material adverse effect on the business, property, assets, operations or prospects of the Loan Parties, taken as a whole (except for or as a result of the commencement of the Chapter 11 Cases and events that typically result from the commencement of cases under Chapter 11 of the Bankruptcy Code as determined by Lender in its Permitted Discretion), (ii) a material impairment of the ability of any Loan Party to perform any of its obligations under the this Agreement and the other Loan Documents as determined by Lender in its Permitted Discretion, (iii) a material adverse effect upon the Collateral or its value as determined by Lender in its Permitted Discretion, or (iv) a material impairment of the enforceability or priority of Lender's liens upon the Collateral or the legality, validity, binding effect or enforceability of this Agreement and the other Loan Documents as determined by Lender in its Permitted Discretion.

"**Maturity Date**" shall mean January 31, 2014.

"**Maturity Event**" shall mean the earliest of (i) the Maturity Date, (ii) the occurrence of an Event of Default and the acceleration by Lender of the Obligations and exercise its rights and remedies after notice to Borrowers and the Committee, (iii) the date of substantial consummation (as defined in Section 1102(b) of the Bankruptcy Code) of the Borrowers' Reorganization Plan; (iv) the last termination date set forth in the Final Order; and (v) the closing of a sale for all or substantially all of the Borrowers' assets.

"**Net Cash Proceeds**" means with respect to any Permitted Disposition, the aggregate cash proceeds (including cash proceeds received pursuant to policies of insurance and by way of deferred payment of principal pursuant to a note, installment receivable or otherwise), received by any Borrower in connection with a Permitted Disposition net of (i) the reasonable direct costs relating to such Permitted Disposition, (ii) any portion of such proceeds deposited in an escrow account pursuant to the documentation relating to so Permitted Disposition (provided that such amounts shall be treated as Net Cash Proceeds upon their release from such escrow account to the applicable Borrower), (iii) taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), and (iv) amounts required to be applied to the repayment of indebtedness secured by a lien that has priority over the lien of Agent on the asset subject to such Permitted Disposition.

"**Notice of Borrowing**" shall have the meaning set forth in <u>Section 2.6.2</u>.

"**Obligations**" shall mean any and all obligations, liabilities and indebtedness of each Loan Party to Lender or to any Affiliate of Lender of any and every kind and nature, howsoever created, arising or evidenced and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, whether primary, secondary, direct, indirect, absolute, contingent or otherwise, in each case arising under this Agreement or any other Loan Documents (including, without limitation, obligations of performance and Bank Product Obligations), whether several, joint or joint and several, and whether arising or existing under written or oral agreement or by operation of law.

"**OFAC**" shall have the meaning set forth in <u>Section 12.11</u> hereof.

"**Orders**" shall mean the Interim Order and, upon entry thereof, the Final Order.

"**Parent**" shall mean, with respect to any Person, the direct parent company of such Person.

-8-

"**PBGC**" shall have the meaning specified in Section 12.2.5 hereof.

"**Permitted Discretion**" means a determination in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"**Permitted Dispositions**" shall mean (i) sales, leases or other dispositions of Inventory in the ordinary course of business, (ii) the use or transfer of money or cash equivalents in a manner that is not prohibited by the terms of any Loan Document, (iii) the granting of Permitted Liens and the making of investments permitted by Section 13.6, (iv) any involuntary loss, damage or destruction of property, (v) the lapse of registered patents, trademarks and other intellectual property of any Borrower or any other Loan Party to the extent economically desirable in the conduct of their business and so long as such lapse is not adverse to the interests of the Lender in any material respect, and (vi) the disposition of obsolete, worn-out or unuseful Equipment.

"**Permitted Liens**" shall mean (i) statutory liens of landlords, carriers, warehousemen, processors, mechanics, materialmen or suppliers incurred in the ordinary course of business and securing amounts not yet due or declared to be due by the claimant thereunder or amounts which are being contested in good faith and by appropriate proceedings and for which Borrowers have maintained adequate reserves; (ii) liens or security interests in favor of Lender; (iii) liens for taxes, assessments and governmental charges not yet due and payable or which are being contested in good faith and by appropriate proceedings and Borrowers are in compliance with Section 12.8 hereof; (iv) zoning restrictions and easements, licenses, covenants and other restrictions affecting the use of real property that do not individually or in the aggregate have a material adverse effect on Borrowers' ability to use such real property for its intended purpose in connection with Borrowers' business; (v) liens in connection with purchase money indebtedness and capitalized leases otherwise permitted pursuant to this Agreement, provided, that such liens attach only to the assets the purchase of which was financed by such purchase money indebtedness or which are the subject of such capitalized leases; (vi) liens set forth on Schedule 1; (vii) liens specifically permitted by Lender in writing; (viii) involuntary liens securing amounts less than $25,000 and which are released or for which a bond acceptable to Lender in its sole discretion, determined in good faith, has been posted within fifteen (15) days of its creation, and (ix) liens granted or authorized by the Orders, including the Primed Liens, the Adequate Protection Liens and the Permitted Liens (each as defined in the Interim Order or the Final Order, as applicable).

"**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or foreign or United States government (whether federal, state, county, city, municipal or otherwise), including, without limitation, any instrumentality, division, agency, body or department thereof.

"**Petition Date**" shall mean August 9, 2013.

"**Plan**" shall have the meaning specified in Section 12.2.5 hereof.

"**Prime Rate**" shall mean, for any day, the rate of interest in effect for such day as publicly announced from time to time by Lender as its prime rate (whether or not such rate is actually charged by Lender), which is not intended to be Lender's lowest or most favorable rate of interest at any one time. Any change in the Prime Rate announced by Lender shall take effect at the opening of business on the day specified in the public announcement of such change; provided that Lender shall not be obligated to give notice of any change in the Prime Rate.

"**Proceeds**" shall have the meaning ascribed to such term in the UCC.

"**Reorganization Plan**" shall mean a joint plan of reorganization in respect of the Loan Parties in the Chapter 11 Cases that provides, among other things, that the order of the Bankruptcy Court confirming such plan of reorganization shall not discharge any of the Obligations of the Loan Parties to Lender under this Agreement and the other Loan Documents other than after payment in full of such Obligations, other than contingent indemnification and reimbursement Obligations for which no claim has been asserted, Obligations which by their terms survive the termination of this Agreement and Obligations in respect of Letters of Credit that have been Cash Collateralized (unless otherwise consented to in advance in writing by Lender), and in no event shall indemnities in favor of the Lender, which by its terms survive the termination of this Agreement and the other Loan Documents, be affected by the repayment of the Obligations.

"**Revolving Loan Availability**" shall mean an amount up to the sum of the following sublimits: (i) eighty five percent (85%) of the face amount (less, without duplication of any such amounts resulting in a reduction in IPC's Eligible Accounts, maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of IPC's business) of IPC's Eligible Accounts; provided that such advance rate shall be reduced by one (1) percentage point for each whole or partial percentage point by which Dilution (as determined by Lender in good faith based on the results of the most recent twelve (12) consecutive month period for which Lender has conducted a field audit of Borrowers) exceeds five percent (5%); plus (ii) eighty percent (80%) of the face amount (less, without duplication of any such amounts resulting in a reduction in IPC's Eligible Unbilled Accounts, the maximum discounts, credits, and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of IPC's business) of IPC's Eligible Unbilled Accounts due from Account Debtors billed monthly, or two million five hundred thousand dollars ($2,500,000), whichever is less; plus (iii) eighty five percent (85%) of the face amount (less, without duplication of any such amounts resulting in a reduction in IPC's Eligible Accounts, maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of IPC's business) of IPC's Eligible Unbilled Accounts due from Account Debtors billed weekly, or two million dollars ($2,000,000), whichever is less; plus (iv) the cash value of any pre-paid insurance up to an amount not to exceed one million dollars ($1,000,000), plus (v) $2,000,000; minus (vi) such reserves as Lender elects, in its Permitted Discretion to establish from time to time, including, without limitation, reserves with respect to outstanding Bank Products Obligations.

"**Revolving Loan Commitment**" shall mean an amount equal to Twelve Million and No/100 Dollars ($12,000,000).

"**Revolving Loans**" shall have the meaning specified in <u>Section 2.1</u> hereof.

"**Subsidiary**" shall mean with respect to any Person, a corporation of which such Person owns, directly or indirectly, more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time stock of any other class of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned by a Borrower, or any partnership, joint venture or limited liability company of which more than fifty percent (50%) of the outstanding equity interests are at the time, directly or indirectly, owned by such Person or any partnership of which such Person is a general partner. Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to Subsidiaries of Borrowers.

"**Supporting Obligations**" shall have the meaning set forth in the UCC.

"**Tangible Chattel Paper**" shall have the meaning ascribed to such term in the UCC.

-10-

"**Taxes**" shall mean any and all present and future taxes, duties, levies, imposts, deductions, assessments, charges or withholdings and any and all liabilities (including interest and penalties and other additions to taxes) with respect to the foregoing, but excluding the Excluded Taxes.

"**UCC**" shall mean the Uniform Commercial Code as in effect in the State of Illinois.

"**USA Patriot Act**" shall have the meaning set forth in Section 18.2 hereof.

SECTION 2    LOANS.

    2.1    Repayment of Existing Obligations.

Upon the Closing Date, Borrowers shall repay the Existing Revolving Loans with the proceeds of the Loans and the Existing Letters of Credit shall be deemed to be Letters of Credit issued under this Agreement.

    2.2    Revolving Loans.

Subject to the terms and conditions of this Agreement and the other Loan Documents, prior to the Maturity Date, Lender shall make revolving loans and advances (the "**Revolving Loans**") in an aggregate amount up to the lesser of Revolving Loan Availability at such time and the Revolving Loan Commitment.

The aggregate unpaid principal balance of the Revolving Loans shall not at any time exceed the lesser of (i) Revolving Loan Availability minus the Letter of Credit Obligations and (ii) the Revolving Loan Commitment minus the Letter of Credit Obligations. If at any time the outstanding Revolving Loans exceeds either Revolving Loan Availability or the Revolving Loan Commitment, in each case minus the Letter of Credit Obligations, or any portion of the Revolving Loans and Letter of Credit Obligations exceeds any applicable sublimit within Revolving Loan Availability, Borrowers shall immediately, and without the necessity of demand by Lender, pay to Lender such amount as may be necessary to eliminate such excess and Lender shall apply such payment to the Revolving Loans to eliminate such excess.

    2.3    [Intentionally Omitted.]

    2.4    [Intentionally Omitted.]

    2.5    Borrowing Procedures.

    (a)    Borrower Representative shall give written notice (each such written notice, a "Notice of Borrowing") substantially in the form of Exhibit B or telephonic notice (followed immediately by a Notice of Borrowing) to Lender of each proposed borrowing not later than 11:00 A.M., Chicago time, on the proposed date of such borrowing. Each such notice shall be effective upon receipt by Lender, shall be irrevocable, and shall specify the date and amount of such borrowing. Each borrowing shall be on a Business Day.

    (b)    Borrowers hereby authorize Lender in its sole discretion, to advance Revolving Loans to pay any Obligations (whether principal, interest, fees or other charges when due), and any such Obligations becoming due, if not paid by or on behalf of Borrowers on or prior to the due date thereof (after giving effect to any applicable grace periods), shall be deemed a request for a borrowing of a Revolving Loan on the due date, in the amount of such Obligations. The proceeds of such Revolving

-11-

Loans shall be disbursed as direct payment of the relevant Obligation. In addition, Lender may, at its option, charge such Obligations against any operating, investment or other account of any Borrower constituting Collateral and maintained with Lender or any of its Affiliates and shall provide prompt written notice thereof to the Borrower Representative; provided that the failure to give such notice shall not affect or limit such charging of Obligations.

    2.6    Repayments.

The Obligations shall be repaid as follows:

    2.6.1    Repayment of Loans. The Loans and all other Obligations shall be repaid on a Maturity Event. Borrowers may repay the Loans in whole or in part at any time without premium or penalty.

    2.6.2    Mandatory Prepayments of the Loans.

    (a)    Sales of Assets. Promptly following receipt of the Net Cash Proceeds of the sale or other disposition of any assets of any Borrower or if any of the Inventory, Equipment or real property of any Borrower is damaged, destroyed or taken by condemnation in whole or in part, the Net Cash Proceeds thereof shall be paid by Borrower to Lender such payment to be applied (subject to the Carve-Out) against the Obligations, as determined by Lender, in its sole discretion.

    2.7    Notes.

The Loans shall, in Lender's sole discretion, be evidenced by one or more promissory notes in the form attached hereto as Exhibit D or otherwise in form and substance satisfactory to Lender. However, if such Loans are not so evidenced, such Loans may be evidenced solely by entries upon the books and records maintained by Lender.

    2.8    Recordkeeping.

Lender shall record in its records the date and amount of each Loan made by Lender and each repayment thereof. The aggregate unpaid principal amount so recorded shall be rebuttably presumptive evidence of the principal amount of the Loans owing and unpaid. The failure to so record any such amount or any error in so recording any such amount shall not, however, limit or otherwise affect the Obligations of Borrowers hereunder or under any note to repay the principal amount of the Loans hereunder, together with all interest accruing thereon in accordance herewith.

    SECTION 3    LETTERS OF CREDIT.

    3.1    General Terms.

Subject to the terms and conditions of this Agreement and the other Loan Documents prior to the Maturity Date, Lender may, in its sole discretion, without any obligation to do so, from time to time cause to be issued and co-sign for or otherwise guarantee, upon Borrower Representative's request, commercial and/or standby Letters of Credit. Payments made by the L/C Issuer to any Person on account of any Letter of Credit shall be immediately payable by Borrowers without notice, presentment or demand and Borrowers agree that each payment made by the L/C Issuer in respect of a Letter of Credit shall constitute a request by Borrowers for a Loan to reimburse L/C Issuer. In the event such Loan is not advanced by Lender for any reason, such reimbursement obligations (whether owing to the L/C Issuer or Lender if Lender is not the issuer) shall become part of the Obligations hereunder and shall bear interest

-12-

at the rate then applicable to Revolving Loans constituting Base Rate Loans until repaid. Borrower shall remit to Lender a Letter of Credit fee equal to two and one-half percent (2.50%) per annum on the aggregate undrawn face amount of all Letters of Credit outstanding (which include the Existing Letters of Credit deemed to be Letters of Credit issued hereunder), which fee shall be payable monthly in arrears on the last Business Day of each month. Upon the occurrence of an Event of Default and during the continuance thereof, the Letter of Credit fee shall be increased to an amount equal to two percent (2%) per annum in excess of the Letter of Credit fee otherwise payable thereon, which fee shall be payable on demand. Said fee shall be calculated on the basis of a 360 day year. Borrower shall also pay promptly following receipt of written demand therefor from the L/C Issuer the normal and customary administrative charges of L/C Issuer for issuance, amendment, negotiation, renewal or extension of any Letter of Credit.

3.2     Letter of Credit Procedures.

3.2.1     L/C Applications. The Master Letter of Credit Agreement shall govern all Letters of Credit issued by Lender (which include the Existing Letters of Credit deemed to be Letters of Credit issued hereunder). Borrowers shall give notice to Lender and the L/C Issuer of the proposed issuance of each Letter of Credit on a Business Day which is at least three Business Days (or such lesser number of days as the L/C Issuer shall agree in any particular instance in its sole discretion) prior to the proposed date of issuance of such Letter of Credit. Each such notice shall be accompanied by an L/C Application, duly executed by Borrowers and in all respects satisfactory to the L/C Issuer, together with such other documentation as the L/C Issuer may reasonably request in support thereof, it being understood that each L/C Application shall specify, among other things, the date on which the proposed Letter of Credit is to be issued, the expiration date of such Letter of Credit (which shall not be later than the scheduled Maturity Date (unless such Letter of Credit is Cash Collateralized on or prior to the Maturity Date)) and whether such Letter of Credit is to be transferable in whole or in part. Any Letter of Credit outstanding after the scheduled Maturity Date which is Cash Collateralized for the benefit of the L/C Issuer shall be the sole responsibility of the L/C Issuer. In the event of any inconsistency between the terms of the Master Letter of Credit Agreement, any L/C Application and the terms of this Agreement, the terms of this Agreement shall control.

3.2.2     Reimbursement Obligations Unconditional. Borrowers' reimbursement obligations hereunder shall be irrevocable and unconditional under all circumstances, including (a) any lack of validity or enforceability of any Letter of Credit, this Agreement or any other Loan Document, (b) the existence of any claim, set-off, defense or other right which any Loan Party may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with any Letter of Credit, this Agreement, any other Loan Document, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between any Loan Party and the beneficiary named in any Letter of Credit), (c) the validity, sufficiency or genuineness of any document which the L/C Issuer has reasonably determined in good faith complies on its face with the terms of the applicable Letter of Credit, even if such document should later prove to have been forged, fraudulent, invalid or insufficient in any respect or any statement therein shall have been untrue or inaccurate in any respect, or (d) the surrender or impairment of any security for the performance or observance of any of the terms hereof. Without limiting the foregoing, no action or omission whatsoever by Lender in its capacity as such under or in connection with any Letter of Credit or any related matters shall result in any liability of Lender to Borrowers, or relieve Borrowers of any of their obligations hereunder to any such Person.

SECTION 4    INTEREST, FEES AND CHARGES.

4.1    Interest Rate.

Subject to the terms and conditions set forth below, the Loans shall bear interest at the per annum rate of interest set forth in subsection (a) or (b) below:

(a)    Prior to the occurrence and continuation of an Event of Default the Loans shall bear interest at the rate of two and one-half percent (2.50%) per annum in excess of the Base Rate in effect from time to time, payable on the first Business Day of each month in arrears for interest through the last day of the prior month. Said rate of interest shall increase or decrease by an amount equal to each increase or decrease in the Base Rate effective on the effective date of each such change in the Base Rate.

(b)    Upon the occurrence of an Event of Default and during the continuance thereof, the Loans shall bear interest at the rate of two percent (2.0%) per annum in excess of the interest rate otherwise payable thereon, which interest shall be payable on demand. All interest shall be calculated on the basis of a 360 day year.

4.2    Fees And Charges.

4.2.1    Unused Line Fee: Borrowers shall pay to Lender an unused line fee of one-half of one percent (0.5%) of the difference between the Revolving Loan Commitment and the average daily balance of the Revolving Loans plus the Letter of Credit Obligations for each month, which fee shall be fully earned by Lender on the first day of each month and payable monthly in arrears on the first Business Day of each month with respect to all activity through the last day of the prior month. Said fee shall be calculated on the basis of a 360 day year.

4.2.2    Costs and Expenses: Borrowers shall reimburse Lender for all out-of-pocket costs and expenses, including, without limitation, reasonable and documented legal expenses and reasonable attorneys' fees of a single firm of counsel (plus one firm of local counsel in each applicable jurisdiction), incurred by Lender in connection with the (i) documentation and consummation of this transaction, including, without limitation, Uniform Commercial Code and other public record searches and filings, overnight courier or other express or messenger delivery, appraisal costs, surveys, title insurance and environmental audit or review costs; (ii) collection, protection or enforcement of any rights in or to the Collateral; (iii) collection of any Obligations; and (iv) administration and enforcement of any of Lender's rights under this Agreement or any other Loan Document (including, without limitation, any reasonable and documented costs and expenses of any third party provider engaged by Lender for such purposes). Borrowers shall also pay all normal service charges of general application to Lender's customers with respect to all accounts maintained by any Borrower with Lender and any additional services requested in writing by any Borrower from Lender.

4.2.3    Facility Fee. Borrowers shall pay to Lender a facility fee in the amount of $100,000, which shall be fully earned as of the date of this Agreement and shall be due and payable on the occurrence of a Maturity Event.

4.3    Taxes.

(a)    All payments made by Borrowers hereunder or under any Loan Documents shall be made without setoff, counterclaim, or other defense. To the extent permitted by applicable law, all payments hereunder or under the Loan Documents (including any payment of principal, interest, or fees) to, or for

-14-

the benefit, of any person shall be made by Borrowers free and clear of and without deduction or withholding for, or account of, any Taxes now or hereinafter imposed by any taxing authority.

(b)      If any Borrower makes any payment hereunder or under any Loan Document in respect of which it is required by applicable law to deduct or withhold any Taxes, Borrowers shall increase the payment hereunder or under any such Loan Document such that after the reduction for the amount of Taxes withheld (and any taxes withheld or imposed with respect to the additional payments required under this Section 4.4(b)), the amount paid to Lender equals the amount that was payable hereunder or under any such Loan Document without regard to this Section 4.4(b). To the extent any Borrower withholds any Taxes on payments hereunder or under any Loan Document, Borrowers shall pay the full amount deducted to the relevant taxing authority within the time allowed for payment under applicable law and shall deliver to Lender within 30 days after it has made payment to such authority a copy of a receipt issued by such authority (or other evidence reasonably satisfactory to Lender) evidencing the payment of all amounts so required to be deducted or withheld from such payment.

If Lender is required by law to make any payments of any Taxes on or in relation to any amounts received or receivable hereunder or under any other Loan Document, or any Tax is assessed against Lender with respect to amounts received or receivable hereunder or under any other Loan Document, Borrowers will indemnify such person against (i) such Tax (and any reasonable counsel fees and expenses associated with such Tax) and (ii) any taxes imposed as a result of the receipt of the payment under this Section 4.4. A certificate prepared in good faith including supporting calculations in reasonable detail as to the amount of such payment by Lender shall, absent manifest error, be final, conclusive, and binding on all parties.

4.4      Maximum Interest.

It is the intent of the parties that the rate of interest and other charges to Borrowers under this Agreement and the other Loan Documents shall be lawful; therefore, if for any reason the interest or other charges payable under this Agreement are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Lender may lawfully charge Borrowers, then the obligation to pay interest and other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be refunded to Borrowers.

SECTION 5      COLLATERAL.

5.1      Grant of Security Interest to Lender.

As security for the payment of all Loans now or in the future made by Lender to Borrowers hereunder and for the payment, performance or other satisfaction of all other Obligations, subject to any limitations contained in the Orders and to the Carve-Out, effective upon the entry of the Interim Order, Borrowers hereby assign to Lender and its Affiliates and grant to Lender and its Affiliates and reaffirm their prior grant to Lender of a continuing security interest in the following property of Borrowers, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located: (a) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by any Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, any Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, payment intangibles, security interests, security deposits and rights to

-15-

indemnification); (c) all Inventory (whether or not Eligible Inventory); (d) all Goods (other than Inventory), including, without limitation, Equipment, vehicles and Fixtures; (e) all Investment Property; (f) all Deposit Accounts, bank accounts, deposits and cash; (g) all Letter-of-Credit Rights; (h) Commercial Tort Claims listed on <u>Exhibit C</u> hereto (i) all Supporting Obligations; (j) any other property of Borrowers now or hereafter in the possession, custody or control of Lender or any agent or any parent, affiliate or subsidiary of Lender or any participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (j) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Borrowers' books and records relating to any of the foregoing and to Borrowers' business.

> 5.2     <u>Other Security.</u>

Lender, in its sole discretion, without waiving or releasing (i) any obligation, liability or duty of Borrowers under this Agreement or the other Loan Documents or (ii) any Event of Default, may at any time or times hereafter, but shall not be obligated to, pay, acquire or accept an assignment of any security interest, lien, encumbrance or claim asserted by any Person in, upon or against the Collateral, provided, that Lender may take such actions with respect to Permitted Liens only after the occurrence and during the continuance of an Event of Default.  All sums paid by Lender in respect thereof and all out-of-pocket costs, fees and expenses including, without limitation, reasonable and documented attorney fees of a single firm of counsel (plus one firm of counsel in each applicable local jurisdiction), all court costs and all other charges relating thereto incurred by Lender shall constitute Obligations, payable by Borrowers to Lender promptly following receipt by Borrowers of written demand therefor from Lender and, until paid, shall bear interest at the rate then applicable to Loans hereunder.

> 5.3     <u>Possessory Collateral.</u>

Within one (1) Business Day following any Borrower's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any Tangible Chattel Paper and any Investment Property consisting of certificated securities, Borrowers shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance reasonably acceptable to Lender).  If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as Borrowers' attorney and agent-in-fact, to endorse or assign the same on Borrowers' behalf.

> 5.4     <u>Electronic Chattel Paper.</u>

To the extent that any Borrower obtains or maintains any Electronic Chattel Paper, Borrowers shall create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (i) a single authoritative copy of the record or records exists which is unique, identifiable and except as otherwise provided in clauses (iv), (v) and (vi) below, unalterable, (ii) the authoritative copy identifies Lender as the assignee of the record or records, (iii) the authoritative copy is communicated to and maintained by the Lender or its designated custodian, (iv) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Lender, (v) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (vi) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

61086372_4

5.5    <u>Super Priority Nature of Obligations and Lender's Liens.</u>

(a)    The priority of Lender's liens on the Collateral owned by the Loan Parties shall be set forth in the Orders entered with respect to the Chapter 11 Cases and shall be subject to the Carve-Out and Permitted Liens.

(b)    Upon the entry of the Orders, all Obligations shall constitute administrative expenses of the Loan Parties in the Chapter 11 Cases, with administrative priority and senior secured status under sections 364(c) and 364(d) of the Bankruptcy Code. Subject to the Carve-Out to the extent of the Carve-Out Reserve and Permitted Liens, (i) such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 326, 328, 330, 331, 506(b), 506(c) (subject to entry of the Orders), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of the Loan Parties, the Loan Parties' bankruptcy estates, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, and (ii) the liens granted to Lender on the Collateral owned by the Loan Parties, and the priorities accorded to the Obligations shall have the priority and senior secured status afforded by sections 364(c) and 364(d)(1) of the Bankruptcy Code (all as more fully set forth in the Orders).

(c)    Notwithstanding anything herein to the contrary, all proceeds received by or on behalf of Lender from the Collateral subject to the liens and security interests granted in this Section 5 or in any other Loan Document or by the Orders shall be subject to the prior payment of the Carve-Out to the extent set forth in the Orders.

SECTION 6    PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY INTERESTS THEREIN.

Borrowers shall, at Lender's request, at any time and from time to time, authenticate, execute and deliver to Lender such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender in its Permitted Discretion) and do such other acts and things or cause third parties to do such other acts and things as Lender may deem necessary or desirable in its sole discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (free and clear of all other liens or security interests, whether voluntarily or involuntarily created, except Permitted Liens and the Carve-Out) to secure payment of the Obligations, and in order to facilitate the collection of the Collateral. Borrowers irrevocably hereby make, constitute and appoint Lender as Borrowers' true and lawful attorney and agent-in-fact to execute and file such financing statements, documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect Lender's security interest in the Collateral. Borrowers further ratify and confirm the prior filing by Lender of any and all financing statements which identify any Borrower as debtor, Lender as secured party and any or all Collateral as collateral for the Obligations.

SECTION 7    POSSESSION OF COLLATERAL AND RELATED MATTERS.

Until otherwise notified by Lender following the occurrence and during the continuation of an Event of Default, Borrowers shall have the right, except as otherwise provided in this Agreement or in the Orders, in the ordinary course of Borrowers' business, to (a) sell, lease or furnish under contracts of service any of Borrowers' Inventory normally held by Borrowers for any such purpose; (b) use and consume any raw materials, work in process or other materials normally held by Borrowers for such purpose; and (c) dispose of obsolete, worn-out or unuseful Equipment so long as all of the Net Cash Proceeds (if any) thereof, subject to the Carve-Out, are paid to Lender for application to the Obligations;

-17-

provided, however, that a sale in the ordinary course of business shall not include any transfer or sale in satisfaction, partial or complete, of a debt owed by any Borrower (other than the Obligations provided that Lender consents thereto and any required orders of the Bankruptcy Court are obtained).

### SECTION 8    COLLECTIONS.

#### 8.1    Lockbox and Lockbox Account.

Borrowers shall direct all of their Account Debtors to make all payments on the Accounts directly to a mailing address designated by, and under the exclusive control of, Lender, at Lender (the "**Lockbox**"). Borrowers shall establish an account (the "**Lockbox Account**") in Borrowers' name, for the benefit of Lender, with Lender, into which all payments received in the Lockbox shall be deposited, and into which Borrowers will on the date of receipt thereof (or, if such date is not a Business Day, on the next succeeding Business Day) deposit all payments received by Borrowers on Accounts in the identical form in which such payments were received, whether by cash or check. If any Borrower, any Affiliate or Subsidiary, any shareholder, officer, director, employee or agent of any Borrower or any Affiliate or Subsidiary, or any other Person acting for or in concert with Borrower shall receive any monies, checks, notes, drafts or other payments relating to or as Proceeds of Accounts or other Collateral, Borrowers and each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Lender and, on the date of receipt thereof (or, if such date is not a Business Day, on the next succeeding Business Day), shall remit the same (or cause the same to be remitted) in kind to the Lockbox Account in a manner reasonably satisfactory to Lender. The daily ledger balance of such accounts as of the beginning of each Business Day shall be transferred to Lender each Business Day for application in accordance with <u>Section 8.3</u>. Borrowers agree that all payments made to such Lockbox Account or otherwise received by Lender, whether in respect of the Accounts or as Proceeds of other Collateral or otherwise (except for proceeds of Collateral or other amounts which are required to be delivered to the holder of a Permitted Lien which is prior in right of payment), will be applied on account of the Obligations in accordance with the terms of this Agreement. Borrowers agree to pay all customary fees, costs and expenses in connection with opening and maintaining the Lockbox and Lockbox Account. All of such fees, costs and expenses if not paid by Borrowers, may be paid by Lender or otherwise charged to Borrowers and in such event all amounts paid by Lender or charged by Lender shall constitute Obligations hereunder, shall be payable to Lender by Borrowers promptly following receipt of written demand therefor, and, until paid, shall bear interest at the rate then applicable to Loans hereunder. All checks, drafts, instruments and other items of payment or Proceeds of Collateral shall be endorsed by Borrowers to Lender, and, if that endorsement of any such item shall not be made for any reason, Lender is hereby irrevocably authorized to endorse the same on Borrowers' behalf. For the purpose of this section, Borrowers irrevocably hereby make, constitute and appoint Lender (and all Persons designated by Lender for that purpose) as Borrowers' true and lawful attorney and agent-in-fact (i) to endorse Borrowers' name upon said items of payment and/or Proceeds of Collateral and upon any Chattel Paper, Document, Instrument, invoice or similar document or agreement relating to any Account of Borrower or Goods pertaining thereto; (ii) to take control in any manner of any item of payment or Proceeds thereof and (iii) to have access to any lockbox or postal box into which any of Borrowers' mail is deposited, and open and process all mail addressed to Borrowers and deposited therein.

#### 8.2    Lender's Rights.

Lender may, at any time and from time to time after the occurrence and during the continuance of an Event of Default, whether before or after notification to any Account Debtor and whether before or after the maturity of any of the Obligations, to the maximum extent permitted by law, (i) enforce collection of any of Borrowers' Accounts or other amounts owed to any Borrower by suit or otherwise; (ii) exercise all of Borrowers' rights and remedies with respect to proceedings brought to

-18-

collect any Accounts or other amounts owed to any Borrower; (iii) surrender, release or exchange all or any part of any Accounts or other amounts owed to any Borrower, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder; (iv) sell or assign any Account of any Borrower or other amount owed to any Borrower upon such terms, for such amount and at such time or times as Lender deems advisable; (v) prepare, file and sign (but not vote) any Borrower's name on any proof of claim in bankruptcy or other similar document against any Account Debtor or other Person obligated to any Borrower; and (vi) do all other acts and things which are necessary, in Lender's sole discretion, to fulfill any Borrower's obligations under this Agreement and the other Loan Documents and to allow Lender to collect the Accounts or other amounts owed to any Borrower. In addition to any other provision hereof, Lender may at any time, after the occurrence and during the continuance of an Event of Default, at Borrowers' expense, notify any parties obligated on any of the Accounts to make payment directly to Lender of any amounts due or to become due thereunder; provided that Lender shall promptly rescind any such notification at such time as no Event of Default shall have occurred and be continuing.

       8.3     Application of Proceeds.

       For purposes of calculating interest and fees, Lender shall, within two (2) Business Days after application of the opening daily ledger balance to the Obligations as set forth in the immediately following sentence, apply the whole or any part of such collections or Proceeds against the Obligations in such order as Lender shall determine in its sole discretion. For purposes of determining the amount of Loans available for borrowing purposes, Lender shall apply the opening daily ledger balance in the Lockbox Account as of the beginning of each Business Day in whole or in part against the Obligations, in such order as Lender shall determine in its sole discretion, subject to actual collection.

       8.4     Account Statements.

       On a monthly basis, within 30 days after the end of each month, Lender shall deliver to Borrowers an account statement showing all Loans, charges and payments for such month, which shall be deemed final, binding and conclusive upon Borrowers, absent manifest error, unless Borrowers notify Lender in writing, specifying any error therein, within thirty (30) days of the date such account statement is received by Borrowers and any such notice shall only constitute an objection to the items specifically identified.

      SECTION 9    COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND SCHEDULES.

       9.1     Weekly Reports.

       Borrowers shall deliver to Lender an executed loan report and certificate in Lender's then current form at least once each week, which shall be accompanied by copies of Borrowers' sales journal, cash receipts journal and credit memo journal for the relevant period. Such report shall reflect the activity of Borrowers with respect to Accounts for the immediately preceding week, and shall be in a form and with such specificity as is reasonably satisfactory to Lender and shall contain such additional information available to Borrowers concerning Accounts Inventory and estimated billings as may be reasonably requested by Lender including, without limitation, but only if specifically requested by Lender, copies of all invoices prepared in connection with such Accounts.

9.2    Monthly Reports.

Borrowers shall deliver to Lender, in addition to any other reports, as soon as practicable and in any event: (i) within fifteen (15) days after the end of each month, (A) a detailed trial balance of Borrowers' Accounts aged per invoice date, in form and substance reasonably satisfactory to Lender including, without limitation, the names and addresses of all Account Debtors of Borrowers, and (B) a summary and detail of accounts payable, including a listing of any held checks.

9.3    Budget Variance Report.

On Tuesday of each calendar week (or, if such Tuesday is not a Business Day, on the next succeeding Business Day), a Budget Variance Report on the basis of the actual prior week. In the event that the Obligations (other than contingent indemnity and reimbursement Obligations for which no claim has been made, such Obligations that by their terms survive the termination of this Agreement and Obligations in respect of outstanding Letters of Credit that are Cash Collateralized) have not been repaid in full and this Agreement terminated prior to November 1, 2013, Borrowers shall provide to Lender, on or before November 1, 2013, a revised DIP Budget in form and substance acceptable to Lender in its sole discretion, covering the period from November 1, 2013 to the Maturity Date.

9.4    Financial Statements.

Borrowers shall deliver to Lender the following financial information, all of which shall be prepared in accordance with generally accepted accounting principles consistently applied over the periods applicable to the relevant financial statements referenced below (subject in the case of unaudited financial statements to the absence of footnotes and customary year-end adjustments), and shall be accompanied by a compliance certificate in the form of Exhibit A hereto, which compliance certificate shall include a calculation of all financial covenants contained in Section 14 this Agreement: (i) no later than twenty (20) days after the end of each calendar month, copies of internally prepared financial statements, including, without limitation, balance sheets and statements of income, retained earnings and cash flow of Borrowers, certified by the Chief Financial Officer of Borrowers; and (iii) no later than one hundred twenty (120) days after the end of each of Borrowers' Fiscal Years, audited annual financial statements with an unqualified opinion by independent certified public accountants selected by Borrowers and reasonably satisfactory to Lender, which financial statements shall be accompanied by copies of any management letters sent to the Borrowers by such accountants.

9.5    Other Information.

Concurrently, (i) with the filing thereof, copies of all pleadings, motions, applications, final information and other papers and documents of any kind filed by or on behalf of any Loan Party in any Chapter 11 Case; (ii) with the furnishing thereof, copies of all written statements, reports, information and other papers and documents of any kind furnished by or on behalf of each Loan Party to the Committee in any Chapter 11 Case; and (iii) with the furnishing thereof, copies of all written statements, reports, information and other papers and documents of any kind furnished to any other creditor of any Loan Party pursuant to the terms of any indenture, loan or credit or similar agreement.

SECTION 10    TERMINATION.

Lender's obligations under this Agreement shall be in effect from the Closing Date until the earlier of (i) occurrence of a Maturity Event and (ii) the termination of this Agreement in accordance with this Section 10. Upon the occurrence and during the continuation of an Event of Default, Lender shall not be obligated to make any additional Loans. Notwithstanding the foregoing, this Agreement shall

-20-

terminate on the date thereafter that the Obligations are paid in full (except for contingent indemnity and reimbursement Obligations for which no claim has been made, such Obligations that by their terms survive the termination of this Agreement and Obligations in respect of outstanding Letters of Credit that are Cash Collateralized), all Letters of Credit are returned to the L/C Issuer for cancellation, are Cash Collateralized in accordance with the terms of this Agreement or expire in accordance with their terms prior to any presentation for payment thereunder, and the commitments to extend credit under this Agreement are terminated.  At such time as this Agreement has terminated, Borrowers shall deliver to Lender a release, in form and substance satisfactory to Lender, of all obligations and liabilities of Lender and its officers, directors, employees, agents, parents, Subsidiaries and Affiliates to Borrowers arising under or in connection with this Agreement and the other Loan Documents, in each case with respect to events, actions or inactions on or prior to the date on which such release is delivered.

     SECTION 11    REPRESENTATIONS AND WARRANTIES.

     Each Borrower hereby represents and warrants to Lender, which representations and warranties (whether appearing in this Section 11 or elsewhere) shall be true at the time of Borrowers' execution hereof and the closing of the transactions described herein or related thereto and shall be remade by each Borrower at the time each Loan is made pursuant to this Agreement, provided, that (i) representations and warranties made as of a particular date shall be true and correct as of such date, and (ii) the representations and warranties shall survive execution and delivery of this Agreement and the closing of the transactions contemplated hereby until the termination of this Agreement.

     11.1    Financial Statements and Other Factual Information.

     The financial statements and other written factual information delivered or to be delivered by any Borrower to Lender after the Petition Date, taken as a whole, fairly present in all material respects the financial condition of such Borrower as of the date thereof, and, other than as a result of the Chapter 11 Cases and except as set forth in any information or financial statements or schedules to this Agreement delivered pursuant to this Agreement or any other Loan Document, there has been no material adverse change in the financial condition or the operations of the Borrowers, taken as a whole, since the date of the financial statements delivered to Lender most recently prior to the date of this Agreement.  All written factual information now or heretofore furnished by any Borrower to Lender pursuant to this Agreement or any other Loan Document is true and correct as of the date with respect to which such information was furnished (except to the extent an earlier date is set forth therein); provided that, for the avoidance of doubt, the Borrowers make no representations or warranties as to information of a general industry or economic nature, or as to any information in the nature of forecasts, projections or budgets, including the Budget, it being agreed that none of the foregoing constitute factual information.

     11.2    Locations.

     The office where each Borrower keeps its books, records and accounts (or copies thereof) concerning the Collateral, each Borrower's principal place of business and all of Borrowers' other places of business, locations of Collateral with a fair market value in excess of $50,000 and post office boxes and locations of bank accounts are as set forth in Schedule 11.2 and at other locations within the United States of which Lender has been advised by Borrower in accordance with Section 12.2.1.  The Collateral, including, without limitation, the Equipment (except any part thereof which any Borrower shall have advised Lender in writing consists of Collateral normally used in more than one state) is kept, or, in the case of vehicles, based, only at the addresses set forth on Schedule 11.2, and at other locations within the United States of which Lender has been advised by any Borrower in writing in accordance with Section 12.2.1 hereof.

-21-

11.3    Loans by Borrower.

No Borrower has made any loans or advances to any Affiliate or other Person except for advances authorized hereunder to employees, officers and directors of a Borrower for travel and other expenses arising in the ordinary course of such Borrower's business and loans permitted pursuant to Section 13.6.

11.4    Accounts and Inventory.

Each Account or item of Inventory which any Borrower shall, expressly or by implication, request Lender to classify as an Eligible Account or as Eligible Inventory, respectively, as of the time when such request is made, conforms in all respects to the requirements of such classification as set forth in the respective definitions of Eligible Account and Eligible Inventory as set forth herein (other than any requirement involving a subjective or discretionary determination by Lender).

11.5    Liens.

Each Borrower is the lawful owner of all Collateral now purportedly owned by such Borrower and will be the lawful owner of or have rights in, or the power to transfer rights in all Collateral hereafter purportedly acquired by such Borrower, free from all liens, claims, security interests and encumbrances whatsoever, whether voluntarily or involuntarily created and whether or not perfected, other than the Permitted Liens and the Carve-Out.

11.6    Organization, Authority and No Conflict.

Each Borrower is a corporation or limited liability company, duly organized, validly existing and in good standing in the State or organization, its state organizational identification number is set forth on Schedule 11.2 and, except for exceptions to the following that would not have a Material Adverse Effect on any Borrower, each Borrower is duly qualified and in good standing in all states where the nature and extent of the business transacted by it or the ownership of its assets makes such qualification necessary. Each Borrower has the right and power and, subject to entry of the Orders, is duly authorized and empowered to enter into, execute and deliver this Agreement and the other Loan Documents and perform its obligations hereunder and thereunder. Subject to entry of the Orders, each Borrower's execution, delivery and performance of this Agreement and the other Loan Documents does not conflict with the provisions of the organizational documents of such Borrower, any statute, regulation, ordinance or rule of law, or any agreement, contract or other document which may now or hereafter be binding on such Borrower, except for conflicts with agreements, contracts or other documents which would not have a Material Adverse Effect on any Borrower, and each Borrower's execution, delivery and performance of this Agreement and the other Loan Documents shall not result in the imposition of any lien or other encumbrance upon any of Borrower's property (other than Permitted Liens) under any existing indenture, mortgage, deed of trust, loan or credit agreement or other agreement or instrument by which any Borrower or any of its property may be bound or affected.

11.7    Litigation.

Except as disclosed to Lender on Schedule 11.7 hereto, there are no actions or proceedings which are pending or, to each Borrower's knowledge, threatened in writing against Borrower which would reasonably be expected to have a Material Adverse Effect on any Borrower, and each Borrower shall, promptly upon becoming aware of any such pending or threatened action or proceeding, give written notice thereof to Lender. No Borrower has any Commercial Tort Claims pending that exceed

-22-

$25,000 in amount other than those set forth on Exhibit D hereto as Exhibit D may be amended from time to time.

### 11.8   Compliance with Laws and Maintenance of Permits.

Subject to entry of the Orders, each Borrower has obtained all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on any Borrower.  Each Borrower is in compliance in all material respects with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety), in each case the failure to comply with which would have a Material Adverse Effect on Borrower.

### 11.9   Affiliate Transactions.

Except as set forth on Schedule 11.9 hereto or as permitted pursuant to Section 11.3 hereof, no Borrower is conducting, permitting or suffering to be conducted, transactions with any Affiliate other than transactions with Affiliates in the ordinary course of business pursuant to terms (taken as a whole) that are no less favorable to such Borrower than the terms (taken as a whole) upon which such transactions would have been made had they been made to or with a Person that is not an Affiliate.

### 11.10   Names and Trade Names.

As of the date hereof, each Borrower's name has always been as set forth on the first page of this Agreement and, as of the date hereof, no Borrower uses any trade names, assumed names, fictitious names or division names in the operation of its business, except as set forth on Schedule 11.10 hereto.

### 11.11   Equipment.

No Equipment constituting Collateral is a Fixture to real estate unless such real estate is owned by such Borrower and is subject to a mortgage in favor of Lender, or if such real estate is leased, is subject to a landlord's agreement in favor of Lender on terms reasonably acceptable to Lender, or an accession to other personal property unless such personal property is subject to a first priority lien in favor of Lender (subject to Permitted Liens).

### 11.12   Enforceability.

Upon Entry of the Orders, this Agreement and the other Loan Documents to which each Borrower is a party are the legal, valid and binding obligations of each Borrower and are enforceable against Borrower in accordance with their respective terms.

### 11.13   Solvency.

The Borrowers, taken as a whole, are, after giving effect to the transactions contemplated hereby and entry of the Orders, solvent, able to pay their debts as they become due, have capital sufficient to carry on their business, now own property having a value both at fair valuation and at present fair saleable value greater than the amount required to pay their debts, and, after giving effect to the entry of the Orders, will not be rendered insolvent by the execution and delivery of this Agreement or any of the other Loan Documents or by completion of the transactions contemplated hereunder or thereunder.

11.14  Indebtedness.

Except as set forth on Schedule 11.14 hereto, after giving effect to the Orders, no Borrower is obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than the Loans or as permitted by Section 13.2.

11.15  Margin Security and Use of Proceeds.

No Borrower owns any margin securities, and none of the proceeds of the Loans hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

11.16  Subsidiaries and Affiliates.

Except as set forth on Schedule 11.16 hereto, no Borrower has any Subsidiaries or other Affiliates (other than direct or indirect parent companies of such Borrower), nor is any Borrower engaged in any joint venture or partnership with any other Person.

11.17  No Defaults.

No Borrower is in default under any contract, lease or commitment to which it is a party or by which it is bound which would reasonably be expected to have a Material Adverse Effect on such Borrower, nor does any Borrower know of any dispute regarding any contract, lease or commitment which would have a Material Adverse Effect on such Borrower.

11.18  Employee Matters.

There are no controversies pending or threatened between any Borrower and any of its employees, agents or independent contractors other than any such controversies which would not, in the aggregate, have a Material Adverse Effect on such Borrower, and each Borrower is in compliance with all federal and state laws respecting employment and employment terms, conditions and practices except for such non-compliance which would not have a Material Adverse Effect on such Borrower.

11.19  Intellectual Property.

Each Borrower possesses adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue to conduct its business as heretofore conducted by it except to the extent that the failure to possess such items would not have a Material Adverse Effect on such Borrower.

11.20  Environmental Matters.

Except for exceptions to the following that would not have a Material Adverse Effect on any Borrower, (i) no Borrower has generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates in any material respect any Environmental Law or any license, permit, certificate, approval or similar authorization thereunder and (ii) the operations of each Borrower comply in all respects with all Environmental Laws and all licenses, permits, certificates, approvals and similar authorizations thereunder.  Except for exceptions to the following that would not reasonably be

-24-

expected to have a Material Adverse Effect on any Borrower, there has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any governmental authority or any other Person, nor is any pending or threatened in writing with respect to any non-compliance with or violation of the requirements of any Environmental Law by any Borrower or the release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter, which affects any Borrower or its business, operations or assets or any properties at which any Borrower has transported, stored or disposed of any Hazardous Materials.  Except for exceptions to the following that would not reasonably be expected to have a Material Adverse Effect on any Borrower, no Borrower has any liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

11.21    ERISA Matters.

Each Borrower has paid and discharged all obligations and liabilities arising under ERISA of a character which, if unpaid or unperformed, would result in the imposition of a Lien against any of its properties or assets (other than a Permitted Lien).

11.22    Investment Company Act.

No Loan Party is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company" within the meaning of the Investment Company Act of 1940.

11.23    Anti-Terrorism Laws.

(a)     No Loan Party (and, to the knowledge of each Loan Party, no joint venture or subsidiary thereof) is in violation in any material respects of any United States Requirements of Law relating to terrorism, sanctions or money laundering (the "**Anti-Terrorism Laws**"), including the United States Executive Order No. 13224 on Terrorist Financing (the "**Anti-Terrorism Order**") and the USA Patriot Act.

(b)     No Loan Party (and, to the knowledge of each Loan Party, no joint venture or Subsidiary thereof) (i) is listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (iii) commits, threatens or conspires to commit or supports "terrorism" as defined in the Anti-Terrorism Order or (iv) is named as a "specially designated national and blocked person" in the most current list published by OFAC.

(c)     No Loan Party (and, to the knowledge of each Loan Party, no joint venture or Affiliate thereof) (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in clauses (b)(i) through (b)(iv) above, (ii) deals in, or otherwise engages in any transactions relating to, any property or interests in property blocked pursuant to the Anti-Terrorism Order or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

11.24   Reorganization Matters.

(a)     The Chapter 11 Cases were commenced, and the motion seeking approval of the Loan Documents and entry of each proposed Order was filed with the Bankruptcy Court, in each case in accordance with the Bankruptcy Code and the Bankruptcy Rules, and proper notice thereof and proper notice of the hearing for the approval of each Order have been given.

(b)     After the entry of each Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Section 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code subject, as to priority only, to the Carve-Out to the extent of the Carve-Out Reserve.

(c)     After the entry of each Order, the Obligations will be secured by a valid and perfected first priority lien on all of the Collateral, subject only to Permitted Liens.

(d)     Each Order (with respect to the period on and after entry of such Order) is in full force and effect and has not been reversed, stayed, modified or amended without the prior written consent of Lender.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of each Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of the Loan Documents.

SECTION 12   AFFIRMATIVE COVENANTS.

Until payment and satisfaction in full of all Obligations (other than contingent indemnity and reimbursement Obligations for which no claim has been made, Obligations that by their terms survive termination of this Agreement and Obligations in respect of outstanding Letters of Credit that have been Cash Collateralized) and termination of this Agreement, unless Borrowers obtain Lender's prior written consent waiving or modifying any of Borrower's covenants hereunder in any specific instance, each Borrower covenants and agrees as follows:

12.1   Maintenance of Records.

Each Borrower shall at all times keep accurate and complete books, records and accounts with respect to all of its business activities, in accordance with sound accounting practices, and shall keep such books, records and accounts, and any copies thereof, only at the addresses indicated for such purpose on Schedule 11.2 (as updated from time to time).

12.2   Notices.

Each Borrower shall:

12.2.1   Locations.  Promptly (but in no event less than ten (10) days prior to the occurrence thereof) notify Lender of the proposed opening of any new place of business or new location of Collateral, the closing of any existing place of business or location of Collateral, any change of in the

-26-

location of any Borrower's books, records and accounts (or copies thereof), the opening or closing of any post office box, the opening or closing of any bank account or, if any of the Collateral consists of Goods of a type normally used in more than one state, the use of any such Goods in any state other than a state in which any Borrower has previously advised Lender that such Goods will be used.

12.2.2  <u>Eligible Accounts and Inventory</u>.  Promptly upon becoming aware thereof, notify Lender if any Account or Inventory identified by any Borrower to Lender as an Eligible Account or Eligible Inventory becomes ineligible for any reason (other than as a result of a subjective or discretionary determination by Lender).

12.2.3  <u>Litigation and Proceedings</u>.  Promptly upon becoming aware thereof, notify Lender of any actions or proceedings which are pending or threatened in writing against any Borrower which would have a Material Adverse Effect on such Borrower and of any Commercial Tort Claims of any Borrower in excess of $25,000 in amount which may arise, which notice shall constitute Borrowers' authorization to Lender to amend <u>Exhibit D</u> to add such Commercial Tort Claim.

12.2.4  **[Reserved]**

12.2.5  <u>ERISA Matters</u>.  Promptly notify Lender of (x) the occurrence of any "reportable event" (as defined in ERISA) which might result in the termination by the Pension Benefit Guaranty Corporation (the "**PBGC**") of any employee benefit plan ("**Plan**") covering any officers or employees of any Borrower, any benefits of which are, or are required to be, guaranteed by the PBGC, (y) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor or (z) its intention to terminate or withdraw from any Plan.

12.2.6  <u>Environmental Matters</u>.  Promptly notify Lender upon becoming aware of any investigation, proceeding, complaint, order, directive, claim, citation or notice with respect to any non-compliance with or violation of the requirements of any Environmental Law by any Borrower or the generation, use, storage, treatment, transportation, manufacture handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter which affects any Borrower or its business operations or assets or any properties at which such Borrower has transported, stored or disposed of any Hazardous Materials, in each case unless the foregoing would not have a Material Adverse Effect on such Borrower.

12.2.7  <u>Default; Material Adverse Change</u>.  Promptly advise Lender of the occurrence of any event having or causing a Material Adverse Effect on any Loan Party, the occurrence of any Event of Default hereunder or of becoming aware of the occurrence of any event which, if uncured, will become an Event of Default after notice or lapse of time (or both).

All of the foregoing notices shall be provided by Borrowers (or the Borrower Representative) to Lender in writing.

12.3  <u>Compliance with Laws and Maintenance of Permits</u>.

Each Borrower shall maintain all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on any Borrower and each Borrower shall remain in compliance with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety), in each case the failure with which to comply would have a Material Adverse Effect on any Borrower.

-27-

12.4    Inspection and Audits.

Each Borrower shall permit Lender, or any Persons designated by it, to call at any Borrower's places of business at any reasonable times and prior to the occurrence of an Event of Default, upon reasonable advance written notice, and, without hindrance or delay, to inspect the Collateral and to inspect, audit, check and make extracts from any Borrower's books, records, journals, orders, receipts and any correspondence and other data relating to any Borrower's business, the Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning any Borrower's business as Lender in good faith may consider reasonable under the circumstances. Each Borrower shall furnish to Lender such information relevant to Lender's rights under this Agreement and the other Loan Documents as Lender shall at any time and from time to time request. Lender, through its officers, employees or agents shall have the right, at any time and from time to time, to verify the validity, amount or any other matter relating to any of any Borrower's Accounts, by mail, telephone, telecopy, electronic mail, or otherwise. Each Borrower authorizes Lender and its agents to discuss the affairs, finances and business of any Borrower with any officers, employees or directors of any Borrower or with its Parent or any Affiliate or the officers, employees or directors of its Parent or any Affiliate, and to discuss the financial condition of any Borrower with such Borrower's independent public accountants. Any such discussions shall be without liability to any officer, director or employee of any Borrower or of any Borrower's direct or indirect parent companies or Affiliates, Lender or to such Borrower's independent public accountants. Borrowers shall pay to Lender all customary fees charged to similarly situated borrowers and all costs and out-of-pocket costs and expenses incurred by Lender in the exercise of its rights hereunder, and all of such fees, costs and expenses shall constitute Obligations hereunder, shall be payable on demand and, until paid, shall bear interest at the rate then applicable to Loans hereunder.

12.5    Insurance.

Each Borrower shall:

12.5.1 Casualty Insurance; Business Interruption Insurance. Keep the Collateral properly housed and insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (in the case of motor vehicles) and such other risks as are customarily insured against by Persons engaged in businesses similar to that of Borrowers, with such companies, in such amounts, with such deductibles, and under policies in such form, as shall be reasonably satisfactory to Lender. Original (or certified) copies of such policies of insurance have been or shall be, as soon as reasonably practicable and in any event within thirty (30) days of the Closing Date or such longer period as Lender shall agree to in its sole discretion, delivered to Lender, together with evidence of payment of all premiums therefor, and shall contain an endorsement, in form and substance reasonably acceptable to Lender, showing loss under such insurance policies payable to Lender. Such endorsement, or an independent instrument furnished to Lender, shall provide that the insurance company shall give Lender written notice before any such policy of insurance is altered or canceled and that no act, whether willful or negligent, or default of any Borrower or any other Person shall affect the right of Lender to recover under such policy of insurance in case of loss or damage. In addition, each Borrower shall cause to be executed and delivered to Lender a collateral assignment of proceeds of its business interruption insurance policies. Each Borrower hereby directs all insurers under all policies of insurance required under this Section 12.5.1 to pay all proceeds payable thereunder directly to Lender. Each Borrower irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as such Borrower's true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of such Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and making all determinations and decisions with respect to such policies of insurance, provided however,

-28-

that if no Event of Default shall have occurred and is continuing, Borrower may make, settle and adjust claims involving less than $50,000 in the aggregate without Lender's consent.

        12.5.2   <u>Liability Insurance</u>. Maintain, at its expense, such public liability and third party property damage insurance as is customary for Persons engaged in businesses similar to that of Borrowers with such companies and in such amounts, with such deductibles and under policies in such form as shall be reasonably satisfactory to Lender and original (or certified) copies of such policies have been or shall be, within thirty (30) days after the Closing Date, delivered to Lender, together with evidence of payment of all premiums therefor; each such policy shall contain an endorsement showing Lender as additional insured thereunder and providing that the insurance company shall give Lender written notice before any such policy shall be altered or canceled.

        12.5.3   <u>Lender May Purchase Insurance</u>. If any Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above under this <u>Section 12.5</u> (and provide evidence thereof to Lender promptly following receipt of written request therefor from Lender) or to pay any premium relating thereto, then Lender, without waiving or releasing any obligation or default by Borrowers hereunder, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Lender deems advisable upon notice to Borrowers. Such insurance, if obtained by Lender, may, but need not, protect Borrowers' interests or pay any claim made by or against Borrowers with respect to the Collateral. Such insurance may be more expensive than the cost of insurance Borrowers may be able to obtain on their own and may be cancelled only upon Borrowers providing evidence that they have obtained the insurance as required above. All sums disbursed by Lender in connection with any such actions, including, without limitation, court costs, expenses, other charges relating thereto and reasonable attorneys' fees, shall constitute Obligations hereunder, shall be payable by Borrower to Lender promptly following receipt of written demand therefor from Lender and, until paid, shall bear interest at the rate then applicable to Loans hereunder. This provision shall constitute the notice to Borrower required pursuant to paragraph (3) of section 180/10 of Chapter 815 of the Illinois Compiled Statutes (2004).

        12.6   <u>Collateral.</u>

        1.1.1.      Each Borrower shall keep the Collateral in good condition, repair and order and shall make all necessary repairs to the Equipment and replacements thereof so that the operating efficiency and the value thereof shall at all times be preserved and maintained in all material respects. Each Borrower shall permit Lender to examine any of the Collateral at any reasonable time during normal business hours upon reasonable advance written notice and wherever the Collateral may be located.

        12.7   <u>Use of Proceeds.</u>

        All monies and other property obtained by any Borrower from Lender pursuant to this Agreement shall be used solely (a) to repay the Existing Revolving Loans; (b) for the generation of receivables and other lawful purposes as permitted under this Agreement and in accordance with the DIP Budget (which may include certain prepetition expenses approved by the Bankruptcy Court provided that the incurrence or payment thereof is not otherwise violative of this Agreement, the Orders, any other order of the Bankruptcy Court or applicable law); (c) to pay fees required to be paid to the Office of the United States Trustee under the Orders; and (d) to pay any of the Obligations or the Existing Obligations.

        12.8   <u>Taxes.</u>

        Each Borrower shall file all required tax returns and, unless otherwise prohibited under any Order and other than taxes owed by any Borrower arising from the period before the Petition Date

that have not been authorized to be paid by the Bankruptcy Court and provided for in the DIP Budget, pay all of its taxes when due, subject to any extensions granted by the applicable taxing authority, including, without limitation, taxes imposed by federal, state or municipal agencies, and shall cause any liens for taxes to be promptly released; provided, that Borrowers shall have the right to contest the payment of such taxes in good faith by appropriate proceedings so long as (i) the amount so contested is shown on Borrowers' next financial statements required to be delivered hereunder if such amount is still being contested during the period covered by such financial statements; and (ii) the contesting of any such payment does not give rise to a lien for taxes. If Borrowers fail to pay any such taxes and in the absence of any such contest by Borrowers, Lender may (but shall be under no obligation to) advance and pay any sums required to pay any such taxes and/or to secure the release of any lien therefor, and any sums so advanced by Lender shall constitute Obligations hereunder, shall be payable by Borrowers to Lender on demand, and, until paid, shall bear interest at the rate then applicable to Loans hereunder.

12.9    Intellectual Property.

Each Borrower shall maintain adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue its business as heretofore conducted by it or as hereafter conducted by it unless the failure to maintain any of the foregoing would not reasonably be expected to have a Material Adverse Effect on any Borrower.

12.10    Checking Accounts and Cash Management Services.

Unless Lender otherwise consents in writing, in order to facilitate Lender's maintenance and monitoring of the Collateral, each Borrower shall maintain, and shall cause each of its Subsidiaries to maintain its general checking/controlled disbursement account and all of its other deposit accounts with Lender. Borrowers shall be responsible for all normal charges assessed thereon. Each Borrower shall notify Lender in writing thirty (30) days prior to opening any new Deposit Account.

12.11    USA Patriot Act, Bank Secrecy Act and Office of Foreign Asset Control.

Each Borrower shall ensure, and cause each other Loan Party to ensure, that no Person who owns a controlling interest in or otherwise controls a Loan Party is or shall be (i) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (ii) a Person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (b) comply, and cause each other Loan Party to comply, with all applicable Bank Secrecy Act ("BSA") and anti-money laundering laws and regulations.

SECTION 13    NEGATIVE COVENANTS.

Until payment and satisfaction in full of all Obligations (other than contingent indemnity and reimbursement Obligations for which no claim has been made, Obligations that by their terms survive termination of this Agreement and Obligations in respect of outstanding Letters of Credit that have been Cash Collateralized) and termination of this Agreement, unless Borrowers obtain Lender's prior written consent waiving or modifying any of Borrowers' covenants hereunder in any specific instance, each Borrower agrees as follows:

61086372_4

13.1    Guaranties.

Each Borrower shall not, and shall not permit any other Loan Party to assume, guarantee or endorse, or otherwise become liable in connection with, the indebtedness for borrowed money of any Person, except by endorsement of instruments for deposit or collection or similar transactions in the ordinary course of business.

13.2    Indebtedness.

Each Borrower shall not, and shall not permit any other Loan Party to create, incur, assume or become obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than the Loans, except that Borrowers and the other Loan Parties may (i) borrow money from a Person other than Lender on an unsecured and subordinated basis if a subordination agreement in favor of Lender and in form and substance satisfactory to Lender is executed and delivered to Lender relative thereto; (ii) maintain their present indebtedness listed on Schedule 11.14 hereto or as permitted under the Orders; and (iii) incur unsecured indebtedness to trade creditors in the ordinary course of business.

13.3    Liens.

No Borrower shall, nor shall it permit any other Loan Party to grant or permit to exist (voluntarily or involuntarily) any Lien on any of its assets, other than Permitted Liens.

13.4    Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary Course of Business.

No Borrower shall, nor shall it permit any other Loan Party to (i) enter into any merger or consolidation; (ii) change the state of any Borrower's organization or enter into any transaction which has the effect of changing any Borrower's state of organization; (iii) sell, lease or otherwise dispose of any of its assets other than Permitted Dispositions; (iv) purchase the stock, other equity interests or all or a material portion of the assets of any Person or division of such Person; or (v) except as otherwise expressly permitted by this Agreement, enter into any other transaction outside the ordinary course of any Borrower's business, including, without limitation, any purchase, redemption or retirement of any shares of any class of its stock or any other equity interest, and any issuance of any shares of, or warrants or other rights to receive or purchase any shares of, any class of its stock or any other equity interest.  No Borrower shall form any Subsidiaries or enter into any joint ventures or partnerships with any other Person.

13.5    Dividends and Distributions.

No Borrower shall declare or pay any dividend or other distribution (whether in cash or in kind) on any class of its stock (if such Borrower is a corporation) or on account of any equity interest in Borrower (if such Borrower is a partnership, limited liability company or other type of entity).

13.6    Investments; Loans.

No Borrower shall nor shall it permit any other Loan Party to purchase or otherwise acquire, or contract to purchase or otherwise acquire, the obligations or stock of any Person, other than direct obligations of the United States, obligations insured by the Federal Deposit Insurance Corporation, obligations unconditionally guaranteed by the United States and obligations or stock of any other Person acquired involuntarily in connection with the satisfaction of indebtedness or other claims due or owing to

-31-

any Borrower or Loan Party (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such indebtedness or claims; nor shall Borrower lend or otherwise advance funds to any Person except for advances made to employees, officers and directors for travel and other expenses arising in the ordinary course of business and loans to employees not exceeding Fifty Thousand Dollars ($50,000) in the aggregate outstanding for all Persons at any one time.

### 13.7    Fundamental Changes, Line of Business.

No Borrower shall nor shall it permit any other Loan Party to (i) amend its organizational documents or change its Fiscal Year unless (w) such actions would not have a Material Adverse Effect on any Borrower; (x) such actions would not adversely affect the obligations of Borrowers or any other Loan Party to Lender; (y) such actions would not adversely affect the interpretation of any of the terms of this Agreement or the other Loan Documents and (z) Lender has received ten (10) days prior written notice of such amendment or change or (ii) enter into a new line of business materially different from any Borrower's current business.

### 13.8    Equipment.

No Borrower shall nor shall it permit any other Loan Party to (i) permit any Equipment constituting Collateral to become a Fixture to real property unless such real property is owned by a Borrower or such Loan Party and is subject to a mortgage in favor of Lender, or if such real estate is leased, is subject to a landlord's agreement in favor of Lender on terms reasonably acceptable to Lender, or (ii) permit any Equipment to become an accession to any other personal property unless such personal property is subject to a first priority lien in favor of Lender (other than Permitted Liens).

### 13.9    Affiliate Transactions.

Except as set forth on Schedule 11.9 hereto or as permitted pursuant to Section 11.3 hereof or as required or authorized by the Orders no Borrower shall conduct, permit or suffer to be conducted, transactions with Affiliates other than transactions for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to such Borrower than the terms upon which such transactions would have been made had they been made to or with a Person that is not an Affiliate.

### 13.10    Settling of Accounts.

No Borrower shall settle or adjust any Account identified by a Borrower as an Eligible Account or with respect to which the Account Debtor is an Affiliate without the consent of Lender, provided, that following the occurrence and during the continuance of an Event of Default, Borrowers shall not settle or adjust any Account without the consent of Lender.

### 13.11    Application to the Bankruptcy Court.

Borrowers shall not apply to the Bankruptcy Court for authority to (a) except as provided in the Orders, take any action that is prohibited by the terms of this Agreement or any of the other Loan Documents, (b) except as provided in the Orders, refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents or (c) permit any indebtedness or claim to be pari passu with or senior to any of the Obligations, except as provided in this Agreement and the Orders.

-32-

13.12   Modifications to Orders.

Borrowers shall not consent to any amendment, supplement, extension or other modification of any of the terms or provisions contained in, or applicable to, the Orders, without Lender's prior written consent.

SECTION 14   FINANCIAL COVENANTS.

Borrowers shall comply with each of the financial covenants set forth below:

14.1   Compliance with DIP Budget.

(a)   Borrowers shall not expend any funds or monies for any purpose other than those line items set forth in the DIP Budget.  Borrowers' actual cash payments (as verified by bank account records) for any measurement period covered by the DIP Budget set forth in (c) below may not exceed the budgeted amount (both as to individual line items and as to total disbursements) through the conclusion of such measurement period set forth in (c) below, plus, the applicable variance set forth in (d) below.

(b)   Borrowers shall comply with the cash receipt projections set forth in the Budget for any measurement period covered by the Budget set forth in (c) below and verified by the actual amounts of cash posted to the Lockbox Account.

(c)   Compliance with the DIP Budget shall be measured on a weekly basis.

(d)   During any weekly period covered by the DIP Budget there will be a permitted variance to the DIP Budget amounts for line item disbursements of ten percent for any single line item contained in the DIP Budget and for any monthly period covered by the DIP Budget there shall be a permitted variance to DIP Budget amounts for line item disbursements of five percent for any single line item contained in the DIP Budget.  Except as provided above, there shall be no other variance to the DIP Budget.

SECTION 15   DEFAULT.

The occurrence of any one or more of the following events shall constitute an "Event of Default" by Borrowers hereunder:

15.1   Payment.

The failure of any Loan Party to pay when due, declared due, or demanded by Lender, any of the Obligations.

15.2   Breach of this Agreement and the other Loan Documents.

The failure of any Loan Party to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Loan Party under this Agreement, any Order or any of the other Loan Documents; provided that any such failure by Borrowers under subsections 12.2.1, 12.4, 12.2.5, 12.2.6, 12.3 and 12.8 of this Agreement shall not constitute an Event of Default hereunder until the fifteenth (15th) day following the occurrence thereof.

-33-